# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 15 |
| MEGA BRANDS INC., *et al.*,[1] | Case No. 10-10485 (___) |
| Debtors in a Foreign Proceeding. | (Joint Administration Requested) |

## PETITION FOR RECOGNITION AND CHAPTER 15 RELIEF

Peter Ferrante, in his capacity as the foreign representative (the "Foreign Representative") of the above-captioned debtors in a foreign proceeding (collectively, the "Chapter 15 Debtors"), with reorganization proceedings under Section 192 of the *Canada Business Corporations Act* (the "CBCA") currently pending before the Superior Court, Commercial Division, for the Judicial District of Montréal, Canada (the "Canadian Proceeding," pending in the "Canadian Court"), respectfully submits this petition (the "Petition") seeking entry of an order, substantially in the form attached hereto as **Exhibit A**, granting:

(a) recognition by this Court of the Foreign Representative as the Chapter 15 Debtors' "foreign representative" as defined in § 101(24) of title 11 of the United States Code (the "Bankruptcy Code"); (b) recognition of the Canadian Proceeding as a "foreign main proceeding" pursuant to Bankruptcy Code §§ 1515, 1517, and 1520 with respect to the Canadian Chapter 15 Debtors (as defined herein); (c) recognition of the Canadian Proceeding as a "foreign nonmain proceeding" pursuant to Bankruptcy Code §§ 1515, 1517, and 1521 with respect to the U.S. Chapter 15

---

[1] The Chapter 15 Debtors, along with the last four digits of each U.S. Debtor's federal tax identification number, are: Mega Brands Inc. ("Mega Brands") (a non-U.S. Debtor that does not maintain a U.S. federal tax identification number); 4402596 Canada Inc. (a non-U.S. Debtor that does not maintain a U.S. federal tax identification number); 4402804 Canada Inc. (a non-U.S. Debtor that does not maintain a U.S. federal tax identification number); MB Finance LLC (7565); MB US Inc. (7561); MB2 LP (7567); Mega Bloks Financial Services, Inc. (a non-U.S. Debtor that does not maintain a U.S. federal tax identification number); Mega Brands America, Inc. ("Mega Brands America") (2083); Rose Moon, Inc. ("Rose Moon") (1445); and Warren Industries, Inc. ("Warren Industries") (4985). The location of the Debtors' corporate headquarters and the service address for all of the Debtors is: 4505 Hickmore, St-Laurent, Québec, H4T 1K4.

Debtors (as defined herein); and (d) recognition of the order approving the CBCA plan of arrangement pursuant to § 1521.[2]

## Preliminary Statement

1.     Mega Brands, a Canadian corporation headquartered in Montréal, is the parent corporation of a global enterprise (collectively, the "Company") with a family of leading brands in construction toys, games, puzzles, arts, crafts, and stationery.  Mega Brands and certain of its wholly-owned direct and indirect subsidiaries, including the Chapter 15 Debtors, commenced the Canadian Proceeding on February 12, 2010, to implement a balance-sheet restructuring of their funded debt obligations and to reposition the Company for a return to profitability.[3]  On February 12, 2010, the Canadian Court issued an interim order staying certain creditor actions, appointing the Foreign Representative, and establishing the guidelines for solicitation, acceptance, and other aspects of the transaction.[4]

2.     The Chapter 15 Debtors all are borrowers and/or guarantors under the Company's senior-secured credit facility and unsecured debentures that are affected by the Company's balance-sheet restructuring and the Canadian Proceeding.  In connection with the Canadian Proceeding, the vast majority of the Company's secured lenders and debenture holders have consented to the recapitalization transaction to be effected through a CBCA "arrangement" (the "Arrangement").

---

[2]    In support of the Petition, the Foreign Representative has filed contemporaneously herewith the *Declaration of Peter Ferrante in Support of Petition for Recognition and Chapter 15 Relief* (the "Ferrante Declaration") and the *Declaration of Sandra Abitan in Support of Petition for Recognition and Chapter 15 Relief* (the "Abitan Declaration"), which are incorporated herein by reference.

[3]    A true and correct copy of the application for an order pursuant to CBCA § § 192 and 248 and § § 2, 20, 33, and 46 of the Canadian Code of Civil Procedure approving the proposed arrangement is attached hereto as **Exhibit B**.

[4]    A true and correct copy of the interim order is attached as **Exhibit C**.

2

3. Much like a "prepackaged" case in the U.S., the Arrangement impacts only the claims of the Chapter 15 Debtors' secured lenders, unsecured debenture holders, and equity holders, and is a largely consensual transaction. The claims of all other creditors, including employees, litigants, trade vendors, licensors and other contract counterparties, and others, are unaffected by the recapitalization transaction and the Company will continue to pay such creditors in the ordinary course.

4. The Court's ultimate recognition and enforcement of the final order approving the Arrangement (the "Arrangement Order"), which releases and discharges liens, claims, and other obligations against the Company's assets, will provide certainty and closure to the recapitalization transaction. Recognition of the Arrangement Order will provide comfort that a dissenting party will not have a U.S. forum to collaterally attack the Arrangement Order, which would delay closing and consummation of the transaction.

5. To this end, and as detailed hereafter, the Chapter 15 Debtors respectfully submit that they have satisfied each of the requirements for recognition under chapter 15 of the Bankruptcy Code. Specifically:

- Peter Ferrante qualifies as a "foreign representative" as defined in § 101(24), and, therefore, can petition this Court directly for recognition of the Canadian Proceeding under § 1509.

- The Canadian Proceeding is a "foreign proceeding" as defined in § 101(23).

- The Canadian Proceeding is a "foreign main proceeding" as defined in § 1502(4) with respect to the Canadian Chapter 15 Debtors, with Canada as the Canadian Chapter 15 Debtors' "center of main interests" ("COMI"), as such term is used in § § 1502(4), 1516(c), and 1517(b)(1).

- In particular, the following factors, among others, demonstrate the COMI of the Canadian Chapter 15 Debtors in Canada in these cases:

  ➢ Montréal serves as the headquarters and the location of the persons managing the Canadian Chapter 15 Debtors, and all of their officers, directors, and employees reside and work in Canada.

  ➢ The Canadian Chapter 15 Debtors' assets and the majority of their affected creditors reside in Canada, with Canadian law governing most disputes.

  ➢ Finally, several other factors point to COMI in Canada for the Canadian Chapter 15 Debtors, including the location of books and records, audits, and the source of working capital needs.

- The Canadian Proceeding is a "foreign nonmain proceeding" as defined in § 1502(5) with respect to the U.S. Chapter 15 Debtors, as each of the U.S. Chapter 15 Debtors has an "establishment" in Canada as such term is used in § § 1502(2) and 1517(b)(2).

