# EXHIBIT B

## Canadian Application

CANADA
PROVINCE OF QUÉBEC
DISTRICT DE MONTRÉAL

No.: 500-11-038398-109

SUPERIOR COURT
(Commercial Division)
*Canada Business Corporations Act*, R.S.C. 1985,
c. C-44 (the "CBCA")

**IN THE MATTER OF A PROPOSED ARRANGEMENT BY :**

**MEGA BRANDS INC.**, a legal person incorporated under the CBCA, having its head office at 4505 Hickmore Street, in the City and district of Montréal, Province of Québec, H4T 1K4

- and -

**4541162 CANADA INC.**, a legal person incorporated under the CBCA, having its head office at 4505 Hickmore Street, in the City and district of Montréal, Province of Québec, H4T 1K4

- and -

**4541171 CANADA INC.**, a legal person incorporated under the CBCA, having its head office at 4505 Hickmore Street, in the City and district of Montréal, Province of Québec, H4T 1K4

- and -

**4402596 CANADA INC.**, a legal person incorporated under the CBCA, having its registered office at 1959 Upper Water Street, Suite 900 Street, in the City of Halifax, Province of Nova Scotia, B3J 2X2

- and -

**4402804 CANADA INC.**, a legal person incorporated under the CBCA, having its registered office at 1959 Upper Water Street, Suite 900 Street, in the City of Halifax, Province of Nova Scotia, B3J 2X2

- and -

**MEGA BLOKS FINANCIAL SERVICES INC.**, legal person incorporated under the CBCA, having its head office at 4505 Hickmore Street, in the City and district of Montréal, Province of Québec, H4T 1K4

<b>Applicants</b>

- and -

**The Impleaded Parties listed in Schedule "A"**

- and -

**THE DIRECTOR UNDER THE CBCA**, having an office at Complexe Jean-Edmonds South, 9th Floor, 365 Laurier Avenue West, Ottawa, Ontario, K1A 0C8.

<b>Mis-en-cause</b>

---

# APPLICATION FOR INTERIM AND FINAL ORDERS WITH RESPECT TO AN ARRANGEMENT
*(Section 192 and 248 of the CBCA and Sections 2, 20, 33 and 46 of the Code of Civil Procedure)*

---

TO ONE OF THE HONOURABLE JUDGES OF THE SUPERIOR COURT, SITTING IN COMMERCIAL DIVISION, IN AND FOR THE JUDICIAL DISTRICT OF MONTRÉAL, THE APPLICANTS RESPECTFULLY SUBMIT THE FOLLOWING:

## 1. INTRODUCTION

### 1.1 Overview of the Arrangement

1. This is an Application pursuant to sections 192(3) and 192(4) of the *Canada Business Corporations Act*, R.S.C. 1985, c. C-44 (the "**CBCA**"), for an order approving the proposed arrangement of MEGA Brands Inc. ("**MEGA Brands**"), 4541162 Canada Inc. ("**IPCO**"), 4541171 Canada Inc. ("**ArrangeCo**"), 4402596 Canada Inc. ("**MBH**"), 4402804 Canada Inc. ("**NSI**") and Mega Bloks Financial Services Inc. ("**MBF**") (the "**Arrangement**").

Gouvernement du Québec
Palais Justice MONTREAL
022451e-0004-0845**DUPLICATA

Greffe                    133,00
2010-02-12
                         133,00

2.      The Arrangement is part of a transaction (the "**Recapitalization Transaction**") involving the overall capital reorganization of the Applicants. The proposed Arrangement is the result of arm's length negotiations that have obtained the substantial support of affected parties, as evidenced by Lock up Agreements entered into between MEGA Brands and holders of approximately 71.5% of the outstanding Secured Debt (as defined below) and 100% of the holders of the Convertible Debentures (as defined below) (the "**Lock Up Agreements**").

3.      In accordance with the terms of the Lock Up Agreements, the Recapitalization Transaction must be fully implemented by no later than May 15, 2010, failing which said agreements will lapse and the parties thereto will no longer be bound by the terms thereof.

4.      The Arrangement represents a unique opportunity to effect a de-leveraging and recapitalization of MEGA Brands in a transaction that will preserve its going-concern value. Under the Arrangement, approximately US$427.0 million of affected secured and unsecured claims (based on the amount of debt outstanding as at January 31, 2010) will be repaid, restructured or exchanged for a combination of (i) cash, (ii) new debt issued by MEGA Brands or its successor corporation, as the case may be, and (iii) equity in MEGA Brands or its successor corporation.

5.      The terms of the Arrangement are more particularly described in the Plan of Arrangement (the "**Plan of Arrangement**") attached as Appendix "C" to the draft form of the information circular (the "**Circular**"). All capitalized terms not otherwise defined herein shall have the meaning ascribed thereto in the Circular. Unless otherwise stated herein, dollar amounts are expressed in U.S. currency.

6.      If approved, the result of the Recapitalization Transaction will be as follows :

(a)     The capital structure of MEGA Brands and its direct and indirect subsidiaries (collectively, the "**MEGA Brands Group**") will be improved by reducing the amount of outstanding net debt by approximately $290 million;

(b)     The annual interest cost relating to the outstanding debt of the MEGA Brands Group will be reduced from approximately $43.8 million to approximately $13.6 million (excluding the utilization of the asset-based lending facility referred to in paragraph 89 hereof);

(c)     The MEGA Brands Group's existing financial covenants will be eliminated;

(d)     Holders of Secured Debt (as defined hereinafter) will benefit from a recovery of approximately 70% (based on the amount of Secured Debt outstanding as at January 31, 2010);

(e)     Holders of Convertible Debentures (as defined hereinafter) will benefit from a recovery of approximately 21% (based on the amount of Convertible Debentures outstanding as at January 31, 2010);

(f)     Existing holders (the "**Shareholders**") of common shares of MEGA Brands (the "**Common Shares**") will benefit from a continued equity value in MEGA Brands; and

(g)     The MEGA Brands Group will have no material debt maturities until March 31, 2013, other than the scheduled repayment of 5% of the principal amount of the Debentures (as defined hereinafter) on the second anniversary of their issuance.

7.     The new capital structure resulting from the Recapitalization Transaction will create financial stability for the MEGA Brands Group and its stakeholders. It will also provide a stronger financial base for the execution of the MEGA Brands Group's operating strategy going forward, with improved cash flow and liquidity from reduced interest expenses to fund operations and investment in innovation.

8.     Apart from the consequences of the Arrangement on the Shareholders (as described more fully below), only the secured and unsecured indebtedness of the Applicants referred to in paragraphs 32 to 47 hereof (including any direct or indirect guarantees provided in respect of any such indebtedness, as the case may be) will be affected upon the implementation of the Plan of Arrangement.

9.     While the Arrangement will not affect the claims of any of the MEGA Brands Group's employees and trade creditors, the Applicants and the Impleaded Parties are seeking a limited stay of proceedings (as more fully described in Conclusions 30 to 32 hereof) to ensure that the business of the MEGA Brands Group is able to maintain a "as usual status" during these proceedings, without stakeholder concerns of possible defaults or creditor actions disrupting operations until the Voting Parties (as hereinafter defined) have had an opportunity to vote upon the Plan of Arrangement and this Court has had an opportunity to consider whether it should be approved.

## 1.2    Overview of this Application

10.     The Applicants make this Application to the Court for, *inter alia*:

(a)     an interim order (the "**Interim Order**") under subsection 192(4) of the CBCA for the calling, holding and conduct of the Shareholders' Meeting (as defined below) and the Lenders' Meeting (as defined below, both sets of meetings being collectively referred to below as the "**Meetings**"), and certain ancillary relief, including a stay of proceedings in respect of the Applicants and the Impleaded Parties; and

(b)     a final order (the "**Final Order**") under subsection 192(4) of the CBCA approving the Plan of Arrangement.

11.     The Record Date for establishing the right to vote at the Meetings is proposed to be February 17, 2010. The Meetings are proposed to be held on or about March 16, 2010, and the hearing of this Application, for the purpose of seeking the issuance of the Final Order, is proposed to be held on or about March 22, 2010. If approved, and provided that all conditions precedent to closing are either satisfied or waived, the Recapitalization Transaction is expected to be completed on or before March 30, 2010.

12. In support of this Application, the Applicants file the following draft documents:

    (a) the Circular, a copy of which is attached hereto as **Exhibit P-1**, including the following documents:

        (i) the Lenders' Notice;

        (ii) the Shareholders' Notice;

        (iii) the Lenders' Arrangement Resolution (Appendix "A" to the Circular);

        (iv) the Shareholders' Arrangement Resolution (Appendix "B " to the Circular);

        (v) the Plan of Arrangement (Appendix "C" to the Circular).

        (vi) the Arrangement Agreement (Appendix "D" to the Circular)

        (vii) a draft Interim Order (the Interim Order to become Appendix "E" to the Circular);

        (viii) the Rothschild Canada Fairness Opinion (Appendix "F" to the Circular); and

        (ix) the Rothschild Canada CBCA Opinion (Appendix "G" to the Circular);

    (b) forms of proxy, copies of which are attached hereto, as **Exhibit P-2**. (Exhibits P-1 and P-2 are collectively referred to hereinafter as the **"Meeting Materials"**).

13. As more fully appears from the Conclusions hereof, the Applicants respectfully request that Exhibit P-1 (which contains heretofore undisclosed information relating to the Applicants) be kept under seal until it is distributed with the Meeting Materials, as provided for in Conclusions 16, 17 and 18 below, failing which the Applicants will be required to make Exhibit P-1 prematurely publicly available in draft form, which could cause prejudice to the Applicants.

14. To the extent required, proceedings will be instituted in other jurisdictions, including the United States, in order to recognize and implement the orders to be rendered herein.

## 2. THE PARTIES

### 2.1 The MEGA Brands Group's Organization Chart

15. A simplified Corporate Organization Chart for the MEGA Brands Group is attached to this Application as **Exhibit P-3**, which includes the Applicants and the Impleaded Parties.

## 2.2 The Applicants

### 2.2.1. MEGA Brands

16. MEGA Brands was incorporated as Ritvik Holdings Inc. under the CBCA on May 16, 1983. On March 19, 2002, MEGA Brands filed articles of amendment to, among other things, change its name from Ritvik Holdings Inc. to Mega Bloks Inc. and remove the private company restrictions contained in its charter documents. On May 8, 2002, in connection with MEGA Brands' initial public offering, MEGA Brands filed articles of amendment to change the structure of its authorized share capital and to modify the minimum and maximum number of directors. On June 22, 2006, MEGA Brands filed articles of amendment to change its name from Mega Bloks Inc. to MEGA Brands Inc.

17. The business of the MEGA Brands Group consists primarily of the manufacturing and distribution of construction toys and stationary activity products, including : building sets, games and puzzles, art materials (crayons, coloured pencils, highlighters and markers), writing instruments (pens, mechanical pencils and woodcase pencils), dry-erase and cork presentation boards, organizers, accessories and craft and activity sets.

18. The head office and senior management of the MEGA Brands Group is located in Montréal.

19. All of the manufacturing activities of the MEGA Brands Group (other than the manufacturing of pencils) are conducted in Montréal. The MEGA Brands Group also sources certain of its products from third party manufacturers and suppliers located in Asia.

20. As of the date hereof, the MEGA Brands Group :

    (a) has approximately 1,300 employees, more than sixty percent (60%) of which are located in Canada;

    (b) has operations in Canada, the United States and Europe, as well as branch offices in Hong Kong, Australia, Switzerland, Luxembourg, China, Italy, Spain, the United Kingdom, France and Mexico;

    (c) had net sales for the year ending December 31, 2008 of approximately $447.7 million; and

    (d) had net sales for the nine-month period ended September 30, 2009 of approximately $231.6 million.

21. The authorized share capital of MEGA Brands consists of an unlimited number of Common Shares, without par value, of which 36,612,202 were issued and outstanding as at January 26, 2010, and an unlimited number of preferred shares, without par value and issuable in series, of which none are issued and outstanding. Mega Brands also has 1,033,565 stock options to purchase Common Shares outstanding, which options have a weighted average exercise price of CDN $14.61. The Common Shares are listed on TSX under the symbol "MB".

22. MEGA Brands is also the sole general partner of MB2 LP ("USLP"), a limited partnership constituted under the laws of Delaware, which is the Borrower under the Term B Facility (defined below). As general partner of USLP, MEGA Brands is also directly liable under such Term B Facility, to the extent that the assets of USLP are insufficient to satisfy its obligations under the Term B Facility, which is currently the case. Moreover, MEGA Brands owns 99.9% of the equity units of USLP.

### 2.2.2. ArrangeCo

23. ArrangeCo was incorporated under the CBCA. ArrangeCo's registered and head office is located in Montréal, Québec.

24. ArrangeCo was formed for the purpose of effecting the Arrangement and will not carry on any business prior the Effective Time, other than in connection with the Arrangement.

### 2.2.3. IPCO

25. IPCO was incorporated under the CBCA. IPCO's registered and head office is located in Montréal, Québec.

26. IPCO was formed for the purpose of effecting the Arrangement and will not carry on any business prior the Effective Time, other than in connection with the Arrangement.

### 2.2.4. MBH

27. MBH was newly continued under the CBCA. MBH's registered office is located in Halifax, Nova Scotia. MBH has financing and non-operational functions.

28. MBH was formerly a Nova Scotia unlimited liability company before it was continued under the CBCA. MBH is the sole limited partner of USLP.

### 2.2.5. NSI

29. NSI was newly continued under the CBCA. NSI's registered office is located in Halifax, Nova Scotia. NSI has financing and non-operational functions.

30. NSI was formerly a Nova Scotia unlimited liability company. NSI is a wholly-owned subsidiary of USLP.

### 2.2.6. MBF

31. MBF is incorporated under the CBCA. MBF's registered office is located in Halifax, Nova Scotia. MBF has financing and non-operational functions.

## 2.3 The Impleaded Parties

32. The Impleaded Parties are direct and indirect subsidiaries of MEGA Brands who are Borrowers and/or Guarantors under the Affected Instruments (as defined hereinafter).

## 3. THE AFFECTED INDEBTEDNESS AND THE AFFECTED PARTIES

33. The Arrangement affects the claims of (i) the secured lenders under the Credit Agreement (as defined below) and under the Swap Agreements (as defined below) and (ii), the holders of the Convertible Debentures (as defined below) (collectively, the **"Creditors"**).

34. As more fully described below, the Arrangement will also effect a dilution of the Shareholders.

35. All other obligations of the Applicants and of the Impleaded Parties will be unaffected by the Arrangement and paid in the ordinary course, including trade debt and obligations to employees.

### 3.1 The Credit Agreement and the Swap Agreements

#### 3.1.1. The Credit Agreement

36. As at January 31, 2010, MEGA Brands, USLP and MEGA Brands America, Inc. ("MBA"), (each a **"Borrower"** and collectively, the **"Borrowers"**) were indebted in the approximate aggregate amount of US$344.3 million under a credit agreement dated July 26, 2005, as amended from time to time (the **"Credit Agreement"**) in respect of the following three (3) facilities :

    (a) MEGA Brands was indebted as Borrower in the approximate aggregate amount of US$44.5 million under the Canadian revolving facility (the **"Canadian Revolving Facility"**);

    (b) USLP was indebted as Borrower in the approximate aggregate amount of US$248.3 million under the Term B facility (the **"Term B Facility"**); and

    (c) MBA was indebted as Borrower in the approximate aggregate amount of US$51.5 million under the U.S. revolving facility (the **"U.S. Revolving Facility"**).

37. The Credit Agreement is governed by the laws of the Province of Québec and the laws of Canada applicable therein. The publicly available version of the Credit Agreement is filed herewith as **Exhibit P-4.**

#### 3.1.2. The Swap Agreements

38. USLP is a party to the following agreements :

    (a) a Swap Agreement entered into with The Bank of Nova Scotia and dated September 28, 2005, as amended (the **"BNS Swap Agreement"**); and

    (b) a Swap Agreement entered into with Bank of Montréal and dated September 28, 2005, as amended (together with the BNS Swap Agreement, the **"Swap Agreements"**).

39. On January 31, 2010, USLP was indebted under the Swap Agreements, in the approximate aggregate amount of US$12.3 million.

40. The Swap Agreements and the amounts owing under the Credit Agreement are secured by the same security referred to below and rank on a *pari passu* basis. All the amounts owed under the Credit Agreement and the Swap Agreements will be referred to as the **"Secured Debt"** and the creditors pursuant to such instruments will collectively be referred to as the **"Lenders"**.

### 3.1.3. The Guarantees and the Security

41. The following members of the MEGA Brands Group are guarantors of the indebtedness owed by the Borrowers under the Credit Agreement and the Swap Agreements : MB US Inc., Rose Moon, Inc., Warren Industries, Inc., Mega Bloks Latinoamerica SA de CV, Mega Brands International, MBH, MBF, NSI and MB Finance LLC (collectively, the **"Guarantors"**).

