## 6.7    Interest on Prime Rate Loans

Prime Rate Loans bear interest until they are converted or repaid in full (both before and after any Event of Default or judgment) at the Prime Rate in effect from time to time, plus the Applicable Margin. Such interest is payable monthly in arrears on the first Business Day of the following month.

## 6.8    Interest on US Base Rate Loans

US Base Rate Loans bear interest until they are converted or repaid in full (both before and after an Event of Default or judgment) at the US Base Rate in effect from time to time, plus the Applicable Margin. Such interest is payable monthly in arrears on the first Business Day of the following month.

## 6.9    Interest on Libor Loans

(a)    Each Libor Loan bears interest at the Libor applicable to each such loan, plus the sum of (i) the Applicable Margin, and (ii) the reserve percentage. Such interest is payable at the maturity of the period of the loan or, if the period of such loan is more than 90 days, at 90-day intervals during the period of the loan;

(b)    The term "reserve adjustment" as used in Section 6.9(a) means, in relation to each Libor Loan, an annual rate of interest equal to the remainder obtained by subtracting (i) the Libor for the applicable Libor Loan from (ii) the rate obtained by dividing such Libor by a percentage equal to 100% minus the eurocurrency reserve percentages in effect two Business Days before the first day of such Libor Loan. The term "eurocurrency reserve percentage" as used in the preceding sentence means the maximum aggregate requirements (expressed as decimal) specified under regulations issued from time to time by the Board of Governors of the Federal Reserve System of the United States and then applicable to assets or liabilities consisting of or including eurocurrency liabilities having a term comparable to the period of such Libor Loan.

## 6.10   Calculation of Interest Rates

(a)    Interest rates and fees calculated at the Applicable Margins or Rates are annual rates and are calculated daily on the basis of a 365-day year, except for (i) Libor Loans and (ii) US Base Rate Loans under the US Revolving Facility, the Term A Facility and the Term B Facility, where rates are calculated on the basis of a 360-day year.

(b)    For the purposes of the *Interest Act* (Canada) only, the annual rate of interest equivalent to a rate otherwise calculated under this Agreement is equal to the rate so calculated multiplied by the actual number of days included in a given year and divided by 365 days (or by 360 days, in the case of a rate calculated on the basis of a 360-day year Loan).

## 6.11 Interest on Arrears

(a) Any amount (other than an amount due on account of principal or interest) which is not paid when due will bear interest at the Prime Rate in effect from time to time, increased by 3%, in the case of an amount to be paid in Dollars, and at the US Base Rate in effect from time to time, increased by 3%, in the case of an amount to be paid in US Dollars.

(b) Any interest which is not paid when due will bear interest at the rate that has been used to calculate such unpaid interest.

(c) Interest on arrears is compounded monthly and is payable on demand.

## 7 - REPAYMENT, PREPAYMENT AND CANCELLATION

### 7.1 Repayment of the Revolving Facilities

Mega Bloks must repay in full the outstanding Loans and pay all other amounts owing under the Canadian Revolving Facility on the Revolving Facilities Maturity Date. Mega Bloks US must repay in full the outstanding Loans and pay all other amounts owing under the US Revolving Facility on the Revolving Facilities Maturity Date.

### 7.2 Repayment of the Term A and B Facilities

Mega Bloks must repay in full the outstanding Loans and pay all other amounts owing under the Term A Facility on the Term A Facility Maturity Date. Mega Bloks Finco must repay in full the outstanding Loans and pay all other amounts owing under the Term B Facility on the Term B Facility Maturity Date. In addition:

(a) Mega Bloks must make quarterly and consecutive instalments on the outstanding Loans under the Term A Facility, each in the amount specified in Schedule "H", on the last Business Day of each quarter and beginning with the quarter ending March 31, 2006;

(b) Mega Bloks Finco must make quarterly and consecutive instalments on the outstanding Loans under the Term B Facility, each in the amount specified in Schedule "H", on the last Business Day of each quarter, beginning with the quarter ending October 31, 2005 if the Term B Extension occurs and beginning with the quarter ending March 31, 2006 if the Term B Extension does not occur.

### 7.3 Prepayments from Asset Dispositions

(a) On the fifth Business Day following the receipt by any Mega Bloks Entity of any net cash proceeds from any disposition of assets (other than inventory sold in the ordinary course or a disposition of accounts receivable permitted pursuant to Section 13.3(b)(iii)) to a Person other than a Credit Party or of any proceeds of insurance covering the loss of assets (other than inventory or accounts receivable), Mega Bloks and Mega Bloks Finco must give to the Agent a notice of such receipt (a

"prepayment offer"), which will contain and constitute an offer to make a prepayment on the outstanding Loans under the Term A Facility and the Term B Facility in an amount equal to "X" minus "Y". In this formula, "X" is the amount of such net cash proceeds less the portion of same that has been used or reserved by a Mega Bloks Entity to purchase, repair or improve assets other than inventory and "Y" is the portion of same that Mega Bloks and Mega Bloks Finco elect to exclude from the prepayment (provided that the aggregate of all amounts so excluded must not exceed US$5,000,000 in any fiscal year), in each case as specified in the notice. For greater certainty, Mega Bloks and Mega Bloks Finco will have no obligation to give said notice in any instance where they would determine that the result of "X" minus "Y" is zero (due to an election made by them pursuant to the previous sentence).

(b)     If any amount reserved for the purchase, repair or improvement of assets in accordance with Section 7.3(a) has not been used for such purposes within a 180-day period from the receipt of the related net cash proceeds, then Mega Bloks and Mega Bloks Finco must give notice thereof (also a "prepayment offer") to the Agent and such notice will constitute and contain an offer to make a prepayment on the outstanding Loans under the Term A Facility and the Term B Facility in an amount equal to the amount not so used.

(c)     The Agent will promptly provide copy of any prepayment offer to the Lenders under the Term B Facility and each such Lender may reject the prepayment offer (to the extent of the amount it would otherwise receive pursuant thereto) by giving written notice of such rejection to the Agent within five Business Days from the receipt of the offer. Unless the Agent otherwise so provides, the failure of any Lender under the Term B Facility to timely give such rejection notice will be deemed an acceptance of the prepayment offer (to the extent of the amount it would receive pursuant thereto). Each Lender under the Term A Facility will be deemed to accept any prepayment offer (to the extent of the amount it would receive pursuant thereto) upon receipt of such offer by the Agent and without further action.

(d)     On the tenth Business Day following the giving of any prepayment offer, Mega Bloks and Mega Bloks Finco must pay to the Agent the entire amount for which the prepayment offer has been made, such amount to be applied as provided in Sections 7.3(e), 7.3(f) and 7.3(g) below.

(e)     Prior to the Term B Extension, any payment made pursuant to Section 7.3(d) will be applied *pro rata* to the outstanding Loans under the Term A Facility and the Term B Facility and ratably against the remaining scheduled instalments of principal due in respect of the Term A Facility and the Term B Facility.

(f)     From the date of the Term B Extension, any payment made pursuant to Section 7.3(d) will be applied (i) first, *pro rata* to the outstanding Loans under the Term B Facility and ratably against the remaining scheduled instalments of principal due in respect of the Term B Facility, and (ii) second, once all Loans under the Term B Facility have been repaid in full, *pro rata* to the outstanding Loans under the

Term A Facility ratably against the remaining scheduled instalments of principal due in respect of the Term A Facility.

(g) Notwithstanding Sections 7.3(e) and 7.3(f), if any Lender under the Term B Facility has rejected any prepayment offer (as contemplated in Section 7.3(c)), any portion of. the amount paid to the Agent pursuant to Section 7.3(d) which would otherwise have been applied to Loans owing to such Lender (as provided in Sections 7.3(e) and 7.3(f)) will be paid to the Lenders under the Term A Facility and applied to their Loans as specified in clause (ii) of Section 7.3(f).

(h) Any prepayments made pursuant to this Section 7.3 on Loans which are outstanding by way of US Base Rate Loans and Libor Loans will first reduce US Base Rate Loans and second Libor Loans.

## 7.4 Optional Prepayments

(a) The Borrower concerned may at any time make prepayments on Loans outstanding under the Canadian Revolving Facility or the US Revolving Facility (as applicable) without affecting its right to re-borrow under such facility up to its maximum available amount. Any such prepayment (except for a prepayment applied to overdraft utilizations made pursuant to Section 2.8) must be in an amount of at least C$1,000,000 or US $1,000,000 and is subject to the Borrower concerned giving the Agent a prior one-Business Day notice to the Agent.

(b) Mega Bloks may prepay Loans outstanding under the Term A Facility and Mega Bloks Finco may prepay Loans outstanding under the Term B Facility, on giving prior notice to the Agent not less than three Business Days before the date of prepayment. Any such prepayment must be in a minimum of C$2,000,000 or US $2,000,000 (as applicable) and will be applied to the installments required to be made pursuant to Section 7.2 on the applicable Facility in the reverse order of their maturities (beginning with the installment payable on the Term A Facility Maturity Date or the Term B Facility Maturity Date (as applicable)).

## 7.5 Exchange Rate Fluctuations

If, at any time, due to fluctuations in the rate of exchange of a currency against another currency, the outstanding amount of the Loans under the Canadian Revolving Facility or the US Revolving Facility, expressed in US Dollars, exceeds the then maximum amount of the relevant Facility, the Borrower concerned must pay to the Agent, three Business Days following a demand to that effect, the amount of such excess. However, no such demand will be made as long as the excess is not more than 2%.

## 7.6 Reduction of the Revolving Facilities

The Borrower concerned may, on giving not less than ten Business Days prior notice to the Agent, permanently reduce the aggregate amount of the Canadian Revolving Facility or the US Revolving Facility (as applicable) by amounts of not less than US$5,000,000. Any such reduction will reduce the Commitment of each Lender under the applicable Facility, on a *pro*

*rata* basis. The notice of reduction must specify the amount of the reduction, and the Business Day when the reduction will be become effective. On such date, the Borrower concerned must make a repayment in an amount sufficient for the outstanding Loans under the relevant Facility not to exceed the new lesser amount of such facility.

## 8 - PLACE AND CURRENCY OF PAYMENT

### 8.1    Payments to the Agent

Unless otherwise provided in the Loan Documents, (i) all payments to be made by a Borrower must be made to the Agent at the applicable Branch of Account, (ii) all payments made to the Agent on account of any indebtedness owing to the Lenders hereunder will be deemed to have been made to the Agent for the ratable benefit of the applicable Lenders, and (iii) any payment received by the Agent on account of any such indebtedness must be distributed among the applicable Lenders proportionately to their share of said indebtedness. Any payment due by a Borrower may be charged to an account maintained by such Borrower with the Agent.

### 8.2    Time of Payments

Any payment that is due on a day that is not a Business Day may be made on the next Business Day but will bear interest until received in full. All payments must be made in funds which are immediately available on the date on which payment is due.

### 8.3    Currency

Unless otherwise provided, (i) all amounts owing under any Loan are payable in the currency of such Loan, (ii) Letter of Credit fees under the Canadian Revolving Facility are payable in Canadian Dollars, except that any such fee owing as a result of a Letter of Credit issued in US Dollars is payable in US Dollars, (iii) Letter of Credit fees under the US Revolving Facility are payable in US Dollars, (iv) standby fees under the Canadian Revolving Facility are payable in Canadian Dollars and standby fees under the US Revolving Facility are payable in US Dollars, and (v) all other amounts are payable in Canadian Dollars or US Dollars, as may be specified by the Agent.

## 9 - CONDITIONS PRECEDENT TO LOANS

### 9.1    Conditions Precedent to the Initial Loan

The Borrowers may not obtain any Loan under the Facilities until the following conditions precedent have been fulfilled to the satisfaction of the Agent and Lenders:

(a)    the Agent and the Lenders must have received satisfactory evidence of the successful completion of the Acquisition;

(b)    Mega Bloks must have raised gross cash proceeds of not less than C$68,975,000 from an equity issuance and such amount must have been used to finance in part the Acquisition.

(c)    all fees and expenses owing by the Borrowers to the Agent and the Lenders at the time of execution of this Agreement and all fees and expenses of the Agent's counsel up to such time in connection with the Loan Documents must have been paid in full;

(d)    the Agent and the Lenders must have received, in form and substance satisfactory to them, each of the following documents:

    (i)    a copy of the constitutive documents of each of the Credit Parties;

    (ii)    a certificate of good standing in respect of each of the Credit Parties;

    (iii)    a copy of the documents evidencing the authority and attesting to the authenticity of the signatures of the Persons acting on behalf of each of the Credit Parties;

    (iv)    the Security Documents required to be delivered pursuant to Article 10;

    (v)    an executed copy of the Purchase Agreement;

    (vi)    a compliance certificate in the form of Schedule "I" and also showing compliance with the financial covenants of Article 14 (with EBITDA of not less than US$90,000,000) after giving effect to the Acquisition, as if the same had occurred on May 31, 2005; .

    (vii)    a certificate of the Chief Financial Officer of Mega Bloks (together with supporting documents) setting out the aggregate amount of the purchase price for the Acquisition (which must not exceed US$365,000,000 plus the Earn-Out Payment but excluding tax adjustments up to US$12,000,000) and also specifying the various components of and the sources of funds for such amount;

    (viii)    the unqualified audited consolidated financial statements of Mega Bloks for each of its fiscal years 2002, 2003 and 2004 and the unaudited consolidated financial statements of Mega Bloks for its fiscal quarter ending March 31, 2005;

    (ix)    the unqualified audited consolidated financial statements of each of Rose Art Industries, Inc. and Warren Industries, Inc. for each of its fiscal years 2002 and 2003 and the unaudited consolidated financial statements of each such Person for its fiscal year 2004 and its fiscal quarter ending March 31, 2005;

    (x)    a consolidated pro forma balance sheet of Mega Bloks giving effect to the Acquisition (as if same had occurred on March 31, 2005);

    (xi)    a certificate of the Chief Financial Officer of Mega Bloks with respect to the calculation of EBITDA for the businesses acquired through the

Acquisition (on a combined basis) as at March 31, 2005 and showing EBITDA not less than US$50,000,000;

(xii) financial forecasts for the operations of Mega Bloks (on a consolidated basis) for each of its fiscal years 2005, 2006, 2007, 2008 and 2009 (after giving effect to the Acquisition);

(xiii) a certificate of the Chief Financial Officer of Mega Bloks setting forth the conclusions that after giving effect to the Acquisition and the transactions contemplated hereunder each of the Credit Parties is Solvent on the date of such certificate;

(xiv) a duly completed Perfection Certificate (after giving effect to the Acquisition);

(xv) a direction of payment for the repayment of each of the 2002 Facilities and of all facilities granted to Credit Parties by PNC Bank together with an undertaking of the lenders thereunder to release the Liens securing such facilities;

(xvi) a certificate evidencing the insurance coverage required to be maintained by the Credit Parties pursuant to this Agreement;

(xvii) a certificate of an officer of Mega Bloks with respect to the governmental and regulatory approvals and material third party consents required to be obtained for the completion of the Acquisition and also certifying that no material condition precedent to the closing of the Acquisition (as provided in the Purchase Agreement) has been waived by Mega Bloks; and

(xviii) legal opinions addressed to the Agent and the Lenders from counsel to the Credit Parties and counsel to the Agent, relating to such matters as the Agent and the Lenders may reasonably require.

