The table below concerns the following entity:

ROSE ART INDUSTRIES, INC.

| UCC FINANCING STATEMENT NUMBER AND DATE | TYPE OF LIEN | SECURED PARTY (IES) | JURISDICTION | LAPSE DATE |
|---|---|---|---|---|
| 2110516-6 July 2, 2002 | Equipment | Emigrant Business Credit Corp. | Department of Treasury, UCC Section, New Jersey | 2007-07-02 |
| 2116914-4 August 12, 2002 | Equipment | Emigrant Business Credit Corp. | Department of Treasury, UCC Section, New Jersey | 2007-08-12 |
| 2120717-4 September 4, 2002 | Equipment | De Lage Landen Financial Services | Department of Treasury, UCC Section, New Jersey | 2007-09-04 |
| 2124923-5 October 3, 2002 | Equipment | De Lage Landen Financial Services | Department of Treasury, UCC Section, New Jersey | 2007-10-03 |
| L014744 95 August 8, 1997 | Judgment US$297,865 | Plaintiff : Tri-State Realty Investment Co. | Superior Court, Trenton, New Jersey | N/A |

The table below concerns the following entity:

WARREN INDUSTRIES, INC.

| UCC FINANCING STATEMENT NUMBER AND DATE | TYPE OF LIEN | SECURED PARTY (IES) | JURISDICTION | LAPSE DATE |
|---|---|---|---|---|
| 2339443<br>August 1, 2000 | Equipment | Associates Commercial Corporation | Secretary of State, Indiana | 2005-08-01 |
| 2348940<br>September 26, 2000 | Equipment | Caterpillar Financial Services Corporation | Secretary of State, Indiana | 2005-09-26 |
| 200200009936425<br>October 24, 2002 | Equipment | CitiCorp Del Lease, Inc. d/b/a Citicorp Dealer Finance | Secretary of State, Indiana | 2007-10-24 |
| 200300003792642<br>April 22, 2003 | Equipment | CitiCorp Del Lease, Inc. | Secretary of State, Indiana | 2008-04-22 |
| J016122 86<br>July 16, 1986 | Judgment US$9,451 | Plaintiff: Integrity Credit Corp. f/k/a Tri-Continental Leasing Corp. | Superior Court, Trenton, New Jersey | N/A |

# S C H E D U L E " F "

## LIST OF MATERIAL SUBSIDIARIES

MEGA BLOKS EUROPE N.V./S.A.

MEGA BLOKS FINANCIAL HOLDINGS INC.

MEGA BLOKS LATINOAMERICA, S.A. DE C.V.

MEGA BLOKS INTERNATIONAL, S.à.r.l.

MB2 LP

3102449 NOVA SCOTIA COMPANY

MB FINANCE LLC

ROSE MOON, INC.

WESTERN GRAPHICS CORPORATION

MB US INC.

MEGA BLOKS FINANCIAL SERVICES INC.

WARREN INDUSTRIES, INC.

## S C H E D U L E  "  G  "

### NOTICE OF LOAN

### [CONVERSION OR RENEWAL]

[   **Date**   ]

[Name and address of Agent]

### RE:  Credit Agreement dated July •, 2005

Sirs:

Reference is made to the above-mentioned Credit Agreement entered into between, *inter alia,* the undersigned and the Lenders mentioned therein.

We confirm our request for a Loan [or for a conversion or renewal] to be made on [ate], the details of which are as follows:

- Applicable Facility;

- Form of Loan: [Prime Rate, Acceptances, US Base Rate Loan, Libor Loan]

- Amount;

- Date of Loan: [or of conversion or renewal]

- Period;

On the date hereof, we certify that the representations and warranties set forth in the Credit Agreement are still true and correct in all material respects and that no Default has occurred and is continuing.

**[Name of the Borrower concerned]**

Note: This form (adapted accordingly) may also be used for a notice of repayment.

# SCHEDULE " H "

## TERM FACILITIES REPAYMENT SCHEDULES

On each instalment payment date set forth in the applicable grid below, the instalment payable under the Term A Facility and the Term B Facility pursuant to Section 7.2 of the Credit Agreement will be in an amount corresponding to the percentage of the aggregate initial principal amount of the Term A Facility and the Term B Facility (as applicable) set forth opposite such date in the applicable grid below.

| Assuming Term B Extension Occurs | | | |
|---|---|---|---|
| Term A | | Term B | |
| March 31, 2006 | 2.00% | October 31, 2005 | 0.25% |
| June 30, 2006 | 4.00% | January 31, 2006 | 0.25% |
| September 30, 2006 | 4.00% | April 30, 2006 | 0.25% |
| December 31, 2006 | 4.00% | July 31, 2006 | 0.25% |
| March 31, 2007 | 4.00% | October 31, 2006 | 0.25% |
| June 30, 2007 | 4.00% | January 31, 2007 | 0.25% |
| September 30, 2007 | 4.00% | April 30, 2007 | 0.25% |
| December 31, 2007 | 4.00% | July 31, 2007 | 0.25% |
| March 31, 2008 | 4.00% | October 31, 2007 | 0.25% |
| June 30, 2008 | 4.00% | January 31, 2008 | 0.25% |
| September 30, 2008 | 4.00% | April 30, 2008 | 0.25% |
| December 31, 2008 | 4.00% | July 31, 2008 | 0.25% |
| March 31, 2009 | 4.00% | October 31, 2008 | 0.25% |
| June 30, 2009 | 4.00% | January 31, 2009 | 0.25% |
| September 30, 2009 | 4.00% | April 30, 2009 | 0.25% |
| December 31, 2009 | 4.00% | July 31, 2009 | 0.25% |
| March 31, 2010 | 4.00% | October 31, 2009 | 0.25% |
| June 30, 2010 | 4.00% | January 31, 2010 | 0.25% |
| September 30, 2010 | 30.00% | April 30, 2010 | 0.25% |
| | 100.00% | July 31, 2010 | 0.25% |
| | | October 31, 2010 | 0.25% |
| | | January 31, 2011 | 0.25% |
| | | April 30, 2011 | 0.25% |
| | | July 31, 2011 | 0.25% |
| | | October 31, 2011 | 0.25% |
| | | January 31, 2012 | 0.25% |
| | | April 30, 2012 | 0.25% |
| | | July 31, 2012 | 93.25% |
| | | | 100.00% |

| Assuming No Term B Extension | | |
|---|---|---|
| | Term A | Term B |
| March 31, 2006 | 1.00% | 1.00% |
| June 30, 2006 | 2.00% | 2.00% |
| September 30, 2006 | 2.00% | 2.00% |
| December 31, 2006 | 2.00% | 2.00% |
| March 31, 2007 | 2.00% | 2.00% |
| June 30, 2007 | 2.00% | 2.00% |
| September 30, 2007 | 2.00% | 2.00% |
| December 31, 2007 | 2.00% | 2.00% |
| March 31, 2008 | 2.00% | 2.00% |
| June 30, 2008 | 2.00% | 2.00% |
| September 30, 2008 | 2.00% | 2.00% |
| December 31, 2008 | 2.00% | 2.00% |
| March 31, 2009 | 2.00% | 2.00% |
| June 30, 2009 | 2.00% | 2.00% |
| September 30, 2009 | 2.00% | 2.00% |
| December 31, 2009 | 2.00% | 2.00% |
| March 31, 2010 | 2.00% | 2.00% |
| June 30, 2010 | 2.00% | 2.00% |
| September 30, 2010 | 65.00% | 65.00% |
| | 100.00% | 100.00% |

SCHEDULE " I "

COMPLIANCE CERTIFICATE

[ Date ]

[Name and address of Agent]

RE:  Credit Agreement dated July •, 2005

Reference is made to the above-mentioned credit agreement entered into between the Lenders mentioned therein and Mega Bloks Inc. ("**Mega Bloks**"), 3102448 Nova Scotia Company and Rose Art Industries, Inc., as borrowers (the "**Credit Agreement**").  I am a senior financial officer of Mega Bloks Inc. and I hereby certify in such capacity that, to the best of my knowledge, but after reasonable enquiry, the representations and warranties set forth in the Credit Agreement are still true and accurate in all material respects and that no Default has occurred and is continuing.

I also certify that, on the last day of the last fiscal quarter of the Borrowers:

1.    the Funded Debt to EBITDA Ratio of Mega Bloks, on a consolidated basis, calculated in the manner set forth in the Credit Agreement, was [•] to 1.00;

2.    the First Lien Leverage Ratio of Mega Bloks, on a consolidated basis, calculated in the manner set forth in the Credit Agreement, was [•] to 1.00;

3.    the Fixed Charge Coverage Ratio of Mega Bloks, on a consolidated basis, calculated in the manner set forth in the Credit Agreement was [•] to 1.00:

4.    the outstanding amount of all obligations secured by Liens permitted under paragraph (c) of the definition of "Permitted Liens" was US$[•];

5.    the requirements of Section 1.2(d) were met;

6.    the aggregate amount of dispositions of assets to which the covenant of Section 13.3(b) applies and made since the beginning of the current fiscal year was [•];

7.    the aggregate amount of the acquisitions and investments to which the covenant of Section 13.4(b) applies and made since the beginning of the current fiscal year was [•];

8.    the aggregate amount of capital expenditures referred to in Section 13.5 and made since the beginning of the current fiscal year was [•];  [**NTD: the foregoing limitation will cease to apply from the date the Lenders have received a compliance certificate showing a Funded Debt to EBITDA Ratio of less than 2:00: 1.00 as at the end of the most recent fiscal quarter of Mega Bloks.**]

9. the aggregate outstanding amount of financial assistance referred to in clause (ii) of Section 13.8 granted by the Mega Bloks Entities was [•];

10. the aggregate notional amount of all currency Hedging Agreements was $[•] and the aggregate notional amount of interest rate Hedging Agreements with Lenders was $[•] (the breakdown by maturities of such Hedging Agreements is attached hereto); and

11. the information contained in the Corporate Structure Chart and the Perfection Certificate delivered pursuant to Section 9.1 was still accurate in all material respects [, **except for such changes as are described in an annex hereto**].

The details of the calculation of all of the above items are set forth in the documents attached hereto.

