# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 15 |
| MEGA BRANDS INC., *et al.*,[1] | Case No. 10-[10485 ] (___) |
| Debtors in a Foreign Proceeding. | (Joint Administration Requested) |

## DECLARATION OF PETER FERRANTE IN SUPPORT OF
## PETITION FOR RECOGNITION AND CHAPTER 15 RELIEF

I, Peter Ferrante, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States of America as follows:

1. I am over the age of 18 and, unless otherwise indicated, all facts set forth in this Declaration are based on: (a) my personal knowledge; (b) my review of relevant documents; or (c) my opinion based upon my experience and knowledge of the Chapter 15 Debtors'[2] operations. If called to testify, I could testify competently to the facts set forth herein.

2. I am the Vice President and Chief Financial Officer of Mega Brands, Inc. ("Mega Brands"). In addition, I serve on the Board of Directors, or as an officer, of each of the Chapter 15 Debtors. I work and reside in Montréal, Canada and am duly authorized to act as foreign representative of the Chapter 15 Debtors, whose reorganization proceedings under Section 192

---

[1] The Chapter 15 Debtors, along with the last four digits of each U.S. Debtor's federal tax identification number, are: Mega Brands Inc. (a non-U.S. Debtor that does not maintain a U.S. federal tax identification number); 4402596 Canada Inc. (a non-U.S. Debtor that does not maintain a U.S. federal tax identification number); 4402804 Canada Inc. (a non-U.S. Debtor that does not maintain a U.S. federal tax identification number); MB Finance LLC (7565); MB US Inc. (7561); MB2 LP (7567); Mega Bloks Financial Services, Inc. (a non-U.S. Debtor that does not maintain a U.S. federal tax identification number); Mega Brands America, Inc. (2083); Rose Moon, Inc. (1445); and Warren Industries, Inc. (4985). The location of the Debtors' corporate headquarters and the service address for all of the Debtors is: 4505 Hickmore, St-Laurent, Québec, H4T 1K4.

[2] Unless otherwise defined in this Declaration, all capitalized terms used but not otherwise defined herein shall have the meanings set forth in the *Petition for Recognition and Chapter 15 Relief* (the "Petition"), filed concurrently herewith.

K&E 16271986.11

of the Canada Business Corporations Act (the "CBCA") currently are pending before the Superior Court, Commercial Division, for the Judicial District of Montréal, Canada.

3. I submit this Declaration in support of the Petition.

4. As Vice President and Chief Financial Officer of Mega Brands, and as director or officer of each of the Chapter 15 Debtors, I have extensive knowledge of each of the Chapter 15 Debtors' structure, operations, and finances.

## I. Background of the Company

### A. The Company's Business and Operations

5. Mega Brands, with its headquarters located at 4505 Hickmore, Montréal, Québec, H4T 1K4, Canada, was incorporated under the CBCA on May 16, 1983, and is a global supplier of construction toys, stationery, and activities including, among other things, building sets, games, puzzles, art materials, and writing instruments. Mega Brands is the parent corporation of each Chapter 15 Debtor.

6. The Company's primary in-house manufacturing operations are located in Canada. The Company also outsources the manufacturing of some products to third party suppliers in Asia. The Company employs 1,300–1,500 people worldwide (more than half located in Canada).

7. The Company distributes its products globally through its wholly-owned direct or indirect subsidiaries. Mega Brands America is a wholly-owned indirect subsidiary of Mega Brands and a U.S. corporation registered in New Jersey. Mega Brands America primarily distributes the Company's products in the U.S. and performs certain distribution and sales support functions for the U.S. market. In addition, Mega Brands America sells products to Mega Brands, which sales are coordinated and implemented by Mega Brands.

2

8. Rose Moon, a wholly-owned indirect subsidiary of Mega Brands and a U.S. corporation registered in Tennessee, operates a small pencil manufacturing facility. Mega Brands funds Rose Moon's working capital needs, without which Rose Moon would be unable to operate.

9. Warren Industries is an inactive entity, registered in Indiana, existing solely to handle past environmental liabilities. Mega Brands officers in Canada handle all decision-making functions related to Warren Industries.