- In particular, the following factors, among others, demonstrate an establishment for the U.S. Chapter 15 Debtors in Canada in these cases:

  ➢ The Company's Montréal offices handle the majority of the U.S. Chapter 15 Debtors' core administrative and corporate functions, without which the U.S. Chapter 15 Debtors could not operate.[5]

---

[5] The U.S. Chapter 15 Debtors pay Mega Brands an arm's length fee to provide these services to the U.S. Chapter 15 Debtors.

4

> The majority of the U.S. Chapter 15 Debtors' directors and officers reside in Canada, each of the U.S. Chapter 15 Debtors' board meetings would take place in Canada, and all of the U.S. Chapter 15 Debtors' corporate resolutions are signed by the U.S. Chapter 15 Debtors' directors in Canada.

> All employees and/or officers of the U.S. Chapter 15 Debtors ultimately report directly or indirectly to an officer or manager in Montréal.

> The U.S. Chapter 15 Debtors all are borrowers and/or guarantors under the Company's Secured Debt (as defined herein) and Convertible Debentures (as defined herein), both Canadian debt facilities.

> The Company's consolidated books and records are maintained by the Company in Montréal, and audits of the U.S. Chapter 15 Debtors are performed or directed by the Montréal branch of PricewaterhouseCoopers.

6.     Thus, the relief sought in this Petition should be granted.

## Jurisdiction

7.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § § 1334 and 157.

8.     This case was properly commenced pursuant to Bankruptcy Code § 1504 by the filing of a petition for recognition of the Canadian Proceeding under Bankruptcy Code § 1515.

9.     Venue is proper pursuant to 28 U.S.C. § § 1410(1) and 1410(3).

10.    The statutory bases for relief are Bankruptcy Code § § 1504, 1515, 1517, 1520, and 1521.

5

## Background

### I. The Company's Business and Operations

11. Mega Brands, with its headquarters located at 4505 Hickmore, Montréal, Quebec, H4T 1K4, Canada, was incorporated under the CBCA on May 16, 1983, and is a global supplier of construction toys, stationery, and activities including, among other things, building sets, games, puzzles, art materials, and writing instruments. Mega Brands is the parent corporation of each Chapter 15 Debtor.

12. The Company's primary in-house manufacturing operations are located in Canada. The Company also outsources the manufacturing of some products to third party suppliers in Asia. The Company employs 1,300–1,500 people worldwide (more than half located in Canada).

13. The Company distributes its products globally through its wholly-owned direct or indirect subsidiaries. Mega Brands America is a wholly-owned indirect subsidiary of Mega Brands and a U.S. corporation registered in New Jersey. Mega Brands America primarily distributes the Company's products in the U.S. and performs certain distribution and sales support functions for the U.S. market. In addition, Mega Brands America sells products to Mega Brands, which sales are coordinated and implemented by Mega Brands.

14. Rose Moon, a wholly-owned indirect subsidiary of Mega Brands and a U.S. corporation registered in Tennessee, operates a small pencil manufacturing facility. Mega Brands funds Rose Moon's working capital needs, without which Rose Moon would be unable to operate.

15. Warren Industries is an inactive entity, registered in Indiana, existing solely to handle past environmental liabilities. Mega Brands officers in Canada handle all decision-making functions related to Warren Industries.

6

16. The Company also directly or indirectly owns and operates certain Canadian subsidiaries that have financing or non-operational functions. These subsidiaries include 4402596 Canada Inc., 4402804 Canada Inc., and Mega Bloks Financial Services Inc. (collectively, with Mega Brands, the "Canadian Chapter 15 Debtors"). Like Mega Brands, these subsidiaries are domiciled, headquartered, and operated from Canada. Also, MB US Inc., MB Finance LLC, and MB2 LP (collectively, with Mega Brands America, Rose Moon, and Warren Industries, the "U.S. Chapter 15 Debtors") are wholly-owned direct or indirect subsidiaries of Mega Brands (each registered in the U.S.) with financing or non-operational functions.[6]

17. The core corporate and managerial support functions for all the U.S. and Canadian Chapter 15 Debtors—including marketing, legal, logistics and distribution, human resources, accounting, financial reporting, and inbound intellectual property licenses—are directed or approved by Canadian-based employees at the Company's Montréal headquarters. Through intercompany arrangements, the U.S. Chapter 15 Debtors compensate Mega Brands for such services through an arm's length fee. [7]

18. The majority of the Chapter 15 Debtors' directors reside in Canada. Also, all of the Chapter 15 Debtors have officers employed by Mega Brands, some residing and working in Montréal.

## II. The Company's Capital Structure

19. As of January 31, 2010, the Company's capital structure consisted of: a senior-secured credit facility for two revolving loans and a term loan (collectively, the "Credit

---

[6]   MB US Inc., MB Finance LLC, and MB2 LP are registered in Delaware.

[7]   Rose Moon's parent, Mega Brands America, pays Mega Brands an arm's length fee for services performed on behalf of Rose Moon.

Facility"),[8] $12.3 million in secured swap agreements (collectively, the "Swap Agreements," and along with the Credit Facility, the "Secured Debt"), $70.4 million in convertible senior unsecured debentures (the "Convertible Debentures"), common stock, and options to purchase common stock, as follows:

    (a)    Credit Facility. Mega Brands, MB2 LP, and Mega America (each a "Borrower") are borrowers under the Credit Facility.[9] As of January 31, 2010, the Credit Facility consisted of: (a) a $44.5 million Canadian revolving facility, with Mega Brands as borrower; (b) a $248.3 million term loan facility, with MB2 LP as borrower; and (c) a $51.5 million U.S. revolving facility, with Mega Brands America as borrower. The Credit Facility is guaranteed and secured by, among other entities, each of the Chapter 15 Debtors. As of January 31, 2010, the Company owed approximately $344.3 million under the Credit Facility. The current Agent under the Credit Facility is Bank of Montréal, a Canadian-based institution, and the Credit Agreement is governed by the laws of the Province of Québec and the laws of Canada applicable therein.[10] For both the Credit Facility and the guarantees, signatories for all entities, including the U.S. Chapter 15 Debtors, request that notices thereunder be mailed to the Company's Canadian headquarters.

---

[8]    Unless otherwise specified herein, all amounts listed are in U.S. Dollars.

[9]    The Credit Facility is that certain credit agreement dated as of July 26, 2005, by and among Mega Bloks, Inc. (n/k/a Mega Brands), 3102448 Nova Scotia Inc. (n/k/a MB2 LP), and Rose Art Industries, Inc. (n/k/a Mega Brands America), as borrowers, The Bank of Nova Scotia and Bank of Montréal as Agents, and the Lenders from time to the party thereto.