42. Each Borrower and each of the Guarantors has guaranteed the obligations of one another under the Credit Agreement and the Swap Agreements.

43. As security for the repayment of the sums owed under the Credit Agreement and the Swap Agreements, each of the Borrowers and the Guarantors has granted comprehensive security over its assets, to the extent permitted by law.

## 3.2    The Convertible Debentures

44. As at January 31, 2010, MEGA Brands was indebted in the approximate aggregate amount of US$70.4 million, to the holders of the convertible senior unsecured debentures (the **"Convertible Debentures"**) issued pursuant to an Indenture (the **"Indenture"**) dated as of August 18, 2008, entered into by, *inter alia*, MEGA Brands, as issuer, and CIBC Mellon Trust Company, as trustee.

45. The Convertible Debentures are unsecured, bear interest at the rate of 8% and are due on August 31, 2013.

46. The indebtedness owed under the Convertible Debentures is guaranteed by the Guarantors, as well as by USLP and MBA.

47. Fairfax, VBSr., Chiefswood Holdings and Owners Fund (each as defined below) are the sole holders of the Convertible Debentures.

48. The Convertible Debentures and related guarantees are governed by the laws of the Province of Ontario and the federal laws of Canada applicable therein.

## 4.    BACKGROUND TO THE ARRANGEMENT

## 4.1    Operational Challenges and Restructuring Efforts

49. In recent years, the MEGA Brands Group has experienced several operational challenges translating into declining sales and gross margins, numerous charges and write-offs, as well as negative publicity related to the recall of the MAGNETIX line of products and downgrades by credit rating agencies.

50.     Along with other toy companies, the MEGA Brands Group's challenges were compounded by the sudden onset of a global recession in the fourth quarter of 2008, which severely impacted consumer confidence in all of the MEGA Brands Group's key markets during the peak toy-selling season and prevented its anticipated profit recovery.

51.     After 22 consecutive years of sales growth and profitability, MEGA Brands first reported lower sales and a net loss in 2007, which trend continued throughout 2008 and 2009.

52.     MEGA Brands' losses are mainly due to:

(a)     Three separate product recalls respectively announced on March 31, 2006, April 2007 and March 2008, which resulted in significant non-recurring charges to MEGA Brands. The voluntary product recall and other charges include, but are not limited to, incremental, selling, administrative, advertising and logistics expenses. MEGA Brands' financial results were also negatively impacted by significant finished goods write-offs related to the products recalls, as well as sales reversals and sales credits associated with recalled products. MEGA Brands recorded product recall charges and other charges of $39.6 million in 2008 and $56.1 million in 2007; and

(b)     Litigation and related charges in relation to the litigation resulting from the acquisition of MBA, the Consumer Protection Safety Commission, as well as various other Magnetix product liability lawsuits claimants. MEGA Brands recorded charges of $11.9 million in 2008 and $8.9 million in 2007; and

(c)     Plant closure, integration and other restructuring charges mostly related to the integration of the MBA acquisition. Incremental charges included, but were not limited to, asset write-offs and severance related to the significant downsizing of MEGA Brands' operation in China, as well as additional selling, distribution and administrative expenses. MEGA Brands recorded plant closure, integration and other restructuring charges of $27.6 million in 2008 and $7.5 million in 2007; and

(d)     Stagnation of North American growth in the traditional toy industry (which excludes video games and computer hardware and software) in recent years and a decline in 2007 and 2008, explained mainly by unfavourable publicity following numerous toy recalls during the year; and

(e)     Fluctuations in the price of plastic resin (the most important raw material used in the manufacturing of the MEGA Brands Group's products), which are driven primarily by the price of crude oil.

53.     The MEGA Brands Group has taken several measures to address these economic challenges over recent years including, amongst others :

(a)     A capital infusion in 2007;

(b)     Certain organizational changes implemented through a concerted Value Enhancement Plan; and

(c)     The issuance of the Convertible Debentures in 2008.

## 4.2     Strategic Review

54.     In addition to the above, management and the board of directors of MEGA Brands (the "**Board**") considered various transactions to improve the MEGA Brands Group's financial position and capital structure, including recapitalization scenarios, the monetization of assets and potential strategic transactions with other companies in the industry.

55.     Commencing in March 2008, with the assistance of Lazard Frères & Co. LLC and BMO Capital Markets, the MEGA Brands Group explored the potential sale of its stationery and activities business. Over 220 parties, both strategic and financial investors, were approached as part of this process. Over time, the process expanded into a broader review of strategic alternatives, including exploring the sale of the toys business or a sale of the whole business.

56.     The process lasted over a fourteen-month period and a number of parties entered into confidentiality agreements, conducted preliminary due diligence and/or submitted letters of intent, but no binding agreements resulted therefrom.

57.     On May 13, 2009, MEGA Brands retained NM Rothschild & Sons Canada Limited ("**Rothschild Canada**") and Rothschild Inc. (together with Rothschild Canada, "**Rothschild**") to act as financial advisers with a view to assessing the MEGA Brands Group's potential strategic alternatives and advise them on contingency planning.

58.     Over 28 financial and strategic parties were contacted by Rothschild in the context of this renewed process. However, Rothschild received no serious offers. Only one financial buyer presented a letter of intent relating to a going private transaction for an implied enterprise value substantially lower than the value relating to the Arrangement.

59.     During the period from May 2009 through November 2009 and the ongoing process of strategic review, Fairfax Financial Holdings Limited ("**Fairfax**") also presented certain recapitalization proposals to MEGA Brands and entered into exclusivity arrangements with MEGA Brands at various points in the process. Steps taken by Fairfax included discussions with MEGA Brands and management in May 2009 in relation to a recapitalization proposal involving a potential equity investment by Fairfax and others, and discussions between June and November 2009 with respect to a potential transaction involving a strategic party and a financial investor. However, the financial investor exited the process in early October 2009 and discussions with the strategic party broke off in mid-November 2009.

60.     On January 13, 2010, following sustained discussions, Fairfax and the Investors (as defined below) formally made, and MEGA Brands accepted, following receipt of the recommendation of the Independent Committee referenced below, a binding commitment in respect of the Recapitalization Transaction and, on January 15, 2010, MEGA Brands formally accepted the Lender Lock-Up Agreements which it had received to that date from a majority of the Lenders.

### 4.3    Independent Committee

61.    On January 29, 2009, a committee comprised of all of MEGA Brands' independent directors (the "**Independent Committee**") was formed to consider and evaluate the potential alternatives available to the MEGA Brands Group. The Independent Committee retained independent legal counsel and also retained an independent financial advisor, Genuity Capital Markets.

62.    The responsibilities of the Independent Committee included, among other things, the review, consideration and evaluation of the details of any strategic transaction and the making of such recommendations as it considered appropriate in this regard, the supervision of the conduct of MEGA Brands in negotiations or discussions with respect to any strategic transaction, and consideration and advice to the Board with respect to any strategic transaction.

63.    Throughout 2009, the Independent Committee met several times, and also met on several occasions with management to consider various alternatives. Over this time period, potential transactions were reviewed and considered by the Independent Committee and the Board. As time passed, it became increasingly important to the MEGA Brands Group that it find ways to improve its balance sheet and financial position, which it considered increasingly unsustainable.

### 4.4    Future Challenges

64.    As mentioned above, the relevant Borrowers are indebted in the approximate aggregate amount of US$96 million (the "**Current Revolving Indebtedness**") under the Canadian Revolving Facility and the US Revolving Facility.

65.    The Current Revolving Indebtedness becomes payable in full to those Lenders having revolving commitments under the Credit Agreement on July 26, 2010. Based on its current projections, the MEGA Brands Group would likely not have sufficient cash to repay the Current Revolving Indebtedness. MEGA Brands also believes that there would be significant challenges in being able to secure new or replacement financing, given its current financial situation.

### 5.    THE RECAPITALIZATION TRANSACTION

### 5.1    The Offering

#### 5.1.1.    The Investors

66.    The Recapitalization Transaction evolved from discussions and negotiations involving a range of parties, including (most recently) between MEGA Brands, MBA and USLP on the first part and Fairfax, MEGA Brands' Chairman, Victor Bertrand Sr. ("**VBSr**"), MEGA Brands' Chief Executive Officer, Marc Bertrand ("**MB**"), MEGA Brands' Chief Innovation Officer, Vic Bertrand ("**VB**"), The Owners' Fund ("**Owners' Fund**"), Chiefswood Holdings Limited ("**Chiefswood Holdings**") and certain mutual funds (the "**Trimark Funds**") represented by Invesco Trimark Limited on the second part (the parties of the second part are collectively referred to as the "**Investors**").

67. Fairfax does not, as of the date hereof, hold any Common Shares but holds CDN$64 million of the Convertible Debentures which are convertible into 20,062,696 Common Shares, being approximately 32.8% of the outstanding Common Shares on a fully diluted basis.

68. VBSr is an insider of MEGA Brands; he owns 4,415,711 Common Shares, or approximately 12.1% of the outstanding Common Shares, and CDN$7 million of the Convertible Debentures which are convertible into 2,194,357 Common Shares, which together with his current holdings would represent approximately 10.8% of the outstanding Common Shares on a fully diluted basis. MB is an insider MEGA Brands; he owns 66,712 Common Shares and holds options and rights entitling him to acquire a further 507,000 Common Shares; which together with his current holdings would represent approximately 0.9% of the outstanding Common Shares on a fully diluted basis. VB is an insider MEGA Brands; he owns 35,940 Common Shares and holds options and rights entitling him to acquire a further 468,000 Common Shares, which together with his current holdings would represent approximately 0.8% of the outstanding Common Shares on a fully diluted basis.

69. Chiefswood and The Owners Fund, although not insiders of MEGA Brands or related persons, each hold CDN$2 million of the Convertible Debentures. Trimark owns 6,671,400 Common Shares as at September 30, 2009, representing approximately 18.2% of the outstanding Common Shares or 10.9% of the outstanding Common Shares on a fully diluted basis.

### 5.1.2. The Commitment Letter

70. On January 13, 2010, MEGA Brands, MBA and USLP and the Investors entered into a commitment letter (the **"Commitment Letter"**) whereby the Investors agreed to participate in the private offering element of an offering of $218.1 million (based on an exchange rate of 0.9688 USD/CDN) of (i) class A subscription receipts (the **"Class A Subscription Receipts"**), (ii) class B subscription receipts (the **"Class B Subscription Receipts"** and, together with the Class A Subscription Receipts, the **"Subscription Receipts"**) and (iii), private units (the **"Private Units"**) the proceeds of which would be used by MEGA Brands to finance the Recapitalization Transaction in accordance with a court-approved plan of arrangement, the whole as more fully detailed below.

71. Pursuant to the Commitment Letter, the Subscription Receipts would be sold through a public offering, and the Private Units, through a private placement, as more fully detailed below.

72. The Arrangement proposed hereby is funded with the proceeds (the **"Proceeds"**) of the Offering (as defined below), as more fully detailed below.

### 5.1.3. The Public Offering

73. On January 28, 2010, MEGA Brands closed the public offering of 71,500 Class A Subscription Receipts and 385,000 Class B Subscription Receipts for gross proceeds of CDN$110 million in Subscription Receipts, at a price of CDN$1,000 per Class A

Subscription Receipt and CDN$100 per Class B Subscription Receipt (the "**Public Offering**").

74. Each Class A Subscription Receipt will, subject to the completion of the Recapitalization Transaction and certain other conditions, be automatically converted, without payment of additional consideration or further action, into one debt unit of MEGA Brands (a "**Debt Unit**") on the effective date provided in the Final Order (the "**Effective Date**").

75. Each Debt Unit is comprised of a 10% senior secured debenture in the principal amount of CDN$1,000 (the "**Debentures**") and 800 common share purchase warrants (the "**Warrants**"). Each Warrant will entitle the holder to purchase one common share ("**New MEGA Shares**") of MEGA Brands or its successor corporation ("**MEGA Amalco**") upon the payment of the exercise price of CDN$0.50 per New MEGA Share.

76. Each Class B Subscription Receipt will, subject to the completion of the Recapitalization Transaction and certain other conditions, be automatically converted, without payment of additional consideration or further action, into one equity unit of MEGA Brands of the same value (an "**Equity Unit**" and together with the Debt Units, the "**Units**") on the Effective Date. Each Equity Unit is comprised of 200 New MEGA Shares and 120 Warrants.

77. The net proceeds of the Public Offering, approximately CDN$105 million, are held in escrow by CIBC Mellon, as bailee and agent for the holders of Subscription Receipts, and will be remitted to Mega Amalco together with the proceeds of the Private Placement as a step in the Plan of Arrangement.

### 5.1.4. The Private Placement

78. Pursuant to the Commitment Letter, the Investors have undertaken, subject to certain conditions (which appear on pages 45 and 46 of the Circular, P-1), including the completion of the Recapitalization Transaction, to purchase $121.25 million of Private Units (the "**Private Placement**" and, together with the Public Offering, the "**Offering**") in the following proportion :

    (a)    $50 million - Fairfax and its affiliates;

    (b)    $15 million - VBSr;

    (c)    $750,000 - MB;

    (d)    $500,000 - VB;

    (e)    $5 million - Owners Fund;

    (f)    $10 million - Chiefswood Holdings; and

    (g)    $40 million – Trimark Funds.

79. Each Private Unit will be comprised of one Debenture, 2000 New MEGA Shares and 2000 Warrants at a price of CDN$2000 per Private Unit.

## 5.2    The Arrangement

### 5.2.1.   The Secured Debt and Convertible Debentures Cancellation

80.    Pursuant to the terms of the Plan of Arrangement, the Secured Debt and Convertible Debentures will be dealt with as follows:

(a)    The Lenders will receive their pro rata share of $215.28 million in cash payments, as well as delivery of their pro rata share of $35.88 million of New MEGA Shares at CDN$0.50 per New MEGA Share, in full satisfaction of all amounts owed under the Secured Debt and in consideration of the irrevocable and final cancellation and discharge of any security and guarantees relating thereto; and

(b)    The holders of the Convertible Debentures will receive their pro rata share of 15.0 million in Private Units, in full satisfaction of all amounts owed under the Indenture and the Convertible Debentures and in consideration of the irrevocable and final cancellation and discharge of any guarantees relating thereto.

## 5.3    Support of the Arrangement

81.    Pursuant to a lock up agreement entered into with MEGA Brands, all four holders of Convertible Debentures have, subject to certain conditions, irrevocably consented and agreed to support the recapitalization of the MEGA Brands Group, including to vote in favour of the Recapitalization Transaction. Consequently, no meeting of the holders of Convertible Debentures will be held by MEGA Brands.

82.    In December 2009, management of MEGA Brands and its financial advisors communicated with the steering committee of the Lenders and their legal and financial advisors (including the Lenders listed in **Exhibit P-5**) to apprise them of the extensive efforts of the MEGA Brands Group and its financial advisors in the pursuit of strategic alternatives, which communications culminated in the presentation, on or about December 14, 2009, of the details of the Recapitalization Transaction.

83.    Pursuant to the Lock Up Agreements, Lenders holding in excess of $259.8 million (representing approximately 71.5% of the Secured Debt outstanding as at January 31, 2010), including both counterparties to the Swap Agreements and all Lenders under the U.S. Revolving Facility, have, subject to certain conditions, irrevocably consented and agreed to support the recapitalization of the MEGA Brands Group, including to vote in favour of the Recapitalization Transaction.

## 5.4    Effect of the Arrangement on MEGA Brands

84.    Subject to the satisfaction or waiver of any of the conditions to closing, it is anticipated that the closing of the Recapitalization Transaction will occur on or about March 31, 2010. Assuming the Recapitalization Transaction is completed, the principal effects on MEGA Brands will be as follows:

(a)    MEGA Brands will transfer certain intellectual property and fixed assets to IPCO;

(b)     MEGA Amalco will issue $67.1 million principal amount of Debentures, 77.0 million New MEGA Shares and 103.4 million Warrants on exchange of the Subscription Receipts for underlying Units;

(c)     The Private Placement will be consummated and the net proceeds thereof will be received by MEGA Amalco in payment for the issuance by MEGA Amalco of $60.6 million principal amount of Debentures, 129.1 million New MEGA Shares and 129.1 million Warrants;

(d)     The proceeds of the Offering, subject to certain adjustments, will be used to exchange and cancel the Secured Debt then outstanding for $215.28 million in cash and 76.4 million New MEGA Shares, which would provide a recovery of approximately 70% to holders of such Secured Debt (based on the amount of Secured Debt outstanding as at January 31, 2010);

(e)     The Convertible Debentures will be exchanged and cancelled through the payment of $7.5 million principal amount of Debentures, 16.0 million New MEGA Shares and 16.0 million Warrants, which would provide a recovery of approximately 21% to the holders of such Convertible Debentures (based on the aggregate principal amount of Convertible Debentures outstanding on January 31, 2010);

(f)     All guarantees and security related to the Secured Debt and all guarantees related to the Convertible Debentures will be cancelled, released and discharged;

(g)     MEGA Amalco will enter into the Asset-Based Credit Facility, as described below; and

(h)     MEGA Amalco will reduce its stated capital as provided in the Plan of Arrangement.