**9.2** **Conditions Precedent to All Loans**

The Borrowers may not obtain any Loan or convert or renew any Loan:

(a) if the Agent has not received timely notice of such Loan, conversion or renewal; or

(b) if a Default has occurred and is continuing.

Each notice of Loan or of the renewal or conversion of a Loan constitutes a certification by the Borrowers that no Default has occurred and is continuing.

**9.3** **Waiver of Conditions Precedent**

The conditions precedent provided for in this Article are for the sole benefit of the Agent and the Lenders. The Agent and the Lenders may waive such conditions precedent, in whole or

in part, with or without conditions, without prejudice to any other or future rights that they might have against the Borrowers and any other Person.

### 9.4 Special Waiver in respect of the Security

The Agent and the Lenders waive the requirements of clauses (i) through (iv) and (xviii) of Section 9.1(d) insofar as they apply to (i) the Material Subsidiaries constituted under the laws of a jurisdiction outside of Canada and the United States and the delivery of certificates evidencing shares of Subsidiaries subject to the Security, (ii) control agreements in respect of deposit accounts in the United States and (iii) leases of real or immovable properties, provided that the relevant Security Documents and opinions are delivered to the Agent within 60 days from the date of this Agreement with respect to any Security to which clause (i) applies and 90 days from the date of this Agreement (or such longer period as the Agent may agree) with respect to any Security to which clauses (ii) and (iii) apply. The Borrowers represent and warrant to the Agent and the Lenders that, after giving effect to the Acquisition, the aggregate book value of the assets of the Credit Parties covered by the foregoing waiver will not exceed on a combined basis 15% of the Credit Parties' combined assets.

### 9.5 Early Termination of the Commitments

If all of the conditions precedent provided for in this Article have not been previously fulfilled or waived, the Lenders' Commitments will terminate on August 31, 2005.

## 10 - SECURITY

### 10.1 Guarantees

Each Borrower must guarantee in favour of the Agent and the Lenders the performance of all obligations of the other Borrowers under the Facilities and the Hedging Agreements and each Material Subsidiary must guarantee in favour of the Agent and the Lenders the performance of all obligations of the Borrowers under the Facilities and the Hedging Agreements.

### 10.2 Security over Assets

To secure the performance of the obligations of the Borrowers under the Facilities and the Hedging Agreements, each of the Borrowers and the Material Subsidiaries must provide in favour of the Agent and the Lenders security over all of its assets, tangible and intangible, present and future.

### 10.3 Non-Disturbance Agreements

The Borrowers must cause each landlord of any major leased premises used for the operations of any Credit Party (i) to acknowledge that the right of such Credit Party as lessee of such premises are subject to the Security and may be transferred in the course of enforcement of the Security, and (ii) to covenant that it will not terminate any such lease further to a default of the applicable Credit Party thereunder unless prior reasonable notice of such default has been given to the Agent and the curable defaults then existing have not been remedied on the expiry of the notice period. Major leased premises as used herein means any premises leased by a Credit

Party where at any time at least 10% of the total inventory of Mega Bloks Entities (on a consolidated basis) is located or where the cost of goods produced at such premises during any four-quarter period represents more than 10% of Mega Bloks' total cost of goods sold for such period (calculated on a consolidated basis).

### 10.4 Insurance

The Borrowers will cause the Agent (or its representative) to be named as loss payee and additional insured on all insurance policies relating to the assets covered by the Security (including credit insurance policies). Each policy covering immovable property and equipment must contain a "mortgage clause", including the enforcement thereof. For such purposes, the 30 days written notice of intended cancellation or non-renewal. The Borrowers must furnish the Agent with evidence satisfactory that the required insurance coverage is in effect. The Borrowers must forthwith give the Agent notice of any loss of US$2,000,000 or more.

### 10.5 Security for Hedging Agreements

(a) The Agent will act as agent for the Lenders in their capacity as counterparties under Hedging Agreements (hereafter, the "hedging lenders") for all purposes of the Security Documents, including the enforcement thereof. For such purposes, the provisions of Sections 5 and 7 of Schedule "A" (adapted accordingly) will also apply to the hedging lenders. However, until termination and repayment in full of the Facilities, the claims of the hedging lenders will not be taken into account in the calculation of the Majority Lenders, including in any situation where a decision regarding the Security has to be made by the Majority Lenders.

(b) The rights of the Lenders and the hedging lenders under the Security will rank *pari passu*. Any proceeds of realization of the Security to be allocated to the hedging lenders will be distributed among them *pro rata* to their claims (irrespective of the dates of the related agreements or transactions).

(c) Each hedging lender will calculate its claim under any Hedging Agreement in accordance with normal market practices (using the mark-to-market method whenever applicable) and after giving effect to any close-out, netting arrangement or right of set-off provided by contract or permitted by law.

(d) The Hedging Agreements secured by the Security will consist of (i) Hedging Agreements made with a hedging lender who is a Lender at the time of the entering into of such Hedging Agreement, and (ii) Hedging Agreements made prior to the date hereof with Persons who have become Lenders hereunder. For greater certainty, the Security will continue to secure the obligations of any Borrower to any hedging lender after such hedging lender has ceased to be a Lender hereunder or after termination and repayment in full of the Facilities.

### 10.6 Validity of the Security and Contents of Security Documents

The Security must be valid, perfected and first-ranking at all times with respect to all property intended to be covered thereby, subject however to Permitted Liens. Each Security

Document must be in form and substance satisfactory to the Agent and remain valid and in force at all times. The Security Documents will include such legal opinions, title insurance policies, Lien searches and certificates of location or surveys as the Agent may reasonably require.

## 10.7 Holding of Security by the Agent

The Agent is authorized to hold any Security on behalf of the Lenders (including the hedging lenders) and to execute in their name any Security Document. For greater certainty, the Agent is authorized to act as their representative (*fondé de pouvoir*), notwithstanding that the Agent is also a Lender, for the purposes of any hypothec granted by any Credit Party pursuant to article 2692 of the *Civil Code of Quebec* to secure debentures or similar instruments issued for the benefit of the Lenders (including the hedging lenders) pursuant to the Security. The Agent is also authorized to release the Security with respect to assets or property which are the subject of a disposition permitted pursuant to this Agreement.

## 10.8 Exception for Certain Assets

Notwithstanding the other provisions of this Article 10, the Credit Parties will not be required to provide and the Agent will not perfect the Security in respect of any real property with a fair market value of less than US$1,500,000 provided that the fair market value of all such real properties not subject to the Security does not exceed US$3,500,000 in the aggregate.

## 10.9 Future Material Subsidiaries

Each Person who becomes a Material Subsidiary after the date of this Agreement must comply with the requirements of this Article 10 within 30 days from the date of becoming a Material Subsidiary.

## 11 - REPRESENTATIONS AND WARRANTIES

Each of the Borrowers represents and warrants that:

## 11.1 Corporate Existence and Capacity

Each Mega Bloks entity

(a)     is a Person duly constituted and organized, validly existing and in good standing under the laws of the jurisdiction of its constitution;

(b)     has all requisite corporate or other power necessary to own its assets and carry on its business as now being or as proposed to be conducted; and

(c)     is qualified to do business and is in good standing in all jurisdictions in which the nature of the business conducted by it makes such qualification necessary and where failure so to qualify could have a Material Adverse Effect.

### 11.2  Authorization and Validity

Each Credit Party has all necessary power, authority and legal right to execute, deliver and perform its obligations under the Loan Documents to which it is a party, has duly authorized by all necessary action the execution, delivery and performance of its obligations under such Loan Documents and has duly and validly executed and delivered the Loan Documents to which it is a party. The obligations of each Credit Party under the Loan Documents to which it is a party constitute legal, valid and binding obligations, of such Credit Party.

### 11.3  No Breach

The execution and delivery of the Loan Documents and the performance by the Credit Parties of their respective obligations thereunder will not conflict with, result in a breach of or require any consent under, the constitutive documents or by-laws of any Credit Party, or any applicable law or regulation in any material respect, or any order or decision of any court or governmental authority or agency, or any agreement to which any Credit Party is a party or by which it or any of its property is bound.

### 11.4  Approvals

Except for filings or registrations required to perfect the Security, no authorization, approval or consent of, nor any filing or registration with, any governmental or regulatory authority or agency, is necessary for the execution, delivery or performance by each Credit Party of the Loan Documents to which it is a party or to ensure the legality, validity or enforceability thereof.

### 11.5  Compliance with Laws and Permits

Each Mega Bloks Entity is in compliance with all Applicable Laws (including Environmental Laws) the non-compliance with which could have a Material Adverse Effect. Each Mega Bloks Entity holds all material permits, licenses, approvals, consents and other authorizations required under Applicable Laws to own its assets and to carry on its business as now being or as proposed to be conducted.

### 11.6  Environmental Warranties

On the date of this Agreement and except as set forth in the Disclosure Statement:

(a)  all facilities and property (including underlying groundwater) owned or leased by any Mega Bloks Entity have been, and continue to be, owned or leased by such entity in compliance with all Environmental Laws the non-compliance with which would have a Material Adverse Effect;

(b)  there are no pending or threatened (i) claims, complaints, notices or requests for information received by any Mega Bloks Entity with respect to any alleged violation of any Environmental Law which could have a Material Adverse Effect, or (ii) complaints, notices or inquiries to any Mega Bloks Entity regarding potential material liability under any Environmental Law;

(c)    there have been no Releases of Hazardous Materials at, on or under any property now or previously owned or leased by any Mega Bloks Entity that have, or could reasonably be expected to have, a Material Adverse Effect;

(d)    all Mega Bloks Entities have been issued and are in material compliance with all material permits, certificates, approvals, licenses and other authorizations relating to environmental matters;

(e)    no property now or previously owned or leased by any Mega Bloks Entity is listed or proposed for listing (with respect to owned property only) on the National Priorities List pursuant to the Comprehensive Environmental Response Compensation Liability Act of 1980 of the United States, as amended ("CERCLA"), on the Comprehensive Environmental Response Compensation Liability Information System List ("CERCLIS") or on any similar list of sites requiring investigation or clean-up except if such listing or proposed listing could not reasonably be expected to have a Material Adverse Effect;

(f)    there are no underground storage tanks, active or abandoned, including petroleum storage tanks, on or under any property now or previously owned or leased by any Mega Bloks Entity that, singly or in the aggregate, have, or could reasonably be expected to have, a Material Adverse Effect;

(g)    no Mega Bloks Entity has directly transported or directly arranged for the transportation of any Hazardous Material to any location which is listed or proposed for listing on the National Priorities List pursuant to CERCLA, on the CERCLIS or on any similar list or which is the subject of enforcement actions or other investigations which may lead to material claims against any Mega Bloks Entity for any remedial work, damage to natural resources or personal injury, including claims under CERCLA the adverse determination of which would have a Material Adverse Effect;

(h)    there are no polychlorinated biphenyls or friable asbestos present at any property now or previously owned or leased by any Mega Bloks Entity that, singly or in the aggregate, have, or could reasonably be expected to have, a Material Adverse Effect; and

(i)    no conditions exist at, on or under any property now or previously owned or leased by any Mega Bloks Entity which, with the passage of time, or the giving of notice or both, would give rise to material liability under any Environmental Law.

## 11.7   Title to Assets

The property and assets of the Mega Bloks Entities, taken as a whole, are not subject to title defects or restrictions which could materially and adversely impair their value or normal use. The Mega Bloks Entities own or have rights of use for all property and assets (including intellectual property) necessary to carry on their businesses.

## 11.8    Litigation

There are no legal or arbitration proceedings at law or in equity, or any proceedings by or before any governmental or regulatory authority or agency, or, to the best of its knowledge, any claim or investigation by any such authority or agency or under Environmental Laws, or any labour disputes, now pending or, to the best of its knowledge, threatened against any of the Mega Bloks Entities or any of their properties or rights that, if adversely determined, could have a Material Adverse Effect, except as provided in the Disclosure Statement.

## 11.9    Labour Matters

(a)    None of the Mega Bloks Entities is a party to any labour dispute that could reasonably be expected to have a Material Adverse Effect and, on the date of this Agreement, there are no strikes or walkouts relating to any labour contracts to which such Person is a party or is otherwise subject;

(b)    there is no unfair labour practice complaint pending against any of the Mega Bloks Entities or, to the knowledge of the Borrowers, threatened against any of them, before any labour relation board that could reasonably be expected to have a Material Adverse Effect;

(c)    there is no grievance or significant arbitration proceeding arising out of or under any collective bargaining agreement pending against any of the Mega Bloks Entities or, to the knowledge of the Borrowers, threatened against any of them that could reasonably be expected to have a Material Adverse Effect;

(d)    no slowdown or stoppage is pending against any of the Mega Bloks Entities or, to the knowledge of the Borrowers, threatened against any of the Mega Bloks Entities that could reasonably be expected to have a Material Adverse Effect;

(e)    none of the Mega Bloks Entities is engaged in any unfair labour practice that could reasonably be expected to have a Material Adverse Effect; and

(f)    there are no pending or threatened claims, complaints, notices, inquiries or requests for information received by any of the Mega Bloks Entities with respect to any alleged violation of, or potential liability under, any law relating to employee health and safety (including the Occupational Safety and Health Act, 29 U.S.C.A. §651 et seq.) which could reasonably be expected to result in liability for the Mega Bloks Entities which could have a Material Adverse Effect (exclusive of amounts fully covered by insurance (less any applicable deductible) and as to which the insurer has acknowledged its responsibility to cover) or which could reasonably be expected to result in a Material Adverse Effect. On the date of this Agreement and except as set forth in the Disclosure Statement, no Mega Bloks Entity is party to any employment contract for a term of more than three years, or providing for annual compensation of more than US$1,000,000 or providing for a termination payment of more than US$2,000,000.

**11.10** <u>No Default</u>

No Default has occurred and is continuing.

**11.11** <u>Solvency</u>

Each of the Credit Parties is Solvent on the date of this Agreement and will be Solvent after giving effect to the Acquisition. Each Credit Party who provides Security at any time after the date of this Agreement will be Solvent at such time.

**11.12** <u>Taxes</u>

Each of the Mega Bloks Entities has filed all income tax returns and all other material tax returns and paid all taxes material in their amount that are required to be filed or paid by them. The charges, accruals and reserves on the books of the Mega Bloks Entities in respect of taxes and other governmental charges are adequate.