_____
**[•]    [Title of Officer]**

# S C H E D U L E  " J "

## ADDRESSES FOR NOTICE PURPOSES

THE BANK OF NOVA SCOTIA, as Lender
(re: Canadian Office)

1002 Sherbrooke Street West, 9th Floor
Montreal, Quebec  H3A 3L6

Attention:  Director


BANK OF MONTREAL, as Lender
(re: Canadian Office)

1501 McGill College Avenue
Suite 3200
Montreal, Quebec  H3A 3M8

Attention:  Director
Fax:          (514) 282-5920

THE BANK OF NOVA SCOTIA, as Agent

For purposes of all notices of utilization,
conversion, renewals or repayment and the
delivery of the information pursuant to
Article 15:

720 King Street West, 4th Floor
Toronto, Ontario  M5V 2T3

Attention:  IBD Loan Administrative and
                  Agency Services
Fax:          (416) 866-5991

**All notices to the Borrowers collectively or
to anyone of them may be addressed to:**

THE BANK OF NOVA SCOTIA, as Lender
(re: US Office)

Credit Department
One Liberty Plaza, 26th Floor
New York, New York 10006
U.S.A.
Attention: Director
Fax:          (212) 225-5090


BANK OF MONTREAL, as Lender
(re: US Office)

115 South LaSalle Street, 12th Floor
Chicago, Illinois 60603
U.S.A.

Attention:  Account Manager
Fax:          (312) 750-6057


For all other purposes:

40 King Street West
Scotia Plaza, 62nd Floor
Toronto, Ontario  M5W 2X6

Attention:  Corporate Banking – Loan
                  Syndication
Fax:          (416) 866-3329


MEGA BLOKS INC.
4505 Hickmore
Saint-Laurent, Quebec  H4T 1L4
Attention:      Vice President and Chief
Financial Officer

Fax:          (514) 333-4470

## EXHIBIT P-5

**Steering Committee Members**

## Steering Committee Members

1. BMO
2. Bank of America
3. Bank of Nova Scotia
4. BNP Paribas
5. Courage Capital
6. Eaton Vance Management
7. Garrison Investments
8. GE Finance Holding Company
9. Metropolitan Life Insurance Co.
10. National Bank of Canada
11. Whitehorse Capital

## EXHIBIT P-6

### Events of Default

# CREDIT AGREEMENT

dated as of July 26, 2005

Among

**MEGA BLOKS INC.**
**3102448 NOVA SCOTIA COMPANY**
**ROSE ART INDUSTRIES, INC.**
(as Borrowers)

- and -

**THE BANK OF NOVA SCOTIA**
(as Administrative Agent)

**BANK OF MONTREAL**
(as Co-Administrative Agent)

- and -

**THE LENDERS**
**FROM TIME TO TIME PARTIES HERETO**
(as Lenders)

---

## US$400,000,000 FACILITIES

---

**THE BANK OF NOVA SCOTIA**
**BANK OF MONTREAL**
(as Co-Lead Arrangers and Co-Syndication Agents)

- and -

**THE BANK OF NOVA SCOTIA**
(as Sole Bookrunner)

**MCCARTHY TÉTRAULT LLP**

## 16 - Events of Default and Remedies

### 16.1 Events of Default

The occurrence of one or more of the following events constitutes an event of default ("Event of Default") under the Loan Documents:

(a) a Borrower defaults in the payment when due of any amount owing under any Facility in respect of principal or interest or fees, or defaults for more than four Business Days in the payment of any other amount owing under a Loan Document or an Hedging Agreement with a Lender;

(b) a Credit Party (i) fails to make a payment or payments exceeding in the aggregate US $5,000,000 in respect of any indebtedness (other than the Facilities), when and as due, or (ii) is in default under any agreement or agreements relating to indebtedness (other than the Facilities) exceeding US $5,000,000 in the aggregate if the effect of such default is to accelerate or to permit the acceleration of such indebtedness and, in each case, such failure or default continues after the applicable notice or grace period, if any;

(c) any representation, warranty or certification made or deemed made by a Credit Party in any Loan Document proves to be false or misleading as of the time made in any material respect;

(d) any of the provisions of Section 1.2, Section 7.3 and of Articles 10 and 14 is not complied with and, but only with respect to Section 1.2 and Article 10, such non-compliance continues unremedied for a period of 15 days;

(e) a Credit Party becomes unable to pay its debts generally as such debts become due or is adjudicated bankrupt or insolvent;

(f) a Credit Party (i) applies for or consents to or is the subject of an order for the appointment of a receiver, interim receiver or trustee (or any Person performing similar functions) in respect of itself or of all or a substantial part of its assets, (ii) makes a general assignment for the benefit of its creditors, (iii) takes advantage of any law relating to bankruptcy, insolvency, reorganization, liquidation, dissolution, arrangement or winding-up, or (iv) takes any action for the purpose of effecting any of the foregoing;

(g) a proceeding (or any similar action) is commenced against a Credit Party seeking (i) its bankruptcy, reorganization, liquidation, dissolution, arrangement or winding-up, or similar relief, (ii) the appointment of a receiver, interim receiver or trustee (or any Person performing similar functions) in respect of itself or of all or any substantial part of its assets, or (iii) the seizure or the attachment of, or the enforcement of remedies on, any part of its assets having a value of more than US $5,000,000, and, in each case, such proceeding (or similar action) is not dismissed or withdrawn after a period of 60 days, provided that such grace period will apply

only if such proceeding (or action) is diligently contested in good faith and does not disrupt the business or normal operations of the Credit Party concerned;

(h)    a Credit Party defaults in the performance of any of its other obligations under a Loan Document and such default continues unremedied for a period of 15 days after notice by the Agent to the Borrowers;

(i)    the 2004 audited financial statements of Rose Art Industries, Inc. and Warren Industries, Inc. are qualified or are materially different (in any adverse manner) from the unaudited 2004 financial statements of the same entities delivered pursuant to Section 9.1;

(j)    a Person (or a group of Persons acting in concert) acquires the Control of Mega Bloks after the date hereof; or

(k)    any of the following events occurs with respect to any Pension Plan: (i) the institution of any steps by any Person to terminate a Pension Plan if, as a result of such termination, any of the Mega Bloks Entities could reasonably be expected to be required to make a contribution to such Pension Plan, or could reasonably expect to incur a liability or obligation to such Pension Plan, in excess of US$1,000,000; or (ii) a contribution failure occurs with respect to any Pension Plan sufficient to give rise to a Lien under Section 302(f) of ERISA.

## 16.2    Remedies

If an Event of Default occurs and is continuing, the Agent may, on giving a notice to the Borrowers, take any one or more of the following actions:

(a)    terminate the right of the Borrowers to use the Facilities;

(b)    declare all indebtedness of the Borrowers under the Loan Documents to be immediately payable and demand immediate payment of the whole or part thereof; and

(c)    exercise all of the rights and remedies of the Agent and the Lenders including their rights and remedies under any Loan Document;

provided that all indebtedness of the Borrower under the Loan Documents will automatically become due and payable without any notice upon the occurrence of any Event of Default specified in Section 16.1(e) or Section 16.1(f).

## 17 - DECISIONS, WAIVERS AND AMENDMENTS

## 17.1    Amendments and Waivers by the Majority Lenders

Subject to the other provisions of this Article 17, the provisions of the Loan Documents may be amended or waived, and consents thereunder may be given, only by an instrument in

MEGA BRANDS INC.,

as Issuer,

the GUARANTORS named herein,

- and -

CIBC MELLON TRUST COMPANY

as Trustee

INDENTURE

Dated as of August 18, 2008

providing for the issue of 8% Convertible Senior

Unsecured Debentures due August 31, 2013

**THIS INDENTURE** dated as of August 18, 2008.

BETWEEN:     **MEGA BRANDS INC.**, a corporation governed by the laws of Canada;

         (the "**Corporation**")

         Each of the Guarantors (as defined herein);

              - and -

         **CIBC MELLON TRUST COMPANY**, a trust company existing under the laws of Canada.

         (the "**Trustee**")

## RECITALS

**A.**  The Corporation wishes to provide for the creation and issue of Convertible Senior Unsecured Debentures with the designation of "**8% Convertible Senior Unsecured Debentures due August 31, 2013**" (the "**Debentures**"), all upon the terms and conditions set forth in this Indenture (as hereinafter defined);

**B.**  The Debentures will be guaranteed on a senior unsecured basis by each of the Guarantors;

**C.**  All necessary acts and proceedings have been done and taken and all necessary resolutions have been passed to authorize the execution and delivery of this Indenture by the Corporation and the Guarantors, to make the same effective and binding upon the Corporation and the Guarantors, and to make the Debentures, when certified by the Trustee and issued as provided in this Indenture, valid, and legally binding obligations of the Corporation with the benefit and subject to the terms of this Indenture, and each Guarantor has done all things necessary to make its Guarantee (as defined herein), when executed by such Guarantor, the valid and legally binding obligation of such Guarantor;

**D.**  All necessary acts and proceedings have been done and taken and all necessary resolutions have been passed to authorize the issuance of the Common Shares (as hereinafter defined) that may be issued upon conversion or maturity of the Debentures; and

**E.**  The foregoing recitals are made as representations and statements of fact by the Corporation and the Guarantors and not by the Trustee;

**THEREFORE,** it is hereby covenanted, agreed and declared as follows:

**8.7**         **Performance of Covenants by Trustee**

If the Corporation fails to perform any of its covenants contained in this Indenture, the Trustee may itself perform any of such covenants capable of being performed by it, but will be under no obligation to do so. All sums expended or advanced by the Trustee for such purpose will be repayable as provided in section 8.8 of the Indenture. No such performance or advance by the Trustee shall relieve the Corporation of any default hereunder or its continuing obligations hereunder.

**8.8**         **Payment of Trustee's Remuneration**

The Corporation will pay on demand the Trustee's reasonable remuneration for its services as Trustee hereunder (including reimbursement for distributions which include legal services) and will repay to the Trustee on demand all moneys which shall have been paid by the Trustee out of its own funds in and about the execution of the trusts hereby created with interest at such reasonable rate as shall have been agreed to by the Trustee from time to time, from the date of expenditure until repayment, with a reasonable rate of interest to be charged by the Trustee on any overdue accounts of the Corporation. The said remuneration shall continue to be payable until the trusts hereof are finally wound up and whether or not the trusts of this Indenture shall be in course of administration by or under the direction of the court. This Section 8.8 shall survive the resignation of the Trustee or the termination of this Agreement. Notwithstanding the foregoing, the Corporation need not pay or reimburse the Trustee for expenses, disbursements or advances if the Trustee incurred such expenses, disbursements or advances as a result of its dishonesty, bad faith, wilful misconduct, negligence or reckless disregard of a right, duty or obligation by the Trustee.

**8.9**         **Further Instruments and Acts**

Upon request of the Trustee, the Corporation and the Guarantors will execute and deliver such further instruments and do such further acts as may be reasonably necessary or proper to carry out more effectively the purposes of this Indenture.