10. The Company also directly or indirectly owns and operates certain Canadian subsidiaries that have financing or non-operational functions. These subsidiaries include 4402596 Canada Inc., 4402804 Canada Inc., and Mega Bloks Financial Services Inc. (collectively, with Mega Brands, the "Canadian Chapter 15 Debtors"). Like Mega Brands, these subsidiaries are domiciled, headquartered, and operated from Canada. Also, MB US Inc., MB Finance LLC, and MB2 LP (collectively, with Rose Moon, Warren Industries, and Mega Brands America, the "U.S. Chapter 15 Debtors") are wholly-owned direct or indirect subsidiaries of Mega Brands (each registered in the U.S.) with financing or non-operational functions.[3]

11. The core corporate and managerial support functions for all the U.S. and Canadian Chapter 15 Debtors—including marketing, legal, logistics and distribution, human resources, accounting, financial reporting, and inbound intellectual property licenses—are directed or approved by Canadian-based employees at the Company's Montréal headquarters. Through intercompany arrangements, the U.S. Chapter 15 Debtors compensate Mega Brands for such services through an arm's length fee.[4]

---

[3] MB US Inc., MB Finance LLC, and MB2 LP are registered in Delaware.

[4] Rose Moon's parent, Mega Brands America, pays Mega Brands an arm's length fee for services performed on behalf of Rose Moon.

3

12. The majority of the Chapter 15 Debtors' directors reside in Canada. Also, all of the Chapter 15 Debtors have officers employed by Mega Brands, some residing and working in Montréal.

**B.    The Company's Capital Structure**

13. As of January 31, 2010, the Company's capital structure consisted of: a senior-secured credit facility for two revolving loans and a term loan, $12.3 million[5] in secured swap agreements, $70.4 million in convertible senior unsecured debentures, common stock, and options to purchase common stock.

14. Mega Brands, MB2 LP, and Mega Brands America are borrowers under the Credit Facility.[6] As of January 31, 2010, the Credit Facility consisted of: (a) a $44.5 million Canadian revolving facility, with Mega Brands as borrower; (b) a $248.3 million term loan facility, with MB2 LP as borrower; and (c) a $51.5 million U.S. revolving facility, with Mega Brands America as borrower. The Credit Facility is guaranteed and secured by, among other entities, each of the Chapter 15 Debtors. As of January 31, 2010, the Company owed approximately $344.3 million under the Credit Facility. The current Agent under the Credit Facility is Bank of Montréal, a Canadian-based institution, and the Credit Agreement is governed by the laws of the Province of Québec and the laws of Canada applicable therein.[7] For both the

---

[5]   Unless otherwise specified herein, all amounts listed herein are in U.S. Dollars.

[6]   The Credit Facility is that certain credit agreement dated as of July 26, 2005, by and among Mega Bloks, Inc. (n/k/a Mega Brands), 3102448 Nova Scotia Inc (n/k/a MB2 LP), and Rose Art Industries, Inc. (n/k/a Mega Brands America), as borrowers, The Bank of Nova Scotia and Bank of Montréal as Agents, and the Lenders from time to the party thereto.

[7]   The laws of the Province of Québec and the federal laws of Canada applicable therein govern the Credit Facility. The guarantee agreement under the Credit Facility is governed by laws of the State of New York, and provides that the guarantors submit to the jurisdiction of courts in Montréal, the Southern District of New York, or any New York state court sitting in New York City for purposes of legal proceedings arising out of or related to the Credit Facility or guarantee agreement.

Credit Facility and the guarantees, signatories for all entities, including the U.S. Chapter 15 Debtors, request that notices thereunder be mailed to the Company's Canadian headquarters.

15. MB2 LP is a party to that certain secured Swap Agreement with The Bank of Nova Scotia, a Canadian-based institution, dated September 28, 2005 (as amended), and that certain secured Swap Agreement with Bank of Montréal, also a Canadian-based institution, dated September 28, 2005 (as amended). As of January 31, 2010, MB2 LP owed approximately $12.3 million pursuant to the Swap Agreements. As security for repayment of the sums owed under the Swap Agreements, each of the Chapter 15 Debtors granted comprehensive security over their assets, to the extent permitted by law.