[10]    The laws of the Province of Québec and the federal laws of Canada applicable therein govern the Credit Facility. The guarantee agreement under the Credit Facility is governed by laws of the State of New York, and provides that the guarantors submit to the jurisdiction of courts in Montréal, the Southern District of New York, or any New York state court sitting in New York City for purposes of legal proceedings arising out of or related to the Credit Facility or guarantee agreement.

(b)     Swap Agreements. MB2 LP is a party to that certain secured Swap Agreement with The Bank of Nova Scotia, a Canadian-based institution, dated September 28, 2005 (as amended), and that certain secured Swap Agreement with Bank of Montréal, also a Canadian-based institution, dated September 28, 2005 (as amended). As of January 31, 2010, MB2 LP owed approximately $12.3 million pursuant to the Swap Agreements. As security for repayment of the sums owed under the Swap Agreements, each of the Chapter 15 Debtors granted comprehensive security over their assets, to the extent permitted by law.

(c)     Convertible Debentures. Mega Brands has approximately $70.4 million outstanding in Convertible Debentures due August 13, 2013, governed by an indenture dated August 18, 2008. The sole holders of the Convertible Debentures are Fairfax Financial Holdings Limited ("Fairfax"), Chiefswood Holdings Limited, Victor Bertrand, Sr., and the Owners Fund, all Canadian investors. The Indenture Trustee is CIBC Mellon Trust Company, a Canadian company with its principal office in Ontario, Canada. The Convertible Debentures bear interest at a rate of 8%, and are guaranteed by the Chapter 15 Debtors, among others. The Convertible Debentures and related guarantees are governed by the laws of the Province of Ontario and the federal laws of Canada applicable therein.

(d)     Common Stock and Options. As of December 31, 2009, the company had issued 36,612,202 shares of common stock, with options to purchase 1,033,565 shares of common stock outstanding. The Company's common stock is publicly listed on the Toronto Stock Exchange.

9

## III. Recent Issues

20. In recent years, the Company has experienced several operational challenges to its business, translating into declining sales and gross margins, numerous charges and write-offs, and negative publicity stemming from product recalls. In 2007, after 22 consecutive years of sales growth and profitability, the Company reported lower sales and a net loss, and that trend has continued. These losses have primarily resulted from stagnation of the North American toy industry and fluctuations in the prices of raw materials, especially plastic resin, a key raw material used in the manufacturing of Mega Brands' products. A global recession beginning in the fourth quarter of 2008 further exacerbated these challenges, as a precipitous decline in consumer spending during the Company's peak toy-selling season curtailed an anticipated recovery.

21. In light of this decline, the Company undertook several measures to address their economic challenges, including a capital infusion and organizational changes. Throughout 2008 and 2009, the Company also considered recapitalization scenarios, asset sales (including the potential sale of the entire Company or certain of its divisions), and strategic partnerships as ways to improve its capital structure and financial position.

22. By the end of 2009, the Company's deteriorating business condition made its debt obligations unmanageable, and the Company was left with no viable alternative to restructure its debt other than pursuing a recapitalization transaction.

## IV. The Recapitalization Transaction

23. On January 13, 2010, Mega Brands and a group of investors entered into a commitment letter whereby the investors agreed to participate in the private placement portion ($121.25 million) of a $218.1 million offering (excluding oversubscription proceeds), the proceeds of which will finance, in part, the recapitalization transaction, in accordance with a

court-approved CBCA arrangement.[11]   The public portion of the offering, originally CDN$100 million, was underwritten by GMP Securities L.P.[12]  Mega Brands closed the public offering on January 28, 2010, for gross oversubscription proceeds of CDN$110 million.

24.     The transaction, if approved through the Canadian Proceeding, will eliminate all of the Company's financial covenants, and will enable the company to secure a $50-million asset-based credit facility with Wachovia Capital Finance Corporation (Central) and Wachovia Capital Finance Corporation (Canada).  In addition, the transaction will reduce the Company's net debt by more than $290 million and reduce the Company's annual interest payments from approximately $43.8 million to approximately $13.6 million, excluding the asset-based credit facility utilization.[13]

25.     Pursuant to the terms of the transaction, holders of existing Secured Debt (in the amount of $356.6 million as of January 31, 2010) will exchange their claims for a cash payment of $215.28 million and $35.88 million in newly-issued common stock, for a recovery of approximately 70%.  The cash payment derives from the proceeds of the offering.  More than

---

[11]  The private placement investors are Fairfax; Mega Brands Chairman, Victor Bertrand Sr.; Mega Brands' Chief Executive Officer, Marc Bertrand; Mega Brands' Chief Innovation Officer, Vic Bertrand; The Owners Fund; Chiefswood Holdings Limited; and certain mutual funds represented by Invesco Trimark Limited.  Of the $121.25 million private placement, Fairfax and its affiliates have committed $50 million; Trimark Funds, $40 million; Victor Bertrand Sr., $15 million; Chiefswood Holdings Limited, $10 million; The Owners Fund, $5 million; Marc Bertrand, $750,000; and Vic Bertrand, $500,000.

[12]  The public offering is comprised of 71,500 Class A subscription receipts (at a price of CDN$1,000 per receipt) and 385,000 Class B subscription receipts (at a price of CDN$100 per receipt).  Each Class A subscription receipt ultimately will convert into one debt unit of Mega Brands, with each debt unit comprised of a 10% senior secured debenture in the principal amount of CDN$1,000 due five years from day following the effective date of the transaction (the "New Debenture") and 800 common share purchase warrants (the "New Warrants"). Each New Warrant will entitle the holder to purchase one common share in the capital of Mega Brands upon the payment of the exercise price of CDN$0.50 per common share.  Each Class B subscription receipt ultimately will convert into one equity unit of Mega Brands, with each equity unit comprised of 200 common shares and 120 New Warrants.  The private placement is comprised of private units (at a price of CDN$2,000 per unit), with each unit consisting of one New Debenture, 2,000 common shares, and 2,000 New Warrants.

[13]  In accordance with the terms of the lock-up agreements, the recapitalization transaction must be fully implemented no later than May 15, 2010, failing which the parties hereto will no longer be bound by the terms thereof.

11

70% of the holders of the Secured Debt have signed lock-up agreements supporting the transaction. The Company continues to negotiate with the remaining Secured Debt holders. The non-consenting Secured Debt holders have the right to object to the recapitalization transaction in the Canadian Proceeding.

26.    Additionally, upon the consummation of the transaction, the Convertible Debentures (in the amount of $70.4 million as of January 31, 2010) will be cancelled in exchange for newly-issued debentures, common shares, and warrants having an aggregate value of $15.0 million, representing a recovery of approximately 21% to the holders of such Convertible Debentures. All of the holders of the Convertible Debentures have signed lock-up agreements supporting the transaction.