## 5.5    Effect of the Arrangement on the Investors

85.    Following the Effective Date, Fairfax will own approximately 66.9 million New MEGA Shares, Trimark will own approximately 49.3 million New MEGA Shares, Victor Bertrand Sr. will own approximately 21.9 million New MEGA Shares, Marc Bertrand will own approximately 0.9 million New MEGA Shares and Vic Bertrand will own approximately 0.6 million New MEGA Shares, representing approximately 20.0%, 14.7%, 6.5%, 0.3% and 0.2% of the outstanding New MEGA Shares, respectively.

86.    Following the Effective Date, Fairfax will own $31.4 million principal amount of Debentures, Trimark will own $20.0 million principal amount of Debentures, Victor Bertrand Sr. will own $8.2 million principal amount of Debentures, Marc Bertrand will own $375,000 principal amount of Debentures and Vic Bertrand will own $250,000 principal amount of Debentures, representing approximately 23.2%, 14.8%, 6.1%, 0.3% and 0.2% of the outstanding principal amount of Debentures, respectively.

87.    Following the Effective Date, if certain insiders, including Fairfax, Trimark, VBSr., MB and VB, were to act together, they would be in a position to materially influence the

outcome of resolutions of holders of Common Shares, Debentures and Warrants and be able to block extraordinary resolutions.

### 5.6 Effect of the Arrangement on the Shareholders

88. Following the Effective Date, the Shareholders will hold 10.9% of the equity of MEGA Amalco, which represents 6.3% on a fully-diluted basis.

### 5.7 The Asset-Based Credit Facility

89. The MEGA Brands Group has also negotiated the terms of a new $50.0 million asset-based revolving credit facility with Wachovia Capital Finance Corporation (Central) and Wachovia Capital Finance Corporation (Canada), as agents and lenders. This new facility will provide the MEGA Brands Group with all of its financing requirements following the implementation of the Plan of Arrangement.

## 6. APPROVAL OF THE RECAPITALIZATION

90. As mentioned earlier, the Independent Committee has met frequently since January 2009, and has consulted with management and its financial and legal advisers, including to consider the Recapitalization Transaction and related matters.

91. On January 13, 2010, having received the advice of its legal and financial advisers, and having considered the opinions of Rothschild Canada referred to below, the Independent Committee unanimously recommended, and the Board unanimously approved (with Paul Rivett, Fairfax' appointed nominee to the board of directors, and VBSr, MB and VB abstaining, due to conflicts of interest) entering into the Recapitalization Transaction and concluded that the Recapitalization Transaction is in the best interests of the MEGA Brands Group, taking into account the interests of the MEGA Brands Group's stakeholders.

## 7. TESTS UNDER SECTION 192 OF THE CBCA

92. As corporations under the CBCA, the Applicants are permitted to avail themselves of the provisions of section 192 of the CBCA. The proposed Arrangement involves a number of steps, including exchanges of securities, and as such qualifies as an "arrangement" within the meaning of subsection 192(1) of the CBCA.

93. The Arrangement is necessary for the continued existence of the MEGA Brands Group and has a valid business purpose, namely the implementation of the Recapitalization Transaction, which effects a fair and balanced arrangement of the legal rights of the Affected Parties.

### 7.1 Fairness Opinion and CBCA Opinion

94. In connection with Recapitalization Transaction, Rothschild Canada rendered a "Fairness Opinion" and a "CBCA Opinion" in the form described in paragraph 4.03 of Industry Canada's Policy Statement 15.1 — *Policy of the Director Concerning Arrangements under Section 192 of the Canada Business Corporations Act*.

95.  In the Fairness Opinion, Rothschild Canada advised the Board and the Independent Committee that, as of January 13, 2010 and based upon and subject to the assumptions, limitations and other matters set forth therein, the Recapitalization Transaction is fair, from a financial point of view, to MEGA Brands and the Shareholders, solely in their capacity as Shareholders. A copy of the Fairness Opinion is attached to the Circular (Exhibit P-1) as Appendix "F".

96.  In the CBCA Opinion, Rothschild Canada advised the Board and the Independent Committee that, as of January 13, 2010 and based upon and subject to the assumptions, limitations and other matters set forth therein: (a) the holders of Secured Debt and Convertible Debentures would be in a better financial position under the Recapitalization than if MEGA Brands were liquidated, as the estimated aggregate value which of the consideration holders of Secured Debt and Convertible Debentures would receive in the Recapitalization would, in the opinion of Rothschild Canada, exceed the estimated value the holders of Secured Debt and Convertible Debentures would receive in a liquidation of MEGA Brands, in each case solely in their capacity as the holders of Secured Debt and Convertible Debentures; and (b) the Shareholders, solely in their capacity as Shareholders, would be in a better financial position under the Recapitalization than if MEGA Brands were liquidated, as the value of a Common Share of MEGA Brands in the offering contemplated by the Recapitalization would, in the opinion of Rothschild Canada, exceed the estimated value per common share that Shareholders would receive if MEGA Brands were liquidated in an insolvency process. A copy of the CBCA Opinion is attached to the Circular (Exhibit P-1) as Appendix "G"

## 7.2  **Solvency**

97.  ArrangeCo is newly incorporated under the CBCA. ArrangeCo was formed for the purpose of effecting the Arrangement and will only carry on business in connection with the Arrangement prior to the Effective Time. ArrangeCo has nominal capital, no liabilities and, in accordance with subsection 192(2) of the CBCA, ArrangeCo is not insolvent.

98.  IPCO is newly incorporated under the CBCA. IPCO was formed for the purpose of effecting the Arrangement and will only carry on business in connection with the Arrangement prior to the Effective Time. IPCO has nominal capital, no liabilities and, in accordance with subsection 192(2) of the CBCA, IPCO is not insolvent.

99.  MBH is a newly continued corporation under the CBCA. MBH is the sole limited partner of USLP. MBH will be solvent upon completion of the Arrangement.

100. NSI is a corporation newly continued under the CBCA. NSI will be amalgamated by vertical short form amalgamation with MEGA Brands and ArrangeCo as part of the Arrangement and will be solvent upon completion of the Arrangement.

101. MBF is a corporation under the CBCA. MBF will be solvent upon completion of the Arrangement.

102. As of this time, MEGA Brands continues to be able to pay its liabilities as they fall due. Upon completion of the Arrangement, MEGA Amalco will be solvent. Pro forma

information relating to MEGA Brands following the implementation of the Arrangement is included in the Circular (Exhibit P-1) under the Sections entitled "Effect of Recapitalization" and "Selected Financial Information — Unaudited Pro Forma Consolidated Balance Sheet".

103. The net proceeds of the Public Offering, approximately CDN$105 million, are held in escrow by CIBC Mellon, as bailee and agent for the holders of Subscription Receipts, and will be remitted to Mega Amalco together with the proceeds of the Private Placement as a step in the Plan of Arrangement.

## 7.3 Impracticability

104. The Arrangement is to be effected in accordance with a number of complex and interrelated steps that are to occur in the sequence set out in the Plan of Arrangement, and in a manner that is advantageous to the MEGA Brands Group.

105. A plan of arrangement under Section 192 of the CBCA is the only efficient and practicable means of completing the Recapitalization Transaction and the related transactions. In particular, MEGA Brands believes that there is no efficient and practicable means under the CBCA, other than pursuant to the arrangement provisions in Section 192, to effect this complex multi-step transaction, including the exchange of cash and securities of MEGA Amalco in full satisfaction of all amounts owed under the Credit Agreement, the Swap Agreements, the Indenture and the Convertible Debentures and in consideration of the irrevocable and final cancellation, release and discharge of any security and guarantees relating thereto.

106. The New MEGA Shares to be issued to the Lenders pursuant to the Arrangement will not be registered under the Securities Act of 1933, as amended, of the United States of America (the "1933 Act"), in reliance on Section 3(a)(10) of the 1933 Act. Section 3(a)(10) exempts from registration the offer and sale of a security which is issued in exchange for an outstanding security, claim or property interest where the terms and conditions of such issue and exchange are approved, after a hearing upon the fairness of such terms and conditions at which all persons to whom it is proposed to issue securities in such exchange have the right to appear, by a court or governmental authority expressly authorized by law to grant such approval. The Applicants wish to advise this Court that MEGA Brands will be relying on the Section 3(a)(10) exemption based on the Final Order in connection with the issuance of the New MEGA Shares to be issued to the Lenders.

## 8. INTERIM ORDER

107. The proposed Interim Order (attached as Appendix "E" to the Circular, Exhibit P-1) is consistent with previous orders that have been issued by Canadian courts in respect of other corporate plans of arrangement.

108. The Applicants respectfully request that the Meetings be held on March 16, 2010, to seek approval of the Arrangements. Pursuant to the proposed Interim Order, and subject to further Order of this Court, for the Arrangement to be implemented:

(a) the Shareholders' Arrangement Resolution will be considered passed if it receives the approval of (i) two thirds of the votes cast in respect of the Shareholders' Arrangement Resolution by holders of Common Shares and (ii) a majority of the votes cast in respect of the Shareholders' Arrangement Resolution by holders of Common Shares, other than Common Shares that are beneficially owned, or over which control or direction is exercised, by MEGA Brands, or any interested party (as defined in MI-61-101) (including, without limitation, Fairfax, Trimark, VBSr, MB and VB), a related party of an interested party, or a joint actor with any such persons in respect of the transaction, on the basis of one (1) vote per Common Share, voting together as a single class, present in person or represented by proxy and entitled to vote at the Shareholders' Meeting; and

(b) the Lenders' Arrangement Resolution will be considered passed if it receives the approval of not less than two-thirds of the votes cast in respect of the Lenders' Arrangement Resolution on the basis of one vote for each $1 of principal amount of Secured Debt, voting together as a single class, present in person or represented by proxy and entitled to vote at the Secured Lenders' Meeting.

109. The Registered Shareholders and those who are Registered Lenders as of the Record Date (as defined below), will be entitled to vote in person or by proxy on the Resolutions. The quorum for the Lenders' Meeting shall be satisfied if two or more Lenders entitled to vote are present, in person or represented by proxy, at the Meetings. The quorum for the Shareholders' Meeting shall be satisfied if the holders of 25% of Common Shares entitled to vote at the Shareholders' Meeting are present in person or represented by proxy, provided a quorum shall not be less than two persons.

110. The Applicants propose to distribute the Meeting Materials to (i) Registered Shareholders and those who are Lenders as of the Record Date, (ii) the directors of the Applicants, (iii) the auditors of MEGA Brands, and (iv) the Director, by prepaid ordinary mail, by delivery, in person or by courier, not later than 21 days prior to the date established for the Meetings in the Notices of Meetings. Distribution to such persons shall be to their addresses as they appear on the books and records of the Applicants as at the Record Date.

111. In addition to the foregoing, the Applicants seek, *inter alia*, the issuance of an order by the Court in favour of the Applicants and the impleaded Parties enjoining all persons from exercising any rights or remedies by reason of these proceedings, the Recapitalization Transaction and the transactions, steps and ancillary proceedings contemplated thereby or related thereto.

112. In addition, although it is the Applicants' position that the proposed Recapitalization Transaction, the Arrangement and the filing of these proceedings do not constitute a default under the Credit Agreement, the Swap Agreements, the Indenture and possibly other debt instruments, such a default could nevertheless be alleged to have occurred (as appears from relevant extracts of the Credit Agreement, the Swap Agreements, the Indenture and certain license agreements between Mega Brands and its co-contractors, produced herewith *en liasse* as **Exhibit P-6**). The requested stay of proceedings is required in order to prevent enforcement of the Creditors' rights, remedies or recourses under the Credit Agreement, the Swap Agreements, the Indenture or otherwise until such

time as the Creditors have had an opportunity to vote upon the Plan of Arrangement and this Court has had an opportunity to consider whether it should be approved.

113.   Notwithstanding the foregoing, the stay of proceedings requested herein shall not purport to affect the rights of the counterparties to the Swap Agreements. All such parties are committed to the Recapitalization Transaction and the Arrangement pursuant to the Lock Up Agreements.

## 9.   FINAL ORDER

114.   The implementation of the Plan of Arrangement will be subject to the satisfaction of several conditions, including the issuance by this Court of the Final Order.

115.   Following the Meetings, the Applicants intend to present an application for the Final Order on or about March 22, 2010. In advance of the hearing of the Application, a supplemental affidavit will be filed to, inter alia, advise this Honourable Court of the results of the votes at the Meetings.

## 10.   NOTICE

116.   In accordance with the Director's Policy Statement 15.1, the CBCA Director's staff was provided with notice that the Applicants would be seeking the issuance of the Interim Order, and was provided with draft copies of this Application and supporting Exhibits, on February 5, 2010.

117.   A copy of a non-appearance letter from the Director is communicated herewith as **Exhibit P-7**.

118.   Applicants have not provided a copy of the present ex-parte application to anyone other than the Director and the attorneys for the Lenders' co-Agent (Bank of Montreal) and GE Canada Finance Holding Company, for the following reasons:

   (a)   they are not required to do so pursuant to Section 192(4) CBCA, and the general practice of this Honourable Court is that such applications for an interim order proceed on an ex-parte basis;

   (b)   the proposed form of order provides that all stakeholders shall have the opportunity to make such representations as they may deem appropriate before this Honourable Court, as set forth in the Conclusions below.

119.   In light of the prejudice that the Applicants will suffer should the mailing of the Meeting Materials and holding of the Meetings be delayed, and the urgency of the above described situation, provisional execution of the orders to be rendered herein is respectfully requested from this Court.

120.   The Application is well-founded in fact and in law.

**WHEREFORE, MAY IT PLEASE THIS HONOURABLE COURT TO:**

[1] **GRANT** the Application for Interim and Final Orders with respect to an Arrangement (the "**Application**").

[2] **DISPENSE** the Applicants from serving the Application, except to the Director (the "**Director**") under the *Canada Business Corporations Act*, R.S.C., 1985, c. C-44 (the "**CBCA**").

[3] **DECLARE** that, as used in the order to be rendered herein, unless otherwise defined, terms beginning with capital letters have the respective meanings set forth in the Application.

**(A)** **ON THE APPLICATION FOR AN INTERIM ORDER (the "Interim Order")**

**MEETINGS**

[4] **ORDER** that the Applicants shall be permitted to call, hold and conduct (i) a meeting of the Shareholders (the "**Shareholders' Meeting**") at 10:00 a.m. on March 16, 2010 and (ii) a meeting of Lenders (the "**Lenders' Meeting**") at 9:30 a.m. (Montréal time) on March 16, 2010, at Hôtel Omni Mont-Royal, Salon Printemps, 1050 rue Sherbrooke Ouest, Montréal, Québec, H3A 2R6. At the Shareholders' Meeting and the Lenders' Meeting (collectively, the "**Meetings**"), the Shareholders and the Lenders (collectively, the "**Voting Parties**" and together with the holders of Convertible Debentures, the "**Affected Parties**") shall be asked, among other things, to consider and, if deemed advisable, to pass, with or without variation, the Shareholders' Arrangement Resolution and the Lenders' Arrangement Resolution respectively, copies of which are attached as Appendix A and Appendix B to the Circular (collectively, the "**Resolutions**") authorizing, approving and agreeing to the Arrangement and Plan of Arrangement.

**THE RECORD DATE**

[5] **ORDER** that the record date (the "**Record Date**") for entitlement to notice of the Meetings and for entitlement to vote at the Meetings shall be February 17, 2010.

[6] **ORDER** that the Chair of each of the Meetings shall be determined by MEGA Brands Inc. ("**MEGA Brands**"). The quorum required for the Lenders' Meeting shall be satisfied if two or more Lenders entitled to vote are present, in person or by proxy at the Lenders' Meeting. The quorum required for the Shareholders' Meeting shall be satisfied if the holders of 25% of Common Shares entitled to vote at the Shareholders' Meeting are present in person or represented by proxy, provided a quorum shall not be less than two persons.

[7] **ORDER** that the Meetings shall be called, held and conducted in accordance with the Shareholders' Notice and the Lenders' Notice (the "**Notices**") forming part of the Circular, with the CBCA, the articles and by-laws of MEGA Brands and the terms of the Interim Order and any further Order of this Court.

## PERMITTED ATTENDEES

[8]     **ORDER** that the only persons entitled to attend the Meetings shall be:

(a)     the Registered Shareholders and the Registered Lenders as of the Record Date or their respective proxy holders, financial and legal advisors.

(b)     the officers, directors, counsel, auditors and financial and other advisors of the Applicants;

(c)     in the case of the Lenders' Meeting, the Agent under the Credit Agreement (the "**Agent**");

(d)     the Director; and

(e)     other persons who may receive the permission of the Chair of the Meetings.

[9]     **ORDER** that at the Meetings, the Applicants may also transact such other business as is contemplated by the Circular or as otherwise may be properly brought before the Meetings.