**11.13** <u>ERISA and Pension Plans</u>

(a) Each Pension Plan and each other pension or employee benefit plan of any Mega Bloks Entity is in compliance in all material respects with the applicable provisions of ERISA, the US Revenue Code and any other Applicable Law. None of the Mega Bloks Entities has any material unfunded liability under any pension plan on an ongoing or termination basis.

(b) On the date of this Agreement, none of the Mega Bloks Entities, (i) maintains or contributes or has any liability with respect to any Pension Plan or Multiemployer Plan, (ii) except as required by Section 4980B of the US Revenue Code, Part 6 of Title I of ERISA or similar state law, maintains a welfare plan which provides health or welfare benefits (through the purchase of insurance or otherwise) for any retired or former employee of any of the Mega Bloks Entities or any of member of their Controlled Group or coverage after a participant's termination of employment, or (iii) has incurred any material liability or obligation under the Worker Adjustment and Retraining Notification Act or similar state law, which remains unpaid or unsatisfied.

(c) During the twelve-consecutive-month period prior to the date of this Agreement and prior to the date of any Loan hereunder, no steps have been taken to terminate any Pension Plan, and no contribution failure has occurred with respect to any Pension Plan sufficient to give rise to a Lien under Section 302(f) of ERISA. No condition exists or event or transaction has occurred with respect to any Pension Plan or Multiemployer Plan which could reasonably be expected to result in the incurrence by any of the Mega Bloks Entities of any material liability, fine or penalty.

### 11.14  Margin Stock Restrictions

None of the Mega Bloks Entities is engaged in the business of extending credit for the purpose of buying or carrying margin stock, and no proceeds of any Loans will be used to buy or carry any margin stock or otherwise for a purpose which violates or would be inconsistent with Regulations T, U and X of the Board of Governors of the Federal Reserve System of the United States. "Margin Stock" herein has the meaning specified in such Regulations.

### 11.15  Investment Company Act

None of the Mega Bloks Entities is an "investment company", or a company "controlled" by an "investment company", required to be registered under (and within the meaning of) the *Investment Company Act* of 1940 of the United States, as amended.

### 11.16  Public Utility Holding Company Act

None of the Mega Bloks Entities is a "holding company", or an "affiliate" of a "holding company" or a "subsidiary company" of a "holding company", within the meaning of the *Public Utility Holding Company Act* of 1935 of the United States, as amended.

### 11.17  Restriction on Payments

Except as provided in the Disclosure Statement, none of the Mega Bloks Entities is subject to any law, regulation, agreement or legal impediment that prohibits, restricts or imposes any condition upon the ability of a Mega Bloks Entity to pay Distributions or to make or repay loans or advances, except for laws of general application providing that the declaration or payment of Distributions by a Person are subject to such Person being in compliance with solvency or other similar requirements.

### 11.18  Corporate Structure Chart and Perfection Certificate

The Corporate Structure Chart and the Perfection Certificate delivered pursuant to Section 9.1(d)(xiv) contain a complete and correct list of all of the Mega Bloks Entities and indicates (i) the jurisdiction of formation of each such entity, (ii) each Person holding ownership interests in each such entity other than Mega Bloks, (iii) the nature of the ownership interests held by each such Person and the percentage of ownership represented by such ownership interests, (iv) the location of the registered and chief executive offices of each Credit Party, (v) any prior name (including any pre-merger corporate name) of each such Credit Party, (vi) the jurisdictions where the material tangible assets and accounts receivable of each such Credit Party are located, and (vii) the material intellectual property of each Credit Party, in each case, on the date of this Agreement.

### 11.19  Financial Statements and Fiscal Year

The last audited financial statements of Mega Bloks are complete and correct and fairly present the consolidated financial condition and results of operation of Mega Bloks as at their stated date, all in accordance with GAAP. Except as reflected or disclosed in such financial statements, none of the Mega Bloks Entities has on the date hereof any material contingent

liabilities, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments that have not been disclosed in writing to the Agent and the Lenders. The fiscal year of Mega Bloks ends on December 31 of each year.

## 11.20  No Material Change

There has been no Material Adverse Change from December 31, 2004 to the date of this Agreement.

## 11.21  True and Complete Disclosure

The information, reports, financial statements and other documents furnished or to be furnished by or on behalf of the Mega Bloks Entities to the Agent or any Lender in connection with the Acquisition and the negotiation, preparation, execution, delivery or performance of the Loan Documents, when taken as a whole, do not and will not contain any untrue statement of material fact or omit to state any material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading. All forecasts have been prepared based upon reasonable assumptions.

## 12 - AFFIRMATIVE COVENANTS

### 12.1  General Covenants

Each of the Borrowers will, and will cause each of the other Mega Bloks Entities to:

(a)  *Legal Existence* – subject to Section 13.3, preserve and maintain its legal existence and all of its material rights, privileges, licenses and franchises;

(b)  *Legal Compliance* – comply with the requirements of all Applicable Laws the non-compliance with which could have a Material Adverse Effect;

(c)  *Environmental Compliance* – use and operate all of its properties and assets in material compliance with all Environmental Laws, hold and comply with the requirements of all material permits, approvals or other authorizations under Environmental Laws and handle all Hazardous Materials in material compliance therewith.

(d)  *Payment of Taxes* – pay and discharge all taxes, assessments and governmental charges or levies imposed on it or on its income or profits or on any of its property or assets prior to the date on which penalties or interest attach thereto, except for any such tax, assessment, charge or levy the payment of which is being contested in good faith and by proper proceedings and against which adequate reserves are being maintained;

(e)  *Maintenance of Property* – maintain all of its properties and assets used or useful in its business in good working order and condition, ordinary wear and tear excepted;

(f)    *Material Agreements* – perform its obligations under and preserve and maintain in force all agreements to which it is a party that are necessary for or material to its operations and business;

(g)    *Insurance* – maintain insurance on its property with financially sound and reputable insurance companies against loss and damage in at least the amounts (and with only those deductibles) customarily maintained, and against such risks as are typically insured against in the same general area (including, without limitation, business interruption insurance outside the United States), by Persons of comparable size engaged in the same or similar business as the Mega Bloks Entities; and also maintain all worker's compensation, employer's liability insurance or similar insurance as may be required under Applicable Laws;

(h)    *Records* – keep adequate records and books of account, in which complete entries will be made in accordance with GAAP; and

(i)    *Access* – permit representatives of the Agent and any Lender, upon reasonable prior notice and during normal business hours, to examine, copy and make extracts from its books and records, to inspect any of its properties or assets, and to discuss its business and affairs with its officers and auditors.

## 12.2    Use of Proceeds

The Borrowers will use the proceeds of the Facilities only for the purposes permitted under this Agreement.

## 12.3    Hedging

From no later than August 31, 2005, the Borrowers will enter into and maintain in force Hedging Agreements to protect themselves against interest rate fluctuations in connection with the Term A Facility and the Term B Facility for a notional amount at any time not less than 50% of the aggregate amount of the Loans outstanding under such Facilities and for terms of not less than the lesser of 36 months and the remaining term of the applicable Facility, provided however that Hedging Agreements are available for such purposes on the Canadian market.

## 12.4    Patriot Act

Promptly, following a request by any Lender, the Borrowers will provide all documentation and other information such Lender reasonably requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act.

## 12.5    Credit Ratings

The Borrowers will use all their commercially reasonable best efforts to cause Moody's Investors Service, Inc. and Standard & Poor's Rating Services, Inc. to assign and maintain at all times a credit rating for the Term B Facility.

## 12.6  Further Assurances

Each of the Borrowers will, and will cause each of the other Credit Parties to, cooperate with the Lenders and the Agent and execute such further instruments and documents as the Agent may reasonably request to carry out to its satisfaction the transactions contemplated by the Loan Documents.

## 12.7  Representations and Warranties

Each of the Borrowers will ensure that all representations made in this Agreement are true and correct at all times, except for representations made as of a date expressly stated therein.

## 13 - NEGATIVE COVENANTS

Each of the Borrowers covenants and agrees that:

## 13.1  Negative Pledge

None of the Mega Bloks Entities will create, incur, assume or suffer to exist any Lien on their present and future property or assets except for the Security and Permitted Liens.

## 13.2  Funded Debt

None of the Mega Bloks Entities will create, incur, assume or permit to exist any Funded Debt other than:

(a)  indebtedness to the Agent and the Lenders under the Loan Documents;

(b)  indebtedness among the Mega Bloks Entities (but subject to Section 13.8 with respect to indebtedness of Non-Material Subsidiaries);

(c)  indebtedness permitted to be secured by Permitted Liens;

(d)  indebtedness under loans from any governmental entity or agency on the condition that such loans carry no Interest Expense and do not provide for any mandatory repayment in principal (including as a result of acceleration) prior to the Term B Facility Maturity Date and provided further that the aggregate of all outstanding amounts under such loans may not at any time exceed US$25,000,000; and

(e)  other indebtedness at any time not exceeding US$10,000,000 in the aggregate.

## 13.3  Limitations on Fundamental Changes

None of the Mega Bloks Entities will:

(a)  enter into any transaction of merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself, except that any Mega Bloks Entity may merge or amalgamate with any other Mega Bloks Entity if not less than 30 days prior notice

of the merger or amalgamation is given to the Agent and provided that the following conditions are fulfilled:

(i)      no Default occurs as a result of the merger or amalgamation;

(ii)      if any of the merging or amalgamating entities is a Credit Party, the surviving or amalgamated entity must be a Credit Party (and also a Borrower to the extent that any merging or amalgamating entity was a Borrower) and must execute and deliver to the Agent all such documents as may be necessary or advisable to confirm that such entity is bound as successor of the merging or amalgamating entities by all Loan Documents to which such entities were parties;

(iii)      the surviving or amalgamated entity is Solvent after the merger or amalgamation; and

(iv)      the Agent has been provided prior to or concurrently with the merger or amalgamation with satisfactory evidence of compliance with the requirements of clauses (i), (ii) and (iii) including such financial information, certificates, documents and legal or other professional opinions as the Agent may reasonably request;

(b)      sell, lease, transfer or otherwise dispose of, in one transaction or a series of related transactions to any Person (in each case, a "disposition"), any property or assets (other than inventory sold in the ordinary course of business), except for the following dispositions (in each case, provided that no Default occurs as a result of the disposition):

(i)      dispositions in an aggregate amount in any fiscal year not exceeding US$5,000,000 for all Mega Bloks Entity (calculated on the basis of the greater of book value and proceeds of disposition but net of any proceeds of disposition which have been used by a Credit Party to purchase, repair or improve assets during such fiscal year);

(ii)      a disposition by a Mega Bloks Entity (but with respect to a disposition by Mega Bloks, to the extent the disposition relates only to intellectual property or shares in Subsidiaries) to a Borrower or another Credit Party, provided that the conditions of paragraph (a) above are fulfilled in the case of a disposition of any material part of the assets of the transferor (to the extent applicable and adapted as if the disposition were a merger and the transferee were the surviving entity) and provided further that if the disposition relates to substantially all of the property or assets of the transferor, the latter (if not a Borrower) may wind-up or dissolve itself after completion of such disposition; and

(iii)      dispositions of accounts receivable of Mega Bloks pursuant to factoring agreements provided that the conditions of clauses (i) through (iv) of paragraph (f) of the definition of Permitted Liens are met;

(c)    except as permitted by this Agreement, reorganize the corporate or capital structure of Mega Bloks as described in the Corporate Structure Chart; or

(d)    carry on any business, directly or indirectly, other than the business currently carried on by it or the business acquired through the Acquisition and activities ancillary or reasonably related thereto.

### 13.4   Investments and Acquisitions

None of the Mega Bloks Entities will, directly or indirectly:

(a)    have any Subsidiary that is not in the same lines of business as the Borrowers or in businesses ancillary or reasonably related thereto;

(b)    make any investment in any Person (other than investments in cash equivalents made for cash management purposes) or make any acquisition of business either by way of purchase of assets or shares or otherwise, unless such Person or the business acquired is in the same line of business as the Borrowers or in an ancillary or related line of business and provided that the aggregate amount of any such investments and acquisitions does not exceed in any fiscal year US$50,000,000 for all Mega Bloks Entities; or

(c)    make any private or public tender offer for the shares or securities of another Person whose governing body has not approved such offer ("hostile take-over").

### 13.5   Capital Expenditures

(a)    None of the Mega Bloks Entities will make unfunded cash capital expenditures in amounts exceeding in the aggregate:

- US$17,000,000 during Mega Bloks' fiscal year 2005;

- US$20,000,000 during Mega Bloks' fiscal year 2006; and

- US$22,500,000 during any other fiscal year of Mega Bloks from fiscal year 2007.

(b)    The foregoing limitation will cease to apply from the date the Lenders have received a compliance certificate showing a Funded Debt to EBITDA Ratio of less than 2:00: 1.00 as at the end of the most recent fiscal quarter of Mega Bloks.

### 13.6   Distributions

None of the Mega Bloks Entities will make any Distribution other than:

(a)    a direct or indirect Distribution to a Credit Party; or

(b)    a Distribution by Mega Bloks, provided that no Default is continuing or would result from such Distribution and provided further that the aggregate of all such

Distributions in any fiscal year may not exceed (i) 15% of the consolidated net income of Mega Bloks for the preceding fiscal year, if Mega Bloks' Funded Debt to EBITDA Ratio as at the end of such preceding year was greater than 2.50:1 and, (ii) 25% of the consolidated net income of Mega Bloks for the preceding fiscal year, if Mega Bloks' Funded Debt to EBITDA Ratio as at the end of such preceding year was 2.50:1 or less but greater than 2.00:1.

## 13.7 Transactions with Related Parties

None of the Mega Bloks Entities will engage in any material transactions or agreements with any related party (including any other Mega Bloks Entity) on terms and conditions not less favourable in any material respect to the relevant Mega Bloks Entity than those that could be obtained on an arm's length basis from unrelated third parties. For the purposes of this Section 13.7, (i) related party means, with respect to a Person, another Person that Controls or is Controlled by or is under common Control with the relevant Person, and (ii) the definition of Control must be read replacing 51% by 20%.

## 13.8 Financial Assistance

None of the Mega Bloks Entities will provide financial assistance (whether by way of loan, Guarantee or otherwise) to any Person, except for financial assistance (i) among the Credit Parties, and (ii) financial assistance to other Persons up to an aggregate outstanding amount at any time not exceeding US $15,000,000.

## 13.9 Derivative Instruments

None of the Mega Bloks Entities will enter into any Hedging Agreement or other derivative instrument or similar transaction for speculative purposes.

## 13.10 Earn-Out Payment

The Borrowers will not fund the Earn-Out Payment from The Canadian Revolving Facility or the US Revolving Facility or from cash on hand unless after giving effect to such payment, (i) the aggregate of the remaining undrawn portions of such Facilities and cash on hand is of at least US$25,000,000, and (ii) the First Lien Leverage Ratio is at least 0.25 less than the required ratio at such time pursuant to Section 14.2.