## ARTICLE 9
## EVENTS OF DEFAULT AND REMEDIES

**9.1**         **Events of Default and Enforcement**

(a)       If and when any one or more of the following events (herein called an **"Event of Default"**) shall happen with respect to the Debentures, namely:

          (i)     a default in payment of any principal amount or any purchase price, or Fundamental Change Repurchase Price with respect to the Debentures, when the same becomes due and payable;

          (ii)    a default in payment of interest on any Debentures when due and payable and the continuance of such default for 30 days;

(iii)    a default in the observance of the covenant contained in subsection 8.5(a) or 10.6(a) and the continuance of such default for 10 Business Days;

(iv)    default in the delivery to any Holder when due of Common Shares and any cash payable upon conversion with respect to the Debentures, which default continues for 5 days;

(v)    a default by the Corporation or any Guarantor in performing or observing any of the other covenants, agreements or obligations of the Corporation or the Guarantor, as the case may be, as described herein, and the continuance of such default for 60 days after written notice to the Corporation by the Trustee or by the Holders of not less than 25% in principal amount of Outstanding Debentures requiring the same to be remedied;

(vi)    the failure to make a Repayment Offer upon the occurrence of a Fundamental Change;

(vii)    a decree, judgment, or order by a court having jurisdiction in the premises shall have been entered adjudging the Corporation or any Guarantor bankrupt or insolvent or approving as properly filed a petition seeking reorganization, readjustment, arrangement, composition or similar relief for the Corporation or any Guarantor, under the *Bankruptcy and Insolvency Act* (Canada), *Companies' Creditors Arrangement Act* (Canada) or any other similar bankruptcy, insolvency or analogous applicable law and such decree, judgment or order of a court having jurisdiction in the premises for the appointment of a receiver or liquidator or trustee or assignee in bankruptcy or insolvency of the Corporation or any Guarantor or of a substantial part of its property, or for the winding up or liquidation of its affairs, shall have remained in force for a period of 30 consecutive days; or any substantial part of the property of the Corporation or any Guarantor shall be sequestered or attached and shall not be returned to the possession of the Corporation or any Guarantor or released from such attachment, as the case may be, whether by filing of a bond, or stay or otherwise, within 30 consecutive days thereafter; or

(viii)    the Corporation or any Guarantor shall institute proceedings to be adjudicated a voluntary bankrupt, or shall consent to the filing of a bankruptcy proceeding against it, or shall file a petition or answer or consent seeking reorganization, readjustment, arrangement, composition or similar relief under the *Bankruptcy and Insolvency Act* (Canada), *Companies' Creditors Arrangement Act* (Canada) or any other similar bankruptcy, insolvency or analogous applicable law or shall consent to the filing of any such petition, or shall consent to the appointment of a receiver or liquidator or trustee or assignee in bankruptcy or insolvency for it or of a substantial part

of its property, or shall make an assignment for the benefit of creditors, or shall be unable, or admit in writing its inability, to pay its debts generally as they become due, or corporate action shall be taken by the Corporation or any Guarantor in furtherance of any of the aforesaid actions;

(ix)    default in the payment of principal by the end of any applicable grace period or resulting in acceleration of any other Indebtedness of the Corporation, any Guarantor, or any of our subsidiaries for borrowed money where the aggregate principal amount with respect to which the default or acceleration occurred exceeds $10 million, provided that if any such default is cured, waived, rescinded or annulled, then the Event of Default by reason thereof would be deemed not to have occurred; and

(x)    any of the Guarantees shall be held in any judicial proceeding to be unenforceable or invalid or shall cease for any reason to be in full force and effect or any Guarantor, or any Person acting on behalf of a Guarantor, shall deny or disaffirm its obligations under its Guarantee;

then, and in each and every such case which has happened and is continuing (other than an Event of Default specified in clause (vii) or (viii) above), the Trustee may, in its discretion, and shall, upon the written request of the Holders of not less than 25% in principal amount of the Outstanding Debentures at such time (or, if there is a Global Debenture Outstanding, a written request of the Participants having received instructions from the Beneficial Holders holding at least 25% of the Outstanding Debentures), declare the principal of (and premium, if any) together with accrued interest on all such Debentures to be due and payable immediately, by a Notice in writing to the Corporation and to each Guarantor (and to the Trustee if given by the Holders), and upon any such declaration such principal amount and premium, if any, together with accrued interest thereon, shall become immediately due and payable. If the Trustee fails to notify in writing the Corporation pursuant to the terms hereof, the Debentureholders having provided the written request to the Trustee may do so. If an Event of Default specified in clause (vii) or (viii) occurs and is continuing, then the principal of (and premium, if any) together with accrued interest on all Outstanding Debentures shall become due and payable without any Declaration or other act on the part of either the Trustee of any Holder.

**9.2**       **Notice of Event of Default**

The Trustee shall give to the Holders within five days after the Trustee becomes aware by way of written Notice of the occurrence of an Event of Default, Notice of every Event of Default so occurring and continuing at the time the Notice is given. When a Notice of the occurrence of an Event of Default is given by the Trustee pursuant to this section 9.2 and the Event of Default is thereafter cured, the Trustee shall give Notice that the Event of Default is no longer outstanding to all Holders to whom Notice of the occurrence of the Event of Default was given

within 5 days after the Trustee becomes aware, by written Notice given by the Corporation to the Trustee, that the Event of Default has been cured and is no longer outstanding.

**9.3**     **Waiver of Acceleration**

At any time after a declaration of acceleration with respect to the Debentures has been made pursuant to Article 9 and before a judgment or decree for payment of the money due has been obtained by the Trustee as hereinafter provided, the Holders of not less than 50% in principal amount of Outstanding Debentures, by written Notice to the Corporation, each Guarantor and the Trustee, may thereupon rescind and annul such declaration and its consequences

(a)     if the Corporation has paid or deposited with the Trustee a sum sufficient to pay:

   (i)     all overdue interest on all Debentures;

   (ii)     the principal of (and premium, if any) any of the Debentures which have become due otherwise than by such declaration of acceleration, and interest thereon at the rate or rates prescribed therefore in such Debentures; and

   (iii)     to the extent that payment of such interest is lawful and applicable, interest upon overdue instalments of interest at the rate or rates prescribed therefor in such Debentures;

(b)     all Events of Default with respect to the Debentures, other than the non-payment of the principal of (and premium, if any), and interest on, such Debentures which have become due solely by such declaration of acceleration, have been cured or waived in accordance with the provisions of this Indenture; and

(c)     the rescission would not conflict with any judgement or degree of a court of competent jurisdiction.

**9.4**     **Waiver**

(a)     The Holders of not less than 50% in aggregate principal amount of the Outstanding Debentures may on behalf of the Holders of all Debentures waive any past default hereunder and its consequences, except a default:

   (i)     in the payment of the principal of (or premium, if any) or interest on any Debentures;

   (ii)     in respect of a covenant or provision hereof that under Article 16 cannot be modified or amended without an Extraordinary Resolution passed by the Holders; or

(iii) the uncured failure by the Corporation to deliver Common Shares when so required pursuant to this Indenture.

(b) Upon any such waiver, such default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured, for every purpose of this Indenture. No such waiver shall extend to any subsequent or other default or impair any right consequent thereon.

**9.5** **Other Remedies**

(a) If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy to collect the payment of principal of (and premium, if any) or interest on Debentures or to enforce the performance of any term of the Debentures or this Indenture.

(b) The Trustee may maintain a Proceeding even if it does not possess any Debentures or does not produce any of them in the Proceeding. A delay or omission by the Trustee or any Holder in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default.

**9.6** **Application of Money Collected**

Any money collected by the Trustee pursuant to this Article in respect of Debentures shall (subject to any claims having priority under Applicable Law) be applied in the following order, at the dates fixed by the Trustee and, in case of the distribution of such money on account of principal of (and premium, if any) or interest, upon presentation of Debentures and the notation thereon of the payment (if only partially paid) and upon surrender thereof (if fully paid):

(a) first, to the payment of all amounts due to the Trustee under this Indenture with respect to such Debentures;

(b) second, to the payment of accrued interest on such Debentures;

(c) third, to the payment of the principal of (and premium, if any) on such Debentures;

(d) fourth, to the payment of any other amounts with respect to such Debentures; and

(e) fifth, to whomever may be lawfully entitled to receive the balance of such money.

**9.7** **Control by Holders**

(a) The Holders of at least a majority in principal amount of the Outstanding Debentures may:

> (i) direct the time, method and place in the Province of Ontario or Québec of conducting any Proceeding for any remedy available to the Trustee or exercising any trust or power conferred on it with respect to the Debentures; and
>
> (ii) take any other action authorized to be taken by or on behalf of the Holders of any specified aggregate principal amount of Debentures under any provisions of this Indenture or under Applicable Law.

(b) The Trustee may refuse, however, to follow any direction that conflicts with law or this Indenture.

## 9.8 Limitation on Suits

No Holder of any Debenture will have any right to pursue any remedy (including any action, suit or proceeding authorized or permitted by this Indenture or pursuant to Applicable Law, but except actions for payment of overdue principal, premium, if any, or interest or for the conversion of the Debentures pursuant to Article 4) with respect to this Indenture or the Debentures unless: (i) the Holder gives to the Trustee notice of a continuing Event of Default; (ii) the Holders of at least 25% in principal amount of the then Outstanding Debentures make a request in writing to the Trustee to pursue the remedy; (iii) such Holder or Holders offer or provide to the Trustee security and indemnity in form satisfactory to the Trustee against any loss, liability or expense; (iv) the Trustee does not comply with the request within 30 days after receipt of such request and indemnity; and (v) during such 30-day period the Holders of a majority in principal amount of Outstanding Debentures do not give the Trustee a direction inconsistent with the request.

Holders may not use this Indenture to prejudice the rights of another Holder or to obtain a preference or priority over another Holder.

## 9.9 Collection Suit by Trustee

If an Event of Default specified in clause (a), (b), (c), (d) or (h) of Article 9 occurs and is continuing, the Trustee may recover judgment in its own name and as trustee against the Corporation for the whole amount of principal (and premium, if any) and interest remaining unpaid.

## 9.10 Trustee May File Proofs of Claim

The Trustee may file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee and the Holders lodged or allowed in any judicial proceedings relative to the Corporation, its creditors or its property.

**9.11** **Undertaking for Costs**

In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as Trustee, a court in its discretion may require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defences made by the party litigant. This section 9.11 does not apply to a suit by the Trustee, a suit by a Holder pursuant to section 9.8, or a suit by any Holder or group of Holders of more than 50% in principal amount of the Outstanding Debentures.

**9.12** **Delay or Omission Not Waiver**

No delay or omission of the Trustee or of any Holder of any Debenture to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein. Every right and remedy given by this Article or by law to the Trustee or to the Holders may be exercised from time to time, and as often as may be deemed expedient, by the Trustee or by the Holders, as the case may be.