16. Mega Brands has approximately $70.4 million outstanding in Convertible Debentures due August 13, 2013, governed by an indenture dated August 18, 2008. The sole holders of the Convertible Debentures are Fairfax, Chiefswood Holdings Limited, Victor Bertrand, Sr., and the Owners Fund, all Canadian investors. The Indenture Trustee is CIBC Mellon Trust Company, a Canadian company with its principal office in Ontario, Canada. The Convertible Debentures bear interest at a rate of 8%, and are guaranteed by the Chapter 15 Debtors, among others. The Convertible Debentures and related guarantees are governed by the laws of the Province of Ontario and the federal laws of Canada applicable therein.

17. As of December 31, 2009, the company had issued 36,612,202 shares of common stock, with options to purchase 1,033,565 shares of common stock outstanding. The Company's common stock is publicly listed on the Toronto Stock Exchange.

### C. Recent Issues

18. In recent years, the Company has experienced several operational challenges to its business, translating into declining sales and gross margins, numerous charges and write-offs, and negative publicity stemming from product recalls. In 2007, after 22 consecutive years of

sales growth and profitability, the Company reported lower sales and a net loss, and that trend has continued. These losses have primarily resulted from stagnation of the North American toy industry and fluctuations in the prices of raw materials, especially plastic resin, a key raw material used in the manufacturing of Mega Brands' products. A global recession beginning in the fourth quarter of 2008 further exacerbated these challenges, as a precipitous decline in consumer spending during the Company's peak toy-selling season curtailed an anticipated recovery.

19. In light of this decline, the Company undertook several measures to address their economic challenges, including a capital infusion and organizational changes. Throughout 2008 and 2009, the Company also considered recapitalization scenarios, asset sales (including the potential sale of the entire Company or certain of its divisions), and strategic partnerships as ways to improve its capital structure and financial position.

20. By the end of 2009, the Company's deteriorating business condition made its debt obligations unmanageable, and the Company was left with no viable alternative to restructure its debt other than pursuing a recapitalization transaction.

21. On February 12, 2010, Mega Brands and certain other subsidiaries and affiliates, including the Chapter 15 Debtors as applicants and certain of the impleaded parties, commenced the Canadian Proceeding to implement a balance sheet restructuring of its funded debt obligations, and to reposition the Company for a return to profitability. The Chapter 15 Debtors all are borrowers and/or guarantors under the Company's senior secured credit facility, swap agreements, and unsecured debentures that are affected by the Company's balance sheet restructuring and the Canadian Proceeding.

## II. The Recapitalization Transaction

22. On January 13, 2010, Mega Brands and a group of investors entered into a commitment letter whereby the investors agreed to participate in the private placement portion ($121.25 million) of a $218.1 million offering (excluding oversubscription proceeds), the proceeds of which will finance, in part, the recapitalization transaction, in accordance with a court-approved CBCA arrangement.[8] The public portion of the offering, originally CDN$100 million, was underwritten by GMP Securities L.P.[9] Mega Brands closed the public offering on January 28, 2010, for gross oversubscription proceeds of CDN$110 million.

23. The transaction, if approved through the Canadian Proceeding, will eliminate all of the Company's financial covenants, and will enable the company to secure a $50-million asset-based credit facility with Wachovia Capital Finance Corporation (Central) and Wachovia Capital Finance Corporation (Canada). In addition, the transaction will reduce the Company's net debt by more than $290 million and reduce the Company's annual interest payments from

---

[8] The private placement investors are Fairfax; Mega Brands Chairman, Victor Bertrand Sr.; Mega Brands' Chief Executive Officer, Marc Bertrand; Mega Brands' Chief Innovation Officer, Vic Bertrand; The Owners Fund; Chiefswood Holdings Limited; and certain mutual funds represented by Invesco Trimark Limited. Of the $121.25 million private placement, Fairfax and its affiliates have committed $50 million; Trimark Funds, $40 million; Victor Bertrand Sr., $15 million; Chiefswood Holdings Limited, $10 million; The Owners Fund, $5 million; Marc Bertrand, $750,000; and Vic Bertrand, $500,000.