27.    As indicated above, only the holders of Secured Debt, Convertible Debentures, and equity have affected interests under the proposed restructuring transaction, the vast majority of which have already consented to the exchange. All other parties—including, but not limited to, the Company's employees, suppliers, customers, and litigation counterparties—will be unimpaired.

## V.    Implementation of the Recapitalization Transaction

28.    The Company intends to implement the recapitalization through the Canadian Proceeding.

29.    On February 12, 2010, Mega Brands and certain other subsidiaries and affiliates, including the Chapter 15 Debtors as applicants and certain of the impleaded parties, commenced the Canadian Proceeding to implement a balance-sheet restructuring of its funded debt obligations, and to reposition the Company for a return to profitability. The Chapter 15 Debtors all are borrowers and/or guarantors under the Company's Credit Facility, Swap Agreements, and

12

Convertible Debentures that are affected by the Company's balance-sheet restructuring and the Canadian Proceeding.

30.     Upon application to the court for an order approving the arrangement, an initial appearance is made for an interim order that specifies such items as the manner for calling and holding a special meeting of the stakeholders (e.g., distribution of proxy materials, notice periods, and time and place of meeting), the persons entitled to vote at the meeting, classes of persons entitled to a separate class vote, and the acceptance thresholds for approval of the arrangement. Once held, and the arrangement resolution passed by the requisite majorities, the applicant requests a final order approving the arrangement. If the court finds that the arrangement satisfies a "fair and reasonable" test, it will grant a final order approving the arrangement.[14] The company then files articles of arrangement under the CBCA. In the Canadian Proceeding, the Canadian Court entered the interim order on February 12, 2010.

31.     Here, the receipt of signed lock-up agreements from 100% of the holders of the Convertible Debentures and approximately 72% of Secured Debt holders has greatly streamlined this process.

## VI.     The Chapter 15 Cases

32.     To protect the Company from actions in the U.S., whether against U.S. assets or otherwise, and to ensure recognition and enforcement in the U.S. of the Arrangement Order as well as other Canadian Court orders in connection with the Arrangement, the Foreign

---

[14]     As discussed in the Abitan Declaration, Canadian courts generally use a three-pronged test when hearing an application for the final approval of a plan of arrangement: (a) whether the statutory procedures have been met; (b) whether the application has been advanced in good faith; and (c) whether the plan of arrangement is fair and reasonable. Moreover, the CBCA provides three main regulatory limits on arrangements: (x) it must not be practicable for the corporation to effect the proposed transaction under any other provision of the CBCA; (y) the applicant corporation must not be insolvent; and (z) the arrangement provisions of the CBCA may only be used in circumstances where the corporation proposes to effect a "fundamental change" in the nature of the business. The Canadian Proceeding satisfies all of these requirements.

Representative has filed these chapter 15 cases (the "Chapter 15 Cases") seeking: (a) recognition of his status as the Chapter 15 Debtors' "foreign representative" as defined under Bankruptcy Code § 101(24); (b) recognition of the Canadian Proceeding as a "foreign main proceeding" for the Canadian Chapter 15 Debtors under § 1517(b)(1);[15] (c) recognition of the Canadian Proceeding as a "foreign nonmain proceeding" for the U.S. Chapter 15 Debtors under § 1517(b)(2);[16] and (d) recognition of the order approving the CBCA plan of arrangement under § 1521.

33.     Congress enacted chapter 15 to ensure that a U.S. bankruptcy court can recognize and enforce actions and orders of a foreign court in a restructuring proceeding undertaken in a jurisdiction where the debtor has its COMI or an "establishment." Chapter 15 provides for both the granting of provisional relief during the pendency of the foreign proceeding, such as application of § 362 to U.S. assets, and recognition and enforcement in the U.S. of any orders entered in the foreign proceeding.

34.     Here, the Canadian Chapter 15 Debtors' assets are in Canada, along with all of their operations and employees, thereby establishing Canada as their COMI. The U.S. Chapter 15 Debtors each have an "establishment" in Canada as, among other things: (a) all employees and/or officers of the U.S. Chapter 15 Debtors ultimately report directly or indirectly to an officer or manager in Montréal; (b) the majority of the U.S. Chapter 15 Debtors' directors and officers reside and work in Canada; (c) the U.S. Chapter 15 Debtors are all borrowers and/or guarantors under the Canadian law governed Credit Facility and Convertible Debentures; and (d)

---

[15]   Alternatively, in the event the Court determines that the Canadian Proceeding is not eligible to be recognized as a "foreign main proceeding" for the Canadian Chapter 15 Debtors, the Canadian Chapter 15 Debtors reserve their right to seek recognition of the Canadian Proceeding as a "foreign nonmain proceeding."

[16]   Alternatively, in the event the Court determines that the Canadian Proceeding is not eligible to be recognized as a "foreign nonmain proceeding" for the U.S. Chapter 15 Debtors, the U.S. Chapter 15 Debtors reserve their right to seek recognition of the Canadian Proceeding as a "foreign main proceeding."

14

the Company's Montréal offices handle the majority of the U.S. Chapter 15 Debtors' core administrative and corporate functions, without which the U.S. Chapter 15 Debtors would be unable to operate.

## Relief Requested

35.    By this Petition, the Foreign Representative respectfully requests that the Court enter an order: (a) granting recognition by this Court of the Foreign Representative as the Chapter 15 Debtors' "foreign representative" as defined in Bankruptcy Code § 101(24); (b) granting recognition of the Canadian Proceeding as a "foreign main proceeding" pursuant to Bankruptcy Code § § 1515, 1517, and 1520 with respect to the Canadian Chapter 15 Debtors; (c) granting recognition of the Canadian Proceeding as a "foreign nonmain proceeding" pursuant to Bankruptcy Code § § 1515, 1517, and 1521 with respect to the U.S. Chapter 15 Debtors; and (d) recognizing and enforcing the order approving the CBCA plan of arrangement pursuant to § 1521.[17]

## Basis for Relief

36.    Congress designed chapter 15 to protect assets and other interests in the U.S. for parties having commenced restructuring proceedings in a foreign jurisdiction. Relief under chapter 15 prevents dismemberment of U.S. or non-U.S. businesses through actions commenced in the U.S. and avoids disruptions that otherwise could derail a party's foreign restructuring.

37.    Consistent with these principles, the Foreign Representative commenced the Chapter 15 Cases to obtain full recognition and enforcement of the Canadian Proceeding. The Foreign Representative anticipates the U.S. proceedings will complement the Chapter 15 Debtors' primary proceedings in Canada and ensure the effective and efficient administration of

---

[17]    The Chapter 15 Debtors reserve the right to request further relief pursuant to Bankruptcy Code § 1521 of the prior to the hearing on the Petition.

their restructuring. Recognition of the Arrangement Order also will facilitate implementation of the restructuring transaction through the discharge of claims and liens in the U.S. against the Chapter 15 Debtors. Further, the Foreign Representative submits that recognition of the Canadian Proceeding will allow the Chapter 15 Debtors to restructure in the most efficient manner without prejudicing the rights of U.S. creditors. Any dissenting lender will have full access and opportunity to participate in the Canadian Proceeding, and the Arrangement Order leaves all other stakeholders and creditors (other than the debenture holders that have consented and diluted equity holders) unimpaired.