## AMENDMENTS TO THE ARRANGEMENT AND PLAN OF ARRANGEMENT

[10]    **ORDER** that the Applicants are authorized to make, subject to the terms of the Arrangement Agreement and the Plan of Arrangement, such amendments, revisions and/or supplements to the Arrangement and to the Plan of Arrangement as they may determine and the Arrangement and the Plan of Arrangement, as so amended, revised and/or supplemented, shall be the Arrangement and the Plan of Arrangement to be submitted to the Voting Parties at the Meetings and shall be the subject of the Resolutions, in accordance with Conclusion 18 below.

## ADJOURNMENTS AND POSTPONEMENTS

[11]    **ORDER** that the Applicants, if they deem advisable, are specifically authorized to adjourn or postpone the Meetings on one or more occasions, without the necessity of first convening the Meetings or first obtaining any vote of Shareholders or Lenders, as applicable, respecting the adjournment or postponement and without the need for approval of the Court. Notice of any such adjournments or postponements shall be given by such method as the Applicants may determine is appropriate in the circumstances.

## NOTICE OF THE MEETINGS

[12]    **ORDER** that the Applicants shall give notice of the Meetings, substantially in the form of the Notices, subject to their ability to change the final form thereof.

## SOLICITATION OF PROXIES

[13]     **ORDER** that the Applicants are authorized to use proxies at the Meetings, either substantially in the form accompanying the draft Circular or in such other form as the Applicants may determine to be reasonable in the circumstances. The Applicants are authorized, at their expense, to solicit proxies, directly and through their officers, directors and employees, and through such agents or representatives as they may retain for that purpose, and by mail or such other forms of personal or electronic communication as they may determine.

[14]     **ORDER** that any proxy to be used at the Meetings must be received by courier, fax or mail, by MEGA Brands' transfer agent, CIBC Mellon Trust Company, prior to 5:00 p.m. (Montréal time) on March 15, 2010. Notwithstanding the foregoing, the Applicants may waive, but have no obligation to do so, the time limit for the deposit of proxies by Voting Parties if the Applicants deem it advisable to do so.

[15]     **ORDER** that Voting Parties will be entitled to revoke a proxy given at any time prior to the exercise thereof at the Meetings by:

(a)     depositing, with CIBC Mellon Trust Company, an instrument in writing executed by such Voting Party or by an attorney authorized in writing or, if the Voting Party is a corporation, by a duly authorized officer or attorney thereof, at any time up to and including the last Business Day preceding the Meetings, or with the Secretary of the applicable Meeting on the day of such Meeting, or

(b)     in any other manner permitted by law.

## DISTRIBUTION OF MEETING MATERIALS

[16]     **ORDER** that the Applicants are hereby authorized to distribute the Application, the Interim Order, the Circular, the Notices, the forms of proxy and any other communications or documents determined by the Applicants to be necessary or desirable (collectively, the **"Meeting Materials"** which term shall include any amendments, revisions or supplements to such documents made in accordance with paragraph 18 hereof), as applicable, to : (i) Registered Shareholders and Registered Lenders entitled to vote as of the Record Date, (ii) the directors of the Applicants, (iii) the auditors of MEGA Brands, (iv) the Agent and, (v), the Director, by pre-paid ordinary mail, by delivery, in person or by fax or courier, not later than twenty-one (21) days prior to the date established for the Meetings in the Notices. Distribution to such persons shall be, to their addresses as they appear on the books and records of the Applicants or as at the Record Date.

[17]     **ORDER** that, in the case of non-registered Shareholders, the Applicants are to distribute the Meeting Materials to intermediaries and registered nominees for sending to both non-objecting beneficial owners and objecting beneficial owners in accordance with National Instrument 54-101 – *Communications with Beneficial Owners of Securities of a Reporting Issuer* of the Canadian Securities

Administrators at least three Business Days prior to the twenty-first (21st) day prior to the date of the Shareholders' Meeting.

[18]  **ORDER** that the Applicants are hereby authorized to make such amendments, revisions or supplements ("**Additional Information**") to the Meeting Materials as the Applicants may determine in accordance with the Plan of Arrangement, and the Applicants shall distribute such Additional Information by such method as the Applicants may determine is appropriate in the circumstances.

[19]  **ORDER** that distribution of the Meeting Materials as well as any Additional Information, pursuant to paragraphs 16, 17 and 18 of the Interim Order, shall constitute good and sufficient service and notice thereof upon all such persons of the Meetings and the within Application. Further, no other form of service of the Meeting Materials or any Additional Information or any portion thereof need be made, or notice given or other material served in respect of these proceedings and/or the Meetings to the persons described in paragraphs 16, 17 and 18 of the Interim Order or to any other persons.

[20]  **ORDER** that a failure or omission to distribute the Meeting Materials and/or any Additional Information in accordance with paragraphs 16, 17 and 18 of the Interim Order as a result of mistake or of events beyond the control of the Applicants shall not constitute a breach of the Interim Order or a defect in the calling of the Meetings and shall not invalidate any resolution passed or proceedings taken at the Meetings, but if any such failure or omission is brought to the attention of the Applicants, then the Applicants shall use commercially reasonable efforts to rectify it by the method and in the time most reasonably practicable in the circumstances.

## VOTING

[21]  **ORDER** that the only persons entitled to vote in person or by proxy on the Resolutions or such other business as may be properly brought before the Meetings shall be the Voting Parties as at the close of business on the Record Date.

[22]  **ORDER** that the Shareholders' Arrangement Resolution shall be considered to be approved at the Shareholders' Meeting by the affirmative vote of not less than (i) two thirds of the votes cast by holders of Common Shares who are entitled to vote at the Shareholders' Meeting and (ii) a majority of the votes cast by holders of Common Shares other than Common Shares that are beneficially owned, or over which control or direction is exercised, by MEGA Brands, or any interested party (as defined in MI-61-101) (including, without limitation, Fairfax Financial Holdings Limited, Invesco Trimark Limited, Victor Bertrand Sr., Marc Bertrand and Vic Bertrand), a related party of an interested party, or a joint actor with any such persons in respect of the transaction, in respect of the Shareholders' Arrangement Resolution, voting together as a single class, present in person or represented by proxy and who are entitled to vote at the Shareholders' Meeting. Such vote shall be sufficient to authorize and direct the Applicants to do all such acts and things as may be necessary or desirable to give effect to the Arrangement

and the Plan of Arrangement on a basis consistent with what is provided for in the Circular without the necessity of any further approval by the Shareholders, subject only to final approval of the Arrangement by the Court.

[23] **ORDER** that in respect of the vote on the Shareholders' Arrangement Resolution and any other matters properly brought before the Meetings, each Shareholder is entitled to one vote per Common Share. Illegible votes, spoiled votes, defective votes and abstentions shall be deemed not to be votes cast. Proxies that are properly signed and dated but which do not contain voting instructions shall be voted in favour of the Shareholders' Arrangement Resolution.

[24] **ORDER** that, subject to further order of the Court, the Lenders' Arrangement Resolution shall be considered to be approved at the Lenders' Meeting by the affirmative vote of not less than two-thirds of the votes cast in respect of the Lenders' Arrangement Resolution by the Lenders, voting together as a single class, present in person or represented by proxy and who are entitled to vote at the Lenders' Meeting. Such votes shall be sufficient to authorize and direct the Applicants to do all such acts and things as may be necessary or desirable to give effect to the Arrangement and the Plan of Arrangement on a basis consistent with what is provided for in the Circular without the necessity of any further approval by the Lenders, subject only to final approval of the Plan of Arrangement by the Court.

[25] **ORDER** that in respect of the vote on the Lenders' Arrangement Resolution and any other matters properly brought before the Meetings, each Lender is entitled to one vote for each US $1.00 principal amount of Secured Debt as at the Record Date. Illegible votes, spoiled votes, defective votes and abstentions shall be deemed not to be votes cast. Proxies that are properly signed and dated but which do not contain voting instructions shall be voted in favour of the Lenders' Arrangement Resolution.

[26] **ORDER** that the Applicants be and are hereby permitted to pass unanimous directors' resolutions to approve the Arrangement and the Recapitalization Transaction in lieu of calling, holding and conducting a special meeting for the purposes thereof.

## DISSENT RIGHTS

[27] **ORDER** that there shall be no right of dissent in respect of the Shareholders' Arrangement Resolution in accordance with the Plan of Arrangement and the provisions of Section 192 of the CBCA.

## HEARING OF APPLICATION FOR APPROVAL OF THE ARRANGEMENT

[28] **ORDER** that, following the holding of the Meetings and the delivery of the directors' resolutions pursuant to paragraph 26 hereof, the Applicants shall be permitted to apply to this Court for final approval of the Arrangement pursuant to this Notice of Application on March 22, 2010.

[29]  **ORDER** that the only persons entitled to appear and to be heard at the hearing on the Application for a final order shall be the Applicants, the Impleaded Parties the Director, the holders of Convertible Debentures, and any person that :

(a)  files an Appearance with the Clerk of the Superior Court of Québec, 1 Notre-Dame Street East, Montréal, Québec, H2Y 1B6, Commercial Division, judicial district of Montréal and serves same on the Applicants' counsel, Osler Hoskin & Harcourt LLP (Attention: George R. Hendy and Martin Desrosiers, 1000 De la Gauchetière West, 21st floor, Montréal, Québec, H3B 4W5), no later than five (5) Business Days before the date of the Meetings; or

(b)  if such Appearance is filed with a view to contest such application or to make representations in relation thereto, files a written contestation or written representations, as the case may be, supported, as to the facts, by affidavit(s) and exhibit(s), if any, with the aforementioned Clerk of the Superior Court of Québec, 1 Notre-Dame Street East, Montréal, Québec, H2Y 1B6, Commercial Division, judicial district of Montréal and serves same on the Applicants' counsel, Osler Hoskin & Harcourt LLP (Attention: George R. Hendy and Martin Desrosiers, 1000 De la Gauchetière West, 21st floor, Montréal, Québec, H3B 4W5), no later than three (3) Business Days before the Meetings,

failing which no contestation of the application for Final Order shall be permitted.

## STAY OF PROCEEDINGS

[30]  **ORDER** that from 12:01AM (Montréal time) on the date of the Interim Order until and including March 31, 2010, or such later date as the Court may order (the "**Stay Termination Date**", the period from the date of the Interim Order to the Stay Termination Date being referred to as the "**Stay Period**"), no right, legal or conventional, may be exercised and no proceeding, at law or under a contract, by reason of or as a result of the MEGA Brands Parties having made an application to this Court pursuant to section 192 of the CBCA, the MEGA Brands Parties being a party to this proceeding or any ancillary proceedings, the Recapitalization Transaction or the Arrangement or any of the steps, transactions or proceedings contemplated thereby or relating thereto, however and wherever taken, may be commenced or proceeded with by any person against or in respect of any of the Applicants or Impleaded Parties (collectively the "**MEGA Brands Parties**"), or any of the present or future property, assets, rights and undertakings of the MEGA Brands Parties, of any nature and in any location, whether held directly or indirectly by the MEGA Brands Parties, in any capacity whatsoever, or held by others for the MEGA Brands Parties (collectively, the "**Property**").

[31]  **ORDER** that nothing in the Interim Order shall be deemed to stay or restrain any rights or proceedings relating to an eligible financial contract (as such term is defined in the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 as amended).

**PROCEDURAL**

[32]  **ORDER** that any Notice of Appearance served in response to the Notice of Application shall be served on counsel for the Applicants at the following address: Osler Hoskin & Harcourt LLP (Attention: George R. Hendy and Martin Desrosiers, 1000 De la Gauchetière West, 21st floor, Montréal, Québec, H3B 4W5.

[33]  **ORDER** that any materials to be filed by the Applicants in support of the Application for final approval of the Arrangement may be filed up to one day prior to the hearing of such Application without further order of this Court.

[34]  **ORDER** that, in the event of any inconsistency or discrepancy between the Interim Order and the terms of any instrument creating, governing or collateral to the Credit Agreement, the Swap Agreements, the Indenture, the Convertible Debentures and any guarantees or security or other agreements (other than the Lock Up Agreements) related to any of the foregoing or the articles or by-laws of any of the MEGA Brands Parties, the Interim Order shall govern.

[35]  **DECLARE** that the Interim Order shall have full force and effect in all other provinces and territories of Canada and shall be enforced in the courts of each of the other provinces and territories of Canada in the same manner in all respects as if the Interim Order had been made by the court enforcing it.

[36]  **ORDER** that this Court respectfully seeks and requests the aid and recognition of any court or any judicial, regulatory or administrative body constituted pursuant to the Parliament of Canada or the legislature of any province and any court or any judicial, regulatory or administrative body of the United States of America or elsewhere to act in aid of and to assist this Court in carrying out the terms of any order rendered by this Court in connection with these proceedings, including that Peter Ferrante is authorized, as necessary, to act as a representative of any of the MEGA Brands Parties or their affiliates in connection therewith.

[37]  **ORDER** that the Applicants shall be entitled to seek leave to vary the Interim Order upon such terms and upon the giving of such notice as this Court may direct.

[38]  **ORDER** that in the event the Application for final order does not proceed on the date set forth in the Interim Order, and is adjourned, only those persons set out in paragraph 29 shall be entitled to be given notice of the adjourned date.

[39]  **ORDER** that any interested person may apply to this Court to vary or rescind the Interim Order or seek other relief within one week of the mailing of the Meeting Materials pursuant to paragraph 16, 17 and 18 of the Interim Order and, upon giving three Business Days notice to the Applicants' counsel, as identified in paragraph 29 of the Interim Order.

[40]  **ORDER** provisional execution of the Interim Order notwithstanding appeal and without the necessity of furnishing any security.

## CONFIDENTIALITY

[41] **ORDER** that Exhibit P-1 be placed under seal in the records of the Superior Court of Québec and that it not be disclosed published or disseminated, directly or indirectly, until the Meeting Materials are distributed, as provided for above.

[42] **ORDER** the Office of the Superior Court of Québec to deny access to Exhibit P-1 to the public.

## (B) ON THE APPLICATION FOR A FINAL ORDER (the "Final Order")

[43] **ORDER AND DECLARE** that the Applicants have complied with all actions or steps required to be taken by them pursuant to the Interim Order or in connection with documents or acts contemplated by the Interim Order, including, without limitation, that the Meeting Materials were distributed in compliance with the Interim Order and that the Meetings were called, held and conducted in compliance with the Interim Order.

[44] **ORDER** that the Arrangement, as described in the Plan of Arrangement, is an arrangement within the meaning of section 192 of the CBCA and is fair and reasonable to all Affected parties.

[45] **ORDER** that the Arrangement, as described in the Plan of Arrangement, shall be and is hereby approved and the provisions of the Plan of Arrangement, including the mutual releases and discharges as contemplated in the Plan of Arrangement, shall be binding and given full force and effect in the manner and at the times specified therein.

[46] **ORDER** that the Applicants and the Impleaded Parties are authorized to take all steps and actions necessary or appropriate to implement the Arrangement and the transactions contemplated thereby in accordance with and subject to the terms of the Arrangement (including entering into any agreements or other documents which are to come into effect in connection with the Arrangement).

[47] **ORDER** that the Applicants are authorized to file Articles of Arrangement with the CBCA Director at the time contemplated in the Arrangement.

[48] **ORDER** that effective on the Effective Time, no Affected Party or person shall have the right to make, commence or enforce any rights, claims or remedies in respect of or arising from any obligations under the Convertible Debentures, the Indenture, the Credit Agreement, the Swap Agreements and any guarantees or security or other agreements related to any of the foregoing (collectively, the **"Affected Instruments"**) and any other matters affected by the Plan of Arrangement and all Affected Parties or persons shall be conclusively deemed to have transferred and exchanged any right, title or interest held in any of the Affected Instruments in the manner prescribed by the Plan of Arrangement for the consideration therein provided and any person maintaining a register or record of any kind respecting the interests, beneficial or otherwise of any person in respect of the Affected Instruments is authorized and directed to give effect to the

cancellation, release, discharge and settlement of the Affected Instruments as prescribed by the Plan of Arrangement.

[49]   **ORDER** and **DIRECT** that the Agent execute any releases and discharges as may be required to give effect to the Plan of Arrangement.

[50]   **ORDER** that effective on the Effective Date, no person shall have the right to make, commence or enforce any rights, claims or remedies in respect of any matters affected by or relating to the MEGA Brands Parties having made an application to this Court pursuant to section 192 of the CBCA, the MEGA Brands Parties being a party to this proceeding or any ancillary proceedings, the Recapitalization Transaction or the Arrangement or any of the steps, transactions or proceedings contemplated thereby or relating thereto.

[51]   **DECLARE** that the Final Order shall have full force and effect in all other provinces and territories of Canada and shall be enforced in the courts of each of the other provinces and territories of Canada in the same manner in all respects as if the Final Order had been made by the court enforcing it.