## 14 - FINANCIAL RATIOS

## 14.1 Funded Debt to EBITDA Ratio

Mega Bloks must maintain on the last day of each fiscal quarter, on a consolidated basis, a Funded Debt to EBITDA Ratio of not more than:

— 4.50:1 until September 30, 2006;

— 3.75:1 from October 1, 2006 to September 30, 2007;

— 3.25:1 from October 1, 2007 to September 30, 2008;

— 2.75:1 thereafter.

## 14.2 First Lien Leverage Ratio

Mega Bloks must maintain on the last day of each fiscal quarter, on a consolidated basis, a First Lien Leverage Ratio of not more than:

— 4.00:1 until September 30, 2006;

— 3.50:1 from October 1, 2006 to September 30, 2007;

— 3.00:1 from October 1, 2007 to September 30, 2008;

— 2.50:1 thereafter.

## 14.3 Fixed Charge Coverage Ratio

Mega Bloks must maintain on the last day of each fiscal quarter, on a consolidated basis, a Fixed Charge Coverage Ratio equal to or greater than 1.25:1.

## 15 - REPORTING REQUIREMENTS

## 15.1 Annual Reporting

The Borrowers will deliver to the Agent, for distribution to the Lenders, as soon as possible and, in any event, within 90 days after the end of each fiscal year of the Borrowers:

(a) the audited annual financial statements of Mega Bloks, on a consolidated basis, accompanied by an audit report with no impermissible qualification and by the applicable consolidating statement by reporting units; for the purposes of the foregoing, an impermissible qualification means any qualification or exception which:

(i) is of a "going concern" or similar nature;

(ii) relates to any limited scope of examination of material matters relevant to such financial statements;

(iii) relates to the treatment or classification of any item in such financial statements and which, as a condition to its removal, would require an adjustment to such item which would result in a Material Adverse Effect; or

(iv) that might suggest that such financial statements as presented are not representative of the operations of Mega Bloks in all material respects;

(b)    the business plan and the operating and capital budgets of Mega Bloks for the current fiscal year and each quarter thereof, prepared on a consolidated basis and also by reporting units;

## 15.2  Quarterly Reports

The Borrowers will deliver to the Agent, for distribution to the Lenders, as soon as possible and, in any event within 45 days after the end of the first, second and third fiscal quarters and 90 days after the end of the fourth quarter of each fiscal year of the Borrowers:

(a)    the unaudited financial statements of Mega Bloks for the relevant fiscal quarter, on a consolidated basis and also by reporting units, accompanied by the applicable consolidating statement by reporting units, together with a comparison to budget and management comments on differences between actual results and budget;

(b)    the financial information permitting to verify compliance with the provisions of Section 1.2(d) regarding the combined EBITDA and assets of the Non-Material Subsidiaries; and

(c)    a compliance certificate relating to the covenants herein in the form of Schedule "I" (with sufficient details to reconcile the financial statements with the calculation base of the financial covenants).

## 15.3  Business Acquisition Report

Within 75 days from the completion of the Acquisition, Mega Bloks will file with the CSA Sedar service and will deliver to the Agent, for distribution to the Lenders, a business acquisition report in the form prescribed by applicable securities regulations in effect as at the date hereof (without taking into account any exemption).

## 15.4  ERISA

Mega Bloks will inform the Agent as soon as possible, and in any event within 10 days after it knows or has reason to believe that any of the events or conditions specified below has occurred or exists (and will provide a copy of any report or notice required to be filed with or given to PBGC):

(a)    any reportable event, as defined in Section 4043(b) of ERISA and the regulations issued thereunder, unless the 30-day notice requirement in respect thereof has been waived by the PBGC;

(b)    a notice of intent to terminate any Pension Plan or any action taken by a Credit Party to terminate any Pension Plan, provided notice of intent to terminate is required pursuant to Section 4041(a)(2) of ERISA;

(c)    the institution by PBGC of proceedings under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan, or

the receipt of a notice from a Multiemployer Plan that such action has been taken by PBGC with respect to such Multiemployer Plan;

(d)     the complete or partial withdrawal from a Multiemployer Plan that results in liability under Section 4201 or 4204 of ERISA or the receipt of notice from a Multiemployer Plan that it is in reorganization or insolvency or that it intends to terminate or has terminated;

(e)     the institution of a proceeding by a fiduciary of any Multiemployer Plan to enforce Section 515 of ERISA, which proceeding is not dismissed within 30 days; and

(f)     the adoption of an amendment to any Pension Plan that, pursuant to Section 401(a)(29) of the US Revenue Code or Section 307 of ERISA, would result in the loss of tax-exempt status of the trust of which such Plan is a part if security has not been provided in accordance with the provisions of these Sections;

## 15.5 Reporting from Time to Time

The Borrowers will promptly notify the Agent of any Default, and of any claim, complaint, notice or enquiry relating to compliance by any Mega Bloks Entity with Environmental Laws and will deliver to the Agent any auditor letter highlighting issues or deficiencies that if not addressed or corrected, could result in a Material Adverse Change. The Borrowers will also furnish to the Agent all information, documents and records and allow any enquiry, study, audit or inspection that the Agent may reasonably request in connection with the business, financial condition, property, assets or prospects of the Credit Parties, or to verify compliance with the obligations of any of the Credit Parties under any Loan Document.

## 15.6 Hedging Agreements

The Borrowers will provide to the Agent, concurrently with the compliance certificate required to be delivered pursuant to Section 15.2, a report on outstanding Hedging Agreements with the Lenders specifying the aggregate notional amounts of all currency Hedging Agreements and all interest rate Hedging Agreements with, in each case, a breakdown by maturities.

## 15.7 Documentation

Any document to be furnished to the Agent by a Borrower must be supplied in a sufficient number of copies for each Lender and two for the Agent (unless such document is sent to the Agent by electronic mail) and promptly after receipt by the Agent, must be forward to the Lenders by the Agent.

## 16 - EVENTS OF DEFAULT AND REMEDIES

### 16.1    Events of Default

The occurrence of one or more of the following events constitutes an event of default ("Event of Default") under the Loan Documents:

(a)    a Borrower defaults in the payment when due of any amount owing under any Facility in respect of principal or interest or fees, or defaults for more than four Business Days in the payment of any other amount owing under a Loan Document or an Hedging Agreement with a Lender;

(b)    a Credit Party (i) fails to make a payment or payments exceeding in the aggregate US $5,000,000 in respect of any indebtedness (other than the Facilities), when and as due, or (ii) is in default under any agreement or agreements relating to indebtedness (other than the Facilities) exceeding US $5,000,000 in the aggregate if the effect of such default is to accelerate or to permit the acceleration of such indebtedness and, in each case, such failure or default continues after the applicable notice or grace period, if any;

(c)    any representation, warranty or certification made or deemed made by a Credit Party in any Loan Document proves to be false or misleading as of the time made in any material respect;

(d)    any of the provisions of Section 1.2, Section 7.3 and of Articles 10 and 14 is not complied with and, but only with respect to Section 1.2 and Article 10, such non-compliance continues unremedied for a period of 15 days;

(e)    a Credit Party becomes unable to pay its debts generally as such debts become due or is adjudicated bankrupt or insolvent;

(f)    a Credit Party (i) applies for or consents to or is the subject of an order for the appointment of a receiver, interim receiver or trustee (or any Person performing similar functions) in respect of itself or of all or a substantial part of its assets, (ii) makes a general assignment for the benefit of its creditors, (iii) takes advantage of any law relating to bankruptcy, insolvency, reorganization, liquidation, dissolution, arrangement or winding-up, or (iv) takes any action for the purpose of effecting any of the foregoing;

(g)    a proceeding (or any similar action) is commenced against a Credit Party seeking (i) its bankruptcy, reorganization, liquidation, dissolution, arrangement or winding-up, or similar relief, (ii) the appointment of a receiver, interim receiver or trustee (or any Person performing similar functions) in respect of itself or of all or any substantial part of its assets, or (iii) the seizure or the attachment of, or the enforcement of remedies on, any part of its assets having a value of more than US $5,000,000, and, in each case, such proceeding (or similar action) is not dismissed or withdrawn after a period of 60 days, provided that such grace period will apply

only if such proceeding (or action) is diligently contested in good faith and does not disrupt the business or normal operations of the Credit Party concerned;

(h)    a Credit Party defaults in the performance of any of its other obligations under a Loan Document and such default continues unremedied for a period of 15 days after notice by the Agent to the Borrowers;

(i)    the 2004 audited financial statements of Rose Art Industries, Inc. and Warren Industries, Inc. are qualified or are materially different (in any adverse manner) from the unaudited 2004 financial statements of the same entities delivered pursuant to Section 9.1;

(j)    a Person (or a group of Persons acting in concert) acquires the Control of Mega Bloks after the date hereof; or

(k)    any of the following events occurs with respect to any Pension Plan: (i) the institution of any steps by any Person to terminate a Pension Plan if, as a result of such termination, any of the Mega Bloks Entities could reasonably be expected to be required to make a contribution to such Pension Plan, or could reasonably expect to incur a liability or obligation to such Pension Plan, in excess of US$1,000,000; or (ii) a contribution failure occurs with respect to any Pension Plan sufficient to give rise to a Lien under Section 302(f) of ERISA.

## 16.2  Remedies

If an Event of Default occurs and is continuing, the Agent may, on giving a notice to the Borrowers, take any one or more of the following actions:

(a)    terminate the right of the Borrowers to use the Facilities;

(b)    declare all indebtedness of the Borrowers under the Loan Documents to be immediately payable and demand immediate payment of the whole or part thereof; and

(c)    exercise all of the rights and remedies of the Agent and the Lenders including their rights and remedies under any Loan Document;

provided that all indebtedness of the Borrower under the Loan Documents will automatically become due and payable without any notice upon the occurrence of any Event of Default specified in Section 16.1(e) or Section 16.1(f).

## 17 - DECISIONS, WAIVERS AND AMENDMENTS

## 17.1  Amendments and Waivers by the Majority Lenders

Subject to the other provisions of this Article 17, the provisions of the Loan Documents may be amended or waived, and consents thereunder may be given, only by an instrument in

writing signed by the Agent, with the approval of the Majority Lenders, and in the case of an amendment, also signed by the relevant Credit Party.

## 17.2 Amendments and Waivers by Unanimous Approval or Special Majority

Except as otherwise expressly provided in this Agreement, an amendment, waiver or consent that relates to any of the following matters must be made or given by an instrument in writing signed by the Agent, with the prior consent of all Lenders, and in the case of an amendment, also signed by the relevant Credit Party:

(a) the extension of the maturity date of any Facility;

(b) any increase in the amount of any Facility or in the Commitment of any Lender;

(c) any postponement of the due date, any subordination or any reduction of any amount payable hereunder;

(d) the reduction of any interest rate, discount rate or fee;

(e) the release or subordination of all or substantially all of the Security or the release of any Credit Party from all or substantially all of its obligations under the Loan Documents;

(f) the provisions of Section 7.3, Section 9.1, Section 18.4, any Event of Default provided in Sections 16.1(a), 16.1(e) and 16.1(f), the provisions of Sections 3, 4, 5, 6 and 7 of Schedule "A" and the definition of the "Majority Lenders";

(g) modify any requirement hereunder that any particular action be taken by all Lenders.

## 17.3 Amendments relating to the Agent or the Issuing Bank

No amendment affecting the rights and obligations of the Agent or the Issuing Bank may be made without the consent of the Agent or the Issuing Bank (as applicable).

## 17.4 Waiver by the Agent Acting Alone

A waiver of the provisions of Section 10.3 may be given by an instrument in writing signed by the Agent acting alone (without the necessity of obtaining any Lender's consent) to the extent such waiver relates only to the leased premises of Rose Art Industries, Inc., located at 38, 42, 68, 74 and Test Cells 11, 13, 15 Passaic Street and 74 South Passaic Street, Wood-Ridge, New Jersey 07075-1004, USA.

## 18 - MISCELLANEOUS

### 18.1  Books and Accounts

The Agent will keep books and accounts evidencing the transactions made pursuant to this Agreement.  Absent manifest error, such books and accounts will be deemed to represent accurately such transactions and the indebtedness of the Borrowers under the Facilities.

### 18.2  Determination

In the absence of manifest error, any determination made by the Agent of the amounts payable hereunder will be conclusive and binding upon the Lenders and the Borrowers.

### 18.3  Prohibition on Assignment by Borrowers

No Borrower may assign its rights, or the amounts to be received by it, under this Agreement.

### 18.4  Breakage Costs

The Borrowers must pay on demand the amount of any loss suffered by a Lender as a result of the conversion or repayment of a Loan before the maturity date of its period, irrespective of the cause of such conversion or repayment (including a repayment resulting from a demand for payment after the occurrence of an Event of Default) or as a result of any failure by a Borrower to act in accordance with any notice of Loan, conversion, renewal, reduction or prepayment.  In the absence of manifest error, a statement prepared by the affected Lender indicating the amount of such loss and the method by which the loss was calculated will be binding and conclusive.

### 18.5  Notes

At the request of a Lender, any Borrower will execute in favour of such Lender a note evidencing its indebtedness to such Lender under this Agreement.

### 18.6  No Waiver

The omission by the Agent or any Lender to exercise any of its rights will not be deemed to be a waiver of the exercise of any such right subsequently.  The omission by the Agent or any Lender to notify any Credit Party of the occurrence of a Default will not be deemed to be a waiver of the right of the Agent or of such Lender to avail itself of such Default.

### 18.7  Irrevocability of Notices of Loans

No Borrower may cancel a notice of Loan, conversion, renewal, reduction or prepayment, unless applicable breakage costs are paid, as contemplated by Section 18.4.

### 18.8 Set-off and Credit Balances

If an Event of Default occurs and is continuing, (i) the Agent and each Lender are authorized to set off and to apply any and all deposits held for any Credit Party against any amount due and payable by any Credit Party under the Loan Documents, and (ii) upon the request of the Agent, Mega Bloks will cause all credit balances in all bank accounts in the names of the Credit Parties to be transferred to an account or accounts in the name of the Agent at a Branch of Account located in the Province of Quebec or in New York State. For greater certainty, the authorization given to the Agent in clause (i) above will also apply to all credit balances in all said accounts in the name of the Agent.

### 18.9 Corrections of Errors

The Agent is authorized to correct any typographical error or other error of an editorial nature in this Agreement and to substitute such corrected text in the counterparts of this Agreement, provided that such corrections do not modify the meaning or the interpretation of this Agreement and provided that copies of the corrected texts are remitted to each party.

### 18.10 Communications

The Agent is entitled to rely in its dealings with any Borrower upon any instruction or notice which the Agent believes in good faith to have been given by a Person authorized to give such instruction or notice or to make the applicable transaction.

### 18.11 Patriot Act

Each Lender hereby notifies the Borrowers that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies the Borrowers, which information includes the name and address of the Borrowers and other information that will allow such Lender to identify the Borrowers in accordance with the Patriot Act.