**9.13** **Remedies Cumulative**

No remedy herein conferred upon or reserved to the Trustee or upon or to the Holders is intended to be exclusive of any other remedy, but each remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now existing or hereafter to exist by law or statute.

**9.14** **Judgment Against the Corporation**

The Corporation covenants and agrees with the Trustee that, in case of any Proceeding to obtain judgment for payment of the principal of, premium, if any, or interest, if any, on the Debentures, judgment may be rendered against it in favour of the Holders or in favour of the Trustee, as holder of a power of attorney for the Holders, for the amount which may remain due in respect of the Debentures and the interest and premium, if any, thereon.

**9.15** **Rights of Holders to Receive Payment and to Convert**

Notwithstanding any other provision of this Indenture, the right of any Holder of a Debenture to receive payment of the principal amount, Fundamental Change Repurchase Price and interest, if any, in respect of the Debentures held by such Holder, on or after the respective due dates expressed in the Debentures and this Indenture (whether upon repurchase or otherwise), and to convert such Debenture in accordance with Article 4, and to bring suit for the enforcement of any such payment on or after such respective due dates or for the right to convert in accordance with Article 4, is, subject to compliance with the provisions of

Section 9.8, absolute and unconditional and shall not be impaired or affected without the consent of the Holder.

## ARTICLE 10
## GUARANTEE

### 10.1 Guarantors

Each of the Guarantors agrees to execute a guarantee in substantially the form attached hereto as Schedule 10.1 concurrently herewith:

### 10.2 Representation of the Corporation

The Corporation represents and warrants that the Guarantors are all of the guarantors under the Credit Agreement.

### 10.3 Limitation of Guarantee

The obligations of each Guarantor, pursuant to the Guarantee given by each Guarantor are limited to the maximum amount as will, after giving effect to all other contingent and fixed liabilities of such Guarantor and after giving effect to any collections from or payments made by or on behalf of any other Guarantor in respect of the obligations of such other Guarantor under its Guarantee or pursuant to its contribution obligations of such other Guarantor under its Guarantee or pursuant to its contribution obligations under the Indenture, result in the obligations of such Guarantor under the Guarantee (i) not constituting a fraudulent conveyance or fraudulent transfer, or (ii) not being such that there would be reasonable grounds to believe such Guarantor would not be able to meet the applicable financial tests, under applicable federal, state, provincial or territorial law. Each Guarantor that makes a payment or distribution under a Guarantee will be entitled to a contribution from each other Guarantor in a *pro rata* amount based on the Adjusted Net Assets of each Guarantor.

### 10.4 Release of Guarantor

Notwithstanding the foregoing, the Trustee shall release a Guarantor from its guarantee if at any time the Corporation delivers to the Trustee an Officer's Certificate and other documentary evidence satisfactory to the Trustee indicating that such Guarantor is no longer a Subsidiary of the Corporation and provided that such Guarantor is not a guarantor under the Credit Agreement.

### 10.5 Waiver Regarding Material Information

Each Guarantor hereby waives any right it may have to disclosure by the Trustee or any of the Holders of material information in respect of the Corporation and/or any dealings between the Corporation and the Trustee with respect to the Debentures.

LICENSE AGREEMENT          D04199

This License Agreement (the "Agreement"), when executed by both parties, is effective as of the 30th of June 2004, by and between

), on the one hand and the party identified below ("Licensee") on the other.

1.    **BASIC INFORMATION AND TERMS**

| (a) Licensee: | | Numbered Section |
|---|---|---|
| Mega Bloks, Inc.<br>4505 Hickmore<br>Montreal, QC H4T 1K4 | Attention: Mr. Vic Bertrand and Mr. Andrew Witkin<br>Tel:    514-333-5555<br>Fax:    514-333-3452<br>Email: awitkin@megabloks.com | |
| (b) Characters: | | 2 |

Mega Bloks Inc.                                                    {00019006 SML}1

submitting such items for review. If such items do not conform to approval of the final pre-[...]on sample commented on by [...], the parties agree no cure is possible).

(b) [...] shall have the right to terminate this Agreement upon ten (10) days prior not[...] upon the occurrence of any of the following events:

(i) If Licensee shall become insolvent or fail to pay its debts and obligations on a current basis or shall make an assignment for the benefit of creditors or become involved in a receivership, bankruptcy or other insolvency or debtor relief proceedings, or any similar proceedings, or in proceedings, voluntary or forced whereby it is limited in the free and unrestrained exercise of its own judgment as to the carrying out of the terms of this Agreement;

(ii) if Licensee shall cease to do business;

(iii) if Licensee shall attempt to assign any of its rights under this Agreement except pursuant to Section 19 (f). For purposes of this Agreement, a merger or consolidation of Licensee with another person or entity, other than its parent or a wholly owned subsidiary, shall be deemed an assignment of this Agreement;

(iv) in the event that this Agreement is held invalid or unenforceable by the determination of any government or any court of competent jurisdiction;

(v) if any Licensed Articles become the subject of a recall by the Federal Consumer Product Safety Commission or any corresponding state or federal agency and Licensee fails to take immediate action to recall such products; or

(vi) if, in [...] opinion, Licensee's ability to perform under this Agreement is or will be impaired due to Licensee's financial inability to comply with its anticipated obligations under this Agreement.

(c) Change in Character of Licensee. It is understood that the grant of the license herein by

<u>MERCHANDISING LICENSE AGREEMENT #243165</u>
Dated as of October 21, 2004

1.    **Licensor:**

      **Licensee:**    Mega Bloks, Inc. ("Licensee")
                       4505 Hickmore
                       Montreal, QC H4T 1K4

                       Attention: Mr. Vic Bertrand and Mr. Andrew Witkin
                       Phone: 514-333-5555 Fax: 514-333-3452
                       Email: <u>awitkin@megabloks.com</u>

2.    **Property:**

3.    **Proprietary Subject Matter:**

4.    **Articles:**

this Agreement is or will be impaired due to Licensee's financial inability to comply with its anticipated obligations under this Agreement; a petition in bankruptcy is filed by or against Licensee; Licensee is adjudicated bankrupt or insolvent, or makes an assignment for the benefit of creditors or an arrangement pursuant to any bankruptcy laws; Licensee discontinues its business; or a receiver is appointed for Licensee or Licensee's business and such receiver is not discharged within thirty (30) days.

30.3.5 Licensee or any of its controlling shareholders, officers, directors or employees take any actions in connection with the manufacture, sale, distribution or advertising of the Articles or takes any other actions which damages or reflects adversely upon the Licensor, the Property and/or the Proprietary Subject Matter.

30.3.6 If a substantial portion of assets (i.e. more than 33%) or controlling stock or ownership in Licensee's business is sold or transferred, or if Licensee's property is expropriated, confiscated, or nationalized by any government or if any government assumes de facto control of Licensee's business, in whole or in part. For clarification, Licensee's inter-group transfer of stock shall not be considered a substantial change under this provision.

30.3.7 Licensee breaches any material term of any other license agreement between Licensee and Licensor, and such license agreement is terminated for cause.

30.3.8 Licensee fails to obtain Licensor's consent or fails to provide Licensor with a Manufacturer's Agreement as required under Paragraph 28.2.

30.3.9 Licensee materially violates any of its other obligations or breaches materially any of its covenants, agreements, representations or warranties hereunder.

30.3 In addition to any and all other remedies available to it hereunder, on thirty (30) days prior written notice to Licensee, Licensor may terminate this Agreement (in which case such termination shall be effective immediately upon expiration of the thirty (30) day notice period), upon the occurrence of any of the following circumstances, provided that during such thirty (30) day period, Licensee fails to cure the breach to Licensor's satisfaction:

30.3.1 Licensee fails to obtain or maintain insurance as required under Paragraph 25 hereof.

30.3.2 If Licensee fails to satisfy Paragraph 28.4 or, during any calendar quarter of the Term, Paragraph 28.5, Licensor may terminate this Agreement as to such Article(s) in any country in the Territory or in whole, by written notice to Licensee.

30.3.3 Licensee fails to timely submit Prototype and/or Preliminary Artwork for approval by Licensor as provided in Paragraph 26.3.

30.3.4 If, in Licensor's commercially reasonable opinion, Licensee's ability to perform under

CONSUMER PRODUCTS
LICENSE AGREEMENT
BETWEEN

And
MEGA BLOKS, INC.
DATED NOVEMBER 30, 2005

---

## Schedule #1
## Contract Number 0617232017

This Schedule #1 is hereby incorporated into and made a part of the License Agreement between

l                                                                   and Mega Bloks,
Inc. ("Licensee"), with its principal place of business at 4505 Hickmore, H4T 1K4, Montreal,
Canada, dated November 30, 2005 ("Agreement"). The provisions of this Schedule shall be
binding on      and Licensee upon full execution by both parties of the Agreement. The
capitalized terms on this Schedule are defined in the Agreement.

1.   **Effective Date** of this Schedule: January 1, 2006.

2.   **End Date** of this Schedule: December 31, 2008.

3.   **Territory:**

A.   North America Region: Canada, the United States, United States PX's wherever located,
and United States territories and possessions, excluding Puerto Rico. However, if sales are made
to chain stores in the United States which have stores in Puerto Rico, such chain stores also may
supply Articles to such stores in Puerto Rico.

B.   Europe/Middle East/Africa Region ("EMEA"):

France, Andorra, Monaco, Belgium, Luxembourg, the Netherlands, United Kingdom, Republic
of Ireland, Malta, Channel Island, Isle of Man, Gibraltar, Italy, San Marino, Spain, Portugal,
Canary Islands, Guinea Bissau, Denmark, Finland, Norway, Sweden, Iceland, Estonia, Latvia,
Lithuania, Germany, Switzerland, Austria, Liechtenstein, Poland, Czech Republic, Hungary,
Bulgaria, Slovakia, Romania, Ukraine, Moldavia, Kazakhstan, Uzbekistan, Kyrgyzstan,
Tajikistan, Turkmenistan, Armenia, Azerbaijan, Russia, Greece, Cyprus, Slovenia, Croatia,
Bosnia, Albania, Turkey, Israel, Lebanon, Bahrain, United Arab Emirates, Qatar, Oman, Jordan,
Yemen, Saudi Arabia, Egypt, Kuwait, South Africa, Comores, Zimbabwe, Uganda, Gambia,
Kenya, Malawi, Mozambique, Nigeria, Sierra Leone, Tanzania, Zambia, Ghana, Mauritius,
Tunisia, Morocco, Algeria, Mali, Senegal, Burundi, Ivory Coast, Chad, Madagascar, Western
Sahara, Rwanda, Liberia, Ethiopia, Somalia, Zaire and Mauritania. (**Articles utilizing the
         or future iterations of the Series may not be sold in
the EMEA Region, except for South Africa.**)

1

27. **WITHDRAWAL OF LICENSED MATERIAL**

28. **TERMINATION**

The rights and remedies granted or reserved to ,         in this Paragraph shall be without prejudice to any other right or remedy available to

A.          shall have the right at any time to terminate this Agreement (or any Schedule(s)) by giving Licensee written notice, if Licensee fails to: (i) manufacture, sell or distribute the Articles in accordance with this Agreement, (ii) timely furnish statements and pay Royalties or other amounts due to :      , (iii) notify ]      of the accurate name and complete address of Licensee's manufacturing facilities or any Manufacturer of the Articles, (iv) have any Manufacturer execute the Manufacturer's Agreement or (v) otherwise comply with or perform any other obligation or covenant or breaches any other term of this Agreement (other than those set forth in Paragraph 28.B. below); provided that Licensee shall have thirty (30) days after         sends Licensee written notice of termination to correct any such failure or breach capable of being corrected and avoid termination.