[9] The public offering is comprised of 71,500 Class A subscription receipts (at a price of CDN$1,000 per receipt) and 385,000 Class B subscription receipts (at a price of CDN$100 per receipt). Each Class A subscription receipt ultimately will convert into one debt unit of Mega Brands, with each debt unit comprised of a 10% senior secured debenture in the principal amount of CDN$1,000 due five years from day following the effective date of the transaction and 800 common share purchase warrants. Each New Warrant will entitle the holder to purchase one common share in the capital of Mega Brands upon the payment of the exercise price of CDN$0.50 per common share. Each Class B subscription receipt ultimately will convert into one equity unit of Mega Brands, with each equity unit comprised of 200 common shares and 120 New Warrants. The private placement is comprised of private units (at a price of CDN$2,000 per unit), with each unit consisting of one New Debenture, 2,000 common shares, and 2,000 New Warrants.

approximately $43.8 million to approximately $13.6 million, excluding the asset-based credit facility utilization.[10]

24. Pursuant to the terms of the transaction, holders of existing Secured Debt (in the amount of $356.6 million as of January 31, 2010) will exchange their claims for a cash payment of $215.28 million and $35.88 million in newly-issued common stock, for a recovery of approximately 70%. The cash payment derives from the proceeds of the offering. More than 70% of the holders of the Secured Debt have signed lock-up agreements supporting the transaction. The Company continues to negotiate with the remaining Secured Debt holders. I understand that the non-consenting Secured Debt holders have the right to object to the recapitalization transaction in the Canadian Proceeding.

25. Additionally, upon the consummation of the transaction, the Convertible Debentures (in the amount of $70.4 million as of January 31, 2010) will be cancelled in exchange for newly-issued debentures, common shares, and warrants having an aggregate value of $15.0 million, representing a recovery of approximately 21% to the holders of such Convertible Debentures. All of the holders of the Convertible Debentures have signed lock-up agreements supporting the transaction.

26. As indicated above, only the holders of Secured Debt, Convertible Debentures, and equity have affected interests under the proposed restructuring transaction, the vast majority of which have already consented to the exchange. All other parties—including, but not limited to, the Company's employees, suppliers, customers, and litigation counterparties—will be unimpaired.

---

[10] In accordance with the terms of the lock-up agreements, the recapitalization transaction must be fully implemented no later than May 15, 2010, failing which the parties hereto will no longer be bound by the terms thereof.

### III. I am the Company's Foreign Representative

27. The Canadian Court specifically authorized me to commence this chapter 15 proceeding. Accordingly, to the best of my information and belief, I believe that I am a "foreign representative" within the meaning of § 101(24) of the Bankruptcy Code.

### IV. The Canadian Proceeding Is a Foreign Proceeding

28. As noted above, I believe that the Company requires the protections afforded to foreign debtors pursuant to chapter 15 of the Bankruptcy Code in order to ensure the success of the recapitalization transaction and protect the Company's assets in the United States.

29. To the best of my information and belief, the Canadian Proceeding is a collective judicial proceeding under Canadian law in which the assets of the Company are subject to the supervision of the Canadian Court for the purpose of reorganization. Accordingly, to the best of my information and belief, I believe that the Canadian Proceeding is a "foreign proceeding" as defined by § 101(23) of the Bankruptcy Code.[11]

### V. The Canadian Proceeding is a Foreign Main Proceeding for the Canadian Chapter 15 Debtors

30. To the best of my information and belief, I believe that the Canadian Proceeding is a "foreign main proceeding" within the meaning of § 1502(4) of the Bankruptcy Code for the Canadian Chapter 15 Debtors, as each of the Canadian Chapter 15 Debtors has its COMI in Canada.