**I.      The Canadian Proceeding Is a Foreign Proceeding**

38.     Bankruptcy Code § 101(23) defines a "foreign proceeding" as:

> a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

11 U.S.C. § 101(23).

39.     Although Congress just enacted chapter 15 in 2005, and courts have not yet fully developed precedent on it, at least one court has opined on the factors necessary to demonstrate that a proceeding constitutes a "foreign proceeding." In *In re Betcorp Ltd.*, 400 B.R. 266, 277 (Bankr. D. Nev. 2009), the court examined chapter 15's legislative history as well as the *Model Law on Cross-Border Insolvency*, which ultimately formed the basis for chapter 15, and disaggregated § 101(23) into a seven-factor test to determine whether a proceeding constitutes a "foreign proceeding." Specifically, the court found that a "foreign proceeding" must be a proceeding:

(i)      in which "acts and formalities [are] set down in law so that courts, merchants and creditors can know them in advance, and apply them evenly in practice;"

16

| (ii) | that has either a judicial or an administrative character; |
|---|---|
| (iii) | collective in nature, in that it considers the rights and obligations of all creditors; |
| (iv) | located in a foreign country; |
| (v) | authorized or conducted under a law related to insolvency or the adjustment of debt, even if the debtor that has commenced such proceedings is not actually insolvent; |
| (vi) | in which the debtor's assets and affairs are subject to the control or supervision of a foreign court or other authority competent to control or supervise a foreign proceeding; and |
| (vii) | for the purpose of reorganization or liquidation. |

See *Betcorp*, 400 B.R. at 275-82; *see also In re Overnight and Control Commission of Avánzit, S.A.*, 385 B.R. 525, 533 (Bankr. S.D.N.Y. 2008) (discussing factors).

40.     As further supported by the facts discussed in the Ferrante and Abitan Declarations, the Chapter 15 Debtors' proceeding in the Canadian Court, commenced to restructure the Chapter 15 Debtors' financial obligations, constitutes a "foreign proceeding" under the *Betcorp* test.

41.     **First**, the Company commenced the Canadian Proceeding pursuant to § 192 of the CBCA, a law relating to adjustment of debts that specifically allows corporations to "apply to a court for an order approving an arrangement" that would "effect a fundamental change in the corporation." *See* CBCA § 192.3.

42.     **Second**, the proceeding is "judicial," having commenced before the Canadian Court, which has the power to enter "any interim or final order it thinks fit." *See* CBCA § 192.4.

43.     **Third**, the Canadian Proceeding is collective in nature, considering all creditors' rights. Indeed, all creditor classes in the Canadian Proceeding either are unimpaired or impaired and entitled to participate in the proceedings. In *Betcorp*, for instance, the bankruptcy court

17

discussed the contrasts between a true collective proceeding, where such proceeding "considers the rights and obligations of all creditors," and a non-collective proceeding, such as a "receivership remedy instigated at the request, and for the benefit, of a single secured creditor." *See Betcorp*, 400 B.R. at 281. Here, only the Company's secured lenders or holders of Convertible Debentures have claims or interests being affected under the Canadian Proceeding, all of whom either signed a pre-filing lock-up agreement or will have an opportunity to participate and raise objections in the Canadian Proceeding. No other creditors will have their claims against the Company reduced or altered in any way.[18]

44.     *Fourth*, the Canadian Court is located in Montréal, Canada.

45.     *Fifth*, as described above, the CBCA is a Canadian law governing, among other things, corporate restructuring, as contemplated by the Canadian Proceeding.

46.     *Sixth*, the Canadian Court supervises the Chapter 15 Debtors' assets and affairs during the pendency of the Canadian Proceeding, as any party-in-interest seeking to object to the Arrangement may appeal to, and obtain relief from, the Canadian Court.

47.     *Finally*, the Canadian Proceeding has one objective: the restructuring of the Company. The Foreign Representative intends to submit, pursuant to the CBCA, a plan of arrangement implementing the recapitalization transaction, which will provide for a substantial de-leveraging of the Company's balance sheet and return the Company to profitability. The Foreign Representative therefore respectfully submits that the Chapter 15 Debtors have commenced the Canadian Proceeding for a reorganization purpose, as required by § 101(23). *Cf. In re Avánzit*, 385 B.R. at 533-34 (recognizing a "financial restructuring" as a "reorganization"

---

[18]   As to shareholders, with interests diluted through the Canadian Proceeding, the CBCA requires a shareholders' meeting as part of the voting, thereby providing such (arguably) affected parties an opportunity to participate. In addition, Rothschild, the Company's financial adviser, issued an opinion, attached to the Company's CBCA Application, explaining that shareholders, solely in their capacity as shareholders, stand in a better financial position under the recapitalization than if the Company liquidated.

18

for purposes of the § § 101(23) and 1517 analysis, especially where the plan at issue provides for repayment of debts).

48.     At least one court already has recognized that a Canadian restructuring proceeding under the CBCA constitutes a "foreign proceeding." *See In re Tembec Indus., Inc.*, Case No. 08-13435 (RDD) [Docket No. 14] (Bankr. S.D.N.Y. Oct. 31, 2008) (granting recognition of a proceeding under the CBCA as a foreign main proceeding).

49.     Accordingly, this Court should find that the Canadian Proceeding satisfies § 101(23) and constitutes a "foreign proceeding" as required by § 1517.[19]

## II.    The Foreign Representative Qualifies as a Foreign Representative

50.     In addition to qualifying as a foreign proceeding as defined in the Bankruptcy Code, to obtain recognition under chapter 15, the Canadian Proceeding must have a "foreign representative." *See* 11 U.S.C. § 1517.

51.     The Foreign Representative submits that he commenced the Chapter 15 Cases as a duly appointed and authorized "foreign representative" within the meaning of § 101(24). Section 101(24) provides as follows:

> The term "foreign representative" means a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding.

11 U.S.C. § 101(24).

---

[19] In addition, the Foreign Representative submits that recognition of the Canadian Proceeding and any orders that issue from the Canadian Court during the pendency of the Canadian Proceeding would not be "manifestly contrary to the public policy of the United States" so as to justify this Court's exercise of its discretion under Bankruptcy Code § 1506 to refuse to recognize the Canadian Proceedings. Indeed, as a sister common law jurisdiction, courts "have consistently extended comity to Canadian bankruptcy proceedings." *Smith v. Dominion Bridge Corp.*, 1999 WL 111465, at *3 (E.D. Pa. 1999).