[52]   **ORDER** that this Court respectfully seeks and requests the aid and recognition of any court or any judicial, regulatory or administrative body constituted pursuant to the Parliament of Canada or the legislature of any province and any court or any judicial, regulatory or administrative body of the United States of America or elsewhere to act in aid of and to assist this Court in carrying out the terms of the Final Order, including that Peter Ferrante is authorized, as necessary, to act as a representative of any of the MEGA Brands Parties or their affiliates in connection therewith.

[53]   **ORDER** that the Applicants shall be entitled to seek leave to vary the Final Order upon such terms and upon the giving of such notice as this Court may direct, to seek the advice and direction of this Court as to the implementation of the Final Order and/or to apply for such further order or orders as may be appropriate.

[54]   **ORDER** provisional execution of the Final Order notwithstanding appeal and without the necessity of furnishing any security.

**THE WHOLE WITHOUT COSTS**, save and except in case of contestation.

MONTRÉAL, February 11, 2010.

_Osler Hoskin Harcourt LLP_
**OSLER, HOSKIN & HARCOURT LLP**
Attorneys for the Applicants and the Impleaded Parties

# AFFIDAVIT

I, the undersigned, Peter Ferrante, business person, domiciled and residing at 8481 Albanel Street, Saint-Léonard, Québec, H1P 2K9, solemnly declare the following:

1. I am the Chief Financial Officer of MEGA Brands and duly authorized representative of the Applicants and Impleaded Parties for the purpose hereof;

2. I have taken cognizance of the attached *Application for interim and Final Orders with respect to an Arrangement*;

3. All the facts alleged in the said Application are true.

AND I HAVE SIGNED:

_____
Peter Ferrante

SOLEMNLY DECLARED BEFORE ME IN MONTRÉAL
on the 11ᵗʰ day of February 2010.

_____
COMMISSIONER OF OATHS
FOR THE JUDICIAL DISTRICT OF MONTREAL

THERESE
CHAWKY
59,822

# NOTICE OF PRESENTATION

**TO:** The Director under the *Canada
Business Corporations Act,*
Complexe Jean-Edmonds South
9th Floor
365 Laurier Avenue West
Ottawa, Ontario K1A 0C8

**TAKE NOTICE** that the attached *Application for Interim Order with respect to an Arrangement*
will be presented for hearing and allowance in room 16.12 at 9:15 a.m., at the Montréal
Courthouse, 1 Notre-Dame Street East, Montréal, on February 12, 2010, or so soon thereafter as
Counsel may be heard.

**DO GOVERN YOURSELF ACCORDINGLY.**

MONTRÉAL, February 11, 2010.

*[signature]*

**OSLER, HOSKIN & HARCOURT LLP**
Attorneys for the Applicants and the Impleaded Parties

## SCHEDULE "A"

1. MB2 LP

2. MB US Inc.

3. Mega Brands America, Inc.

4. MB Finance LLC

5. Rose Moon, Inc.

6. Warren Industries, Inc.

7. Mega Brands International

8. Mega Bloks Latinoamerica SA de CV.

CANADA
PROVINCE OF QUÉBEC
DISTRICT OF MONTRÉAL

No.: 500-11-

SUPERIOR COURT
(Commercial Division)
*Canada Business Corporations Act*, R.S.C. 1985,
c. C-44

In the matter of a proposed arrangement by :

MEGA BRANDS INC. *et al.*

- and -

The Impleaded Parties

- and -

THE DIRECTOR UNDER THE CBCA

## NOTICE OF DENUNCIATION OF EXHIBITS

**TAKE NOTICE** that in support of its Motion, Applicants intend to introduce in evidence the following Exhibits:

P-1       Copy of Mega Brands Circular;

P-2       Copy of forms of proxy included in the Circular;

P-3       MEGA Brands Group Corporate Organization Chart;

P-4       Copy of the Credit Agreement dated July 26, 2005;

P-5       A list of the Steering Committee Members;

P-6       Copy of extracts of the Credit Agreement, the Swap Agreements, the Indenture and certain license agreements between Mega Brands and its co-contractors, *en liasse*;

P-7       Letter from the CBCA Director.

MONTRÉAL, February 11, 2010.

_____
**OSLER, HOSKIN & HARCOURT LLP**
Attorneys for the Applicants and the Impleaded Parties

## EXHIBIT P-1

**Mega Brands Circular**

**THESE DOCUMENTS HAVE BEEN OMITTED IN ACCORDANCE
WITH THE CONFIDENTIALITY ORDER RENDERED BY JUSTICE CASTONGUAY
IN PARAGRAPHS 41 AND 42 OF THE INTERIM ORDER IN THE
CANADIAN PROCEEDING**

## EXHIBIT P-2

### Meeting Materials

Q-2

# FORM OF PROXY

## MEGA BRANDS INC.

**THIS PROXY IS SOLICITED BY THE MANAGEMENT OF MEGA BRANDS INC. IN CONNECTION WITH THE SPECIAL MEETING OF SHAREHOLDERS TO BE HELD ON ●, 2010.**

As a holder of COMMON SHARES of MEGA Brands Inc. (the "Corporation"), I, the undersigned, hereby appoint Marc Bertrand (President and Chief Executive Officer and Director of the Corporation) or Vic Bertrand (Chief Innovation Officer and Director of the Corporation) or _____, as my proxyholder, with full power of substitution, to attend and act for and on my behalf in respect of all matters that may come before the Special Meeting of Shareholders of the Corporation to be held on ●, 2010 at ● a.m. (local time) at ●, Montreal, Québec, and at any and all adjournments thereof to the same extent and with the same power as if the undersigned were personally present thereat and with authority to act in the said proxyholder's discretion with respect to amendments or variations to matters referred to in the notice of meeting and with respect to other matters which may properly come before the meeting, and do hereby revoke any proxy previously given.

Before completing this proxy, please read carefully the instructions accompanying this proxy for information respecting the proper completion and return of this proxy. Terms used and not otherwise defined herein shall have the meanings ascribed thereto in the management proxy circular (the "Circular") of the Corporation dated February ●, 2010.

The said proxyholder is specifically directed to vote or withhold from voting the COMMON SHARES registered in the name of the undersigned as indicated below:

1. **Plan of Arrangement**

   (mark only one)

   FOR ____ or AGAINST ____ the Shareholders' Arrangement Resolution authorizing, approving and agreeing to an arrangement pursuant to Section 192 of the *Canada Business Corporations Act*, the full text of which "resolution is set forth in Appendix "B" accompanying the Circular, as more particularly described in the Circular.

The undersigned hereby ratifies and confirms all the said proxyholder may do by virtue of this appointment, provided that, if a choice is specified herein with respect to any of the items set forth in the Circular for such meeting (receipt of which is hereby acknowledged), the said proxyholder shall vote as specified.

Date _____, 2010      _____
                                          (Signature of holder of COMMON SHARES)

Notes:
1. A shareholder has the right to appoint as a proxyholder a person, who need not be a shareholder, other than those mentioned above to attend and act on his or her behalf at the meeting. This can be done by striking out the two printed names and inserting the name of such other person in the blank space provided.
2. If no choice is specified for an item, it is intended to vote your shares FOR that item.
3. This proxy appointment is valid only if signed by the shareholder or by his or her attorney authorized in writing. The signature must correspond in all respects with the shareholder's name written upon the face of the certificate representing the COMMON SHARES.
4. Please sign and date this form of proxy, and return it as soon as possible in the envelope provided. If this form of proxy is not dated in the space provided, it will be deemed to bear the date on which it was mailed by the Corporation. Forms of proxy must be received by the Corporation's transfer agent, CIBC Mellon Trust Company (Attention: Proxy Unit) at 200 Queen's Quay East, Unit 6, Toronto, Ontario M5A 4K9 or 2001 University Street, Suite 1600, Montreal, Québec H3A 2A6, or sent by facsimile to (416) 368-2502, prior to ● p.m. (local time) on ●, 2010.
5. If the shareholder is a corporation, this form of proxy must be signed by an officer or a duly authorized representative of such corporation.
6. Please consult the Circular for further information.

**Please return promptly**

FORM OF PROXY

## MEGA BRANDS INC.

THIS PROXY IS SOLICITED BY THE MANAGEMENT OF MEGA BRANDS INC. IN CONNECTION WITH THE SPECIAL MEETING OF LENDERS OF SECURED DEBT TO BE HELD ON ●, 2010.

As a holder of SECURED DEBT of MEGA Brands Inc. (the "Corporation"), I, the undersigned, hereby appoint Marc Bertrand (President and Chief Executive Officer and Director of the Corporation) or Vic Bertrand (Chief Innovation Officer and Director of the Corporation) or _____, as my proxyholder, with full power of substitution, to attend and act for and on my behalf in respect of all matters that may come before the Special Meeting of Lenders of Secured Debt of the Corporation to be held on ●, 2010 at ● a.m. (local time) at ●, Montreal, Quebec, and at any and all adjournments thereof to the same extent and with the same power as if the undersigned were personally present thereat and with authority to act in the said proxyholder's discretion with respect to amendments or variations to matters referred to in the notice of meeting and with respect to other matters which may properly come before the meeting, and do hereby revoke any proxy previously given.

Before completing this proxy, please read carefully the instructions accompanying this form of proxy for information respecting the proper completion and return of this form of proxy. Terms used and not otherwise defined herein shall have the meanings ascribed thereto in the management proxy circular (the "Circular") of the Corporation dated February ●, 2010.

The said proxyholder is specifically directed to vote or withhold from voting the principal amount of SECURED DEBT registered in the name of the undersigned as indicated below:

1.   **Plan of Arrangement**

(mark only one)

FOR ____ or AGAINST ____ the Lenders' Arrangement Resolution, the full text of which is set out in Appendix "A" to the Circular, authorizing, approving and agreeing to an arrangement pursuant to Section 192 of the *Canada Business Corporations Act*, which arrangement is more particularly described in the Circular.

The undersigned hereby ratifies and confirms all the said proxyholder may do by virtue of this appointment, provided that, if a choice is specified herein with respect to any of the items set forth in the Circular for such meeting (receipt of which is hereby acknowledged), the said proxyholder shall vote as specified.

Date: _____ , 2010
Principal amount of SECURED DEBT held by the undersigned as at the Record Date: _____

_____
(Signature of holder of SECURED DEBT)

Notes:
7.   A holder of SECURED DEBT has the right to appoint as a proxyholder a person, who need not be a holder of SECURED DEBT, other than those mentioned above to attend and act on his or her behalf at the meeting. This can be done by striking out the two printed names and inserting the name of such other person in the blank space provided.
8.   If no choice is specified for an item, it is intended to vote your shares FOR that item.
9.   This proxy appointment is valid only if signed by the holder of SECURED DEBT or by his or her attorney authorized in writing.
10.  Please sign and date this form of proxy, and return it as soon as possible in the envelope provided. If this form of proxy is not dated in the space provided, it will be deemed to bear the date on which it was mailed by the Corporation. Forms of proxy must be received by the Corporation's transfer agent, CIBC Mellon Trust Company (Attention: Proxy Unit) at 200 Queen's Quay East, Unit 6, Toronto, Ontario M5A 4K9 or 2001 University Street, Suite 1600, Montreal, Quebec H3A 2A6, or sent by facsimile to (416) 368-2502, prior to ● p.m. (local time) on ●, 2010.
11.  If the holder of SECURED DEBT is a corporation, this form of proxy must be signed by an officer or a duly authorized representative of such corporation.
12.  Please consult the Circular for further information.

**Please return promptly**

## EXHIBIT P-3

**Corporate Organizational Chart**

P3

MBI Group Condensed Organizational Structure[1]
As of February 10, 2010



---

[1] This MBI Group Condensed Organizational Structure chart only shows those entities that are Applicants or are Impleaded Parties in the Application for Interim and Final Orders.

MONTREAL/2591970.1

# EXHIBIT P-4

**Credit Agreement**

Execution Copy

# CREDIT AGREEMENT

dated as of July 26, 2005

Among

**MEGA BLOKS INC.**
**3102448 NOVA SCOTIA COMPANY**
**ROSE ART INDUSTRIES, INC.**
(as Borrowers)

- and -

**THE BANK OF NOVA SCOTIA**
(as Administrative Agent)

**BANK OF MONTREAL**
(as Co-Administrative Agent)

- and -

**THE LENDERS**
**FROM TIME TO TIME PARTIES HERETO**
(as Lenders)

---

## US$400,000,000 FACILITIES

---

**THE BANK OF NOVA SCOTIA**
**BANK OF MONTREAL**
(as Co-Lead Arrangers and Co-Syndication Agents)

- and -

**THE BANK OF NOVA SCOTIA**
(as Sole Bookrunner)

**McCARTHY TÉTRAULT LLP**

## TABLE OF CONTENTS

Page

1 - INTERPRETATION ........................................................................................................1
    1.1    Definitions.................................................................................................1
    1.2    Material Subsidiaries ...............................................................................12
    1.3    Currency Conversions.............................................................................12
    1.4    Accounting Terms and Calculations.......................................................12
    1.5    Time........................................................................................................13
    1.6    Schedules ................................................................................................13
    1.7    Headings and Table of Contents..............................................................13
    1.8    Governing Law .......................................................................................13
    1.9    Previous Agreements...............................................................................13
    1.10   Inconsistency...........................................................................................13

2 - THE FACILITIES........................................................................................................13
    2.1    The Facilities...........................................................................................13
    2.2    The Term B Extension ............................................................................14
    2.3    Increase of the Term Facilities................................................................14
    2.4    Purpose of Credit Facilities.....................................................................15
    2.5    Availability and Loan Options.................................................................15
    2.6    Loans Proportionate to Commitments .....................................................16
    2.7    Notice of Loans.......................................................................................16
    2.8    Swingline Utilizations.............................................................................17
    2.9    Funding ...................................................................................................17
    2.10   Conversions and Renewals......................................................................18
    2.11   Limitations on Lender's Obligation to Fund ...........................................18

3 - ACCEPTANCES ..........................................................................................................18
    3.1    Period and Amounts................................................................................18
    3.2    Disbursement ..........................................................................................19
    3.3    Power of Attorney...................................................................................19
    3.4    Depository Bills ......................................................................................19
    3.5    Availability .............................................................................................19

4 - LIBOR LOANS...........................................................................................................19
    4.1    Amounts and Periods..............................................................................19
    4.2    Conversion or Repayment Prior to Maturity ..........................................20

5 - LETTERS OF CREDIT.................................................................................................20
    5.1    Availability .............................................................................................20
    5.2    Maturity of Letters of Credit...................................................................20
    5.3    Loans.......................................................................................................20
    5.4    Payments under Letters of Credit ...........................................................21

5.5     Currency Conversion ....................................................................................21
5.6     Indemnity .....................................................................................................21
5.7     I.C.C. Rules..................................................................................................21

**6 - FEES AND INTEREST**...................................................................................................**21**

6.1     Agency Fee ...................................................................................................21
6.2     Underwriting Fee ..........................................................................................22
6.3     Letter of Credit Fees .....................................................................................22
6.4     Administrative Charges with respect to Letters of Credit ............................22
6.5     Standby Fee...................................................................................................22
6.6     Acceptance Fees............................................................................................22
6.7     Interest on Prime Rate Loans........................................................................23
6.8     Interest on US Base Rate Loans....................................................................23
6.9     Interest on Libor Loans.................................................................................23
6.10    Calculation of Interest Rates.........................................................................23
6.11    Interest on Arrears........................................................................................24

**7 - REPAYMENT, PREPAYMENT AND CANCELLATION**.................................................**24**

7.1     Repayment of the Revolving Facilities..........................................................24
7.2     Repayment of the Term A and B Facilities ...................................................24
7.3     Prepayments from Asset Dispositions ...........................................................24
7.4     Optional Prepayments...................................................................................26
7.5     Exchange Rate Fluctuations..........................................................................26
7.6     Reduction of the Revolving Facilities...........................................................26

**8 - PLACE AND CURRENCY OF PAYMENT**................................................................**27**

8.1     Payments to the Agent ..................................................................................27
8.2     Time of Payments .........................................................................................27
8.3     Currency........................................................................................................27

**9 - CONDITIONS PRECEDENT TO LOANS**.................................................................**27**

9.1     Conditions Precedent to the Initial Loan ......................................................27
9.2     Conditions Precedent to All Loans ...............................................................29
9.3     Waiver of Conditions Precedent ...................................................................29
9.4     Special Waiver in respect of the Security......................................................30
9.5     Early Termination of the Commitments ........................................................30

**10 - SECURITY**.................................................................................................................**30**

10.1    Guarantees.....................................................................................................30
10.2    Security over Assets......................................................................................30
10.3    Non-Disturbance Agreements........................................................................30
10.4    Insurance.......................................................................................................31
10.5    Security for Hedging Agreements .................................................................31
10.6    Validity of the Security and Contents of Security Documents.......................31
10.7    Holding of Security by the Agent .................................................................32
10.8    Exception for Certain Assets ........................................................................32
10.9    Future Material Subsidiaries.........................................................................32