### 18.12 - Notices

Unless otherwise provided in this Agreement, any notice to be given to a party in connection with this Agreement will be addressed to the recipient at its address specified in Schedule "J" hereof or at such other address as may be notified by such party to the others pursuant to Section 8 of Schedule "A".

IN WITNESS WHEREOF the parties have caused this Agreement to be duly executed as of the date and year first above written.

MEGA BLOKS INC.

Per: _____

Per: _____

ROSE ART INDUSTRIES, INC.

Per: _____

3102448 NOVA SCOTIA COMPANY

Per: _____

THE BANK OF NOVA SCOTIA,
as Agent

Per: _____
Ian D. McKay
Director

Per: _____
Stella Luna
Associate Director

*(the names and signatures of the Lenders
are on the next page)*

| COMMITMENTS | | LENDERS |
|---|---|---|
| Canadian Revolving Facility: | US$30,000,000 | THE BANK OF NOVA SCOTIA, as Lender |
| Term A Facility: | US$20,000,000 | |
| US Revolving Facility: | US$20,000,000 | THE BANK OF NOVA SCOTIA, NEW YORK BRANCH, as Lender |
| Term B Facility: | US$130,000,000 | |
| Canadian Revolving Facility: | US$30,000,000 | BANK OF MONTREAL, as Lender |
| Term A Facility: | US$20,000,000 | |
| US Revolving Facility: | US$20,000,000 | BANK OF MONTREAL, CHICAGO BRANCH, as Lender |
| Term B Facility: | US$130,000,000 | |

**COMMITMENTS**

Canadian Revolving Facility: US$30,000,000

**LENDERS**

THE BANK OF NOVA SCOTIA,
as Lender

Per: _____

Term A Facility: US$20,000,000

Per: _____

US Revolving Facility: US$20,000,000

THE BANK OF NOVA SCOTIA,
NEW YORK BRANCH, as Lender

Per: _____

Term B Facility: US$130,000,000

Per: _____

Canadian Revolving Facility: US$30,000,000

BANK OF MONTREAL, as Lender

Per: _____

Term A Facility: US$20,000,000

US Revolving Facility: US$20,000,000

BANK OF MONTREAL, CHICAGO BRANCH,
as Lender

Per: _____

Term B Facility: US$130,000,000

Per: _____

| COMMITMENTS | | LENDERS |
|---|---|---|
| Canadian Revolving Facility: | US$30,000,000 | THE BANK OF NOVA SCOTIA, as Lender |
| | | Per: _____ |
| Term A Facility: | US$20,000,000 | |
| | | Per: _____ |
| US Revolving Facility: | US$20,000,000 | THE BANK OF NOVA SCOTIA, NEW YORK ~~BRANCH~~ Agency, as Lender |
| | | Per: _____ Todd Meller Managing Director |
| Term B Facility: | US$130,000,000 | |
| | | Per: _____ Brian Allen Managing Director |
| Canadian Revolving Facility: | US$30,000,000 | BANK OF MONTREAL, as Lender |
| | | Per: _____ |
| Term A Facility: | US$20,000,000 | |
| US Revolving Facility: | US$20,000,000 | BANK OF MONTREAL, NEW YORK BRANCH, as Lender |
| | | Per: _____ |
| Term B Facility: | US$130,000,000 | |
| | | Per: _____ |

*MTL_LAW #1664789 v. 13*

| COMMITMENTS | | LENDERS |
|---|---|---|
| Canadian Revolving Facility: | US$30,000,000 | **THE BANK OF NOVA SCOTIA,** as Lender |
| | | Per: _____ |
| Term A Facility: | US$20,000,000 | |
| | | Per: _____ |
| US Revolving Facility: | US$20,000,000 | **THE BANK OF NOVA SCOTIA, NEW YORK BRANCH,** as Lender |
| | | Per: _____ |
| Term B Facility: | US$130,000,000 | |
| | | Per: _____ |
| Canadian Revolving Facility: | US$30,000,000 | **BANK OF MONTREAL,** as Lender |
| | | Per: _____ |
| Term A Facility: | US$20,000,000 | |
| US Revolving Facility: | US$20,000,000 | **BANK OF MONTREAL, CHICAGO BRANCH,** as Lender |
| | | Per: _Bruce R Fith_ |
| Term B Facility: | US$130,000,000 | |
| | | Per: _____ |

# S C H E D U L E  " A "

## GENERAL PROVISIONS

The attached model credit agreement Provisions form part of this Agreement, except for the footnotes to the model credit agreement provisions and subject to the following variations:

### VARIATIONS

1.  The terms "Affiliate", "Control", "Default" and "Loan" as used in the Provisions have the respective meanings set out in Section 1.1 of the Agreement (and not in Section 1 of the Provisions).

2.  The term "Borrower" as used in the Provisions refers to all Borrowers under the Agreement or, whenever the context may require, to the applicable Borrower.

3.  The Loans under the Term B Facility are considered for the purposes of the definition of Excluded Taxes in the Provisions as Loans made on the premise that an exemption from withholding tax would be available. Accordingly, withholding taxes in respect of Loans and other obligations under the Term B Facility are not Excluded Taxes.

4.  The definition of "Excluded Taxes" as used in the Provisions is amended by adding the words "gross income, gross receipts or profits or its capital or net worth" after the words "its net income" in the third line.

5.  The terms "Required Lenders" and "LIBO Rate Loan" as used in the Provisions have the meaning assigned to the terms "Majority Lenders" and "Libor Loan", respectively, in Section 1.1 of the Agreement.

6.  Any reference to the Administrative Agent in the Provisions is a reference to the Agent under and as defined in the Agreement.

7.  Any determination permitted to be made by the Required Lenders under Section 3.5 of the Provisions will be made by the Agent (instead of by the Required Lenders).

8.  The following sentence is added at the end of Section 7.5 of the Provisions: "In no event, shall the Administrative Agent be required to exercise any right or power, if in its judgment, doing so would contravene any Loan Document or Applicable Law or where the Administrative Agent determines that the indemnification provided in this Section 7.5 is not adequate.".

9.  The last sentence of Section 7.7(1) of the Provisions is removed.

10. Section 7.9 of the Provisions is amended by adding the following words at the end of the second sentence: "to the extent such prior written agreement is required under this Agreement".

11. The text of clause (v) of Section 10(b) of the Provisions is replaced by the following:

    "(v) any assignment must be approved by the Borrower (such approval not to be unreasonably withheld or delayed, it being understood that the Borrower may withhold its approval if the assignment were to increase its obligations pursuant to Section 3.2) unless the proposed assignee is itself already a Lender with a Commitment under the credit to which the assignment relates or a Default has occurred and is continuing;"

12. The second paragraph of Section 10(d) of the Provisions and the text of Section 10(e) of the Provisions are removed.

\* \* \*

## MODEL CREDIT AGREEMENT PROVISIONS

### 1. Definitions

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Agreement" means the credit agreement of which these Provisions form part.

"Applicable Law" means (a) any domestic or foreign statute, law (including common and civil law), treaty, code, ordinance, rule, regulation, restriction or by-law (zoning or otherwise); (b) any judgement, order, writ, injunction, decision, ruling, decree or award; (c) any regulatory policy, practice, guideline or directive; or (d) any franchise, licence, qualification, authorization, consent, exemption, waiver, right, permit or other approval of any Governmental Authority, binding on or affecting the Person referred to in the context in which the term is used or binding on or affecting the property of such Person, in each case whether or not having the force of law.

"Applicable Percentage" means with respect to any Lender, the percentage of the total Commitments represented by such Lender's Commitment. If the Commitments have terminated or expired, the Applicable Percentages shall be the percentage of the total outstanding Loans and participations in respect of Letters of Credit represented by such Lender's outstanding Loans and participations in respect of Letters of Credit.

"Approved Fund" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee and accepted by the Administrative Agent, in substantially the form of Exhibit A or any other form approved by the Administrative Agent.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any Applicable Law, (b) any change in any Applicable Law or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any Applicable Law by any Governmental Authority.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have corresponding meanings.

"Default" means any event or condition that constitutes an Event of Default or that would constitute an Event of Default except for satisfaction of any condition subsequent required to make the event or condition an Event of Default, including giving of any notice, passage of time, or both.

"Eligible Assignee" means any Person (other than a natural person, any Obligor or any Affiliate of an Obligor), in respect of which any consent that is required by Section 10(b) has been obtained.

"Excluded Taxes" means, with respect to the Administrative Agent, any Lender, the Issuing Bank or any other recipient of any payment to be made by or on account of any obligation of an Obligor hereunder, (a) taxes imposed on or measured by its net income, and franchise taxes imposed on it (in lieu of net income taxes), by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable lending office is located, (b) any branch profits taxes or any similar tax imposed by any jurisdiction in which the Lender is located and (c) in the case of a Foreign Lender (other than (i) an assignee pursuant to a request by the Borrower under Section 3.3(b), (ii) an assignee pursuant to an Assignment and Assumption made when an Event of Default has occurred and is continuing or (iii) any other assignee to the extent that the Borrower has expressly agreed that any withholding tax shall be an Indemnified Tax), any withholding tax that (A) is not imposed or assessed in respect of a Loan that was made on the premise that an exemption from such withholding tax would be available where the exemption is subsequently determined, or alleged by a taxing authority, not to be available and (B) is required by Applicable Law to be withheld or paid in respect of any amount payable hereunder or under any Loan Document to such Foreign Lender at the time such Foreign Lender becomes a party hereto (or designates a new lending office) or is attributable to such Foreign Lender's failure or inability (other than as a result of a Change in Law) to comply with Section 3,2(e), except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from an Obligor with respect to such withholding tax pursuant to Section 3,2(a). For greater certainty, for purposes of item (c) above, a withholding tax includes any Tax that a Foreign Lender is required to pay pursuant to Part XIII of the Income Tax Act (Canada) or any successor provision thereto.1

"Foreign Lender" means any Lender that is not organized under the laws of the jurisdiction in which the Borrower is resident for tax purposes and that is not otherwise considered or deemed in respect of any amount payable to it hereunder or under any Loan Document to be resident for income tax or withholding tax purposes in the jurisdiction in which the Borrower is resident for tax purposes by application of the laws of that jurisdiction. For purposes of this definition Canada and each Province and Territory thereof shall be deemed to constitute a single jurisdiction and the United States of America, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"Governmental Authority" means the government of Canada or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government, including any supra-national bodies such as the European Union or the European Central Bank and including a Minister of the Crown, Superintendent of Financial Institutions or other comparable authority or agency.

"Indemnified Taxes" means Taxes other than Excluded Taxes.

"Issuing Bank" means the Person named elsewhere in this Agreement2 as the issuer of Letters of Credit on the basis that it is "fronting" for other Lenders and not on the basis that it is the

---

1      Please note that this definition of "Excluded Taxes" will result in Foreign Lenders not being grossed up for withholding taxes that exist at the time of execution and delivery of the Credit Agreement, except in the circumstances specified. If a loan is intended to be exempt from withholding tax as a "5/25" structure or otherwise, this premise should be specified in the Credit Agreement.

2      Ensure that the Credit Agreement identifies the Issuing Bank or indicates that there is none.

attorney of other Lenders to sign Letters of Credit on their behalf, or any successor issuer of Letters of Credit. For greater certainty, where the context requires, references to "Lenders" in these Provisions include the Issuing Bank.

"Loan" means any extension of credit by a Lender under this Agreement, including by way of bankers' acceptance or LIBO Rate Loan, except for any Letter of Credit or participation in a Letter of Credit.

"Obligors" means, collectively, the Borrower and each of the guarantors of the Borrower's obligations that are identified elsewhere in this Agreement.

"Other Taxes" means all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or under any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

"Participant" has the meaning assigned to such term in Section 10(d).

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Provisions" means these model credit agreement provisions.

"Related Parties" means, with respect to any Person, such Person's Affiliates and the directors, officers, employees, agents and advisors of such Person and of such Person's Affiliates.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

## 2. Terms Generally

(1)     The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein (including this Agreement) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented, restated or otherwise modified (subject to any restrictions on such amendments, supplements, restatements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and permitted assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) unless otherwise expressly stated, all references in these Provisions to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, these Provisions, but all such references elsewhere in this Agreement shall be construed to refer to this Agreement apart from these Provisions, (e) any reference to any law or regulation herein shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time and (f) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(2)     If there is any conflict or inconsistency between these Provisions and the other terms of this Agreement, the other terms of this Agreement shall govern to the extent necessary to resolve the conflict or inconsistency.

3. Yield Protection

3.1     Increased Costs.

(a) Increased Costs Generally. If any Change in Law shall:

(i) impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender;

(ii) subject any Lender to any Tax of any kind whatsoever with respect to this Agreement, any Letter of Credit, any participation in a Letter of Credit or any Loan made by it, or change the basis of taxation of payments to such Lender in respect thereof, except for Indemnified Taxes or Other Taxes covered by Section 3.2 and the imposition, or any change in the rate, of any Excluded Tax payable by such Lender; or

(iii) impose on any Lender or any applicable interbank market any other condition, cost or expense affecting this Agreement or Loans made by such Lender or any Letter of Credit or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Loan (or of maintaining its obligation to make any such Loan), or to increase the cost to such Lender or the Issuing Bank of participating in, issuing or maintaining any Letter of Credit (or of maintaining its obligation to participate in or to issue any Letter of Credit), or to reduce the amount of any sum received or receivable by such Lender or the Issuing Bank hereunder (whether of principal, interest or any other amount), then upon request of such Lender the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b) Capital Requirements. If any Lender determines that any Change in Law affecting such Lender or any lending office of such Lender or such Lender's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by, or the Letters of Credit issued or participated in by such Lender, to a level below that which such Lender or its holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of its holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or its holding company for any such reduction suffered.

(c) Certificates for Reimbursement. A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section, including reasonable detail of the basis of calculation of the amount or amounts, and delivered to the Borrower shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

(d) Delay in Requests. Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation, except that the Borrower shall not be required to compensate a Lender pursuant to this Section for any increased costs incurred or reductions suffered more than nine months prior to the date

that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefore, unless the Change in Law giving rise to such increased costs or reductions is retroactive, in which case the nine-month period referred to above shall be extended to include the period of retroactive effect thereof.

3.2    Taxes.

(a) Payments Subject to Taxes. If any Obligor, the Administrative Agent, or any Lender is required by Applicable Law to deduct or pay any Indemnified Taxes (including any Other Taxes) in respect of any payment by or on account of any obligation of an Obligor hereunder or under any other Loan Document, then (i) the sum payable shall be increased by that Obligor when payable as necessary so that after making or allowing for all required deductions and payments (including deductions and payments applicable to additional sums payable under this Section) the Administrative Agent or Lender, as the case may be, receives an amount equal to the sum it would have received had no such deductions or payments been required, (ii) the Obligor shall make any such deductions required to be made by it under Applicable Law and (iii) the Obligor shall timely pay the full amount required to be deducted to the relevant Governmental Authority in accordance with Applicable Law.