B.          shall have the right at any time to terminate this Agreement immediately upon giving Licensee written notice if one or more of the following events occur (provided, however, that with respect to clause (6) below such termination shall occur automatically and immediately without the need for any notice):

(1)     Licensee manufactures, sells or delivers, without         's written authorization, any merchandise other than the Articles licensed and approved in

44

accordance with this Agreement containing representations of the Intellectual Property, or other material proprietary to        ;

(2)     Licensee delivers Articles outside the Territory or knowingly sells Articles to a third party when Licensee knows or should know in the exercise of prudent business judgment that such sales ultimately will result in delivery outside the Territory, unless pursuant to a written distribution permission or separate written license agreement with        or any of  .        's Affiliates;

(3)     Licensee commits a breach of the same nature, that violates the same provision of this Agreement as a breach of which        previously gave Licensee written notice;

(4)     Licensee breaches any material term of any other agreement between the parties, and        terminates such agreement for cause;

(5)     Licensee breaches any surviving obligation under any other expired or terminated agreement between the parties;

(6)     Licensee shall generally not pay its debts as such debts become due, or shall make a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against Licensee seeking to adjudicate it as bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of any order for relief or the appointment of a receiver, trustee or other similar official for all or for any substantial part of its property or assets;

(7)     Licensee is not permitted or is unable to operate Licensee's business in the usual manner, or is not permitted or is unable to provide        with assurance satisfactory to        that Licensee will so operate Licensee's business, as debtor in possession or its equivalent;

(8)     any event shall occur or condition shall exist under any agreement or instrument relating to institutional indebtedness or financial obligations owed by Licensee, including the failure to pay principal or interest, and such event or condition shall continue after any applicable grace period specified in such agreement or instrument, and the effect of such event or condition is to accelerate, or to permit the acceleration of, the maturity of such indebtedness or obligations or otherwise cause, or to permit the holder thereof to cause, such indebtedness or obligations to mature;

Agreement made as of the 1st day of June, 2006, by and between

, and **Mega Brands Inc.** ("Licensee"), a corporation organized under the laws of the
Province of Quebec, Canada, with offices at 4505 Rue Hickmore, Montreal, Quebec, Canada H4T-1K4.

<u>BASIC PROVISIONS</u>

A.  LICENSED PROPERTY or
    LICENSED PROPERTIES:

B.  LICENSED PRODUCTS:

and/or settlement of any such claim or suit so brought and that no settlement of any such claim or suit is made without the prior written consent of        .

11.    INSURANCE:

Licensee shall obtain and maintain at its own cost and expense from a qualified insurance company licensed to do business in New York, standard Product Liability Insurance naming       as an additional named insured, with respect to all Licensed Products manufactured hereunder, whether sold during the License Term or thereafter. Such policy shall provide protection against any and all claims, demands and causes of action arising out of any defects or failure to perform, alleged or otherwise, of the Licensed Products or any material used in connection therewith or any use thereof. The amount of coverage shall be Five Million Dollars ($5,000,000) combined single limit coverage. The policy shall provide for thirty (30) days notice to       from the insurer by Registered or Certified Mail, return receipt requested, in the event of any modification, cancellation or termination thereof. Licensee agrees to furnish       a certificate of insurance evidencing same within thirty (30) days after execution of this Agreement and in no event shall Licensee manufacture, distribute or sell the Licensed Products prior to receipt by       of such evidence of insurance.

12.    DEFAULT:

(a)       Upon the occurrence of any of the following events (each of which is a "Default"), then in addition and without prejudice to any rights which it may have at law, in equity or otherwise,  .       shall have the right to terminate this Agreement, to delete from this Agreement any elements of the Licensed Property or any Licensed Products and/or to require the immediate payment of any Guaranteed Minimum Royalty and royalties due or to become due hereunder:

(i)       Licensee fails to meet the Presentation And Ship Dates To Licensee's Retailers of the Licensed Products;

(ii)       Licensee fails to actively manufacture, advertise, distribute or sell the Licensed Products;

(iii)       Licensee fails to make any monetary payment, or furnish any statement or other document, required under any provision of this Agreement, and does not cure such failure within fifteen (15) days after notice thereof;

(iv)       Licensee fails to comply with the approval, quality, and/or safety requirements hereunder and/or the Licensed Products do not comply with such requirement or any applicable laws or regulations and/or the Licensed Products are the subject matter of adverse or negative publicity due to such failure;

(v)       Licensee fails to comply with any other of Licensee's material obligations hereunder or breaches any warranty or representation made by it hereunder and does not cure such failure or breach within fifteen (15) days after notice thereof;

(vi)       Licensee sells or otherwise disposes of all or substantially all of its business or assets to a third party, or control of Licensee is transferred;

(vii)       Licensee sells or causes others to sell the Licensed Products outside Licensee's Licensed Distribution Channels and/or outside the Licensed Territory (including, without limitation, sales or distribution via the World Wide Web except as specified above in the BASIC PROVISIONS);

(viii)       Licensee fails to obtain or maintain product liability insurance in the amount of the type provided for herein;

(ix)       A final judgment or order for payment of money in excess of Five Hundred Thousand Dollars ($500,000) is rendered against Licensee which remains unpaid, unstayed unappealable, undischarged,

1/23/07:af

unbonded or undismissed (provided however, that the applicable creditor does not assert a claim or interest in Licensed Products); or

(x)     Licensee fails to comply with any provision of any other agreement between     and Licensee.

(b)     In the event that the Licensed Products pose a safety threat to the consumer, or are the subject of a claim or inquiry by the Consumer Product Safety Commission or the Child Safety Protection Act or any other person, agency or commission because of quality and/or safety concerns, and/or labeling or are the subject of negative publicity due to poor quality and/or safety of the Licensed Products, Licensee shall, upon reasonable request, immediately recall such Licensed Products from the marketplace, and take any other measures may reasonably demand.

(c)     If a petition in bankruptcy is filed by or against Licensee or Licensee is adjudicated bankrupt, which is not dismissed within thirty (30) days, or Licensee makes any assignment for the benefit of creditors or becomes insolvent, is placed in the hands of a trustee or receiver, fails to satisfy any judgment against it or is unable to pay its debts as they become due, whichever is sooner, this License shall automatically terminate forthwith without any notice whatsoever. Upon such termination for any reason under this subparagraph Licensee, its receiver, representatives, trustees, agents, administrators, successors and assigns shall have no further rights hereunder, and neither this License nor any right or interest herein shall be deemed an asset in any insolvency, receivership, and/or bankruptcy.

13.     **FORCE MAJEURE:**

14.     <u>EFFECT OF EXPIRATION OR TERMINATION:</u>

DocuSign Envelope ID: 71A8826C-26B6-4302-8DC3-5A4BAC6C7749

DP579279
ID17194

## MERCHANDISING LICENSE AGREEMENT

No. 26848

Agreement dated as of November 3, 2008, between
Mega Brand Inc. (**"Licensee"**).

("**Trademark Licensor**") and

### SCHEDULE

A.   "PROPRIETARY  SUBJECT  MATTER":

B.   "LICENSED ARTICLES":

C.   "DISTRIBUTION CHANNELS":

D.   "TERM":

    1.   "Term":

    2.   "Earliest  Commencement  Date"

    3.   "Latest  Commencement  Date"

Mega Brand Inc.                    -1-

(f)     Reservation     by     Trademark     Licensor:

(g)     Customer Service:

14.     EVENTS OF DEFAULT, TERMINATION:

(a)     Bankruptcy:  If Licensee's liabilities exceed its assets, or if Licensee becomes unable to pay its debts as they become due, or files or has filed against Licensee a petition in bankruptcy, reorganization or for the adoption of an arrangement under any present or future bankruptcy, reorganization or similar law (which petition if filed against Licensee shall not be dismissed within 30 calendar days from the filing date), or if

Licensee makes an assignment for the benefit of its creditors or is adjudicated as bankrupt, or if a receiver or trustee of all or substantially all of Licensee's property is appointed, or if Licensee discontinues its business, this Agreement shall automatically terminate forthwith without notice to Licensee.  In the event this Agreement is so terminated, Licensee, its receivers, representatives, trustees, agents, administrators, successors and/or assigns shall have no right to sell, exploit or in any way deal with any of the Licensed Articles or any related advertising, promotional or display materials, except with and under the express written consent and instructions of Trademark Licensor.

(b)     Transfer or Change of Control:  If a substantial portion of the assets or controlling stock in Licensee's business is sold or transferred, or if there is a substantial change in Licensee's management, or if Licensee's property is expropriated, confiscated or nationalized by any government or if any government assumes de facto control of Licensee's business, in whole or in part, Trademark Licensor may terminate this Agreement upon 30 calendar days' notice to Licensee.

(c)     Failure to Pay:  If Licensee fails to pay the Advance or any Guarantee installment or fails to make any Royalty payments or to fulfill any other monetary obligation hereunder, Trademark Licensor may terminate this Agreement upon 10 business days' notice to Licensee.

(d)     Failure to Exploit:  If, during any calendar quarter, Licensee fails to sell, manufacture and/or distribute commercially reasonable quantities of any Licensed Articles, Trademark Licensor may terminate this Agreement as to such Licensed Articles and/or Licensed Territory, either in whole or in part, by notice to Licensee from Trademark Licensor.

(e)     Unauthorized Uses:  If Licensee transfers, sells or distributes to any unauthorized third party any Copyrighted Materials, artwork or other materials incorporating the Proprietary Subject Matter, then Trademark Licensor may terminate this Agreement forthwith on written notice without any cure period, and Licensee shall be fully liable to Trademark Licensor for all losses and damages, including legal expenses, incurred by Trademark Licensor as a result thereof.