31. <u>The Location of the Canadian Chapter 15 Debtors' Headquarters</u>. The Canadian Chapter 15 Debtors all are corporations organized and existing under the laws of Canada, and have no other corporate presence apart from the Company's Montréal headquarters (which also

---

[11] I understand that the Declaration of Sandra Abitan, which describes the nature of the Canadian Proceeding and the CBCA in more depth, has been filed contemporaneously herewith.

serves as the headquarters for each of the Canadian Chapter 15 Debtors) and a small presence in Ontario.

32. <u>The Location of Those Persons or Entities Managing the Canadian Chapter 15 Debtors</u>. Each of the Canadian Chapter 15 Debtors' officers, directors, and employees are permanently located in and work in Canada. Further, strategic planning for the Canadian Chapter 15 Debtors takes place at the Company's Montréal headquarters and all budgets and business plans ultimately get approved by managers operating in Montréal. In addition, pricing, sales programs, and procurement for the Canadian Chapter 15 Debtors are ultimately approved by the Company's headquarters in Montréal.

33. Authority to enter into agreements with third parties related to the Company's Mega Bloks product line, such as merchandising licenses or sales agreements on behalf of the Canadian Chapter 15 Debtors, is vested with managers located at the Company's Montréal headquarters and such third party agreements regularly get negotiated, approved, and executed by managers in Montréal.

34. The Credit Facility and the guarantees at issue in the Canadian Proceeding were executed by officers of the Canadian Chapter 15 Debtors.

35. <u>The Location of the Canadian Chapter 15 Debtors' Primary Assets</u>. The Canadian Chapter 15 Debtors are Canadian corporations, with substantially all of their assets located in Canada. In particular, the Company's primary in-house manufacturing operations are located in Canada, and more than half of the Company's worldwide workforce is located in Canada.

36. <u>The Location of the Majority of the Canadian Chapter 15 Debtors' Creditors Affected By the Canadian Proceeding</u>. The only creditors with rights affected by the Chapter 15

Cases are the Company's holders of Secured Debt (including the Swap Agreements), Convertible Debentures, and equity. The Agent under the Credit Facility is Bank of Montréal, a Canadian-based institution. The notice provisions under the Credit Agreement specify Canadian addresses for the Agent and each of the Chapter 15 Debtors.

37. The holders of Convertible Debentures are located solely in Canada. The Indenture Trustee (CIBC Mellon Trust Company) is also a Canadian company with its principal office in Ontario, Canada. The Company's common stock is traded on the Toronto Stock Exchange.

38. <u>The Jurisdiction Whose Law Would Apply To Most Disputes</u>. The Credit Facility is governed by the laws of the Province of Québec and the laws of Canada applicable therein. The Convertible Debentures and related Canadian Chapter 15 Debtors' guarantees are governed by the laws of the Province of Ontario and the federal laws of Canada applicable therein. As for the recapitalization transaction, the relevant agreements, including the lock-up agreements and commitment letters, identify Canadian law as governing disputes.

39. <u>Other Factors Demonstrating Canada is the Center of Main Interest of the Canadian Chapter 15 Debtors</u>. Several other factors demonstrate that the Canadian Chapter 15 Debtors' centers of main interest lie in Canada. First, substantially all of the books and records of the Canadian Chapter 15 Debtors are maintained by the Company in Montréal. Second, audits of the Canadian Chapter 15 Debtors are performed or directed by the Montréal branch of PricewaterhouseCoopers, and Mega Brands issues consolidated financial statements covering all of the Chapter 15 Debtors. Third, the working capital and funding needs of the Canadian Chapter 15 Debtors are satisfied by sources of funds obtained and approved by Canadian-based managers.

## VI. The Canadian Proceeding is a Foreign Nonmain Proceeding for the U.S. Chapter 15 Debtors

40. To the best of my information and belief, I believe that the Canadian Proceeding is a "foreign nonmain proceeding" within the meaning of § 1502(5) of the Bankruptcy Code with respect to the U.S. Chapter 15 Debtors, as each of the U.S. Chapter 15 Debtors maintains nontransitory operational, managerial, and financing and other economic activities in Canada, thereby constituting an "establishment" in Canada.