52.     The Canadian Court specifically authorized the Foreign Representative to commence this chapter 15 proceeding. Concurrently herewith, and attached hereto as **Exhibit C**, the Foreign Representative has filed a copy of the order entered by the Canadian Court commencing the Canadian Proceeding and appointing the Foreign Representative with authority to commence the Chapter 15 Cases. Thus, the Foreign Representative submits that he has met the requirements of § 101(24). *Cf. In re SPhinX, Ltd.*, 351 B.R. 103, 116-17 (Bankr. S.D.N.Y. 2006), *aff'd* 371 B.R. 10 (S.D.N.Y. 2007) (noting that the foreign representatives had submitted a "copy of the Cayman Court's order appointing them to administer the Debtors' winding up under the Companies Law and authorizing their commencement of these chapter 15 cases, thereby satisfying Bankruptcy Code § 101(24)").

## III.     The Canadian Proceeding is a Foreign Main Proceeding for the Canadian Chapter 15 Debtors

53.     The Canadian Proceeding constitutes a "foreign main proceeding" for the Canadian Chapter 15 Debtors as defined in § 1517(b)(1).

54.     Section 1517(b)(1) provides that a "foreign main proceeding" is a "foreign proceeding" pending in the country where the debtor has its center of main interests, or COMI. 11 U.S.C. § 1517(b)(1).

55.     Section 1516(c) provides that, "in the absence of evidence to the contrary, the debtor's registered office . . . is presumed to be the center of the debtor's main interests." 11 U.S.C. § 1516(c); *In re Bear Stearns High-Grade Structured  Credit Strategies Master Fund*, 374 B.R. 122, 127 (Bankr. S.D.N.Y. 2007), *aff'd* 389 B.R. 325 (S.D.N.Y. 2008). However, the presumption that the location of the debtor's registered office is also the debtor's COMI was adopted merely for "speed" and administrative convenience, and is therefore rebuttable. *In re SPhinX, Ltd.*, 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006), *aff'd* 371 B.R. 10 (S.D.N.Y. 2007)

20

(citing H.R. Rep. 109-31, pt. 1, 109th Cong., 1st Sess. at 112-13 (2005)). And, as described below, courts look to a number of factors to determine a debtor's COMI. *Bear Stearns*, 374 B.R. at 129–30 (finding that COMI did not lie at the location of the debtor's registered office in the Cayman Islands, as administration of the debtor's business occurred in the U.S., and its principal interests, assets, and management resided in the U.S.).

56.     Though the Bankruptcy Code does not specify the factors to determine a debtor's COMI, courts have generally identified five relevant factors. These factors include: (a) the location of the debtor's headquarters; (b) the location of those persons or entities managing the debtor (which, in certain instances, could be the holding company headquarters); (c) the location of the debtor's primary assets; (d) the location of the majority of the debtor's creditors or of a majority of the creditors affected by the case; and (e) the jurisdiction whose law would apply to most disputes. *Bear Stearns*, 389 B.R. at 336 (citing *SPhinX*, 351 B.R. at 116-17; *In re Tradex Swiss AG*, 384 B.R. 34, 43 (Bankr. D. Mass. 2008)); *Betcorp*, 400 B.R. at 287-88 (discussing *Bear Stearns*, *Tradex* and certain European insolvency law cases for COMI analysis). "The flexibility inherent in chapter 15 strongly suggests, however, that [a] court should not apply such factors mechanically," but with an eye toward "chapter 15's emphasis on protecting the reasonable interests of parties in interest pursuant to fair procedures and the maximization of the debtor's value." *SPhinX*, 351 B.R. at 117.

57.     An analysis of these factors demonstrates that Canada constitutes the Canadian Chapter 15 Debtors' COMI.

58.     The Location of the Canadian Chapter 15 Debtors' Headquarters. The Canadian Chapter 15 Debtors all are corporations organized and existing under the laws of Canada, and have no other corporate presence apart from the Company's Montréal headquarters (which also

21

serves as the headquarters for each of the Canadian Chapter 15 Debtors) and a small presence in Ontario.

59.     The Location of Those Persons or Entities Managing the Canadian Chapter 15 Debtors. Each of the Canadian Chapter 15 Debtors' officers, directors, and employees are permanently located in and work in Canada. Further, strategic planning for the Canadian Chapter 15 Debtors takes place at the Company's Montréal headquarters and all budgets and business plans ultimately get approved by managers operating in Montréal. In addition, pricing, sales programs, and procurement for the Canadian Chapter 15 Debtors are ultimately approved by the Company's headquarters in Montréal.

60.     Authority to enter into agreements with third parties related to the Company's Mega Bloks product line, such as merchandising licenses or sales agreements on behalf of the Canadian Chapter 15 Debtors, is vested with managers located at the Company's Montréal headquarters and such third party agreements regularly get negotiated, approved, and executed by managers in Montréal.

61.     The Credit Facility and the guarantees at issue in the Canadian Proceeding were executed by officers of the Canadian Chapter 15 Debtors.

62.     The Location of the Canadian Chapter 15 Debtors' Primary Assets. The Canadian Chapter 15 Debtors are Canadian corporations, with substantially all of their assets located in Canada. In particular, the Company's primary in-house manufacturing operations are located in Canada, and more than half of the Company's worldwide workforce is located in Canada.

63.     The Location of the Majority of the Canadian Chapter 15 Debtors' Creditors Affected By the Canadian Proceeding. The only creditors with rights affected by the Chapter 15

22

Cases are the Company's holders of Secured Debt (including the Swap Agreements), Convertible Debentures, and equity. The Agent under the Credit Facility is Bank of Montréal, a Canadian-based institution. The notice provisions under the Credit Agreement specify Canadian addresses for the Agent and each of the Chapter 15 Debtors.

64.     The holders of Convertible Debentures are located solely in Canada. The Indenture Trustee (CIBC Mellon Trust Company) is also a Canadian company with its principal office in Ontario, Canada. The Company's common stock is traded on the Toronto Stock Exchange.

65.     <u>The Jurisdiction Whose Law Would Apply To Most Disputes</u>. The Credit Facility is governed by the laws of the Province of Québec and the laws of Canada applicable therein. The Convertible Debentures and related Canadian Chapter 15 Debtors' guarantees are governed by the laws of the Province of Ontario and the federal laws of Canada applicable therein. As for the recapitalization transaction, the relevant agreements, including the lock-up agreements and commitment letters, identify Canadian law as governing disputes.