**11 - REPRESENTATIONS AND WARRANTIES**................................................................32

    11.1    Corporate Existence and Capacity ....................................................32
    11.2    Authorization and Validity ..............................................................33
    11.3    No Breach .......................................................................................33
    11.4    Approvals........................................................................................33
    11.5    Compliance with Laws and Permits ................................................33
    11.6    Environmental Warranties ..............................................................33
    11.7    Title to Assets ................................................................................34
    11.8    Litigation........................................................................................35
    11.9    Labour Matters...............................................................................35
    11.10   No Default.......................................................................................36
    11.11   Solvency.........................................................................................36
    11.12   Taxes..............................................................................................36
    11.13   ERISA and Pension Plans...............................................................36
    11.14   Margin Stock Restrictions...............................................................37
    11.15   Investment Company Act ................................................................37
    11.16   Public Utility Holding Company Act ...............................................37
    11.17   Restriction on Payments .................................................................37
    11.18   Corporate Structure Chart and Perfection Certificate.......................37
    11.19   Financial Statements and Fiscal Year...............................................37
    11.20   No Material Change.........................................................................38
    11.21   True and Complete Disclosure.........................................................38

**12 - AFFIRMATIVE COVENANTS**...........................................................................38

    12.1    General Covenants..........................................................................38
    12.2    Use of Proceeds..............................................................................39
    12.3    Hedging..........................................................................................39
    12.4    Patriot Act......................................................................................39
    12.5    Credit Ratings ................................................................................39
    12.6    Further Assurances..........................................................................40
    12.7    Representations and Warranties.......................................................40

**13 - NEGATIVE COVENANTS**.................................................................................40

    13.1    Negative Pledge .............................................................................40
    13.2    Funded Debt...................................................................................40
    13.3    Limitations on Fundamental Changes ..............................................40
    13.4    Investments and Acquisitions .........................................................42
    13.5    Capital Expenditures ......................................................................42
    13.6    Distributions...................................................................................42
    13.7    Transactions with Related Parties ...................................................43
    13.8    Financial Assistance.......................................................................43
    13.9    Derivative Instruments....................................................................43
    13.10   Earn-Out Payment..........................................................................43

**14 - FINANCIAL RATIOS**.......................................................................................43

    14.1    Funded Debt to EBITDA Ratio .......................................................43
    14.2    First Lien Leverage Ratio ...............................................................44

| | 14.3 | Fixed Charge Coverage Ratio | 44 |

**15 - REPORTING REQUIREMENTS** .......................................................................44

| | 15.1 | Annual Reporting | 44 |
| | 15.2 | Quarterly Reports | 45 |
| | 15.3 | Business Acquisition Report | 45 |
| | 15.4 | ERISA | 45 |
| | 15.5 | Reporting from Time to Time | 46 |
| | 15.6 | Hedging Agreements | 46 |
| | 15.7 | Documentation | 46 |

**16 - EVENTS OF DEFAULT AND REMEDIES** ...........................................................47

| | 16.1 | Events of Default | 47 |
| | 16.2 | Remedies | 48 |

**17 - DECISIONS, WAIVERS AND AMENDMENTS** .....................................................48

| | 17.1 | Amendments and Waivers by the Majority Lenders | 48 |
| | 17.2 | Amendments and Waivers by Unanimous Approval or Special Majority | 49 |
| | 17.3 | Amendments relating to the Agent or the Issuing Bank | 49 |
| | 17.4 | Waiver by the Agent Acting Alone | 49 |

**18 - MISCELLANEOUS** .......................................................................................50

| | 18.1 | Books and Accounts | 50 |
| | 18.2 | Determination | 50 |
| | 18.3 | Prohibition on Assignment by Borrowers | 50 |
| | 18.4 | Breakage Costs | 50 |
| | 18.5 | Notes | 50 |
| | 18.6 | No Waiver | 50 |
| | 18.7 | Irrevocability of Notices of Loans | 50 |
| | 18.8 | Set-off and Credit Balances | 51 |
| | 18.9 | Corrections of Errors | 51 |
| | 18.10 | Communications | 51 |
| | 18.11 | Patriot Act | 51 |
| | 18.12 | - Notices | 51 |

**COMMITMENTS** .................................................................................................54

**LENDERS** ........................................................................................................54

**SCHEDULE " A "** ..............................................................................................55

GENERAL PROVISIONS ........................................................................55

**COMPANY LEVEL   DEAL SPECIFIC FACILITY SPECIFIC** ....................................80

**SCHEDULE "B "** ..............................................................................................82

APPLICABLE MARGINS OR RATES ........................................................82

**SCHEDULE " C "** ..............................................................................................84

CORPORATE STRUCTURE ....................................................................84

**SCHEDULE " D "** ..............................................................................................85

DISCLOSURE STATEMENT ................................................................85

**SCHEDULE " E "** .............................................................................86

    OTHER PERMITTED LIENS ..........................................................86

**SCHEDULE " F "** ..............................................................................93

    LIST OF MATERIAL SUBSIDIARIES ............................................93

**SCHEDULE " G "** .............................................................................94

    NOTICE OF LOAN ...........................................................................94

**SCHEDULE " H "** .............................................................................95

    TERM FACILITIES REPAYMENT SCHEDULES ............................95

**SCHEDULE " I "** ...............................................................................97

    COMPLIANCE CERTIFICATE .........................................................97

**SCHEDULE " J "** ..............................................................................99

    ADDRESSES FOR NOTICE PURPOSES ..........................................99

## CREDIT AGREEMENT

THIS AGREEMENT is made as of July 26, 2005 among MEGA BLOKS INC., a corporation incorporated under the laws of Canada ("**Mega Bloks**"), ROSE ART INDUSTRIES, INC., a corporation incorporated under the laws of the State of New Jersey ("**Mega Bloks US**") and 3102448 NOVA SCOTIA COMPANY an unlimited liability company formed under the laws of the Province of Nova Scotia ("**Mega Bloks Finco**") (each a "**Borrower**" and, collectively the "**Borrowers**"), THE BANK OF NOVA SCOTIA, a Canadian bank, as administrative agent and collateral agent (in such capacity, the "**Agent**"), and each of the financial institutions having executed this Agreement as a Lender.

### RECITALS

A.  Mega Bloks has requested that the Lenders make available to it a 5-year revolving facility in the principal amount of US$60,000,000 for general corporate purposes including to finance the Acquisition and to refinance existing indebtedness.

B.  Mega Bloks US has requested that the Lenders make available to it a 5-year revolving facility in a principal amount of US$40,000,000 for general corporate purposes including to finance the Acquisition and to refinance existing indebtedness.

C.  Mega Bloks has requested that the Lenders make available to it a 5-year term A facility in the principal amount of US$40,000,000 for the purposes of financing the Acquisition;

D.  Mega Bloks Finco has requested that the Lenders make available to it a 5-year term B facility in the principal amount of US$260,000,000 for the purposes of financing the Acquisition (which will become a 7-year facility upon the occurrence of the Term B Extension).

E.  Upon completion of the Acquisition, Mega Bloks US and Mega Bloks Finco will be indirect Subsidiaries of Mega Bloks.

F.  The Lenders are willing to make the Facilities available to the Borrowers and the Agent has agreed to act in such capacity on the terms and subject to the conditions set out in this Agreement.

THEREFORE, the parties agree as follows:

## 1 - INTERPRETATION

### 1.1  Definitions

In this Agreement, unless the context otherwise requires, the following terms have the respective meanings set out below and the terms defined in the definitional section of Schedule "A" have the respective meanings set out therein.

"**Acceptance**" means:

(a) in respect of a Lender who is a bank that customarily accepts bankers' acceptances, at such Lender's discretion, either a depository bill subject to the *Depository Bills and Notes Act* (Canada) or a bill of exchange subject to the *Bills of Exchange Act* (Canada), in each case, drawn by Mega Bloks on and accepted by such Lender; and

(b) in respect of any other Lender, a promissory note bearing no interest, made by Mega Bloks to the order of such Lender;

"**Acquisition**" means the acquisition by Mega Bloks or a Material Subsidiary of all of the outstanding capital stock of Rose Art Industries, Inc. and Warren Industries, Inc. pursuant to the Purchase Agreement;

"**Affiliate**" means, with respect to a Person, any other Person that directly or indirectly Controls, or is Controlled by, or is under common Control with, that Person;

"**Agent**" means The Bank of Nova Scotia or any successor agent appointed pursuant to Schedule "A";

"**Agent's Office**" means the administrative office of the Agent designated by the Agent from time to time as its administrative office for the purposes hereof, after notice to the Lenders;

"**Applicable Law**" has the meaning set out in Schedule A;

"**Applicable Margin (or Rate)**" means a margin (or rate) determined in accordance with Schedule "B";

"**Branch of Account**" means, with respect to each Facility, a branch of the Agent where the Agent has established an account for such Facility as may be designated by the Agent from time to time as the applicable branch of account, after consultation with the applicable Borrower;

"**Business Day**" means a day on which banks are open for business in Montreal and in Toronto, excluding Saturday and Sunday; where such term is used in the context of a US Base Rate Loan, such day must also be a day on which banks are open for business in New York City and where such term is used in the context of a Libor Loan, such day must also be a day on which banks are open for business in New York City and London, England;

"**Canadian Dollar**" or the symbol "**C$**" means lawful money of Canada;

"**Canadian Revolving Facility**" means the US$60,000,000 facility referred to in Section 2.1;

"**CDOR Rate**" means, for any day, the arithmetic average of the bankers' acceptances rates of the Schedule I Canadian banks for the applicable period which appear on the Reuter's Screen CDOR Page at 10:00 a.m., or if such day is not a Business Day, then on the immediately preceding Business Day; provided however, that if such rates are not available, then the CDOR Rate for any day shall be the bankers' acceptance rate of the Agent for the applicable period as of

10:00 a.m. on such day, or if said day is not a Business Day, then on the immediately preceding Business Day;

"**Commitment**" means, with respect to each Lender, its proportion (expressed as a percentage or as an amount, as the case may be) of the aggregate amount of the Facilities or, as the case may be, of the relevant Facility, as specified opposite its name on the signature pages of this Agreement, subject however to any readjustment resulting from a reduction in the amount of any Facility or from an assignment of Commitment made pursuant to this Agreement;

"**Control**" (including any correlative term) means the possession, directly or indirectly, of the power to direct or cause the direction of management or policies of a Person (whether through ownership of securities or partnership or trust interests, by contract or otherwise); without limiting the generality of the foregoing (i) a Person is deemed to Control a corporation if such Person (or such Person and its Affiliates) holds outstanding shares of the corporation carrying votes in sufficient number to elect a majority of the board of directors of the corporation, (ii) a Person is deemed to Control a partnership if such Person (or such Person and its Affiliates) holds more than 50% in value of the equity of the partnership, (iii) a Person is deemed to Control a trust if such Person (or such Person and its Affiliates) holds more than 50% in value of the beneficial interests in the trust, and (iv) a Person that controls another Person is deemed to Control any Person controlled by that other Person;

"**Controlled Group**" means all members of a controlled group of corporations and all members of a controlled group of trades or businesses (whether or not incorporated) under common control which, together with any Borrower, are treated as a single employer under Section 414(b) or 414(c) of the US Revenue Code or Section 4001 of ERISA.

"**Corporate Structure Chart**" means the corporate structure of the Mega Bloks Entities after giving effect to the Acquisition, as described in Schedule "C";

"**Credit Parties**" means each of the Borrowers and the Material Subsidiaries;

"**Default**" means any event or circumstance which constitutes an Event of Default or which, with the lapse of time, the giving of a notice or both, would constitute an Event of Default;

"**Disclosure Statement**" means the disclosures made in Schedule "D";

"**Discounted Proceeds**" means, with respect to any issue of Acceptances, an amount (rounded to the nearest whole cent and with one-half of one cent being rounded up) calculated by multiplying:

(a)     the aggregate face amount of such Acceptances; by

(b)     the price, where the price is determined by dividing one by the sum of one plus the product of:

(i)     the Discount Rate applicable to such Acceptances (expressed as a decimal); and

(ii)    a fraction, the numerator of which is the number of days in the period of such Acceptances and the denominator of which is 365;

with the price as so determined being rounded up or down to the fifth decimal place and .000005 being rounded up;

"**Discount Rate**" means,

(a)    in respect of any Acceptance accepted by a Lender that is a Canadian Schedule I bank, the CDOR Rate for the applicable period; and

(b)    in respect of any Acceptance to which clause (a) does not apply, the lesser of (i) the discount rate of the accepting Lender in effect at or about 10:00 a.m. on the relevant date for bankers' acceptances (or equivalent instruments, if such Lender does not customarily accept bankers' acceptances) of such Lender for a period comparable to the period of such Acceptance and (ii) the CDOR Rate plus 0.10%;

"**Distribution**" means any payment in cash or in kind that provides an income (including interest or dividend) or a return on, or constitutes a distribution or redemption or other retirement of, the equity or capital of a Person (other than a dividend paid by way of the issuance of new equity interests and the Earn-Out Payment);

"**Earn-Out Payment**" means the earn-out payment payable in respect of fiscal year 2005 pursuant to Section 2.6 of the Purchase Agreement;

"**EBITDA**" means, with respect to a Person, the net income of such Person for the rolling four-quarter period ending on the date that EBITDA is determined, plus the following items, to the extent such items have been deducted in calculating net income:

(a)    Interest Expense;

(b)    amortization and depreciation; and

(c)    income taxes;

provided that net income is calculated without taking into account gains or losses from extraordinary, unusual or non-recurring items (and such other items as may be acceptable to the Majority Lenders) and non-cash items (including unrealized foreign exchange gains and losses); and

provided further that:

(d)    for any calculation period ending prior to July 1, 2006, the contribution of the businesses acquired through the Acquisition to Mega Bloks' EBITDA will be determined as follows:

(i)    for the quarter ending on September 30, 2004, such contribution will be deemed to be US$13,580,419;

(ii)    for the quarter ending on December 31, 2004, such contribution will be deemed to be US$18,226,813;

(iii)    for the quarter ending on March 31, 2005, such contribution will be deemed to be US$10,415,814; and

(iv)    for the quarter ending on June 30, 2005, such contribution will be deemed to be the US$13,600,000;

(e)    for the calculation period that includes the quarter ending on September 30, 2005, Mega Bloks' EBITDA will be calculated integrating the results of the businesses acquired through the Acquisition as if same had occurred on July 1, 2005 and, for such quarter, the net income of such businesses will be calculated by adding to their actual net income an amount equal to US$1,855,000 multiplied by a fraction, the numerator of which is the number of days elapsed from July 1, 2005 until the date of the Acquisition and the denominator of which is 365;

"**Environmental Laws**" shall mean all Applicable Laws and any legally binding policies, in each case as now or hereafter in effect, relating to the regulation or protection of human health, safety or the environment or to emissions, discharges, releases or threatened releases of pollutants, contaminants, chemicals or toxic or hazardous substances or wastes into the indoor or outdoor environment, including, without limitation, ambient air, soil, surface water, ground water, wetlands, land or subsurface strata, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of pollutants, contaminants, chemicals or toxic or hazardous substances or wastes;

"**Environmental Liability**" means any liability of any Mega Bloks Entity in connection with or arising from (i) any inaccuracy or breach of any warranty contained or referred to in Section 11.6, or (ii) any breach by any Mega Bloks Entity of any Environmental Laws;

"**ERISA**" means the Employee Retirement Income Security Act of 1974 of the United States, as amended, and any successor statute thereto of similar import, together with the regulations thereunder, in each case as in effect from time to time (any references to Sections of ERISA also referring to any successor Sections thereto).