(b) Payment of Other Taxes by the Borrower. Without limiting the provisions of paragraph (a) above, the Borrower shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with Applicable Law.

(c) Indemnification by the Borrower. The Borrower shall indemnify the Administrative Agent and each Lender, within 10 days after demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed on or attributable to amounts payable under this Section) paid by the Administrative Agent or such Lender and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d) Evidence of Payments. As soon as practicable after any payment of Indemnified Taxes or Other Taxes by an Obligor to a Governmental Authority, the Obligor shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e) Status of Lenders. Any Foreign Lender that is entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which the Borrower is resident for tax purposes, or any treaty to which such jurisdiction is a party, with respect to payments hereunder or under any other Loan Document shall, at the request of the Borrower, deliver to the Borrower (with a copy to the Administrative Agent), at the time or times prescribed by Applicable Law or reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by Applicable Law as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, (a) any Lender, if requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by Applicable Law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to withholding or information reporting requirements, and (b) any Lender that ceases to be, or to be deemed to be, resident in Canada for purposes of Part XIII of the Income Tax Act (Canada) or any successor provision thereto shall within five days thereof notify the Borrower and the Administrative Agent in writing.

(f) <u>Treatment of Certain Refunds and Tax Reductions</u>. If the Administrative Agent or a Lender determines, in its sole discretion, that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which an Obligor has paid additional amounts pursuant to this Section or that, because of the payment of such Taxes or Other Taxes, it has benefited from a reduction in Excluded Taxes otherwise payable by it, it shall pay to the Borrower or Obligor, as applicable, an amount equal to such refund or reduction (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower or Obligor under this Section with respect to the Taxes or Other Taxes giving rise to such refund or reduction), net of all out-of-pocket expenses of the Administrative Agent or such Lender, as the case may be, and without interest (other than any net after-Tax interest paid by the relevant Governmental Authority with respect to such refund). The Borrower or Obligor as applicable, upon the request of the Administrative Agent or such Lender, agrees to repay the amount paid over to the Borrower or Obligor (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender if the Administrative Agent or such Lender is required to repay such refund or reduction to such Governmental Authority. This paragraph shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Borrower or any other Person, to arrange its affairs in any particular manner or to claim any available refund or reduction.

3.3    <u>Mitigation Obligations: Replacement of Lenders</u>.

(a) <u>Designation of a Different Lending Office</u>. If any Lender requests compensation under Section 3.1, or requires the Borrower to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.2 , then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.1 or 3.2 , as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b) <u>Replacement of Lenders</u>.3 If any Lender requests compensation under Section 3.1, if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.2, if any Lender's obligations are suspended pursuant to Section 3.4 or if any Lender defaults in its obligation to fund Loans hereunder, then the Borrower may, at its sole expense and effort, upon 10 days' notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 10), all of its interests, rights and obligations under this Agreement and the related Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), provided that:

(i) the Borrower pays the Administrative Agent the assignment fee specified in Section 10(b)(vi);

(ii) the assigning Lender receives payment of an amount equal to the outstanding principal of its Loans and participations in disbursements under Letters of Credit, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any breakage costs and amounts required to be paid under this Agreement as a result of prepayment to a Lender) from the assignee (to

---

3    Please note that the Breakfunding section in the Credit Agreement should expressly include any amounts payable as a result of an assignment required by this Section.

the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts);

(iii) in the case of any such assignment resulting from a claim for compensation under Section 3.1 or payments required to be made pursuant to Section 3.2, such assignment will result in a reduction in such compensation or payments thereafter; and

(iv) such assignment does not conflict with Applicable Law.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

3.4     Illegality.

If any Lender determines that any Applicable Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable Lending Office to make or maintain any Loan (or to maintain its obligation to make any Loan), or to participate in, issue or maintain any Letter of Credit (or to maintain its obligation to participate in or to issue any Letter of Credit), or to determine or charge interest rates based upon any particular rate, then, on notice thereof by such Lender to the Borrower through the Administrative Agent, any obligation of such Lender with respect to the activity that is unlawful shall be suspended until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist. Upon receipt of such notice, the Borrower shall, upon demand from such Lender (with a copy to the Administrative Agent), prepay or, if conversion would avoid the activity that is unlawful, convert any Loans, or take any necessary steps with respect to any Letter of Credit in order to avoid the activity that is unlawful. Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted. Each Lender agrees to designate a different Lending Office if such designation will avoid the need for such notice and will not, in the good faith judgment of such Lender, otherwise be materially disadvantageous to such Lender.

3.5     Inability to Determine Rates Etc.

If the Required Lenders determine that for any reason a market for bankers' acceptances does not exist at any time or the Lenders cannot for other reasons, after reasonable efforts, readily sell bankers' acceptances or perform their other obligations under this Agreement with respect to bankers' acceptances, the Administrative Agent will promptly so notify the Borrower and each Lender. Thereafter, the Borrower's right to request the acceptance of bankers' acceptances shall be and remain suspended until the Required Lenders determine and the Agent notifies the Borrower and each Lender that the condition causing such determination no longer exists. If the Required Lenders determine that for any reason adequate and reasonable means do not exist for determining the LIBO Rate for any requested Interest Period with respect to a proposed LIBO Rate Loan, or that the LIBO Rate for any requested Interest Period with respect to a proposed LIBO Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, the Administrative Agent will promptly so notify the Borrower and each Lender. Thereafter, the obligation of the Lenders to make or maintain LIBO Rate Loans shall be suspended until the Administrative Agent (upon the instruction of the Required Lenders) revokes such notice. Upon receipt of such notice, the Borrower may revoke any pending request for a borrowing, conversion or continuation of LIBO Rate Loans or, failing that, will be deemed to have converted such request into a request for a borrowing of Base Rate Loans in the amount specified therein.

4. Right of Setoff.

If an Event of Default has occurred and is continuing, each of the Lenders and each of their respective Affiliates is hereby authorized at any time and from time to time to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other

obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of any Obligor against any and all of the obligations of the Borrower now or hereafter existing under this Agreement or any other Loan Document to such Lender, irrespective of whether or not such Lender has made any demand under this Agreement or any other Loan Document and although such obligations of the Obligor may be contingent or unmatured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness. The rights of each the Lenders and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff, consolidation of accounts and bankers' lien) that the Lenders or their respective Affiliates may have. Each Lender agrees to promptly notify the Borrower and the Administrative Agent after any such setoff and application, but the failure to give such notice shall not affect the validity of such setoff and application. If any Affiliate of a Lender exercises any rights under this Section 4, it shall share the benefit received in accordance with Section 5 as if the benefit had been received by the Lender of which it is an Affiliate.

5. Sharing of Payments by Lenders.

If any Lender, by exercising any right of setoff or counterclaim or otherwise, obtains any payment or other reduction that might result in such Lender receiving payment or other reduction of a proportion of the aggregate amount of its Loans and accrued interest thereon or other obligations hereunder greater than its pro rata share thereof as provided herein, then the Lender receiving such payment or other reduction shall (a) notify the Administrative Agent of such fact, and (b) purchase (for cash at face value) participations in the Loans and such other obligations of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders rateably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and other amounts owing them, provided that

> (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest,

> (ii) the provisions of this Section shall not be construed to apply to (x) any payment made by any Obligor pursuant to and in accordance with the express terms of this Agreement or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans or participations in disbursements under Letters of Credit to any assignee or participant, other than to any Obligor or any Affiliate of an Obligor (as to which the provisions of this Section shall apply); and

> (iii) the provisions of this Section shall not be construed to apply to (w) any payment made while no Event of Default has occurred and is continuing in respect of obligations of the Borrower to such Lender that do not arise under or in connection with the Loan Documents, (x) any payment made in respect of an obligation that is secured by a Permitted Lien or that is otherwise entitled to priority over the Borrower's obligations under or in connection with the Loan Documents, (y) any reduction arising from an amount owing to an Obligor upon the termination of derivatives entered into between the Obligor and such Lender4, or (z) any payment to which such Lender is entitled as a result of any form of credit protection obtained by such Lender.

---

4  Those preparing Credit Agreements should consider whether this exclusion of proceeds of derivatives is appropriate in the particular circumstances of the Credit Agreement. It may be appropriate to provide for sharing of, for example, any net amount available after the termination of all derivatives entered into between the Obligors and a Lender and the setoff of resulting amounts owing by the Obligors and to the Obligors if there is more than one such derivative.

The Obligors consent to the foregoing and agree, to the extent they may effectively do so under Applicable Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against each Obligor rights of setoff and counterclaim and similar rights of Lenders with respect to such participation as fully as if such Lender were a direct creditor of each Obligor in the amount of such participation.

6. Administrative Agent's Clawback

(a) Funding by Lenders; Presumption by Administrative Agent. Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any advance of funds that such Lender will not make available to the Administrative Agent such Lender's share of such advance, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with the provisions of this Agreement concerning funding by Lenders and may, in reliance upon such assumption, make available to the Borrower a corresponding amount. In such event, if a Lender has not in fact made its share of the applicable advance available to the Administrative Agent, then the applicable Lender shall pay to the Administrative Agent forthwith on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at a rate determined by the Administrative Agent in accordance with prevailing banking industry practice on interbank compensation. If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such advance. If the Lender does not do so forthwith, the Borrower shall pay to the Administrative Agent forthwith on demand such corresponding amount with interest thereon at the interest rate applicable to the advance in question. Any payment by the Borrower shall be without prejudice to any claim the Borrower may have against a Lender that has failed to make such payment to the Administrative Agent.

(b) Payments by Borrower; Presumptions by Administrative Agent. Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of any Lender hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute the amount due to the Lenders. In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at a rate determined by the Administrative Agent in accordance with prevailing banking industry practice on interbank compensation.

7. Agency.

7.1    Appointment and Authority. Each of the Lenders and the Issuing Bank hereby irrevocably appoints the Person identified elsewhere in this Agreement as the Administrative Agent[5] to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. The provisions of this Article are solely for the benefit of the Administrative Agent, the Lenders and the Issuing Bank, and no Obligor shall have rights as a third party beneficiary of any of such provisions.

7.2    Rights as a Lender. The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent and the term "Lender" or "Lenders" shall, unless otherwise

---

5       Ensure that the Credit Agreement identifies the Administrative Agent for the purpose of this reference

expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with any Obligor or any Affiliate thereof as if such Person were not the Administrative Agent and without any duty to account to the Lenders.

7.3    Exculpatory Provisions.

(1)    The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents.6 Without limiting the generality of the foregoing, the Administrative Agent:

   (a)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

   (b)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for in the Loan Documents), but the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or Applicable Law; and

   (c)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the person serving as the Administrative Agent or any of its Affiliates in any capacity. ·

(2)    The Administrative Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as is necessary, or as the Administrative Agent believes in good faith is necessary, under the provisions of the Loan Documents) or (ii) in the absence of its own gross negligence or wilful misconduct. The Administrative Agent shall be deemed not to have knowledge of any Default unless and until notice describing the Default is given to the Administrative Agent by the Borrower or a Lender.

(3)    Except as otherwise expressly specified in this Agreement, the Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or (v) the satisfaction of any condition specified in this Agreement, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

7.4    Reliance by Administrative Agent. The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for

---

6       It is anticipated that the Credit Agreement will require the Borrower to be responsible for compliance with all requirements to maintain perfection of security.

relying thereon. In determining compliance with any condition hereunder to the making of a Loan, or the issuance of a Letter of Credit, that by its terms must be fulfilled to the satisfaction of a Lender or the Issuing Bank, the Administrative Agent may presume that such condition is satisfactory to such Lender or the Issuing Bank unless the Administrative Agent shall have received notice to the contrary from such Lender or the Issuing Bank prior to the making of such Loan or the issuance of such Letter of Credit. The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

7.5    Indemnification of Administrative Agent. Each Lender agrees to indemnify the Administrative Agent and hold it harmless (to the extent not reimbursed by the Borrower), rateably according to its Applicable Percentage (and not jointly or jointly and severally) from and against any and all losses, claims, damages, liabilities and related expenses, including the fees, charges and disbursements of any counsel, which may be incurred by or asserted against the Administrative Agent in any way relating to or arising out of the Loan Documents or the transactions therein contemplated. However, no Lender shall be liable for any portion of such losses, claims, damages, liabilities and related expenses resulting from the Administrative Agent's gross negligence or wilful misconduct.

7.6    Delegation of Duties. The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent from among the Lenders (including the Person serving as Administrative Agent) and their respective Affiliates. The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The provisions of this Article and other provisions of this Agreement for the benefit of the Administrative Agent shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

7.7    Replacement of Administrative Agent.

(1)    The Administrative Agent may at any time give notice of its resignation to the Lenders, the Issuing Bank and the Borrower. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with the Borrower, to appoint a successor, which shall be a Lender having a Commitment to a revolving credit if one or more is established in this Agreement and having an office in Toronto, Ontario or Montréal, Québec, or an Affiliate of any such Lender with an office in Toronto or Montréal. The Administrative Agent may also be removed at any time by the Required Lenders upon 30 days' notice to the Administrative Agent and the Borrower as long as the Required Lenders, in consultation with the Borrower, appoint and obtain the acceptance of a successor within such 30 days, which shall be a Lender having a Commitment to a revolving credit if one or more is established in this Agreement and having an office in Toronto or Montréal, or an Affiliate of any such Lender with an office in Toronto or Montréal.

(2)    If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may on behalf of the Lenders, appoint a successor Administrative Agent meeting the qualifications specified in Section 7.7(1), provided that if the Administrative Agent shall notify the Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders under any of the Loan Documents, the retiring Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (2) all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly,

until such time as the Required Lenders appoint a successor Administrative Agent as provided for above in the preceding paragraph.

(3)      Upon a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the former Administrative Agent, and the former Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided in the preceding paragraph). The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the termination of the service of the former Administrative Agent, the provisions of this Section 7 and of Section 9 shall continue in effect for the benefit of such former Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the former Administrative Agent was acting as Administrative Agent.

7.8      Non-Reliance on Administrative Agent and Other Lenders. Each Lender and the Issuing Bank acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender and the Issuing Bank also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

7.9      Collective Action of the Lenders. Each of the Lenders hereby acknowledges that to the extent permitted by Applicable Law, any collateral security and the remedies provided under the Loan Documents to the Lenders are for the benefit of the Lenders collectively and acting together and not severally and further acknowledges that its rights hereunder and under any collateral security are to be exercised not severally, but by the Administrative Agent upon the decision of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for in the Loan Documents). Accordingly, notwithstanding any of the provisions contained herein or in any collateral security, each of the Lenders hereby covenants and agrees that it shall not be entitled to take any action hereunder or thereunder including, without limitation, any declaration of default hereunder or thereunder but that any such action shall be taken only by the Administrative Agent with the prior written agreement of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for in the Loan Documents). Each of the Lenders hereby further covenants and agrees that upon any such written agreement being given, it shall co-operate fully with the Administrative Agent to the extent requested by the Administrative Agent. Notwithstanding the foregoing, in the absence of instructions from the Lenders and where in the sole opinion of the Administrative Agent, acting reasonably and in good faith, the exigencies of the situation warrant such action, the Administrative Agent may without notice to or consent of the Lenders take such action on behalf of the Lenders as it deems appropriate or desirable in the interest of the Lenders.