(f)     Other Breaches:  If Licensee fails to perform any of its obligations hereunder, Trademark Licensor may terminate this Agreement upon 10 calendar days' notice, unless Licensee cures any such breach within said 10 calendar days and gives notice to Trademark Licensor thereof within that period, provided, however, that there shall be no cure period for Licensee's failure

-6-

## Standard Terms and Conditions

These Standard Terms and Conditions ("Standard Terms") shall be incorporated by reference into the (
Deal Memo ("Deal Memo") dated as of October 13, 2008 by and between _____ (hereinafter referred to as "Licensor"),
and Mega Brands Inc. (hereinafter referred to as "Licensee"), 4505 Hickmore, Montreal,
Quebec H4T 1K4. The Deal Memo and Standard Terms shall collectively be referred to as the "Agreement." To the extent a conflict
exists between the Deal Memo and the Standard Terms, the terms of the Deal Memo shall govern.

1.     **GRANT OF LICENSE:**

2.     **TERRITORY:**

3.     **LICENSE PERIOD:**

4.     **PAYMENT:**

       (a)     **Royalty Rate.**

       (b)     **Minimum Royalties.**

(vi)     Acts or Omissions.

(b)     **Licensee Indemnity.**   Licen

(c)     **Defense.**

## 11.     LIMITATION OF LIABILITY:

## 12.     DEFAULT AND TERMINATION:

(a)     **Bankruptcy.**   This Agreement may be terminated by Licensor, in its sole discretion to the fullest extent permitted by law at the time of the occurrence, if:

(i) a petition in bankruptcy is filed by or against Licensee, or if Licensee becomes insolvent, or makes an assignment for the benefit of its creditors or an arrangement pursuant to any bankruptcy law; or

(ii) Licensee discontinues its business or if a receiver is appointed for it or its business.

(b)     **Licensee Infringement.**   This Agreement may be terminated by Licensor, in its sole discretion, if Licensee becomes subject to or otherwise involved in any claim or lawsuit of the kind set forth in Paragraph 10 herein, which in the sole reasonable judgment of Licensor materially interferes with Licensee's ability to perform its duties and obligations hereunder or harms the reputation of Licensor or the Property.

## RETAIL LICENSE AGREEMENT

THIS RETAIL LICENSE AGREEMENT ("Agreement") is made effective as of January 1, 2010, by and between                          and MEGA BRANDS, INC. ("Mega Brands").

## W I T N E S S E T H:

WHEREAS, Mega Brands desires to use the                (as defined below) in connection with the manufacture, sale, marketing and distribution of the Licensed Products (as defined below);

WHEREAS,                  is willing to grant Mega Brands certain rights to use the                ; on or in connection with the Licensed Products subject to the terms of this Agreement;

WHEREAS, Mega Brands and                  agree that certain restrictions on Mega Brands' use of the                are necessary to ensure that                  's rights in the                are preserved and not diluted and that neither                  's reputation nor the                are subjected to disrepute as a result of Mega Brands' use thereof.

NOW, THEREFORE, in consideration of the mutual promises, covenants and conditions contained herein, it is hereby agreed as follows:

1.    **DEFINITIONS**.  As used in the Agreement, the following terms shall have the following respective meanings:

(a)        **Properties:**

(b)    **Licensed Products:**

(v)

(vi)

(vii)

(viii)

(b)    Right to Terminate on Notice.                           may terminate this
Agreement effective on thirty (30) days' prior written notice to Mega Brands, under any of the
following circumstances, provided that during the thirty (30) day notice period, Mega Brands
fails to cure the default to the reasonable satisfaction of                    :

(i)     If Mega Brands fails to timely submit its marketing and
distribution programs as required pursuant to Paragraph 7(a) hereof
or, having submitted and obtained                        's approval of
such program, fails to comply with the requirements thereof;

(ii)    If Mega Brands does not commence in good faith to manufacture,
distribute and sell each Licensed Product and utilize each of the
                    in connection therewith throughout all of the
Distribution Channels throughout the Territory on or before the
Marketing Date and thereafter fails to diligently and continuously
manufacture, distribute and sell each of the Licensed Products and
utilize each of the                        throughout all of the
Distribution Channels throughout the Territory;

(iii) If Mega Brands shall violate any of its obligations under this Agreement, including, without limitation, the failure to timely make any payment due or submit any statement required hereunder; or

(iv) If Mega Brands shall be unable to pay its obligations when due, shall make any assignment for the benefit of creditors, shall file a voluntary petition in bankruptcy, shall be adjudicated bankrupt or insolvent or shall have any receiver or trustee in bankruptcy or insolvency appointed for its business or property.

(c) <u>Mutual Right to Terminate on Notice</u>. Either party may terminate this Agreement on thirty (30) days' prior written notice to the other in the event that the other party commits a material breach of any provision of this Agreement which is not cured within thirty (30) days after receipt of notice from the non-breaching party.

16. **<u>EFFECT OF TERMINATION</u>.**

(a) <u>Cessation of All Activities</u>.

(b) <u>Limited Sell-Off Rights</u>.

## <u>Merchandising Agreement</u> - <u>Manufacture and Distribution</u>

**and**

**and**

**MEGA BRANDS, INC.**

THIS AGREEMENT is made the *11th* day of *May 2007*

BETWEEN:

(1)

(2)

(3) Mega Brands, Inc. ("Licensee") a company incorporated in Canada (registered number 1143840131) of 4505 Hickmore, Montreal, Quebec H4T 1K4, Canada.

PREAMBLE

A. each have the right to permit others to exploit the rights specified in this Agreement in the Territory and the Territory respectively.

B. each wish to grant the Licensee and the Licensee wishes to take a licence to exploit such rights on the terms and conditions set out in this Agreement.

IT IS AGREED as follows:

and the Licensee hereby agree to be contractually bound by the terms of this Agreement. The Recitals, Schedules and Appendix form part of this Agreement and any reference to this "Agreement" includes the Recitals, Schedules and Appendix.

IN WITNESS whereof the hands of the Parties or their duly authorised attorneys or representatives the day and year first above written.

Signed for and on behalf of
Mega Brands, Inc.
By:

Print Name: *Vic Bertrand*

Title: *CTO*

3

(c)

(d)

(e)

(f)

(g)

16.3 The Licensor may terminate this Agreement immediately upon written notice to the Licensee in the event that:

(a) any meeting of creditors of the Licensee is held or any arrangement or composition with or for the benefit of its creditors (including any voluntary arrangement as defined in the Insolvency Act 1986) is proposed or entered into by or in relation to the Licensee (other than for the purpose of a bona fide reconstruction or amalgamation);

(b) a supervisor, receiver, administrator, administrative receiver or other encumbrancer takes possession of or is appointed over or any distress, execution or other process is levied or enforced (and is not discharged within 5 (five) Working Days upon the whole or any substantial part of the assets of the Licensee;

(c) the Licensee ceases or threatens to cease to carry on business or is or becomes unable to pay its debts within the meaning of Section 123 of the Insolvency Act 1986;

(d) a petition is presented, or a meeting is convened for the purpose of considering a resolution, for the making of an administration order, the winding-up, bankruptcy, or dissolution of the Licensee;

(e) any event analogous to any of the foregoing occurs in any jurisdiction.

17. CONSEQUENCES OF EXPIRY OR TERMINATION

17.1

17.2

17.3

17.4

(a)

(b)

17.5

APPENDIX

STANDARD BBC TRADE MARK LICENCE

Date:

BETWEEN          *11th May 2007*

AND

The Licensee          **MEGA BRANDS, INC.** a company incorporated under the laws of Canada with registered number 1143840131 whose registered/principal office is at 4505 Hickmore, Montreal, Quebec H4T 1KA, Canada

grants to the Licensee a non-exclusive licence to use, and the Licensee undertakes to use, the Trade Marks in the Territory during the Term on Products and Associated Material subject to the terms and conditions of this agreement, including the General Terms ("this Licence").

In this Licence, the following Special Definitions apply:

Main Agreement:          An Agreement made between

and the Licensee of even date with this Licence pursuant to which this Licence is granted

The Trade Marks:                                              :

Associated Material:

The Trade Mark Notice
(General Term 6):

35

5.6

5.7

## 6   Trade Mark and Copyright Notices

## 7   Termination

7.1   Subject to subclauses 7.2 and 7.4 below, this Licence shall terminate on the termination or expiry of the Main Agreement for whatever reason save that if the Main Agreement provides for a sell-off period after expiry or termination the Licensee shall have the non-exclusive right to use the Trade Marks on the items covered by this Licence for the duration of the sell-off period subject to the terms and conditions of this Licence.

7.2            may terminate this Licence immediately on the giving of written notice to the Licensee if:

7.2.1   the Licensee commits a breach of any of the terms of this Licence or the Main Agreement and fails to remedy such a breach (if capable of remedy) within 30 (thirty) days (or such shorter reasonable period as is specified in the notice) after receiving written notice from          to do so; or

7.2.2   the Licensee makes or authorises any representation or does or authorises any act which may be taken to indicate that it has any right, title or interest to the ownership or use of the Trade Marks except under the terms of this Licence; or

7.2.3   the Licensee or any company within its Group challenges the validity of or          title to any of the Trade Marks; or

7.2.4   there is any change in control of the Licensee or any Holding Company of the Licensee unless such change of control occurs as part of a bona fide solvent restructuring within its Group; or

7.2.5   any material step is taken with a view to the Licensee ceasing to carry on business, or going or being put into receivership, administrative receivership, administration, bankruptcy, liquidation or any equivalent process in any relevant jurisdiction; or

7.2.6   the Licensee fails to comply with a notice served under clause 4.3.3, 4.3.4 or 4.4.3.

7.3   The Licensee will immediately notify          of any event giving          the right to terminate under clause 7.2.4 or 7.2.5.

7.4   Either party may terminate this Licence forthwith on written notice if the continued performance of it is prevented for a period of 60 (sixty) days or more by reason of an event beyond the reasonable control of either party.

7.5   On termination of this Licence or, if relevant, any sell-off period provided for by the Main Agreement, the Licensee shall immediately cease using the Trade Marks in any form and all rights granted under this Licence shall immediately revert to          Termination of this Licence shall be without prejudice to the accrued rights of each party at the date of termination.