### A. Operational Activities in Canada

41. Certain of the U.S. Chapter 15 Debtors—MB US Inc., MB Finance LLC, and MB2 LP—were established as holding companies for financing purposes, and have their bank accounts located in Canada. MB US, Inc., MB Finance LLC, and MB2 LP do not have other significant assets and do not conduct other economic activity. The only other noteworthy asset of MB US, Inc.—the shares of Mega Brands America—are pledged to the Agent under the Credit Facility and are physically held in Toronto, Canada.

42. Mega Brands America primarily distributes the Company's products in the U.S., including products manufactured by an associated company in Canada. In addition, Mega Brands America sells certain products to Mega Brands, which sales are coordinated and implemented by Mega Brands.

43. Rose Moon, a wholly-owned indirect subsidiary of Mega Brands and a U.S. corporation registered in Tennessee, operates a small pencil manufacturing facility. Mega Brands funds Rose Moon's working capital needs, without which Rose Moon would be unable to operate.

44. Warren Industries is an inactive entity, registered in Indiana, existing solely to resolve past environmental liabilities. Mega Brands officers in Canada handle all decision-making functions related to Warren Industries.

### B. Managerial Activities

45. The majority of directors and officers of each of the U.S. Chapter 15 Debtors permanently reside in Canada, the Company would hold meetings for the Boards of Directors for the U.S. Chapter 15 Debtors in Montréal, and all of the U.S. Chapter 15 Debtors' corporate resolutions are signed by the U.S. Chapter 15 Debtors' directors in Canada. All budgets and business plans are ultimately approved by Marc Bertrand, as CEO, in Montréal. Canadian-based managers obtain and approve amounts needed to satisfy the U.S. Chapter 15 Debtors' working capital and funding needs.

46. Executives in Montréal also ultimately approve the U.S. Chapter 15 Debtors' pricing, sales programs, and procurement. Many of the U.S. Chapter 15 Debtors' relationships with third parties, such as customers, vendors, and other counter-parties, are primarily managed by Canadian-based officers or managers or by employees of Mega Brands International.

47. Further, as described above, the Company's Montréal offices handle the majority of the U.S. Chapter 15 Debtors' core administrative and corporate functions, without which the certain of the U.S. Chapter 15 Debtors would be unable to operate.[12] All employees and/or officers of the U.S. Chapter 15 Debtors ultimately report directly or indirectly to an officer or manager in Montréal.

48. Finally: (a) the Company's consolidated books and records are maintained by the Company in Montréal; (b) audits of the U.S. Chapter 15 Debtors are performed or directed by the

---

[12] As noted above, through intercompany arrangements, the U.S. Chapter 15 Debtors compensate Mega Brands for such services through an arm's length fee.

13

Montréal branch of PricewaterhouseCoopers; and (c) Mega Brands issues consolidated financial statements covering all of the U.S. Chapter 15 Debtors.

### C. Financing Activities

49. The U.S. Chapter 15 Debtors all are borrowers and/or guarantors under the Company's Secured Debt and Convertible Debentures. In fact, the Credit Facility and the guarantees at issue in the Canadian Proceeding were executed on behalf of the U.S. Chapter 15 Debtors by Canadian officers located in Canada.

50. The Swap Agreements, to which U.S. Chapter 15 Debtor MB2 LP is a party, are with Canadian-based institutions, The Bank of Nova Scotia and Bank of Montréal.

51. As mentioned above, Rose Moon relies on Mega Brands for essential working capital needed to operate its business.

52. For purposes of the recapitalization, negotiations with the lender group on behalf of the U.S. Chapter 15 Debtors have occurred principally in Canada, through Canadian-based advisors. Further, the Canadian Proceeding has resulted from an entirely Canadian-based implementation process involving the Company, a Canadian-headquartered entity, the Agent and Indenture Trustee, both Canadian institutions, and led by Canadian employees and advisors, on all sides, and Canadian sponsors. Finally, through the Arrangement and the Canadian Proceeding, the parties will exchange their debt for new, Canadian-law governed debt instruments and equity interests in a Canadian legal entity headquartered in Montréal.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on this February 18, 2010
Montréal, Québec, Canada

*[signature]*
Peter Ferrante
Foreign Representative
Vice President and CFO, Mega Brands, Inc.