66.     <u>Other Factors Demonstrating Canada is the Center of Main Interest of the Canadian Chapter 15 Debtors</u>. Several other factors demonstrate that the Canadian Chapter 15 Debtors' centers of main interest lie in Canada. First, substantially all of the books and records of the Canadian Chapter 15 Debtors are maintained by the Company in Montréal. Second, audits of the Canadian Chapter 15 Debtors are performed or directed by the Montréal branch of PricewaterhouseCoopers, and Mega Brands issues consolidated financial statements covering all of the Chapter 15 Debtors. Third, the working capital and funding needs of the Canadian Chapter 15 Debtors are satisfied by sources of funds obtained and approved by Canadian-based managers.

23

67.     The Foreign Representative respectfully submits that this Court should find that COMI lies in Canada for each of the Canadian Chapter 15 Debtors, and the Court should recognize the Canadian Proceeding as a "foreign main proceeding" under § 1517(b) with respect to the Canadian Chapter 15 Debtors.

## IV.     The Canadian Proceeding is a Foreign Nonmain Proceeding for the U.S. Chapter 15 Debtors

68.     The Canadian Proceeding constitutes a "foreign nonmain proceeding" for the U.S. Chapter 15 Debtors as defined in § 1517(b)(2).

69.     Section 1517(b)(2) provides that a "foreign nonmain proceeding" is a "foreign proceeding" pending in a country where the debtor has an "establishment" within the meaning of § 1502. 11 U.S.C. § 1517(b)(2). Section 1502(2) broadly defines an "establishment" as "any place of operations where the debtor carries out a nontransitory economic activity." 11 U.S.C. § 1502(2). In contrast to COMI, "the existence of an establishment is essentially a factual question, with no presumption in its favor." *Lavie v. Ran*, 406 B.R. 277, 284 (S.D. Tex. 2009) (citing *Bear Stearns*, 389 B.R. at 338).

70.     Each of the U.S. Chapter 15 Debtors has an "establishment" in Canada, as such term is defined in the Bankruptcy Code. In particular, the U.S. Chapter 15 Debtors carry out the nontransitory operational, managerial, and financing and other economic activities in Canada described below.

### A.     Operational Activities in Canada

71.     Certain of the U.S. Chapter 15 Debtors—MB US Inc., MB Finance LLC, and MB2 LP—were established as holding companies for financing purposes, and have their bank accounts located in Canada. MB US, Inc., MB Finance LLC, and MB2 LP do not have other significant assets and do not conduct other economic activity. The only other noteworthy asset

24

of MB US, Inc.—the shares of Mega Brands America—are pledged to the Agent under the Credit Facility and are physically held in Toronto, Canada.

72.     Mega Brands America primarily distributes the Company's products in the U.S., including products manufactured by an associated company in Canada. In addition, Mega Brands America sells certain products to Mega Brands, which sales are coordinated and implemented by Mega Brands.

73.     Rose Moon, a wholly-owned indirect subsidiary of Mega Brands and a U.S. corporation registered in Tennessee, operates a small pencil manufacturing facility. Mega Brands funds Rose Moon's working capital needs, without which Rose Moon would be unable to operate.

74.     Warren Industries is an inactive entity, registered in Indiana, existing solely to resolve past environmental liabilities. Mega Brands officers in Canada handle all decision-making functions related to Warren Industries.

**B.     Managerial Activities in Canada**

75.     The majority of directors and officers of each of the U.S. Chapter 15 Debtors permanently reside in Canada, the Company would hold meetings for the Boards of Directors for the U.S. Chapter 15 Debtors in Montréal, and all of the U.S. Chapter 15 Debtors' corporate resolutions are signed by the U.S. Chapter 15 Debtors' directors in Canada. All budgets and business plans are ultimately approved by Marc Bertrand, as CEO, in Montréal. Canadian-based managers obtain and approve amounts needed to satisfy the U.S. Chapter 15 Debtors' working capital and funding needs.

76.     Executives in Montréal also ultimately approve the U.S. Chapter 15 Debtors' pricing, sales programs, and procurement. Many of the U.S. Chapter 15 Debtors' relationships

with third parties, such as customers, vendors, and other counter-parties, are primarily managed by Canadian-based officers or managers or by employees of Mega Brands International.

77.     Further, as described above, the Company's Montréal offices handle the majority of the U.S. Chapter 15 Debtors' core administrative and corporate functions, without which the certain of the U.S. Chapter 15 Debtors would be unable to operate.[20] All employees and/or officers of the U.S. Chapter 15 Debtors ultimately report directly or indirectly to an officer or manager in Montréal.

78.     Finally: (a) the Company's consolidated books and records are maintained by the Company in Montréal; (b) audits of the U.S. Chapter 15 Debtors are performed or directed by the Montréal branch of PricewaterhouseCoopers; and (c) Mega Brands issues consolidated financial statements covering all of the U.S. Chapter 15 Debtors.

## C.     Financing Activities in Canada

79.     The U.S. Chapter 15 Debtors all are borrowers and/or guarantors under the Company's Secured Debt and Convertible Debentures.  In fact, the Credit Facility and the guarantees at issue in the Canadian Proceeding were executed on behalf of the U.S. Chapter 15 Debtors by Canadian officers located in Canada.

80.     The Swap Agreements, to which U.S. Chapter 15 Debtor MB2 LP is a party, are with Canadian-based institutions, The Bank of Nova Scotia and Bank of Montréal.

81.     As mentioned above, Rose Moon relies on Mega Brands for essential working capital needed to operate its business.

82.     For purposes of the recapitalization, negotiations with the lender group on behalf of the U.S. Chapter 15 Debtors have occurred principally in Canada, through Canadian-based

---

[20]     As noted above, through intercompany arrangements, the U.S. Chapter 15 Debtors compensate Mega Brands for such services through an arm's length fee.

26

advisors. Further, the Canadian Proceeding has resulted from an entirely Canadian-based implementation process involving the Company, a Canadian-headquartered entity, the Agent and Indenture Trustee, both Canadian institutions, and led by Canadian employees and advisors, on all sides, and Canadian sponsors. Finally, through the Arrangement and the Canadian Proceeding, the parties will exchange their debt for new, Canadian-law governed debt instruments and equity interests in a Canadian legal entity headquartered in Montréal.

## V. The Court Should Recognize and Enforce the Arrangement

83. Enforcement and recognition of the Arrangement aligns with the purposes of chapter 15 and the Canadian Proceeding, and the Court should give the Arrangement Order full force and effect. As set forth in the preamble to the *Model Law on Cross-Border Insolvency*, the Model Law seeks to promote:

> (a) cooperation between the courts and other competent authorities of this State and foreign States involved in cases of cross-border insolvency; (b) greater legal certainty for trade and investment; (c) fair and efficient administration of cross-border insolvencies that protects the interests of all creditors and other interested persons, including the debtor; (d) protection and maximization of the value of the debtor's assets; and (e) facilitation of the rescue of financially troubled businesses, thereby protecting investment and preserving employment.