"**Facilities**" means the Canadian Revolving Facility, the US Revolving Facility, the Term A Facility and the Term B Facility;

"**First Lien Leverage Ratio**" means the ratio of (i) Funded Debt under or arising from the Facilities and Funded Debt secured by any Lien ranking prior to or *pari passu* with the Security, to (ii) EBITDA;

"**Fixed Charge Coverage Ratio**" means the ratio of

(a)    EBITDA less unfunded cash capital expenditures for the period for which EBITDA has been calculated, to

(b)    the sum of (i) Interest Expense, cash taxes actually paid and cash Distributions (excluding cash Distributions made by Mega Bloks US and Warren Industries Inc. prior to the Acquisition), in each case, for the period for which EBITDA has been calculated and (ii) the current portion of long-term Funded Debt;

provided that:

(c)    for any calculation period ending prior to July 1, 2006, the amounts in clause (b)(i) will be calculated by annualizing Interest Expense and accruing taxes from the date of the Acquisition;

"**Funded Debt**" means, with respect to a Person, and without duplication;

(a)    indebtedness of such Person for monies borrowed or raised, including any indebtedness represented by a note, bond, debenture or other similar instrument of such Person;

(b)    reimbursement obligations of such Person arising from bankers' acceptances, letters of credit or letters of guarantee or similar instruments;

(c)    indebtedness of such Person for the deferred purchase price of property or services, other than for consumable non-capital goods and services purchased in the ordinary course of business, including arising under any conditional sale or title retention agreement;

(d)    obligations of such Person under capital or synthetic leases and sale and leaseback transactions;

(e)    the aggregate amount at which shares in the capital of such Person that are redeemable at fixed dates or intervals or at the option of the holder thereof may be redeemed; and

(f)    Guarantees or Liens granted by such Person in respect of Funded Debt of another Person;

"**Funded Debt to EBITDA Ratio**" means the ratio of Funded Debt to EBITDA;

"**GAAP**" means generally accepted accounting principles in Canada which (i) with respect to the financial ratios referred to in Article 14, are in effect on the date hereof, and (ii) for all other purposes, are in effect from time to time;

"**Guarantee**" means any obligation, contingent or not, directly or indirectly guaranteeing any liability or indebtedness of any Person or protecting a creditor of such Person from a loss in respect of any such liability or indebtedness or having the same economic effect;

"**Hazardous Material**" means

(a)    any "hazardous substance" or "hazardous waste" as defined in any applicable Environmental Law; or

(b)    any other substance, product, waste, residue, pollutant, material, chemical, contaminant, dangerous good, constituent or other material that is or becomes listed, regulated, defined or addressed under or subject to any Environmental Law, including, without limitation, asbestos, petroleum, tailings, mining residue, polychlorinated biphenyls and radioactive materials;

"**Hedging Agreement**" means any foreign exchange contract, interest rate hedging contract and any other financial contract or arrangement capable of protecting Mega Bloks or any of its Subsidiaries against fluctuations in currencies or interest rates;

"**Interest Expense**" means, for any period, the aggregate amount of interest and other financing charges during such period;

"**Issuing Bank**" means, in respect of each of the Canadian Revolving Facility and the US Revolving Facility, the Lender who is the Agent or such other lender selected by the Agent and the Borrower concerned who is willing and has the capability to issue Letters of Credit;

"**Lender**" means each of the Persons having executed this Agreement as Lender and any other Person that becomes a Lender pursuant to an assignment made in accordance with this Agreement;

"**Letter of Credit**" means a documentary or standby letter of credit or a letter of guarantee issued pursuant to this Agreement;

"**Libor**" with respect to any Libor Loan, the annual rate of interest determined by the Agent as being the average (rounded upwards to the nearest multiple of 1/16%) of the rates for deposits in US Dollars which appear on the applicable Telerate page of the Telerate Service as of 11:00 a.m. (London, England time) on the second Business Day prior to the commencement of the applicable Libor Loan and for a comparable period, or if such rates are not available, the average (rounded up to the nearest 1/16%) of the rates per annum which leading banks in the London interbank market offer to the Agent for placing deposits in U.S. Dollars at approximately 11:00 a.m. (London time) on the second Business Day prior to the commencement of the applicable Libor Loan and for a comparable period;

"**Libor Loan**" means a loan denominated in US Dollars made pursuant to this Agreement and bearing interest at Libor, plus the Applicable Margin;

"**Lien**" means any hypothec, security interest, mortgage, lien, right of preference, pledge, assignment by way of security or any other agreement or encumbrance of any nature that secures the performance of an obligation, and a Person is deemed to own subject to a Lien any property or assets that it has acquired or holds subject to the interest of a vendor or lessor under any conditional sale agreement, capital or synthetic lease or similar agreement (other than an operating lease) relating to such property or assets;

"**Loan Documents**" means this Agreement, the Security Documents, any note issued pursuant to Section 18.5 and any other present and future document relating to any of the foregoing, in each case, as amended, supplemented or restated;

"**Loans**" means the Prime Rate Loans, the US Base Rate Loans, the Acceptances, the Libor Loans and the Letters of Credit;

"**Majority Lenders**" means any group of Lenders whose Commitments amount in the aggregate to at least 51% of the aggregate amount of the Facilities, provided that with respect to a matter which adversely affects the Lenders under a Facility differently from the Lenders under any other Facility, the Majority Lenders must also include Lenders whose Commitments amount in the aggregate to at least 51% of such Facility;

"**Material Adverse Change**" means any change, condition, event or occurrence which, when considered individually or together with other changes, conditions, events or occurrences, could reasonably be expected to have a Material Adverse Effect;

"**Material Adverse Effect**" means (i) a material adverse effect on the financial condition, business, operations, assets or liabilities of Mega Bloks and its Subsidiaries taken as a whole, (ii) a material adverse effect on the ability of a Credit Party to perform its obligations under any Loan Document, or, (iii) a material impairment of the rights or remedies of the Lenders under any Loan Document;

"**Material Subsidiaries**" means all Subsidiaries of Mega Bloks (other than a Borrower) designated as Material Subsidiaries pursuant to Section 1.2;

"**Mega Bloks Entities**" means each of Mega Bloks and its Subsidiaries;

"**Multiemployer Plan**" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA to which any Mega Bloks Entity or any member of their Controlled Group has contributed to, or has been obligated to contribute to, at any time during the preceding six (6) years;

"**Non-Material Subsidiaries**" means all Subsidiaries of Mega Bloks (other than a Borrower) that are not Material Subsidiaries;

"**Patriot Act**" means the USA PATRIOT Act of 2001 of the United States, as amended from time to time;

"**PBGC**" shall mean the Pension Benefit Guaranty Corporation or any entity succeeding to any or all of its functions under ERISA;

"**Pension Plan**" means a "pension plan," as such term is defined in Section 3(2) of ERISA, which is subject to Title IV of ERISA (other than a Multiemployer Plan), and to which Mega Bloks Entity, or any Person that is, along with such Mega Bloks Entity, a member of a Controlled Group, may have liability, including any liability by reason of having been a substantial employer within the meaning of Section 4063 of ERISA at any time during the preceding five years, or by reason of being deemed to be a contributing sponsor under Section 4069 of ERISA;

"**Perfection Certificate**" means a certificate setting forth the information necessary to determine how and where to perfect the Security;

"**Permitted Liens**" means:

(a)     Liens imposed or arising by operation of law, in each case, in respect of obligations not yet due or which have been postponed or are being contested in good faith and by appropriate proceedings to the extent that adequate reserves are maintained;

(b)     pledges or deposits made in the ordinary course of business in connection with bids or tenders or to comply with the requirements of any legislation or regulation applicable to the Person concerned or its business or assets;

(c)     Liens securing obligations incurred in connection with the purchase or the lease of any real or immovable property, improvement thereto and equipment or securing any renewal, extension or replacement of such obligations, provided that any such Lien charges only the property purchased or leased and for an amount not in excess of the related obligation and that the aggregate of all outstanding amounts secured by such Liens does not at any time exceed US$10,000,000;

(d)     Liens securing Funded Debt incurred to finance or refinance the payment of the Earn-Out Payment, provided that (i) such Funded Debt is on terms and conditions acceptable to the Agent and provided further that (ii) such Liens rank after the Security, and (iii) an intercreditor agreement in form and substance satisfactory to the Agent is entered into among the Agent and the holders of such Funded Debt prior to or concurrently with the grant of such Liens;

(e)     Liens securing Funded Debt among Mega Bloks Finco, 3102449 Nova Scotia Company, MB 2LP, MB Finance LLC and Mega Bloks US, provided that such Liens rank after the Security and that an intercreditor agreement in form and substance satisfactory to the Agent is entered into among the Agent and the holders of such Funded Debt prior to or concurrently with the grant of such Liens; and

(f)     Liens securing obligations under factoring agreements relating to the sale of accounts receivable of Mega Bloks, provided that such Liens charge only accounts receivable sold pursuant to such agreements (and related assets) and provided further that (i) copies of all such agreements (and related Liens documents) are furnished to the Agent, (ii) the aggregate amount of all accounts receivable so sold and remaining outstanding does not exceed at any time 25% of the aggregate amount of all accounts receivable of Mega Bloks and its Subsidiaries (on a consolidated basis) at such time, (iii) the rights of Mega Bloks under such agreements are subject to the Security and (iv) an intercreditor agreement in form and substance satisfactory to the Agent is entered into among the Agent and the applicable factor prior to or concurrently with the grant of such Liens (or within 60 days from the date of this Agreement, in respect of Liens relating to a factoring agreement with The CIT Group/Commercial Services, Inc.); and

(g)     the Liens listed in Schedule "E";

"**Person**" has the meaning set out in Schedule "A";

"**Prime Rate**" means, for any day, the greater of:

(a)     the annual rate of interest established by the Agent as being its reference rate then in effect for determining interest rates for commercial loans denominated in Canadian Dollars made in Canada; and

(b)      the CDOR Rate for bankers' acceptances with a period of one month, plus 1.00%;

"**Prime Rate Loan**" means a loan denominated in Canadian Dollars made pursuant to this Agreement and bearing interest at the Prime Rate, plus the Applicable Margin;

"**Purchase Agreement**" means the Stock Purchase Agreement for the Acquisition dated as of June 15, 2005 between Sydney Rosen, Jeffrey H. Rosen and Lawrence J. Rosen, as sellers, and Mega Bloks, as buyers;

"**Release**" means any release into the air, land, surface water or groundwater;

"**Revolving Facilities Maturity Date**" means the fifth anniversary date of this Agreement;

"**Security**" means the security and subordinations granted and the guarantees, undertakings and acknowledgments provided to or for the benefit of the Lenders and the Agent pursuant to Article 10;

"**Security Documents**" means any document or agreement evidencing or relating to the Security, including any intercreditor agreement referred to in the definition of Permitted Liens;

"**Solvent**" means, with respect to any Person, that as of the date of determination:

(a)     (i) the sum of such Person's indebtedness does not exceed all of its property, at a fair valuation; (ii) the present fair saleable value of the property of such Person is not less than the amount that will be required to pay such Person's indebtedness as it becomes due; (iii) such Person's capital is not unreasonably small in relation to its business or any contemplated or undertaken transaction; and (iv) such Person does not intend to incur, or believe (nor should it reasonably believe) that it will incur, indebtedness beyond its ability to pay as and when due; and

(b)     such Person is "solvent" within the meaning given to that term and similar terms under applicable laws relating to fraudulent transfers or conveyances.

For purposes of this definition, the amount of any contingent liability at any time will be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (as determined under applicable bankruptcy or fraudulent conveyance laws but irrespective of whether such contingent liabilities meet the criteria for accrual under GAAP);

"**Subsidiary**" means a Person that is under the Control of another Person;

"**Swingline Lender**" means the Lender who is the Agent or such other Lender selected by Mega Bloks and Mega Bloks US who is willing to provide overdraft utilisations pursuant to Section 2.8;

"**Term A Facility**" means the US$40,000,000 facility referred to in Section 2.1;

"**Term A Facility Maturity Date**" means the Business day immediately following the fifth anniversary date of this Agreement;

"**Term B Extension**" has the meaning set out in Section 2.2;

"**Term B Facility**" means the US$260,000,000 facility referred to in Section 2.1;

"**Term B Facility Maturity Date**" means the Business day immediately following the fifth anniversary date of this Agreement or, if the Term B Extension occurs, the seventh anniversary date of this Agreement;

"**US Base Rate**" means, for any day, the greater of:

(a) the annual rate of interest established by the Agent as being its reference rate then in effect for determining interest rates for commercial loans denominated in US Dollars made in Canada (in the case of US Base Rate Loans made to Mega Bloks) or made in New York City (in the case of US Base Rate Loans made to Mega Bloks US or Mega Bloks Finco); and

(b) the federal funds effective rate in effect on such day (and if such day is not a Business Day, then on the preceding Business Day), plus 1.00%; the term "federal funds effective rate" means the rate usually designated as such and as published by the Federal Reserve Bank of New York for the relevant Business Day, or if such rate is not available on any Business Day, the rate that the Agent is prepared to offer, at approximately 9:00 a.m. on such day, for overnight deposits in US Dollars in New York;

"**US Base Rate Loan**" means a loan denominated in US Dollars and bearing interest at the US Base Rate, plus the Applicable Margin;

"**US Dollar**" or the symbol "**US$**" means lawful money of the United States of America;

"**US Revenue Code**" shall mean the Internal Revenue Code of 1986 of the United States, as amended from time to time;

"**US Revolving Facility**" means the US$40,000,000 facility referred to in Section 2.1;

"**2002 Facilities**" means the credit facilities made available to Mega Bloks under the credit agreement dated May 1, 2002 among Mega Bloks and the other parties thereto, as amended.

1.2 **Material Subsidiaries**

    (a)    The Subsidiaries of Mega Bloks listed in Schedule "F" hereof are hereby designated as Material Subsidiaries.

    (b)    Mega Bloks may designate any of its Subsidiaries (other than a Borrower) as a Material Subsidiary upon giving not less than 30 days' prior notice to the Agent. Any such designation will be effective on the date specified in the notice (such date to be no earlier than the 30th day following the date the notice is given). No such designation may be cancelled or revoked.

    (c)    Each Material Subsidiary must provide Security as required by Article 10 and must be a wholly-owned Subsidiary of Mega Bloks (except for qualifying directors' shares);

    (d)    The following provisions will apply in respect of the Non-Material Subsidiaries, and Mega Bloks covenants and agrees that such provisions will be complied with at all times:

        (i)    the aggregate amount of the EBITDA of all Non-Material Subsidiaries must not at any time exceed 15% of Mega Bloks' EBITDA (on a consolidated basis);

        (ii)    the aggregate amount of the assets of all Non-Material Subsidiaries must not at any time exceed 15% of Mega Bloks' assets (on a consolidated basis); and

        (iii)    the aggregate amount of outstanding loans or other financial assistance by the Credit Parties to Non-Material Subsidiaries must not at any time exceed US$15,000,000.

1.3 **Currency Conversions**

    Where any amount expressed in any currency has to be converted or expressed in another currency, or where its equivalent in another currency has to be determined (or *vice versa*), the calculation is made at the exchange rate announced or quoted by the Agent in accordance with its normal practices at or around noon on the relevant date for the relevant currency against the other currency (or *vice versa*).

1.4 **Accounting Terms and Calculations**

    Unless otherwise provided, (i) terms and expressions of an accounting or financial nature have the respective meanings given to such terms and expressions under GAAP; (ii) calculations must be made in accordance with GAAP insofar as applicable, and (iii) financial ratios must be calculated on a consolidated basis of Mega Bloks.

## 1.5 Time

Except where otherwise indicated in this Agreement, any reference to time means local time in Montreal.

## 1.6 Schedules

The Schedules attached hereto ("A" through "J") form integral part of this Agreement.

## 1.7 Headings and Table of Contents

The headings and the Table of Contents are inserted for convenience of reference only and do not affect the construction or interpretation of this Agreement.

## 1.8 Governing Law

This Agreement is governed by and construed in accordance with laws of the Province of Quebec and the laws of Canada applicable therein.

## 1.9 Previous Agreements

This Agreement supersedes any previous agreement in connection with the Facilities. It is understood, however, that the syndication provisions of the Commitment and Fee Letters dated June 13, 2005 (as supplemented by the syndication letter agreement executed by the parties hereto concurrently with this Agreement) continue to be in effect.

## 1.10 Inconsistency

In the event of inconsistency between this Agreement and any other Loan Document, the provisions of this Agreement must be accorded precedence.

## 2 - THE FACILITIES

## 2.1 The Facilities

Each Lender individually agrees to make the following facilities available to the Borrowers in a principal amount not to exceed its Commitment set out opposite its name on the signature pages of this Agreement and in the aggregate principal amount initially for each facility as set forth below:

(a) a 5-year revolving facility in the aggregate principal amount of US$60,000,000 in favour of Mega Bloks (the "**Canadian Revolving Facility**");

(b) a 5-year revolving facility in the aggregate principal amount of US$40,000,000 in favour of Mega Bloks US (the "**US Revolving Facility**");

(c) a 5-year non-revolving term A facility in the aggregate principal amount of US$40,000,000 in favour of Mega Bloks (the "**Term A Facility**"); and

(d)     a 5-year (or 7 – year, if the Term B Extension occurs) non-revolving term B facility in the aggregate principal amount of US$260,000,000 in favour of Mega Bloks Finco (the "**Term B Facility**").

## 2.2    The Term B Extension

(a)     Until the 90th day following the date of this Agreement, the Lenders under the Term B Facility may, by giving a notice to that effect to Mega Bloks Finco (the "extension notice"), extend the Term B Facility Maturity Date to the seventh anniversary date of this Agreement (the "**Term B Extension**"). The Term B Extension will occur on the date specified in the extension notice (which date must not be later than the 90th day following the date of this Agreement).

(b)     The right and obligation of the Lenders under the Term B Facility to give an extension notice to Mega Bloks Finco are set out in the syndication agreement referred to in Section 1.9.

## 2.3    Increase of the Term Facilities

(a)     At any time after the 90th day following the execution of this Agreement but no later than the sixth (or fourth, if the Term B Extension does not occur) anniversary date of this Agreement, Mega Bloks and Mega Bloks Finco may, by notice to the Agent, request an increase up to US$50,000,000 in the amount of the Term A Facility or the Term B Facility (the "**Increase**"). The notice must specify:

    (i)     the amount of the proposed Increase, which must be not less than US$10,000,000, provided that the aggregate amount of all Increases made pursuant to this Section 2.3 may not exceed US$50,000,000;

    (ii)     whether the Increase will be allocated to the Term A Facility or the Term B Facility; and

    (iii)     the proposed date of the Increase.