7.10     No Other Duties. etc. Anything herein to the contrary notwithstanding, none of the Bookrunners, Arrangers or holders of similar titles, if any, specified in this Agreement shall have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as the Administrative Agent or a Lender hereunder.

8. Notices: Effectiveness: Electronic Communication

(a) Notices Generally. Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier

service, mailed by certified or registered mail or sent by telecopier to the addresses or telecopier numbers specified elsewhere in this Agreement7 or, if to a Lender, to it at its address or telecopier number specified in the Register or, if to an Obligor other than the Borrower, in care of the Borrower.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopier shall be deemed to have been given when sent (except that, if not given on a business day between 9:00 a.m. and 5:00 p.m. local time where the recipient is located, shall be deemed to have been given at 9:00 a.m. on the next business day for the recipient). Notices delivered through electronic communications to the extent provided in paragraph (b) below, shall be effective as provided in said paragraph (b).

(b) Electronic Communications. Notices and other communications to the Lenders and the Issuing Bank hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent,8 provided that the foregoing shall not apply to notices to any Lender of Loans to be made or Letters of Credit to be issued if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication. The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c) Change of Address. Etc. Any party hereto may change its address or telecopier number for notices and other communications hereunder by notice to the other parties hereto.

9. Expenses; Indemnity: Damage Waiver 9

(a) Costs and Expenses. The Borrower shall pay (i) all reasonable out-of-pocket expenses incurred by the Administrative Agent and its Affiliates, including the reasonable fees, charges and disbursements of counsel for the Administrative Agent, in connection with the syndication of the credit facilities provided for herein, the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all reasonable out-of-pocket expenses incurred by the Issuing Bank in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand for payment thereunder and (iii) all reasonable out-of-pocket expenses incurred by the Administrative Agent, any Lender or the Issuing Bank, including the reasonable fees, charges and disbursements of counsel, in connection with the enforcement or protection of its rights in connection with this Agreement and the other

---

7       Ensure that the Credit Agreement contains the contact information referred to.

8       Administrative Agents may wish to prescribe procedures for electronic communications and to disseminate those procedures to Lenders.

9       A reference to this Section should be included in the Survival Section, if any, of the Credit Agreement.

Loan Documents, including its rights under this Section, or in connection with the Loans made or Letters of Credit issued hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans or Letters of Credit.

(b) Indemnification by the Borrower. The Borrower shall indemnify the Administrative Agent (and any sub-agent thereof), each Lender and the Issuing Bank, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including the fees, charges and disbursements of any counsel for any Indemnitee, incurred by any Indemnitee or asserted against any Indemnitee by any third party or by any Obligor arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance or non-performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation or non-consummation of the transactions contemplated hereby or thereby, (ii) any Loan or Letter of Credit or the use or proposed use of the proceeds therefrom (including any refusal by the Issuing Bank to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit), (iii) any actual or alleged presence or Release of Hazardous Materials on or from any property owned or operated by any Obligor, or any Environmental Liability related in any way to any Obligor, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by an Obligor and regardless of whether any Indemnitee is a party thereto, provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or wilful misconduct of such Indemnitee or (y) result from a claim brought by the Borrower or any other Obligor against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if the Obligor has obtained a final and nonappealable judgment in its favour on such claim as determined by a court of competent jurisdiction, nor shall it be available in respect of matters specifically addressed in Sections 3.1, 3.2 and 9(a).

(c) Reimbursement by Lenders. To the extent that the Borrower for any reason fails to indefeasibly pay any amount required under paragraph (a) or (b) of this Section to be paid by it to the Administrative Agent (or any sub-agent thereof), the Issuing Bank or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent), the Issuing Bank or such Related Party, as the case may be, such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent) or the Issuing Bank in its capacity as such, or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent) or Issuing Bank in connection with such capacity. The obligations of the Lenders under this paragraph (c) are subject to the other provisions of this Agreement concerning several liability of the Lenders.

(d) Waiver of Consequential Damages. Etc. To the fullest extent permitted by Applicable Law, the Obligors shall not assert, and hereby waive, any claim against any Indemnitee, on any theory of liability, for indirect, consequential, punitive, aggravated or exemplary damages (as opposed to direct damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby (or any breach thereof), the transactions contemplated hereby or thereby, any Loan or Letter of Credit or the use of the proceeds thereof. No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby.

(e) <u>Payments</u>. All amounts due under this Section shall be payable promptly after demand therefor. A certificate of the Administrative Agent or a Lender setting forth the amount or amounts owing to the Administrative Agent, Lender or a sub-agent or Related Party, as the case may be, as specified in this Section, including reasonable detail of the basis of calculation of the amount or amounts, and delivered to the Borrower shall be conclusive absent manifest error.

## 10. Successors and Assigns

(a) <u>Successors and Assigns Generally</u>. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Obligor may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee in accordance with the provisions of paragraph (b) of this Section, (ii) by way of participation in accordance with the provisions of paragraph (d) of this Section, or (iii) by way of pledge or assignment of a security interest subject to the restrictions of paragraph (f) of this Section (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in paragraph (d) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b) <u>Assignments by Lenders</u>. Any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); <u>provided</u> that:

(i) except if an Event of Default has occurred and is continuing or in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and the Loans at the time owing to it or in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund with respect to a Lender, the aggregate amount of the Commitment being assigned (which for this purpose includes Loans outstanding thereunder) or, if the applicable Commitment is not then in effect, the principal outstanding balance of the Loan of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date) shall not be less than $5,000,000, in the case of any assignment in respect of a revolving facility, or $1,000,000, in the case of any assignment in respect of a term facility, unless each of the Administrative Agent and, so long as no Default has occurred and is continuing, the Borrower otherwise consent to a lower amount (each such consent not to be unreasonably withheld or delayed);

(ii) each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loan or the Commitment assigned, except that this clause (ii) shall not prohibit any Lender from assigning all or a portion of its rights and obligations among separate credits on a non-*pro rata* basis;

(iii) any assignment of a Commitment relating to a credit under which Letters of Credit may be issued must be approved by any Issuing Bank (such approval not to be unreasonably withheld or delayed) unless the Person that is the proposed assignee is itself already a Lender with a Commitment under that credit;

(iv) any assignment must be approved by the Administrative Agent, (such approval not to be unreasonably withheld or delayed) unless:

(x) in the case of an assignment of a Commitment relating to a revolving credit, the proposed assignee is itself already a Lender with the same type of Commitment,

(y) no Event of Default has occurred and is continuing, and the assignment is of a Commitment relating to a non-revolving credit that is fully advanced, or

(z) the proposed assignee is a bank whose senior, unsecured, non-credit enhanced, long term debt is rated at least A3, A- or A low by at least two of Moody's Investor Services Inc., Standard & Poor's, a division of The McGraw-Hill Companies, Inc. and Dominion Bond Rating Service Limited, respectively;

(v) any assignment must be approved by the Borrower (such approval not to be unreasonably withheld or delayed) unless the proposed assignee is itself already a Lender with the same type of Commitment or a Default has occurred and is continuing; and

(vi) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee in an amount specified elsewhere in this Agreement10 and the Eligible Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to paragraph (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement and the other Loan Documents, including any collateral security, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 3 and 9, and shall continue to be liable for any breach of this Agreement by such Lender, with respect to facts and circumstances occurring prior to the effective date of such assignment. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (d) of this Section. Any payment by an assignee to an assigning Lender in connection with an assignment or transfer shall not be or be deemed to be a repayment by the Borrower or a new Loan to the Borrower.

(c) Register. The Administrative Agent shall maintain at one of its offices in Toronto, Ontario or Montréal, Québec a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive, absent manifest error, and the Borrower, the Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding

---

10 Ensure that the Credit Agreement specifies the amount of this fee.

notice to the contrary. The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(d) Participations. Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than a natural person, an Obligor or any Affiliate of an Obligor11) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any payment by a Participant to a Lender in connection with a sale of a participation shall not be or be deemed to be a repayment by the Borrower or a new Loan to the Borrower.

Subject to paragraph (e) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Section 3 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 4 as though it were a Lender, provided such Participant agrees to be subject to Section 5 as though it were a Lender.

(e) Limitations upon Participant Rights. A Participant shall not be entitled to receive any greater payment under Sections 3.1 and 3.2 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent. A Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of Section 3.2 unless the Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrower, to comply with Section 3.2(e) as though it were a Lender.

(f) Certain Pledges. Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, but no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

11. Governing Law; Jurisdiction; Etc.

(a) Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the Province specified elsewhere in this Agreement12 and the laws of Canada applicable in that Province.

(b) Submission to Jurisdiction. Each Obligor irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the courts of the Province specified elsewhere in this Agreement, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or any other Loan Document, or for recognition or enforcement of any judgment, and each of the parties hereto irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement or in any other Loan Document shall affect any right that the Administrative Agent or any

---

11    Consideration should be given to the percentage of Lenders required to permit the sale of a participation to an Obligor or any Affiliate or Subsidiary of an Obligor.
12    Ensure that the Credit Agreement identifies the Province referred to here and in paragraph (b) immediately below.

Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against any Obligor or its properties in the courts of any jurisdiction.

(c) Waiver of Venue. Each Obligor irrevocably and unconditionally waives, to the fullest extent permitted by Applicable Law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in paragraph (b) of this Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by Applicable Law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

## 12. WAIVER OF JURY TRIAL

EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

## 13. Counterparts: Integration: Effectiveness: Electronic Execution

(a) Counterparts: Integration: Effectiveness. This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Loan Documents and any separate letter agreements with respect to fees payable to the Administrative Agent constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in the conditions precedent Section(s) of this Agreement, this Agreement shall become effective when it has been executed by the Administrative Agent and when the Administrative Agent has received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto. Delivery of an executed counterpart of a signature page of this Agreement by telecopy or by sending a scanned copy by electronic mail shall be effective as delivery of a manually executed counterpart of this Agreement.

(b) Electronic Execution of Assignments. The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any Applicable Law, including Parts 2 and 3 of the Personal Information Protection and Electronic Documents Act (Canada), the Electronic Commerce Act, 2000 (Ontario) and other similar federal or provincial laws based on the Uniform Electronic Commerce Act of the Uniform Law Conference of Canada or its Uniform Electronic Evidence Act, as the case may be.

## 14. Treatment of Certain Information: Confidentiality

(1)     Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to it, its Affiliates and its and its Affiliates' respective partners, directors, officers, employees, agents, advisors and representatives (it

being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority), (c) to the extent required by Applicable Laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap, derivative, credit-linked note or similar transaction relating to the Borrower and its obligations, (g) with the consent of the Borrower or (h) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section or (y) becomes available to the Administrative Agent or any Lender on a non-confidential basis from a source other than an Obligor.

(2)     For purposes of this Section, "Information" means all information received in connection with this Agreement from any Obligor relating to any Obligor or any of its Subsidiaries or any of their respective businesses, other than any such information that is available to the Administrative Agent or any Lender on a non-confidential basis prior to such receipt. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information. In addition, the Administrative Agent may disclose to any agency or organization that assigns standard identification numbers to loan facilities such basic information describing the facilities provided hereunder as is necessary to assign unique identifiers (and, if requested, supply a copy of this Agreement), it being understood that the Person to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to make available to the public only such Information as such person normally makes available in the course of its business of assigning identification numbers

(3)     In addition, and notwithstanding anything herein to the contrary, the Administrative Agent may provide the information described on Exhibit B concerning the Borrower and the credit facilities established herein to Loan Pricing Corporation and/or other recognized trade publishers of information for general circulation in the loan market.

## ASSIGNMENT AND ASSUMPTION

      This Assignment and Assumption (the "Assignment and Assumption") is dated as of the Effective Date set forth below and is entered into by and between [*Insert name of Assignor*] (the "Assignor") and [*Insert name of Assignee*] (the "Assignee"). Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as amended, the "Credit Agreement"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

      For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below (i) all of the Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the respective facilities identified below (including without limitation any letters of credit, guarantees, and swingline loans included in such facilities) and (ii) to the extent permitted to be assigned under Applicable Law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as, the "Assigned Interest"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by the Assignor.

1.     Assignor:         _____

2.     Assignee:         _____
                         [and is an Affiliate/Approved Fund of [*identify Lender*]1]

3.     Borrower(s):      _____

4.     Administrative Agent: _____,as the administrative agent under the Credit Agreement

5.     Credit Agreement:     [The [*amount*] Credit Agreement dated as of _____ among [*name of Borrower(s)*], the Lenders parties thereto, [*name of Administrative Agent*], as Administrative Agent, and the other agents parties thereto]

---

1      Select as applicable.

6.    Assigned Interest:

| Facility Assigned[2] | Aggregate Amount of Commitment/Loans for all Lenders[3] | Amount of Commitment/Loans Assigned[3] | Percentage Assigned of Commitment/Loans[4] | CUSIP Number |
|---|---|---|---|---|
| | $ | $ | % | |
| | $ | $ | % | |
| | $ | $ | % | |

[7.    Trade Date:              _____ ]5

<hr>

[2]    Fill in the appropriate terminology for the types of facilities under the Credit Agreement that are being assigned under this Assignment (e.g. "Revolving Credit Commitment," "Term Loan Commitment," etc.)

[3]    Amount to be adjusted by the counterparties to take into account any payments or prepayments made between the Trade Date and the Effective Date.

[4]    Set forth, to at least 9 decimals, as a percentage of the Commitment/Loans of all Lenders thereunder.

[5]    To be completed if the Assignor and the Assignee intend that the minimum assignment amount is to be determined as of the Trade Date.

Effective Date: _____, 20___ [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

The terms set forth in this Assignment and Assumption are hereby agreed to:

<div style="margin-left:40%">

ASSIGNOR
[NAME OF ASSIGNOR]

By :
_____
    Title:

ASSIGNEE
[NAME OF ASSIGNEE]

By :
_____
    Title:

</div>

[Consented to and]6 Accepted:

[NAME OF ADMINISTRATIVE AGENT],
as
Administrative Agent

By _____
    Title:

[Consented to:]7

[NAME OF RELEVANT PARTY]

By _____
    Title:

---

6    To be added only if the consent of the Administrative Agent is required by the terms of the Credit Agreement.
7    To be added only if the consent of the Borrower and/or other parties (e.g. Swingline Lender, L/C Issuer) is required by the terms of the Credit Agreement.