7.6   Clauses 5.5, 5.7, 7.5, 9 and 12.2 shall survive termination or expiry of this Licence.

## EXHIBIT P-7

**Non-Appearance Letter from the Director**

**Industry Canada    Industrie Canada**

Corporations Canada
9th Floor,
Jean Edmonds Towers S.
365 Laurier Ave. West
Ottawa, Ontario K1A OC8

9ième étage
Tour Jean Edmonds sud
365, rue Laurier ouest
Ottawa (Ontario) K1A OC8

February 11, 2010

BY EMAIL

Ward A. Sellers
Osler, Hoskin & Harcourt LLP
1000 De La Gauchetière Street West
Suite 2100
Montréal, Québec
H3B 4W5

Dear Mr. Sellers:

RE:    **Mega Brands Inc., et al.**
       **Proposed Arrangement Pursuant to s. 192 CBCA**

We acknowledge receipt of the email sent February 5, 2010 and subsequent
correspondence enclosing:

1.    Application for Interim and Final Orders, in draft form;
2.    Affidavit of Peter Ferrante, in draft form;
3. .  Plan of Arrangement, in draft form; and
4.    Notices of Meetings and Management Proxy Circular, in draft form.

Based on the foregoing information filed in support of the interim hearing, please be
informed that the staff of the Director has determined that the Director does not need to
appear or be heard on the application.

We would however like to raise two issues. The first relates to the lack of dissent rights
for shareholders voting on the proposed transaction. While we recognize that the
transaction had it occurred outside of a s.192 arrangement may not have attracted
mandatory dissent rights, in the context of arrangements, dissent rights play another role.
In approving an arrangement under the CBCA, the court must determine whether the
arrangement is fair and reasonable. This was reinforced by the 2008 Supreme Court of
Canada decision in *Re BCE Inc. v. 1976 Debentureholders.* In that decision, the SCC
stated one of the indicia a court can use to determine the fairness of a transaction is
shareholders' access to dissent remedies.

The second issue relates to the request for a stay of proceedings where no right may be
exercised and no proceeding, at law or under a contract may be commenced or proceeded

# Canadä

with by any persons, by reason of this application to the court. While we take no position on this matter, we note the unusualness of seeking a stay of proceedings in an arrangement that is not being done within the context of a *Companies' Creditors Arrangement Act* restructuring. Moreover, the scope of the proposed stay extends beyond those who are affected by the proposed arrangement.

Please confirm that you will provide a copy of this letter to the court. We also trust that you will provide a copy of the interim order and any documentation filed with the court on the application for final order to the Director for review prior to the hearing for final order.

Yours truly,

*Valérie Carpentier*

Valérie Carpentier
Compliance and Policy Directorate
Corporations Canada
t: 613.957.4422
f: 613.941.5781
valerie.carpentier@ic.gc.ca

## EXHIBIT C

### Interim Order in the Canadian Proceeding

# SUPERIOR COURT

CANADA
PROVINCE OF QUÉBEC
DISTRICT OF MONTRÉAL

No:    500-11-038398-109

DATE:    February 12, 2010

_____

BY:    **THE HONOURABLE MARTIN CASTONGUAY, J.S.C.**

_____

**IN THE MATTER OF A PROPOSED ARRANGEMENT BY:**

**MEGA BRANDS INC.**

**AND**

**4541162 CANADA INC.**

**AND**

**4541171 CANADA INC.**

**AND**

**4402596 CANADA INC.**

**AND**

**4402804 CANADA INC.**

**AND**

**MEGA BLOKS FINANCIAL SERVICES INC.**

    Applicants
**AND**

**THE IMPLEADED PARTIES**

**AND**

**THE DIRECTOR UNDER THE CBCA**

   Mis-en-cause

---

## ORDER

---

**CONSIDERING** the Applicants' Application for Interim and Final Orders with respect to an Arrangement (the "**Application**") and the Affidavit filed in support thereof;

**CONSIDERING** the representations made by Counsel for the Applicants, the Impleaded Parties, Bank of Montreal and GE Canada Finance Holding Company;

**FOR THESE REASONS, THE COURT:**

[1]   **GRANTS** the Application for Interim Order with respect to an Arrangement (the "**Application**").

[2]   **DISPENSES** the Applicants from serving the Application, except to the Director (the "**Director**") under the *Canada Business Corporations Act*, R.S.C., 1985, c. C-44 (the "**CBCA**").

[3]   **DECLARES** that, as used in the order to be rendered herein, unless otherwise defined, terms beginning with capital letters have the respective meanings set forth in the Application.

## (A)  ON THE APPLICATION FOR AN INTERIM ORDER (the "Interim Order")

## MEETINGS

[4]   **ORDERS** that the Applicants shall be permitted to call, hold and conduct (i) a meeting of the Shareholders (the "**Shareholders' Meeting**") at 10:00 a.m. on March 16, 2010 and (ii) a meeting of Lenders (the "**Lenders' Meeting**") at 9:30 a.m. (Montréal time) on March 16, 2010, at Hôtel Omni Mont-Royal, Salon Printemps, 1050 rue Sherbrooke Ouest, Montréal, Québec, H3A 2R6. At the Shareholders' Meeting and the Lenders' Meeting (collectively, the "**Meetings**"), the Shareholders and the Lenders (collectively, the "**Voting Parties**" and together with the holders of Convertible Debentures, the "**Affected Parties**")) shall be asked, among other things,

to consider and, if deemed advisable, to pass, with or without variation, the Shareholders' Arrangement Resolution and the Lenders' Arrangement Resolution respectively, copies of which are attached as Appendix A and Appendix B to the Circular (collectively, the "**Resolutions**") authorizing, approving and agreeing to the Arrangement and Plan of Arrangement.

## THE RECORD DATE

[5]   **ORDERS** that the record date (the "**Record Date**") for entitlement to notice of the Meetings and for entitlement to vote at the Meetings shall be February 17, 2010.

[6]   **ORDERS** that the Chair of each of the Meetings shall be determined by MEGA Brands Inc. ("**MEGA Brands**"). The quorum required for the Lenders' Meeting shall be satisfied if two or more Lenders entitled to vote are present, in person or by proxy at the Lenders' Meeting. The quorum required for the Shareholders' Meeting shall be satisfied if the holders of 25% of Common Shares entitled to vote at the Shareholders' Meeting are present in person or represented by proxy, provided a quorum shall not be less than two persons.

[7]   **ORDERS** that the Meetings shall be called, held and conducted in accordance with the Shareholders' Notice and the Lenders' Notice (the "**Notices**") forming part of the Circular, with the CBCA, the articles and by-laws of MEGA Brands and the terms of the Interim Order and any Order of this Court.

## PERMITTED ATTENDEES

[8]   **ORDERS** that the only persons entitled to attend the Meetings shall be:

(a)   the Registered Shareholders and the Registered Lenders as of the Record Date or their respective proxy holders, financial and legal advisors.

(b)   the officers, directors, counsel, auditors and financial and other advisors of the Applicants;

(c)   in the case of the Lenders' Meeting, the Agent under the Credit Agreement (the "Agent");

(d)   the Director; and

(e)   other persons who may receive the permission of the Chair of the Meetings.

[9]   **ORDERS** that at the Meetings, the Applicants may also transact such other business as is contemplated by the Circular or as otherwise may be properly brought before the Meetings.

## AMENDMENTS TO THE ARRANGEMENT AND PLAN OF ARRANGEMENT

[10] **ORDERS** that the Applicants are authorized to make, subject to the terms of the Arrangement Agreement and the Plan of Arrangement, such amendments, revisions and/or supplements to the Arrangement and to the Plan of Arrangement as they may

determine and the Arrangement and the Plan of Arrangement, as so amended, revised and/or supplemented, shall be the Arrangement and the Plan of Arrangement to be submitted to the Voting Parties at the Meetings and shall be the subject of the Resolutions, in accordance with Conclusion 18 below.

## ADJOURNMENTS AND POSTPONEMENTS

[11] **ORDERS** that the Applicants, if they deem advisable, are specifically authorized to adjourn or postpone the Meetings on one or more occasions, without the necessity of first convening the Meetings or first obtaining any vote of Shareholders or Lenders, as applicable, respecting the adjournment or postponement and without the need for approval of the Court. Notice of any such adjournments or postponements shall be given by such method as the Applicants may determine is appropriate in the circumstances.

## NOTICE OF THE MEETINGS

[12] **ORDERS** that the Applicants shall give notice of the Meetings, substantially in the form of the Notices, subject to their ability to change the final form thereof.

## SOLICITATION OF PROXIES

[13] **ORDERS** that the Applicants are authorized to use proxies at the Meetings, either substantially in the form accompanying the draft Circular or in such other form as the Applicants may determine to be reasonable in the circumstances. The Applicants are authorized, at their expense, to solicit proxies, directly and through their officers, directors and employees, and through such agents or representatives as they may retain for that purpose, and by mail or such other forms of personal or electronic communication as they may determine.

[14] **ORDERS** that any proxy to be used at the Meetings must be received by courier, fax or mail, by MEGA Brands' transfer agent, CIBC Mellon Trust Company, prior to 5:00 p.m. (Montréal time) on March 15, 2010. Notwithstanding the foregoing, the Applicants may waive, but have no obligation to do so, the time limit for the deposit of proxies by Voting Parties if the Applicants deem it advisable to do so.

[15] **ORDERS** that Voting Parties will be entitled to revoke a proxy given at any time prior to the exercise thereof at the Meetings by:

(a)   depositing, with CIBC Mellon Trust Company, an instrument in writing executed by such Voting Party or by an attorney authorized in writing, or, if the Voting Party is a corporation, by a duly authorized officer or attorney thereof, at any time up to and including the last Business Day preceding the Meetings, or with the Secretary of the applicable Meeting on the day of such Meeting, or

(b)   in any other manner permitted by law.

## DISTRIBUTION OF MEETING MATERIALS

[16] **ORDERS** that the Applicants are hereby authorized to distribute the Application, the Interim Order, the Circular, the Notices, the forms of proxy and any other communications or documents determined by the Applicants to be necessary or desirable (collectively, the "**Meeting Materials**" which term shall include any amendments, revisions or supplements to such documents made in accordance with paragraph 18 hereof), as applicable, to : (i) Registered Shareholders and Registered Lenders entitled to vote as of the Record Date, (ii) the directors of the Applicants, (iii) the auditors of MEGA Brands, (iv) the Agent and (v), the Director, by pre-paid ordinary mail, by delivery, in person or by fax or courier, not later than twenty-one (21) days prior to the date established for the Meetings in the Notices. Distribution to such persons shall be to their addresses as they appear on the books and records of the Applicants or as at the Record Date.

[17] **ORDERS** that, in the case of non-registered Shareholders, the Applicants are to distribute the Meeting Materials to intermediaries and registered nominees for sending to both non-objecting beneficial owners and objecting beneficial owners in accordance with National Instrument 54-101 – *Communications with Beneficial Owners of Securities of a Reporting Issuer* of the Canadian Securities Administrators at least three Business Days prior to the twenty-first (21st) day prior to the date of the Shareholders' Meeting.