*See Model Law on Cross-Border Insolvency*, available at www.uncitral.org.

84. Bankruptcy Code § 1521(a) permits the Court to, "where necessary to effectuate the purpose of [chapter 15] . . . at the request of the foreign representative, grant any appropriate relief." 11 U.S.C. § § 1521(a). Section 1521 also sets forth various forms of relief that may be granted upon recognition of a foreign proceeding, including "entrust[ing] the distribution of all or part of the debtor's assets in the U.S. to the foreign representative." 11 U.S.C. § 1521(b). Further, § § 1525 and 1527, when read in conjunction, direct this Court to cooperate "to the maximum extent possible" with the Canadian Court regarding "the coordination of the

27

administration and supervision" of the Chapter 15 Debtors' assets and affairs. 11 U.S.C. § §

1525, 1527(3).

85.     Courts in this district have routinely enforced foreign orders in chapter 15 cases

where such courts also granted recognition of a foreign proceeding. *See, e.g., In re Chemokine*

*Therapeutics Corp.*, Case No. 09-11189 (PJW) (Bankr. D. Del. April 28, 2009) [Docket No. 15]

(recognizing and giving full force and effect to two Canadian orders approving the sale of certain

assets); *In re Abitibi-Consolidated, Inc.*, Case No. 09-11348 (KJC) (Bankr. D. Del. April 21,

2009) [Docket No. 18] (giving full force and effect to Canadian court order approving debtors'

securitization plan); *In re Destinator Technologies, Inc.*, Case No. 08-11003 (CSS) (Bankr. D.

Del. July 8, 2008) [Docket No. 63] (granting enforcement of Canadian order approving sale of

two of debtors' subsidiaries); *In re Hollinger, Inc.*, Case No. 07-11029 (PJW) (Bankr. D. Del.

May 30, 2008) [Docket No. 89] (granting full force and effect to Canadian order and authorizing

Foreign Representative to take any steps necessary to implement its terms).

86.     Here, recognition and enforcement of the Canadian Court's orders, including the

Arrangement Order, certainly serves the purposes of chapter 15 and the Canadian Proceeding, as

the transaction parties have stipulated to such relief as a condition precedent to the transaction's

success.

87.     The Company's restructuring and the Canadian Proceeding rely on a highly

choreographed and detailed set of steps and transactions, not least of which being the release and

discharge of liens, claims, and other obligations of the Chapter 15 Debtors relating to the

Secured Debt and Convertible Debentures. Without deference to the Canadian Proceeding, and

enforcement of Canadian Court orders and the Arrangement in the U.S., the Company cannot

obtain certainty and closure in the recapitalization, and hence cannot restructure. Further, the

Company also would not obtain its new working capital facility, which is the backbone of its entire restructuring effort. The proposed Arrangement Order recognizes the importance of the recognition of such order in the U.S., stating that:

> this Court respectfully seeks and requests the aid and recognition of any court or any judicial, regulatory, or administrative body constituted pursuant to the Parliament of Canada or the legislature of any province and any court or any judicial, regulatory or administrative body of the United States of America or elsewhere to act in aid of and to assist this Court in carrying out the terms of the Final Order, including that Peter Ferrante is authorized, as necessary, to act as a representative of any of the MEGA Brands Parties or their affiliates in connection therewith.

Proposed Arrangement Order at ¶52. In short, the Canadian restructuring cannot happen without U.S. Court assistance, and the foreign representative respectfully submits that under the circumstances the Chapter 15 Debtors represent the proverbial "poster children" for the relief requested herein.

## VI. Compliance with Bankruptcy Rule 2002(q)(1)

88. Bankruptcy Rule 2002(q)(1) prescribes 21 days' notice of a hearing to consider granting the relief requested in a chapter 15 petition. Fed. R. Bankr. P. 2002(q)(1). Bankruptcy Rule 9007 permits this Court to shorten the time, form, and manner in which notice shall be given. Fed. R. Bankr. P. 9007.

89. The Foreign Representative requests that the recognition hearing be scheduled for March 23, 2010, or as soon thereafter as this Court may be available.[21] This will provide the appropriate parties-in-interest with the required 21 days notice (plus any additional days for mailing). Notice of the hearing on the Petition will be provided to those parties required to receive notice pursuant to Rule 2002(q) or their counsel and to other interested parties in

---

[21] The Foreign Representative also requested this hearing date in the *Motion for an Order Scheduling Hearing and Specifying Form and Manner of Service of Notice*, filed concurrently herewith.

29

accordance with the procedures established by the Court. The Foreign Representative proposes to notify parties by electronic mail, overnight delivery, or otherwise by U.S. mail.

90.     The above-described notice meets the requirements of Rule 2002(q) because it is provided to the required parties within the proscribed time period, and it is also in keeping with this Court's "discretion to set the particularities of notice procedures" pursuant to Rule 9007. *See In re Pierce*, 435 F.3d 891, 892 (8th Cir. 2006).

## Conclusion

91.     The Foreign Representative respectfully submits that the Petition satisfies the requirements for recognition of: the Canadian Proceeding as a "foreign main proceeding" with respect to the Canadian Chapter 15 Debtors, the Canadian Proceeding as a "foreign nonmain proceeding" with respect to the U.S. Chapter 15 Debtors, and Peter Ferrante as the Chapter 15 Debtors' "foreign representative." Further, the Court should recognize the Arrangement Order and any Canadian Court orders issued in connection therewith.

## Notice

92.     The Foreign Representative has provided notice of the Petition, pursuant to Bankruptcy Rules 1011(b) and 2002(q), to: (a) the Office of the United States Trustee; (b) the Securities and Exchange Commission; (c) all parties to litigation currently pending in the United States in which the Debtor is a party; and (d) the agent under the Credit Facility. In light of the relief requested, the Foreign Representative submits that no further notice is necessary.

## No Prior Request

93.     No prior request for the relief sought in this Motion has been made to this or any other court.

30

WHEREFORE, the Foreign Representative respectfully requests entry of an order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and such other and further relief as is just and proper.

Dated: February 18, 2010

**PACHULSKI STANG ZIEHL & JONES LLP**

Laura Davis Jones (Bar No. 2436)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:     (302) 652-4100
Facsimile:      (302) 652-4400

- and -

**KIRKLAND & ELLIS LLP**
James H.M. Sprayregen, P.C. (*pro hac vice* pending)
David R. Seligman (*pro hac vice* pending)
David A. Agay (*pro hac vice* pending)
Scott B. Kitei (*pro hac vice* pending)
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200

Counsel to the Foreign Representative

68700-001\DOCS_DE:157642.2