(b)     After giving such notice, Mega Bloks will have the right to offer to Lenders under the Facilities or to other Persons who are not Lenders to participate in the Increase, provided that no such offer may be made to a Person who is not a Lender unless such Person would qualify as an Eligible Assignee (as defined in Schedule "A"), if such offer were an assignment of Commitment made pursuant to this Agreement.

(c)     If offers made pursuant to Section 2.3(a) have been accepted, the Agent, the Borrowers and the Lenders and other Persons who have accepted such offers will execute an amendment to this Agreement providing that:

    (i)     each of such Lenders and other Persons will have a Commitment under the Facility being increased in an amount equal to its participation of the Increase;

(ii) the amount of the Increase, when drawn, will become Borrowings under the Term A Facility or the Term B Facility (as applicable) and all such Borrowings will be governed by all provisions (including pricing and repayment provisions) applicable to Borrowings under such Facility; and

(iii) the Borrower concerned will use the proceeds from the Increase only to finance acquisitions that are permitted under this Agreement;

and containing such other provisions as may be necessary to give effect to the Increase, including conditions precedent to the effectiveness of the Increase such as the absence of a Default and the delivery of legal opinions.

(d) For greater certainty, (i) nothing in this Section is intended to commit any Lender to participate or the Agent to arrange for a participation in any Increase, and (ii) the aggregate amount of all Increases made pursuant to this Section 2.3 may not exceed US$50,000,000. Notwithstanding any other provision of this Agreement, the amendment agreement giving effect to an Increase will not require the consent of Lenders other than those participating in the Increase.

## 2.4    Purpose of Credit Facilities

(a) *Revolving Facilities* – Mega Bloks will use the Canadian Revolving Facility and Mega Bloks US will use the US Revolving Facility for general corporate purposes including to finance the Acquisition and to refinance existing indebtedness; and

(b) *Term Facilities* – Mega Bloks will use the Term A Facility and Mega Bloks Finco will use the Term B Facility to finance the Acquisition.

## 2.5    Availability and Loan Options

(a) *Canadian Revolving Facility* – The Canadian Revolving Facility will revolve and, accordingly, Loans may be obtained, repaid and re-obtained by Mega Bloks until the Revolving Facilities Maturity Date. Loans may be obtained under the Canadian Revolving Facility in the form of:

(i) Prime Rate Loans;

(ii) Acceptances;

(iii) US Base Rate Loans;

(iv) Libor Loans; and

(v) Letters of Credit;

(b) *US Revolving Facility* – The US Revolving Facility will revolve and, accordingly, Loans may be obtained, repaid and re-obtained by Mega Bloks US until the Revolving Facilities Maturity Date. Loans may be obtained under the US Revolving Facility in the form of:

        (i)     US Base Rate Loans;

        (ii)    Libor Loans; and

        (iii)   Letters of Credit;

(c)    *Term A Facility* -- The Term A Facility will not revolve and must be drawn down by Mega Bloks in one single drawing on or before August 31, 2005. After such drawing, any unused portion of such Facility will cease to be available. Loans may be obtained under the Term A Facility in the form of:

        (i)     Prime Rate Loans;

        (ii)    Acceptances;

        (iii)   US Base Rate Loans; and

        (iv)   Libor Loans.

(d)    *Term B Facility* – The Term B Facility will not revolve and must be drawn down in one single drawing by Mega Bloks Finco on or before August 31, 2005. After such drawing, any unused portion of such Facility will cease to be available. Loans may be obtained under the Term B Facility in the form of:

        (i)     US Base Rate Loans; and

        (ii)    Libor Loans in US Dollars.

## 2.6   Loans Proportionate to Commitments

Each Loan will be made through the Agent at the applicable Branch of Account and will be allocated by the Agent among the Lenders approximately in the proportion of their respective Commitments under the applicable Facility subject however to the provisions of Section 2.8.

## 2.7   Notice of Loans

To obtain a Loan (other than a Letter of Credit), the Borrower concerned must give a notice to the Agent specifying:

(a)    the Facility to be utilized and the selected form of Loan;

(b)    the amount of the Loan, with a minimum of US$1,000,000 (or C$1,000,000 as the case may be) per Loan;

(c)    the date of the Loan, which must be a Business Day; and

(d)    to the extent applicable, the period of the Loan.

The notice must be given by telephone no later than 10:00 a.m. on the first Business Day prior to the date of the Loan, except in the case (i) of an Acceptance where the notice must be given no later than 10:00 a.m. on the second Business Day prior to the issue date of such Acceptance, and (ii) of a Libor Loan where the notice must be given no later than 10:00 a.m. on the third Business Day prior to the date of such Libor Loan. Each telephone notice must be followed by a written confirmation on the same date, in the form of Schedule "G" or in any other manner as may be agreed between the Agent and the relevant Borrower.

## 2.8  Swingline Utilizations

(a)     The notice and minimum amount requirements otherwise applicable to Loans under the Canadian Revolving Facility and the US Revolving Facility do not apply to Loans in the form of Prime Rate Loans or US Base Rate Loans obtained by way of an overdraft in accounts opened for such purpose with the Swingline Lender up to a maximum outstanding amount not exceeding US$5,000,000 in respect of each of the Canadian Revolving Facility and the US Revolving Facility.  Any cheque or payment instruction or debit authorization from the Borrower concerned and resulting in an overdraft in any such account will be deemed to be a request for such a Loan.

(b)     For greater certainty, the said accounts may include accounts of the Borrower concerned and of its Subsidiaries in respect of which consolidation or netting arrangements have been made with the Swingline Lender, including any notional account reflecting any such consolidation or netting of accounts.

(c)     The Agent may also permit that Prime Rate Loans and US Base Rate Loans be owing to the Lenders in proportions other than those of their respective Commitments under the Canadian Revolving Facility or the US Revolving Facility, as the case may be, but the Agent may at any time, and will upon the request of the Swingline Lender, make adjustments among the Lenders so that all such Loans be approximately in the proportion of the respective Commitments of the Lenders (including the Lender who is the Swingline Lender) under the Canadian Revolving Facility and the US Revolving Facility.

## 2.9  Funding

(a)     At the request of the Agent, each Lender will promptly pay to the Agent such Lender's share of any Loan made or to be made by the Agent on behalf of the Lenders and of any adjustment payable pursuant to Section 2.8(c).  The Agent will provide the Lenders with such information as may be necessary in order for the Lenders to make payments to the Agent and fund their respective shares of any Loan.

(b)     Any amount to be paid by a Lender to the Agent must be available to the Agent at the Agent's Office by 2:00 p.m. on the applicable day. Any amount to be disbursed by the Agent to a Borrower will be made available to the relevant Borrower by crediting such Borrower's account at the applicable Branch of Account or at any

other place to be agreed upon from time to time between the relevant Borrower and the Agent.

### 2.10 Conversions and Renewals

(a) A Borrower may convert from one form of permitted Loans to another form of permitted Loans the whole or any part of the outstanding Loans under any of the Facilities and renew Acceptances and Libor Loans, provided that (i) Acceptances may not be converted prior to the maturity of their respective periods and, (ii) Letters of Credit may not be converted.

(b) Sections 2.5 to 2.9 apply to a conversion or a renewal with such modifications as may be required.

(c) Unless they are repaid, converted or renewed upon the maturity date of their respective periods, (i) Acceptances will then become Prime Rate Loans for the face amount of such Acceptances, and (ii) Libor Loans will then become US Base Rate Loans.

(d) Any conversion to Loans in another currency is effected by the repayment of the Loans to be so converted and by the re-Loan of an equivalent amount in the other currency.

### 2.11 Limitations on Lender's Obligation to Fund

Each Lender's obligation to fund Loans is limited to such Lender's Commitment under the relevant Facility. The obligations of the Lenders hereunder are not solidary and are not joint and several, and no Lender is responsible for the obligations of any other Lender.

## 3 - ACCEPTANCES

### 3.1 Period and Amounts

Acceptances

(a) are for periods of one, two, three or six months, but must mature on a date which is a Business Day and which is no later than the maturity date of the applicable Facility;

(b) are denominated in Dollars, in multiples of C$100,000 with a minimum of C$2,000,000 per issue, provided that the Agent may round each Lender's allocation of such issue to the nearest C$100,000 increment;

(c) constitute outstanding Loans for their face amount;

(d) do not bear interest nor carry any days of grace; and

(e) may be discounted by the Lenders for their own account or may be sold to third parties.

## 3.2 Disbursement

(a)     The amount to be disbursed to Mega Bloks with respect to Acceptances discounted by the Lenders is the Discounted Proceeds of such Acceptances, less the applicable acceptance fee.

(b)     In the case of an issue of Acceptances for the purposes of replacing existing Loans, Mega Bloks must, concurrently with such issue, pay to the Agent an amount equal to the aggregate amount of the Loans so replaced. The amount so paid to the Agent will be applied to the portion of the Loans which have been replaced by such Acceptances.

## 3.3 Power of Attorney

(a)     Upon any issue of Acceptances, each Lender is authorized to sign, complete, endorse and deliver on behalf of Mega Bloks the Acceptances to be issued and to do all things necessary or useful in order to facilitate such issuance. The Agent is also authorized to make the necessary arrangements for the negotiation and delivery of Acceptances intended to be sold on the money market.

(b)     In the case of an issue of Acceptances by way of promissory notes to the Lenders who do not customarily accept banker's acceptances (as provided in the definition of Acceptances), the Borrower will be deemed to have issued the corresponding notes to such Lenders, without the necessity of physical execution and delivery of any note.

## 3.4 Depository Bills

A Lender who accepts Acceptances that are "depository bills" within the meaning of the *Depository Bills and Notes Act* (Canada) may deposit same with the Canadian Depository for Securities Limited ("CDS") and such Acceptances may be dealt with in accordance with the rules and procedures of CDS.

## 3.5 Availability

The availability of Acceptances is subject to funds being available for such purpose in the Canadian money market; the Agent will notify Mega Bloks if Acceptances cease to be so available as well as when availability resumes.

## 4 - LIBOR LOANS

## 4.1 Amounts and Periods

(a)     Libor Loans may be obtained for periods of one, two, three or six months, but must mature on a Business Day which is not later than the maturity date of the relevant Facility; and

(b)    Libor Loans must be in multiples of US$100,000, with a minimum of US$1,000,000 per Loan;

## 4.2   Conversion or Repayment Prior to Maturity

For greater certainty, the provisions of Section 18.4 apply to any Libor Loan which is converted, repaid or prepaid prior to the maturity of the period of such Loan.

## 5 – LETTERS OF CREDIT

## 5.1   Availability

(a)    Letters of Credit will be issued by the Issuing Bank in Canadian Dollars, US Dollars, Euros or any other freely tradable currency acceptable to the Agent and the Issuing Bank, for such transactions and on such terms and conditions as are mutually agreed upon between the Borrower concerned and the Issuing Bank and are not inconsistent with the provisions of this Article 5. Letters of Credit are available only up to an aggregate outstanding amount (expressed in US Dollars) at any time not exceeding, with respect to Letters of Credit under the Canadian Revolving Facility, 15% of the amount of such Facility, and with respect to Letters of Credit under the US Revolving Facility, 30% of the amount of such Facility.

(b)    Upon giving not less than ten Business Day notice to the Agent and the Issuing Bank, Mega Bloks and Mega Bloks US may on the last day of June and of December of each year reallocate between the Canadian Revolving Facility and the US Revolving Facility the portions of such Facilities which are available by way of Letters of Credit, provided that no such reallocation (i) may result in the sum of such portions totalling more than 21% of the aggregate of the amount of the Canadian Revolving Facility and the amount of the US Revolving Facility, and (ii) no reallocation will be effective if, after giving effect to the reallocation, the amount of all outstanding Letters of Credit under any of the Canadian Revolving Facility and the US Revolving Facility exceeds the portion of the applicable Facility which is available by way of Letters of Credit.

## 5.2   Maturity of Letters of Credit

No Letter of Credit may have at any time a remaining term exceeding 365 days from such time.

## 5.3   Loans

(a)    Any Letter of Credit constitutes from the date of its issue an outstanding Loan under the Canadian Revolving Facility or the US Revolving Facility, as applicable, in a principal amount equal to the maximum amount of the obligation of the Agent thereunder.

(b)    For greater certainty, if Letters of Credit are outstanding on the Facilities Maturity Date or on the date the indebtedness of the Borrower concerned becomes repayable

pursuant to Section 16.2, the aggregate amount of such outstanding Letters of Credit will be included in the Loans to be repaid on any such date. However, if any such Letter of Credit expires or is cancelled without having been drawn, the amount repaid in respect of same will be reimbursed to the Borrower concerned but only after performance of all other obligations of, and payment of all other amounts payable by, the Credit Parties under the Loan Documents.

## 5.4 Payments under Letters of Credit

Each amount paid by the Issuing Bank under a Letter of Credit issued under the Canadian Revolving Facility will constitute, as of the date of payment, a Prime Rate Loan, if the payment is made in Canadian Dollars or in a currency other than the US Dollar, and a US Base Rate Loan if the payment is made in US Dollars. Each amount paid by the Issuing Bank under a Letter of Credit issued under the US Revolving Facility will constitute, as of the date of payment, a US Base Rate Loan. Any such Loan will be allocated among the Lenders *pro rata* to their respective Commitments under the relevant Facility. Each Lender must fund such loan by remitting to the Agent (for the account of the Issuing Bank) the amount of its share of such loan. The provisions of Section 6 of Schedule "A" will apply in the event of non-disbursement by a Lender.

## 5.5 Currency Conversion

If the Agent has paid an amount under a Letter of Credit in a currency other than the Canadian Dollar or the US Dollar, such amount will be converted into the applicable currency (as specified in Section 5.4) on the date of payment.

## 5.6 Indemnity

The Borrower concerned will pay all costs incurred and indemnify the Agent and the Lenders in respect of any loss or damage suffered by them in connection with Letters of Credit, including legal fees and other costs of litigation, except for any loss, damage or cost resulting from willful misconduct or gross negligence of the Agent or the Lenders.

## 5.7 I.C.C. Rules

Unless otherwise provided in this Agreement or in any agreement relating to their issue, Letters of Credit are governed by the Uniform Customs and Practice for Documentary Credits (I.C.C. Publication 500, 1993 revision).

### 6 - FEES AND INTEREST

## 6.1 Agency Fee

The Borrowers must pay to the Agent, for its own account, an annual agency fee in an amount agreed to between the Borrowers and the Agent in the agency fee letter executed by Mega Bloks as of June 13, 2005.

## 6.2 Underwriting Fee

The Borrowers must pay, concurrently with the execution of this Agreement, the underwriting fees specified in the fee letter agreement executed by Mega Bloks as of June 13, 2005.

## 6.3 Letter of Credit Fees

Mega Bloks must pay a fee for each Letter of Credit issued under the Canadian Revolving Facility and Mega Bloks US must pay a fee for each Letter of Credit issued under the US Revolving Facility. The fee for each non-documentary Letter of Credit or each letter of guarantee will be at an annual rate equal to the Applicable Rate. The fee for each documentary Letter of Credit will be determined on the basis of the rate then offered by the Agent to its customers for similar documentary letters of credit. Fees are calculated on the face amount of each Letter of Credit for the number of days included in the period of same subject to a minimum of C$250 (or US $250 for any Letter of Credit in US Dollars). Any such fee must be paid to the Agent quarterly in arrears on the first Business Day of the following quarter (except for any documentary Letter of Credit where the fee is payable upon the issue (or any renewal) of the relevant Letter of Credit), for distribution to the Lenders *pro rata* to their Commitments under the relevant Facility. Concurrently with the payment of any such fee, the Borrower concerned must also pay to the Agent, for its own account, a fronting fee at an annual rate equal to 0.125%, calculated as aforesaid.

## 6.4 Administrative Charges with respect to Letters of Credit

The Borrower concerned must pay to the Agent administrative charges in connection with Letters of Credit at the rates and on the terms generally applicable to the other customers of the Agent.

## 6.5 Standby Fee

Mega Bloks must pay to the Agent, for distribution to the Lenders *pro rata* to their Commitments under the Canadian Revolving Facility a standby fee on the unused portion of the Canadian Revolving Facility and Mega Bloks US must pay to the Agent, for distribution to the Lenders *pro rata* to their Commitments under the US Revolving Facility, a standby fee on the unused portion of the US Revolving Facility. The standby fee will be calculated daily at an annual rate equal to the Applicable Rate and will be payable monthly in arrears on the first Business Day of the following month.

## 6.6 Acceptance Fees

Upon the issue of any Acceptance, Mega Bloks must pay to the relevant Lender (or to the Agent for the account of such Lender) an acceptance fee at an annual rate equal to the Applicable Rate. The acceptance fee will be calculated on the face amount of the applicable Acceptance and for the number of days included in the period of same.