[_____]1

STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AND ASSUMPTION

1. Representations and Warranties.

1.1    Assignor. The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document2, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

1.2    Assignee. The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it meets all requirements of an Eligible Assignee under the Credit Agreement (subject to receipt of such consents as may be required under the Credit Agreement), (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it has received a copy of the Credit Agreement, together with copies of the most recent financial statements delivered pursuant to Section ___ thereof, as applicable, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest on the basis of which it has made such analysis and decision independently and without reliance on the Administrative Agent or any other Lender, and (v) if it is a Foreign Lender3, attached to the Assignment and Assumption is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender..

2. Payments. From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignee whether such amounts have accrued prior to, on or after the Effective Date. The Assignor and the Assignee shall make all appropriate adjustments in payments by the Administrative Agent for periods prior to the Effective Date or with respect to the making of this assignment directly between themselves.

3. General Provisions. This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and permitted assigns. This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment and Assumption

---

1        Describe Credit Agreement at option of Administrative Agent.
2        The term "Loan Document" should be conformed to the term used in the Credit Agreement.
3        The concept of "Foreign Lender" should be conformed to the section in the Credit Agreement governing withholding taxes and gross-up.

by telecopy or by sending a scanned copy by electronic mail shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption. This Assignment and Assumption shall be governed by, and construed in accordance with, the law governing the Credit Agreement.

## LOAN MARKET DATA TEMPLATE

**Recommended Data Fields – At Close**
The items highlighted in bold are those that Loan Pricing Corporation (LPC) deem essential. The remaining items are those that LPC has seen become more prominent over time as transparency has increased in the U.S. Loan Market.

| COMPANY LEVEL | DEAL SPECIFIC | FACILITY SPECIFIC |
|---|---|---|
| **Issuer Name** | **Currency/Amount** | **Currency/Amount** |
| **Location** | **Date** | **Type** |
| **SIC (Cdn)** | **Purpose** | **Purpose** |
| . Identification Number(s) | **Sponsor** | **Tenor** |
| **Revenue** | **Financial Covenants** | Term Out Option |
| | | **Expiration Date** |
| | Target Company | **Facility Signing Date** |
| ***Measurement of Risk** | **Assignment Language** | **Pricing** |
| **S&P Sr. Debt** | Law Firms | **Base Rate(s)/Spread(s)/BA/LIBOR** |
| **S&P Issuer** | MAC Clause | **Initial Pricing Level** |
| **Moody's Sr. Debt** | Springing lien | **Pricing Grid (tied to, levels)** |
| **Moody's Issuer** | Cash Dominion | **Grid Effective Date** |
| **Fitch Sr. Debt** | Mandatory Prepays | Fees |
| **Fitch Issuer** | Restrct'd Payments (Neg Covs) | **Participation Fee (tiered also)** |
| S&P Implied | | |
| (internal assessment) | · Other Restrictions | **Commitment Fee** |
| **DBRS** | | |
| Other Ratings | | **Annual Fee** |
| *Industry Classification | | **Utilization Fee** |
| Moody's Industry | | LC Fee(s) |
| S&P Industry | | **BA Fee** |
| Parent | | Prepayment Fee |
| Financial Ratios | | Other Fees to Market |
| | | Security |
| | | **Secured/Unsecured** |
| | | Collateral and Seniority of Claim |
| | | Collateral Value |
| | | **Guarantors** |
| | | **Lenders Names/Titles** |
| | | **Lender Commitment ($)** |
| | | Commited/Uncommited |
| | | Distribution method |
| | | **Amortization Schedule** |
| | | Borrowing Base/Advance Rates |
| | | New Money Amount |
| | | **Country of Syndication** |
| | | Facility Rating (Loss given default) |
| | | **S&P Bank Loan** |
| | | **Moody's Bank Loan** |
| | | **Fitch Bank Loan** |

**DBRS**
**Other Ratings**

* These items would be considered useful to capture from an analytical perspective

- 82 -

# S C H E D U L E  " B "

## APPLICABLE MARGINS OR RATES

1.  Canadian Revolving Facility and US Revolving Facility

| Ratio (R) | Prime Rate/ US Base Rate | Libor/ Acceptance Fee/ Letter of Credit | Standby Fee |
|---|---|---|---|
| R <2.00 | 0.25% | 1.25% | 0.25% |
| 2.00 ≤ R < 2.50 | 0.50% | 1.50% | 0.25% |
| 2.50 ≤ R < 3.00 | 0.75% | 1.75% | 0.375% |
| 3.00 ≤ R <3.50 | 1.00% | 2.00% | 0.50% |
| R ≥ 3.50 | 1.25% | 2.25% | 0.625% |

2.  Term A Facility

| Ratio (R) | Prime Rate/ US Base Rate | Libor/ Acceptance Fee |
|---|---|---|
| R <2.00 | 0.25% | 1.25% |
| 2.00 ≤ R < 2.50 | 0.50% | 1.50% |
| 2.50 ≤ R < 3.00 | 0.75% | 1.75% |
| 3.00 ≤ R < 3.50 | 1.00% | 2.00% |
| R ≥ 3.50 | 1.25% | 2.25% |

3.  Term B Facility

Prior to the occurrence of the Term B Extension or in the event the Term B Extension does not occur

| Ratio (R) | Prime Rate/ US Base Rate | Libor/ Acceptance Fee |
|---|---|---|
| R <2.00 | 0.25% | 1.25% |
| 2.00 ≤ R < 2.50 | 0.50% | 1.50% |
| 2.50 ≤ R < 3.00 | 0.75% | 1.75% |
| 3.00 ≤ R < 3.50 | 1.00% | 2.00% |
| R ≥ 3.50 | 1.25% | 2.25% |

*MTL_LAW #1664789 v. 13*

## DETERMINATION OF APPLICABLE MARGIN OR RATE

1.  The rates of the margins applicable to Prime Rate, US Base Rate and Libor and the rates of the Acceptance fees, Letter of Credit fees and standby fees under the Facilities (the "**Rates**") will be determined based on the Funded Debt to EBITDA Ratio (the "**Ratio**"), as set forth in the above grids and this Schedule, subject however to paragraph 7 below.

2.  On (i) the 45th day after the end of the first, second and third fiscal quarters of each fiscal year of the Borrowers, and (ii) the 90th day after the end of the fourth quarter of each fiscal year of the Borrowers (the "**Rate Determination Date**"), the Rates will be modified and determined by the Agent on the basis of the Ratio in effect on the last day of such quarter, and, for any day until the next Rate Determination Date, each such Rate will be as indicated in the column corresponding to the applicable Ratio.

3.  From the date of this Agreement and until the first Rate Determination Date falling after the date hereof, the applicable Rates will be those which, for each Facility, correspond to the Ratio greater than 3.00 but less than 3.50.

4.  Interest, Letter of Credit fees and standby fees will be calculated, for any day, using the applicable Rate in effect on the relevant day. Acceptance fees will be calculated using the Rate in effect on the date such fees are payable. Any change in the Ratio resulting in a modification of Rates will give rise to adjustments to Acceptance fees previously calculated if the period of calculation extended beyond the date of the modification.

5.  On each Rate Determination Date, the Agent will be entitled to calculate the Rates relying on the compliance certificate (Schedule "I") furnished for the applicable quarter. If, on any Rate Determination Date, the Agent has not yet received such compliance certificate, the Rates in effect until the earlier of (i) receipt of a satisfactory certificate in respect of such quarter, (ii) the next Rate Determination Date will be as if the Ratio were greater than 3.50. If such certificate is furnished before the next Rate Determination Date, then the Agent will calculate the Rates for each day of the period from the delivery date of the certificate until the next Rate Determination Date as if such delivery date was the Rate Determination Date applicable to that period.

6.  This Schedule does not apply to the Letter of Credit fee applicable to a documentary Letter of Credit. As provided in Section 6.3 of the Credit Agreement, the fee payable in respect of any documentary Letter of Credit will be based on the rate then offered by the Issuing Bank to its customers for similar documentary letters of credit.

7.  Notwithstanding any other provision of this Schedule, the Applicable Margin for Libor Loans and US Base Rate Loans under the Term B Facility upon and after the occurrence of the Term B Extension will be 2.25% for Libor Loans and 1.25% for US Base Rate Loans.

# SCHEDULE " C "

## CORPORATE STRUCTURE

[See attachment]

# S C H E D U L E  "  D  "

## DISCLOSURE STATEMENT

**[Revised text to be provided by Mega Bloks / Osler]**

SCHEDULE " E "

OTHER PERMITTED LIENS

The table below concerns the following entities:

**GESTIONS RITVIK INC.**
**RITVIK HOLDINGS INC.**
**MEGA BLOKS INC.**
**6070329 CANADA INC.**
**MEGA BLOKS FINANCIAL SERVICES INC.**
**SERVICES FINANCIERS MEGA BLOKS INC.**
**MEGA BLOKS FINANCIAL HOLDINGS INC.**
**GESTION FINANCIÈRE MEGA BLOKS INC.**

| REGISTRATION NUMBER AND DATE | TYPE OF LIEN | SECURED PARTY (IES) | AMOUNT | REGISTRATION EXPIRATION DATE |
|---|---|---|---|---|
| 05-0064387-0038 February 8, 2005 | Rights of ownership of the lessor (under a leasing contract or *crédit-bail*) Global registration | IBM Canada Limited | N/A | 2015-02-08 |
| 05-0064387-0037 February 8, 2005 | Rights resulting from a lease Global registration | IBM Canada Limited | N/A | 2015-02-08 |
| 04-0687591-0005 November 29, 2004 | Rights of ownership of the lessor (under a leasing contract or *crédit-bail*) | De Lage Landen Financial Services Canada Inc. | N/A | 2010-11-26 |
| 04-0682092-0002 November 25, 2004 | Rights of ownership of the lessor (under a leasing contract or *crédit-bail*) | De Lage Landen Financial Services Canada Inc. | N/A | 2009-11-24 |

| REGISTRATION NUMBER AND DATE | TYPE OF LIEN | SECURED PARTY (IES) | AMOUNT | REGISTRATION EXPIRATION DATE |
|---|---|---|---|---|
| 04-0662622-0020<br>November 16, 2004 | Rights resulting from a lease | Claireview Leasing Inc. | N/A | 2008-07-31 |
| 04-0541334-0002<br>September 16, 2004 | Rights resulting from a lease | Claireview Leasing Inc. | N/A | 2008-02-29 |
| 04-0541334-0001<br>September 16, 2004 | Rights resulting from a lease | Claireview Leasing Inc. | N/A | 2008-02-29 |
| 04-0539964-0038<br>September 16, 2004 | Rights resulting from a lease | Claireview Leasing Inc. | N/A | 2009-02-28 |
| 04-0539964-0035<br>September 16, 2004 | Rights resulting from a lease | Claireview Leasing Inc. | N/A | 2008-02-29 |
| 04-0539964-0034<br>September 16, 2004 | Rights resulting from a lease | Claireview Leasing Inc. | N/A | 2008-02-29 |
| 04-0458839-0002<br>August 4, 2004 | Rights resulting from a lease | Danka Financial Services Inc. | N/A | 2009-08-04 |

| REGISTRATION NUMBER AND DATE | TYPE OF LIEN | SECURED PARTY (IES) | AMOUNT | REGISTRATION EXPIRATION DATE |
|---|---|---|---|---|
| 04-0282570-0041 May 14, 2004 | Rights resulting from a lease | Claireview Leasing Inc. | N/A | 2007-11-30 |
| 03-0669865-0015 December 16, 2003 | Rights resulting from a lease | Sound Trust | N/A | 2007-05-31 |
| 03-0669865-0012 December 16, 2003 | Rights resulting from a lease | Claireview Leasing Inc. | N/A | 2007-05-31 |
| 03-0630166-0002 November 25, 2003 | Rights resulting from a lease and the assignment thereof | Montreal Fairview Chrysler Inc. | N/A | 2007-11-03 |
| 03-0374720-0001 July 21, 2003 | Rights of ownership of the lessor (under a leasing contract or *crédit-bail*) | Société de services de crédit-bail GE Canada | N/A | 2007-06-15 |
| 03-0374716-0001 July 21, 2003 | Rights of ownership of the lessor (under a leasing contract or *crédit-bail*) | Société de services de crédit-bail GE Canada | N/A | 2009-06-15 |
| 03-0305773-0041 June 16, 2003 | Rights resulting from a lease | Sound Trust | N/A | 2005-11-30 |
| 03-0273184-0001 May 30, 2003 | Rights of ownership of the lessor (under a leasing contract or *crédit-bail*) | Citicapital Limited | N/A | 2008-06-01 |

| REGISTRATION NUMBER AND DATE | TYPE OF LIEN | SECURED PARTY (IES) | AMOUNT | REGISTRATION EXPIRATION DATE |
|---|---|---|---|---|
| 03-0160596-0001<br>April 8, 2003 | Rights of ownership of the lessor (under a leasing contract or *crédit-bail*) | Équipements G.N. Johnston Ltée | N/A | 2008-04-04 |
| 03-0115301-0037<br>March 14, 2003 | Rights resulting from a lease | Sound Trust | N/A | 2007-02-28 |
| 02-0546039-0005<br>December 3, 2002 | Rights of ownership of the lessor (under a leasing contract or *crédit-bail*) | Citicorp Vendor Finance, Ltd. | N/A | 2008-05-02 |
| 02-0336834-0003<br>August 1, 2002 | Rights of ownership of the lessor (under a leasing contract or *crédit-bail*) | IBM Canada Limitée | N/A | 2012-07-31 |
| 02-0000371-0013<br>January 3, 2002 | Rights of ownership of the lessor (under a leasing contract or *crédit-bail*) | IBM Canada Limitée | N/A | 2011-12-28 |
| 01-0403440-0001<br>November 1, 2001 | Rights of ownership of the lessor (under a leasing contract or *crédit-bail*) | Services de crédit-bail GE Capital Canada Inc. | N/A | 2009-03-26 |
| 01-0335144-0001<br>September 14, 2001 | Rights resulting from a lease | MTC Leasing Inc. | N/A | 2006-09-01 |

| REGISTRATION NUMBER AND DATE | TYPE OF LIEN | SECURED PARTY (IES) | AMOUNT | REGISTRATION EXPIRATION DATE |
|---|---|---|---|---|
| 01-0270505-0005 July 30, 2001 | Rights resulting from a lease | MTC Leasing Inc. | N/A | 2006-08-01 |
| 01-0053030-0001 February 21, 2001 | Rights resulting from a lease (as appears from a rectification registered on April 25, 2001 under number 01-0136602-0001) | MTC Leasing Inc. | N/A | 2006-03-01 |
| 00-0163627-0001 June 15, 2000 | Reservation of ownership (instalment sale) | Norampac Inc. | N/A | 2005-08-22 |
| 00-0005328-0008 January 11, 2000 | Rights of ownership of the lessor (under a leasing contract or *crédit-bail*) | OE Financial Services Inc. | N/A | 2005-12-29 |