[18] **ORDERS** that the Applicants are hereby authorized to make such amendments, revisions or supplements ("**Additional Information**") to the Meeting Materials as the Applicants may determine in accordance with the Plan of Arrangement, and the Applicants shall distribute such Additional Information by such method as the Applicants may determine is appropriate in the circumstances.

[19] **ORDERS** that distribution of the Meeting Materials as well as any Additional Information, pursuant to paragraphs 16, 17 and 18 of the Interim Order, shall constitute good and sufficient service and notice thereof upon all such persons of the Meetings and the within Application. Further, no other form of service of the Meeting Materials or any Additional Information or any portion thereof need be made, or notice given or other material served in respect of these proceedings and/or the Meetings to the persons described in paragraphs 16, 17 and 18 of the Interim Order or to any other persons.

[20] **ORDERS** that a failure or omission to distribute the Meeting Materials and/or any Additional Information in accordance with paragraphs 16, 17 and 18 of the Interim Order as a result of mistake or of events beyond the control of the Applicants shall not constitute a breach of the Interim Order or a defect in the calling of the Meetings and shall not invalidate any resolution passed or proceedings taken at the Meetings, but if any such failure or omission is brought to the attention of the Applicants, then the Applicants shall use commercially reasonable efforts to rectify it by the method and in the time most reasonably practicable in the circumstances.

## VOTING

[21] **ORDERS** that the only persons entitled to vote in person or by proxy on the Resolutions or such other business as may be properly brought before the Meetings shall be the Voting Parties as at the close of business on the Record Date.

[22] **ORDERS** that the Shareholders' Arrangement Resolution shall be considered to be approved at the Shareholders' Meeting by the affirmative vote of not less than (i) two thirds of the votes cast by holders of Common Shares who are entitled to vote at the Shareholders' Meeting and (ii) a majority of the votes cast by holders of Common Shares other than Common Shares that are beneficially owned, or over which control or direction is exercised, by MEGA Brands, or any interested party (as defined in MI-61-101) (including, without limitation, Fairfax Financial Holdings Limited, Invesco Trimark Limited, Victor Bertrand Sr., Marc Bertrand and Vic Bertrand), a related party of an interested party, or a joint actor with any such persons in respect of the transaction, in respect of the Shareholders' Arrangement Resolution, voting together as a single class, present in person or represented by proxy and who are entitled to vote at the Shareholders' Meeting. Such vote shall be sufficient to authorize and direct the Applicants to do all such acts and things as may be necessary or desirable to give effect to the Arrangement and the Plan of Arrangement on a basis consistent with what is provided for in the Circular without the necessity of any further approval by the Shareholders, subject only to final approval of the Arrangement by the Court.

[23] **ORDERS** that in respect of the vote on the Shareholders' Arrangement Resolution and any other matters properly brought before the Meetings, each Shareholder is entitled to one vote per Common Share. Illegible votes, spoiled votes, defective votes and abstentions shall be deemed not to be votes cast. Proxies that are properly signed and dated but which do not contain voting instructions shall be voted in favour of the Shareholders' Arrangement Resolution.

[24] **ORDERS** that, subject to further order of the Court, the Lenders' Arrangement Resolution shall be considered to be approved at the Lenders' Meeting by the affirmative vote of not less than two-thirds of the votes cast in respect of the Lenders' Arrangement Resolution by the Lenders, voting together as a single class, present in person or represented by proxy and who are entitled to vote at the Lenders' Meeting. Such vote shall be sufficient to authorize and direct the Applicants to do all such acts and things as may be necessary or desirable to give effect to the Arrangement and the Plan of Arrangement on a basis consistent with what is provided for in the Circular without the necessity of any further approval by the Lenders, subject only to final approval of the Plan of Arrangement by the Court.

[25] **ORDERS** that in respect of the vote on the Lenders' Arrangement Resolution and any other matters properly brought before the Meetings, each Lender is entitled to one vote for each US $1.00 principal amount of Secured Debt as at the Record Date. Illegible votes, spoiled votes, defective votes and abstentions shall be deemed not to be votes cast. Proxies that are properly signed and dated but which do not contain voting instructions shall be voted in favour of the Lenders' Arrangement Resolution.

[26] **ORDERS** that the Applicants be and are hereby permitted to pass unanimous directors' resolutions to approve the Arrangement and the Recapitalization Transaction in lieu of calling, holding and conducting a special meeting for the purposes thereof.

## DISSENT RIGHTS

[27] **ORDERS** that there shall be no right of dissent in respect of the Shareholders' Arrangement Resolution in accordance with the Plan of Arrangement and the provisions of Section 192 of the CBCA.

## HEARING OF APPLICATION FOR APPROVAL OF THE ARRANGEMENT

[28] **ORDERS** that, following the holding of the Meetings and the delivery of the directors' resolutions pursuant to paragraph 26 hereof, the Applicants shall be permitted to apply to this Court for final approval of the Arrangement pursuant to this Notice of Application on March 22, 2010.

[29] **ORDERS** that the only persons entitled to appear and to be heard at the hearing on the Application for a final order shall be the Applicants, the Impleaded Parties the Director, the holders of Convertible Debentures, the Lenders and their co-Agents and any person that :

a)    files an Appearance with the Clerk of the Superior Court of Québec, 1 Notre-Dame Street East, Montréal, Québec, H2Y 1B6, Commercial Division, judicial district of Montréal and serves same on the Applicants' counsel, Osler Hoskin & Harcourt LLP (Attention: George R. Hendy and Martin Desrosiers, 1000 De la Gauchetière West, 21st floor, Montréal, Québec, H3B 4W5), no later than five (5) Business Days before the date of the Meetings; or

b)    if such Appearance is filed with a view to contest such application or to make representations in relation thereto, files a written contestation or written representations, as the case may be, supported, as to the facts, by affidavit(s) and exhibit(s), if any, with the aforementioned Clerk of the Superior Court of Québec, 1 Notre-Dame Street East, Montréal, Québec, H2Y 1B6, Commercial Division, judicial district of Montréal and serves same on the Applicants' counsel, Osler Hoskin & Harcourt LLP (Attention: George R. Hendy and Martin Desrosiers, 1000 De la Gauchetière West, 21st floor, Montréal, Québec, H3B 4W5), no later than three (3) Business Days before the Meetings,

failing which no contestation of the application for Final Order shall be permitted, unless authorized by the Court.

## STAY OF PROCEEDINGS

[30] **ORDERS** that from 12:01 AM (Montréal time) on the date of the Interim Order until and including March 22, 2010, at 7:00 PM, or such later date as the Court may order (the "**Stay Termination Date**", the period from the date of the Interim Order to

the Stay Termination Date being referred to as the "**Stay Period**"), no right, legal or conventional, may be exercised and no proceeding, at law or under a contract, by reason of or as a result of the MEGA Brands Parties having made an application to this Court pursuant to section 192 of the CBCA, the MEGA Brands Parties being a party to this proceeding or any ancillary proceedings, the Recapitalization Transaction or the Arrangement or any of the steps, transactions or proceedings contemplated thereby or relating thereto, however and wherever taken, may be commenced or proceeded with by any person against or in respect of any of the Applicants or Impleaded Parties (collectively the "**MEGA Brands Parties**"), or any of the present or future property, assets, rights and undertakings of the MEGA Brands Parties, of any nature and in any location, whether held directly or indirectly by the MEGA Brands Parties, in any capacity whatsoever, or held by others for the MEGA Brands Parties (collectively, the "**Property**").

[31] **ORDERS** that nothing in the Interim Order shall be deemed to stay or restrain any rights or proceedings relating to an eligible financial contract (as such term is defined in the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 as amended).

## PROCEDURAL

[32] **ORDERS** that any Notice of Appearance served in response to the Notice of Application shall be served on counsel for the Applicants at the following address: Osler Hoskin & Harcourt LLP (Attention: George R. Hendy and Martin Desrosiers, 1000 De la Gauchetière West, 21st floor, Montréal, Québec, H3B 4W5.

[33] **ORDERS** that any materials to be filed by the Applicants in support of the Application for final approval of the Arrangement may be filed up to one day prior to the hearing of such Application without further order of this Court.

[34] **ORDERS** that, in the event of any inconsistency or discrepancy between the Interim Order and the terms of any instrument creating, governing or collateral to the Credit Agreement, the Swap Agreements, the Indenture, the Convertible Debentures and any guarantees or security or other agreements (other than the Lock Up Agreements) related to any of the foregoing or the articles or by-laws of any of the MEGA Brands Parties, the Interim Order shall govern.

[35] **DECLARES** that the Interim Order shall have full force and effect in all other provinces and territories of Canada and shall be enforced in the courts of each of the other provinces and territories of Canada in the same manner in all respects as if the Interim Order had been made by the court enforcing it.

[36] **ORDERS** that this Court respectfully seeks and requests the aid and recognition of any court or any judicial, regulatory or administrative body constituted pursuant to the Parliament of Canada or the legislature of any province and any court or any judicial, regulatory or administrative body of the United States of America or elsewhere to act in aid of and to assist this Court in carrying out the terms of any order

rendered by this Court in connection with these proceedings, including that Peter Ferrante is authorized, as necessary, to act as a representative of any of the MEGA Brands Parties or their affiliates in connection therewith.

[37] **ORDERS** that the Applicants shall be entitled to seek leave to vary the Interim Order upon such terms and upon the giving of such notice as this Court may direct.

[38] **ORDERS** that in the event the Application for final order does not proceed on the date set forth in the Interim Order, and is adjourned, only those persons set out in paragraph 29 shall be entitled to be given notice of the adjourned date.

[39] **ORDERS** that any interested person may apply to this Court to vary or rescind the Interim Order or seek other relief within one week of the mailing of the Meeting Materials pursuant to paragraph 16, 17 and 18 of the Interim Order and, upon giving three Business Days notice to the Applicants' counsel, as identified in paragraph 29 of the Interim Order.

[40] **ORDERS** provisional execution of the Interim Order notwithstanding appeal and without the necessity of furnishing any security.

**CONFIDENTIALITY**

[41] **ORDERS** that Exhibit P-1 be placed under seal in the records of the Superior Court of Québec and that it not be disclosed published or disseminated, directly or indirectly, until the Meeting Materials are distributed, as provided for above.

[42] **ORDERS** the Office of the Superior Court of Québec to deny access to Exhibit P-1 to the public.

**THE WHOLE WITHOUT COSTS.**

Martin Castonguay, J.S.C.

COPIE CONFORME

Greffier adjoint